# EXHIBIT E

```
 1

 2    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 3    ----------------------------------------X
      NESTOR ALMONTE,
 4
                              PLAINTIFF,
 5

 6       -against-          Case No:
                            14-CV-5951-(KPF)
 7

 8    437 Morris Park, LLC, D/B/A F&T MANAGEMENT
      CO., 1195 SHERMAN AVE LLC, SHERMAN
 9    MANAGEMENT ASSOCIATES LLC, CHANINA KLAHR,
      KALMAN TABAK and ABRAHAM FINKELSTEIN,
10
                              DEFENDANTS.
11    ----------------------------------------X

12

13                      DATE: January 26, 2015

14                      TIME: 11:09 A.M.

15

16

17            DEPOSITION of the Plaintiff,

18    taken by the Defendant, pursuant to a Court

19    Order and to the Federal Rules of Civil

20    Procedure, held at the offices of Goldberg

21    & Weinberger, 630 Third Avenue, New York,

22    New York, before Evanguelia Galarza, a

23    Notary Public of the State of New York.

24

25
```

```
 1

 2     A P P E A R A N C E S:

 3


 4     VALLI, KANE & VAGNINI
         Attorneys for the Plaintiff
 5       NESTOR ALMONTE
         600 Old Country Road, Suite 519
 6       Garden City, New York 11530
         BY: ROBERT P. VALLETTI, ESQ.
 7


 8
       GOLDBERG & WEINBERGER
 9       Attorneys for the Defendants
         437 Morris Park, LLC, D/B/A F&T
10     MANAGEMENT CO., 1195 SHERMAN AVE LLC,
         SHERMAN MANAGEMENT ASSOCIATES LLC,
11       CHANINA KLAHR, KALMAN TABAK and ABRAHAM
         FINKELSTEIN
12       630 Third Avenue
         New York, New York 10017
13       BY: STEWART WEINBERGER, ESQ.
                 -and-
14           ANNETTE ALETOR, ESQ.

15

16     ALSO PRESENT:
         Dennis Vargas - Spanish Interpreter
17       Chanina Klahr
         Kalman Tabak
18

19
                 *       *       *
20

21

22

23

24

25
```

1

2      F E D E R A L   S T I P U L A T I O N S

3

4

5      IT IS HEREBY STIPULATED AND AGREED by and

6      between the counsel for the respective

7      parties herein that the sealing, filing and

8      certification of the within deposition be

9      waived; that the original of the deposition

10     may be signed and sworn to by the witness

11     before anyone authorized to administer an

12     oath, with the same effect as if signed

13     before a Judge of the Court; that an

14     unsigned copy of the deposition may be used

15     with the same force and effect as if signed

16     by the witness, 30 days after service of

17     the original & 1 copy of same upon counsel

18     for the witness.

19

20      IT IS FURTHER STIPULATED AND AGREED that

21     all objections except as to form, are

22     reserved to the time of trial.

23

24                  *     *     *     *

25

```
 1                   N. ALMONTE
 2    D A N N I S   V A R G A S, a Spanish
 3    interpreter, solemnly swore to translate
 4    the following questions from English to
 5    Spanish and answers from Spanish to
 6    English:
 7
 8    N E S T O R   A L M O N T E, called as a
 9    witness, having been first duly sworn,
10    through an interpreter, by a Notary Public
11    of the State of New York, was examined and
12    testified as follows:
13    EXAMINATION BY
14    MR. WEINBERGER:
15         Q.    Please state your name for the
16    record.
17         A.    Nestor Almonte.
18         Q.    What is your address?
19         A.    4536 Park Avenue, Apartment 12,
20    Weehawken, New Jersey 07086.
21         Q.    Good morning.
22         A.    Good morning.
23         Q.    I am going to ask you some
24    questions.  If you do not understand the
25    question, please tell me.  I will rephrase
```

```
 1                    N. ALMONTE
 2    the question.  If you answer the question,
 3    I am going to assume that you understood
 4    the question.
 5          A.     Thank you.
 6          Q.     Are you taking any medications
 7    now that will affect your ability to answer
 8    questions?
 9          A.     No.
10          Q.     Is there any reason why you
11    cannot tell the truth in response to
12    questions I am going to ask you?
13          A.     I will always answer the truth.
14          Q.     Did you discuss the testimony
15    you are about to give with anyone, other
16    than your attorneys, in order to prepare
17    for what you're going to say today?
18          A.     No.
19          Q.     Where were you born?
20          A.     In the Dominican Republic.
21          Q.     Did you go to school in the
22    Dominican Republic?
23          A.     Yes.
24          Q.     What was the highest level of
25    education you completed in the Dominican
```

```
 1                      N. ALMONTE
 2    Republic?
 3         A.    High school.
 4         Q.    Did you graduate high school?
 5         A.    No.
 6         Q.    When did you come to the United
 7    States?
 8         A.    December of 1986.
 9         Q.    Did you go to school in the
10    United States?
11         A.    No.
12         Q.    Are you married?
13         A.    Yes.
14         Q.    Who are you married to?
15         A.    With Mildred Munoz.
16         Q.    She has a different last name;
17    is that correct?
18         A.    Different from mine, yes.
19         Q.    I am not inquiring -- it is not
20    a personal inquiry.  I am just trying to
21    get the facts.
22               Are you legally married to
23    Mildred Munoz?
24         A.    Yes.
25         Q.    Thank you.
```

```
 1                    N. ALMONTE
 2            Do you have any children?
 3       A.      Three.
 4       Q.    What are their names, and what
 5   are their ages?
 6       A.    Nestor Almonte, 35.
 7       Q.    Go ahead.
 8       A.    Ashley Almonte, 22.  Manuel
 9   Almonte, 21.
10            MR. WEINBERGER:  Please mark
11         this.
12            (Whereupon, the aforementioned
13         document was marked as Defendants'
14         Exhibit A for identification as of
15         this date by the Reporter.)
16       Q.    Take a look at this, please.
17            Can I ask you questions about
18   it now?  Are you ready?
19            MR. VALLETTI:  Are you finished
20         reviewing it, though?  If you want to
21         review it, review it, that's fine.
22       Q.    Let me ask you this, have you
23   ever seen this document before?
24       A.    Yes.
25       Q.    When was the first time you saw
```

```
 1                    N. ALMONTE
 2    that document?
 3         A.    Well, a lot of them that are
 4    here were provided by me.
 5              MR. VALLETTI:  Are you talking
 6          about the exhibits?
 7         Q.    You're talking about the
 8    exhibits?
 9         A.    Yes.
10         Q.    What about the body of the
11    complaint, the non-exhibit part?
12         A.    I had seen it, yes.
13         Q.    Are you aware of claims that
14    are being alleged in this case?
15         A.    Yes.
16         Q.    Did you work at 437 Morris Park
17    Avenue?
18         A.    Yes.
19         Q.    When did you start working at
20    437 Morris Park Avenue?
21         A.    March of 2011.
22         Q.    When did you stop working at
23    437 Morris Park?
24         A.    December 2nd of 2013.
25         Q.    The amended complaint indicates
```

                              N. ALMONTE

1

2      that loan payments were deducted from your

3      pay; is that correct?

4                    MR. VALLETTI:  Note my

5              objection, please.  You can answer.

6           A.    I don't understand the

7      question.

8           Q.    Were there ever any loan

9      payments deducted from your pay?

10          A.    Yes.

11          Q.    Did you ever sign documents

12     related to receipt of a loan from the

13     company?

14          A.    No.

15                   MR. WEINBERGER:  Off the

16             record.

17                   (Whereupon, an off-the-record

18             discussion was held.)

19                   (Whereupon, the aforementioned

20             document was marked as Defendants'

21             Exhibit B for identification as of

22             this date by the Reporter.)

23          Q.    I'd like to show you what has

24     marked as Defendant B.  I'd like you to

25     read that.

1                      N. ALMONTE

2          A.    I read it.

3          Q.    Have you ever seen that

4    document before?

5          A.    Yes.

6          Q.    Did you sign that document?

7          A.    No.

8          Q.    You didn't sign that document?

9          A.    No.

10         Q.    Is it your testimony -- I am

11   going refer over here -- that this is not

12   your signature, it says "Manuel Almonte"?

13              MR. VALLETTI:  Note my

14         objection, asked and answered.  He

15         has already answered.

16         Q.    What about the one below it?

17         A.    No.

18              MR. WEINBERGER:  Please mark

19         this.

20              (Whereupon, the aforementioned

21         document was marked as Defendants'

22         Exhibit C for identification as of

23         this date by the Reporter.)

24         Q.    I am going to show you what is

25   marked as Exhibit C.

```
 1                         N. ALMONTE
 2               Have you ever seen this before?
 3         A.    Yes.
 4         Q.    Is that your signature on the
 5    document?
 6         A.    No.
 7         Q.    Tell us, how did you see this
 8    document before?
 9         A.    When I requested a loan from
10    the company, the loan was given to me under
11    the super's name, which is my son.  He is
12    the one that signed.
13         Q.    I didn't ask that.
14               MR. VALLETTI:  You asked how he
15          saw the paper.
16         Q.    I asked how you saw -- I have a
17    question for you.
18               You said you are familiar with
19    this complaint; is that correct?
20         A.    Yes.
21         Q.    In here it says you're suing
22    for monies illegally deducted from your
23    pay?
24         A.    Yes.
25         Q.    Well, if you didn't sign for
```

```
 1                    N. ALMONTE
 2  the loan, can you explain why monies were
 3  deducted from your pay?
 4       A.    The money was started to be
 5  deducted from my son's check who was the
 6  super.  When I then started to be the super
 7  in April of 2013, the deduction then
 8  started on my pay.
 9       Q.    So, you would then concede that
10  since it was deducted from somebody else's
11  pay, not yours, that you have no claim for
12  the money, for the deduction; is that
13  correct?
14            MR. VALLETTI:  Objection.  I
15         think that is a mischaracterization
16         of what he just said.  I will direct
17         him not to answer that.
18            MR. WEINBERGER:  It is not a
19         valid basis.
20            MR. VALLETTI:  If you can
21         rephrase it.
22            MR. WEINBERGER:  I will
23         rephrase it.
24       Q.    Are you suing for the deduction
25  of pay for the time that the check was in
```

```
 1                    N. ALMONTE
 2    Manuel Almonte's name?  Are you suing for
 3    that?
 4          A.    No, that corresponds to him.
 5          Q.    So can you tell us then what is
 6    the nature of -- when was money deducted
 7    from your pay, the loans from your pay?
 8          A.    April of 2013.
 9          Q.    Do you know how much was
10    deducted from your pay?
11          A.    I don't have the exact amount
12    in my mind right now.
13          Q.    Can you give us a ballpark
14    idea?
15          A.    Each check -- they had deducted
16    about $50 from each check, but that's not
17    an exact amount.  It would vary sometimes.
18          Q.    I am going to go back to the
19    statement, just to be clear, from B and C.
20                Is it your testimony that your
21    handwriting is not on this document?
22          A.    It does not appear, no.
23          Q.    So looking at the last name
24    there, Almonte, that is not what you
25    signed?
```

```
 1                    N. ALMONTE
 2              MR. VALLETTI:  Objection, asked
 3          and answered, but go ahead.
 4         A.    I did not sign it.
 5         Q.    Was were you present when this
 6    document was signed?
 7         A.    Yes.
 8         Q.    Where were you present?  Where
 9    was it?
10         A.    In Mr. Klahr's office.
11         Q.    Who was in Mr. Klahr's office
12    when they signed this document?
13         A.    Mr. Klahr, Manuel Almonte, and
14    myself.
15         Q.    When did you start as a
16    superintendent for 437 Morris Park Avenue?
17         A.    As a superintendent in April of
18    2013.
19         Q.    Did you give the same answer at
20    an unemployment hearing this past Friday
21    when you were asked when you started as a
22    superintendent?
23         A.    It was a similar question, but
24    not the same.
25         Q.    So your testimony is that this
```

```
 1                    N. ALMONTE
 2   past Friday you never testified that you
 3   were the superintendent in 2012 or 2011 at
 4   437 Morris Park Avenue?
 5                MR. VALLETTI:  Objection.
 6            You can answer if you can.  It sounds
 7            confusing.
 8        A.    I answered as to when I had
 9   started working with the company, which was
10   in February of 2011.  To be exact, it was
11   the 11th.
12        Q.    Just to be clear, you're
13   denying that you said that testimony on
14   Friday, this past Friday, at unemployment?
15        A.    I never said that I had been a
16   super in 2012.
17        Q.    What about 2011?  Did you say
18   at unemployment that you were
19   superintendent in 2011 at 437 Morris Park
20   Avenue?
21        A.    No, no.
22        Q.    Let's go back.
23                Did you ever work at 1056
24   Boyton Avenue in the Bronx?
25        A.    Yes.
```

```
 1                    N. ALMONTE
 2         Q.    Before that, let me get -- I am
 3    sorry.
 4              Before you started at 1056
 5    Boyton Avenue, where did you work?
 6         A.    I worked self-employed as a
 7    handyman doing jobs on my own.
 8         Q.    How long were you doing that
 9    for?
10         A.    Since arriving into this
11    country.
12         Q.    Did you ever work for any
13    company since arriving in this country
14    before 1056 Boyton?
15         A.    Yes.
16         Q.    What companies did you work
17    for?
18         A.    I worked with a company that
19    was called DEFO or D-E-F-O.
20         Q.    DEFO?
21         A.    DEFO.
22         Q.    Thank you.
23              When did you work for DEFO
24    Construction?
25         A.    I don't know the name DEFO
```

```
 1                    N. ALMONTE
 2   Construction.   I know the name DEFO
 3   Restoration.
 4        Q.    When did you work for DEFO
 5   Restoration?
 6        A.    Approximately 1995.
 7        Q.    Until?
 8        A.    Until 1998.
 9        Q.    After that, what did you do
10   after you left?
11        A.    I then continued working as a
12   handyman working on my own.
13        Q.    Did your son work for DEFO
14   Restoration?
15             MR. VALLETTI:  Objection,
16          Number 1, specify which son, and
17          Number 2 --
18             MR. WEINBERGER:  I'm going to
19           ask either son.
20             MR. VALLETTI:  Okay.
21        A.    Impossible.
22        Q.    Why?  Either son, I asked.
23        A.    He was only about 2 or 3 years
24   old.
25        Q.    When you say "he," who are you
```

```
 1                    N. ALMONTE
 2    referring to?
 3         A.    Manuel Almonte.
 4         Q.    When did you start working at
 5    1056 Boyton?  I want to go back there.
 6         A.    February of 2011.
 7         Q.    How long did you work there
 8    for?
 9         A.    Less than a month.
10         Q.    Now, I would like to read
11    paragraph 37 of the complaint and ask you
12    if this is correct.
13              MR. WEINBERGER:  Could you read
14         paragraph 37?
15              THE INTERPRETER:  I thought you
16         were going to read it.
17              MR. WEINBERGER:  I was, but you
18         are going to have to translate it.
19         You want me to read it, you translate
20         to make it easier?
21              THE INTERPRETER:  Yes.
22         Q.    "As a handyman, Plaintiff
23    worked five days a week, Monday through
24    Friday, for 40 hours per week.  Plaintiff
25    received $400 per week as a handyman."
```

```
 1                    N. ALMONTE
 2              Is that correct?
 3        A.    Yes, that is correct.
 4        Q.    So you're not claiming any
 5   monies for the time you worked at 1056
 6   Boyton Avenue in this lawsuit; is that
 7   correct?
 8        A.    The claim is I would get paid
 9   by check under the super's name, the super
10   would then cash the check at a cashier, and
11   I would get the money cash.  And the
12   cashier would then charge an amount to cash
13   that check, and that would be deducted.
14        Q.    Please listen to the question.
15   If you don't understand it, please tell me.
16              I am asking you, do you have
17   any claim against the defendants for
18   anytime you worked at 1056 Boyton Avenue?
19        A.    No.
20              MR. VALLETTI:  Put on the
21         record Mr. Tabak has entered the room
22         as well.  Thank you.
23        Q.    The complaint, in paragraph 38,
24   says, "On or about early April 2011,
25   defendants promoted Plaintiff to
```

```
 1                    N. ALMONTE
 2   superintendent apartment building located
 3   at the 437 Morris Park Avenue"; is that
 4   correct?
 5             MR. VALLETTI:  Note my
 6        objection.  Are you talking about
 7        what is written or what he has
 8        testified to?
 9             MR. WEINBERGER:  What is
10        written.
11             MR. VALLETTI:  Okay.
12        A.    I was moved to 437 Morris Park
13   with the intentions of making me a super of
14   that building.
15        Q.    I am asking you to please
16   answer the question.  Is that statement
17   correct or not correct that you just read?
18   What the first paragraph says?
19        A.    That is a confusing question.
20   And I'll explain why.  The reason being, as
21   I said before, I was moved to 437 Morris
22   Park to become the super, but I still
23   didn't have my papers for authorization to
24   work in the United States.  Then Manuel
25   Almonte was named the super.
```

```
 1                    N. ALMONTE
 2         Q.    I am not asking that.  You seem
 3    to be answering that question all the time.
 4    Can you tell us why you keep saying about
 5    Manuel Almonte being the superintendent?
 6              MR. VALLETTI:  Object to the
 7         question.  And if you seek
 8         clarification, ask him a clarifying
 9         question.
10              MR. WEINBERGER:  I am asking
11         him that question.  I will withdraw
12         that.  I will withdraw that.
13         Q.    Again, I am going to ask you,
14    is this first sentence in paragraph 38 true
15    or not?  Just a question.
16         A.    No.
17         Q.    By the way, is there anything
18    else you noticed in the complaint that you
19    claim is not true?
20              MR. VALLETTI:  Objection.
21         A.    At this point, I don't know of
22    anything else that is not true, as far as I
23    know.  And it's not so much as not being
24    not true as it is as confusing.
25         Q.    Before you started work even at
```

```
1                     N. ALMONTE
2    Boynton Avenue, did you fill out an
3    employment application?
4                 MR. VALLETTI:   Objection.   Can
5             you clarify with who did you fill
6             that out with?   When?
7         Q.    With any of the defendants in
8    this case.
9         A.    For what date?
10        Q.    Before you started to work at
11   1056 Boynton Avenue?
12        A.    No.
13        Q.    What about before you started
14   at 437 Morris Park?
15        A.    No.
16        Q.    I would like to show you what
17   has been marked D.   We will mark it.
18               (Whereupon, the aforementioned
19            document was marked as Defendants'
20            Exhibit D for identification as of
21            this date by the Reporter.)
22        Q.    Going back, I would like to
23   show you what is marked as D, Exhibit D.
24   Now on there it says, "Previous
25   experience."   Under that, in the middle of
```

```
 1                      N. ALMONTE
 2    the page, it says, "Company name."  What is
 3    that, what is that next to it?  Can you
 4    just read the company name for me?
 5         A.    It says DeFore Construction.
 6         Q.    Do you know anything about that
 7    company, DeFore Construction?
 8         A.    No, not DeFore Construction.
 9         Q.    I am going to make a request
10    that you produce your tax records, if you
11    have them, going back for 2001 and '02 or
12    any other documents referring to DEFO.
13              MR. VALLETTI:  I'll just make
14         an objection and note that any
15         document requests please be put in
16         writing so we can respond.
17         Q.    So this DEFO Construction is
18    different than the DEFO you testified about
19    before?
20         A.    It's different.
21         Q.    It says in here, just looking
22    at it again, that you worked from -- excuse
23    me, somebody worked from 1995 to 2002.  See
24    that?
25         A.    This is not my writing, and, as
```

```
 1                    N. ALMONTE
 2    I said before, I worked for DEFO which
 3    doesn't have an R in it.  And it's not
 4    construction, it's DEFO, the name was DEFO
 5    a restoration company.
 6         Q.    Now Manuel Almonte, your son,
 7    did not work for DEFO Construction,
 8    correct?
 9         A.    No.
10         Q.    In fact, when you were -- you
11    were interviewed by Mr. Klahr in February
12    of 2011 for a position with the defendants?
13    Yes?  Were you interviewed by Mr. Klahr for
14    a job?
15         A.    Yes, I was interviewed.
16         Q.    Did you tell Mr. Klahr that you
17    lived at 1161 Stratford Avenue, Number 3K?
18         A.    Yes.
19         Q.    Was your cell phone number
20    (917) 945-2366?
21         A.    Yes.
22         Q.    At that time, who was in the
23    room with you when you interviewed with
24    Mr. Klahr?
25         A.    No, it wasn't a room.  He
```

```
 1                    N. ALMONTE
 2    interviewed me at his car in the street.
 3          Q.    When did that take place?
 4          A.    February of 2011.
 5          Q.    I would like to show you again,
 6    if you take at look at -- you have it in
 7    front of you.
 8                Can you take a look at this
 9    document?  Have you ever seen this document
10    before?
11          A.    I am confused, but this -- I
12    know my son's signature appears at the end
13    there, but this document isn't from the
14    date that is written here.
15          Q.    Can you tell us how do you know
16    that?
17          A.    This isn't my writing.  I know
18    that my son signed it on the bottom, and I
19    know that these are the numbers as well,
20    but I never recall seeing anything above
21    that before.  Ever.
22          Q.    Do you have any idea how your
23    son came to sign this document?
24          A.    It is signed by him a long time
25    ago, but it's possible when I told Mr. --
```

```
 1                    N. ALMONTE
 2    that it was when I told Mr. Klahr that I
 3    didn't have my papers yet.  So everything
 4    would need to be signed by my son, and I
 5    had to be like his shadow at the job.
 6             MR. VALLETTI:  Mind if we take
 7         a quick break, I have to talk to
 8         Nestor.
 9             MR. WEINBERGER:  Not about
10         this.  He is answering questions.
11             MR. VALLETTI:  Okay, fine.
12             MR. WEINBERGER:  I don't mind
13         taking a break generally, but I just
14         want to go through something.
15         Q.   It says in here (indicating),
16    the complaint, again, I am going to read
17    this to you.  "In April of 2011," it says
18    in here "Mr. Munoz" -- I am referring to
19    paragraph 41 -- "complained to defendants
20    that he feared trouble with the Internal
21    Revenue Service."
22             Do you know anything about
23    that?
24         A.   What paragraph are you speaking
25    about?
```

```
 1                    N. ALMONTE
 2        Q.     Let's clarify something.
 3               Are you related to Wilton
 4    Munoz?
 5        A.     Yes.
 6        Q.     How are you related to him?
 7        A.     He is my brother-in-law.
 8        Q.     Now, it indicates in paragraph
 9    41 that Mr. Munoz complained to defendants
10    in April of 2011?
11        A.     Yes, I do recall that.
12        Q.     Now going to paragraph 43, it
13    says, "Defendants then told Plaintiff that
14    in order for Plaintiff to keep his job,"
15    meaning that apparently that you had
16    already started to work at 437 Morris Park;
17    is that correct?
18        A.     I don't understand the
19    question.
20        Q.     Well, it indicates here that
21    you had started to work, does it not, in
22    paragraph 43 -- I am not arguing with you,
23    I am just reading the language -- that you
24    had started to work at Morris Park, 437
25    Morris Park, and then the issue came up?
```

```
 1                        N. ALMONTE
 2          A.     And then that's -- when I went
 3     to Morris Park, then that aspect had
 4     stopped.
 5          Q.     What aspect had stopped?
 6          A.     To give the payments to me
 7     under the name Wilton Munoz.
 8          Q.     But this says you had started.
 9     Is this correct?  Is this correct?  It said
10     you had started at 437 Morris Park when
11     they came to you, quote/unquote, to change,
12     to change the name to Manuel.
13                 MR. VALLETTI:  Note my
14          objection.
15          Q.     It is what it says, does it
16     not?  Which one?  Is that statement
17     accurate that to keep your job, defendants
18     would hire Manuel's son?
19          A.     Yes.
20          Q.     So before then you were working
21     under what name?
22                 MR. VALLETTI:  Objection.
23          A.     With my name, Nestor Almonte.
24          Q.     Have you ever heard of the
25     word, by the way, Nestor Lopez?
```

```
1                    N. ALMONTE
2         A.    That is my maternal last name.
3         Q.    I am going to go back to this.
4               Is it your testimony that, so
5    it is clear, that you did not sign "Manuel
6    Almonte," that is not your signature or
7    that is not what you signed?
8         A.    My son had signed it.
9         Q.    And it was signed on 2/21/2011?
10   Is that correct?  That's when it was
11   signed?
12        A.    I don't remember the date, but
13   there is a date there.
14        Q.    The date is there, correct?
15        A.    And what do you want to know
16   about this?
17        Q.    By the way, do you have any
18   explanation how Mr. Klahr would have known
19   about the name DEFO if you hadn't told him?
20             MR. VALLETTI:  Objection.
21         To the extent you know you can
22          answer.
23        A.    Because I had introduced my son
24   to him.
25        Q.    In February 2011?
```

1                      N. ALMONTE

2          A.    When I started to work there at

3    Morris Park.

4          Q.    At Morris Park.  What about

5    1056 Boynton in February when you worked

6    there?

7          A.    I started at the beginning of

8    February, I worked less than a month there,

9    as I said, and then I was transferred to

10   437 Morris Park.

11         Q.    I will get to that in a second.

12         A.    I don't have the exact date

13   when I went over to Morris Park or crossed

14   over to Morris Park.  March.

15         Q.    But it could have been April

16   then; is that correct?  2011?

17         A.    No, in April of 2011, I had

18   already started as handyman at Morris Park.

19         Q.    You started in April 2011 as a

20   handyman.  When did you become the super?

21         A.    When I left Boynton at the end

22   of February, around then, Mr. Klahr then

23   brought me to Morris Park.  As I said, he

24   said, "Come with me, bring your tools."  He

25   then brought me to Morris Park.  He told

```
 1                     N. ALMONTE
 2   me, "From this point on, you're going to
 3   start working here."  The one who was the
 4   super was Ernesto Hernandez.
 5             MR. VALLETTI:  That is correct.
 6        A.    He was the super at 437 Morris
 7   Park, so I was working with him for another
 8   three or four weeks more.
 9        Q.    So you became the super after
10   Ernesto Hernandez left; is that correct?
11        A.    Yes.
12             MR. VALLETTI:  You can
13         discuss --
14        Q.    Can you tell us what your job
15   was as the superintendent when you replaced
16   Nestor?  What your job was at 437 Morris
17   Park when you replaced Nestor Hernandez?
18   Could you just go over the duties?
19             MR. VALLETTI:  Objection, I
20         think you have the name wrong.  It is
21         not Nestor Hernandez.
22        Q.    Whatever Hernandez.  When you
23   replaced that other guy?
24             MR. VALLETTI:  I am trying to
25         keep it clear.
```

```
 1                   N. ALMONTE
 2        A.    From the beginning, the company
 3   was looking for a super.  That was the
 4   information that Wilton Munoz had given me,
 5   to be more specific about it.  I worked at
 6   1056 Boynton taking instructions as a
 7   trial, then I was transferred to 437 Morris
 8   Park to start to get to know the building
 9   with the purpose that I would eventually
10   become the super of that building.
11        Q.    What were your job duties as
12   superintendent of the building in May of
13   2011?  What were you supposed to do?
14             MR. VALLETTI:  Objection.  He
15        testified he didn't become the super
16        there.
17             MR. WEINBERGER:  No objection
18        to that.  He said he did.  He just
19        said he did.
20             MR. VALLETTI:  No, he didn't.
21        You're wrong about that.
22             MR. WEINBERGER:  The record
23        speaks for itself.
24             MR. VALLETTI:  Let the record
25        speak.  Clarify your question.
```

```
 1                    N. ALMONTE
 2               MR. WEINBERGER:  I asked the
 3          question.  That is not a proper
 4          objection.
 5               MR. VALLETTI:  It is not the
 6          correct testimony.  Move forward.
 7               MR. WEINBERGER:  No, I think he
 8          said that.  He said he replaced --
 9          Q.     By the way, it was Ernest
10     Torres you replaced?
11          A.     Torres.
12          Q.     That is the one you replaced as
13     the superintendent?
14          A.     Yes, Torres.
15          Q.     What were your duties when you
16     replaced Ernest Torres as the
17     superintendent?
18          A.     The work of every
19     superintendent, which is to do maintenance
20     for the building, following work orders,
21     taking calls, any complaints by phone call.
22     It didn't matter what time of day.
23               MR. VALLETTI:  Guys, you have
24          to stop talking.  She is recording
25          everything that is being said in the
```

```
 1                    N. ALMONTE
 2        room.
 3        A.    In other words, it would be
 4   24 hours a day, seven days a week.
 5        Q.    I had a more mundane question.
 6   Let me try this.
 7              As the superintendent, did you
 8   do maintenance repairs like fixing faucets?
 9   I am trying to get the simple stuff.
10        A.    Yes, yes.  As I said before,
11   that is part of maintenance.
12        Q.    That is what you did when you
13   replaced Torres; is that correct?
14        A.    All of those responsibilities
15   of a superintendent.
16        Q.    Let me go a little slower here.
17   Break it down.
18              Were you given work orders or
19   did you make work orders?
20        A.    I would receive the work
21   orders.
22        Q.    What would you do with the work
23   orders?
24        A.    Fix whatever needed to be fixed
25   on those work orders.
```

```
 1                    N. ALMONTE
 2         Q.    And you did that work yourself;
 3    is that correct?
 4         A.    Always accompanied by Manuel
 5    Almonte because he was, on paper, the
 6    superintendent of the building, so I was
 7    his shadow.
 8         Q.    So he was doing the repairs or
 9    you were doing the repairs?
10         A.    I would be doing the repairs,
11    showing him how to do those repairs so that
12    the following time, he could do them.
13         Q.    By the way, let's go back to
14    your son.  In 2011, he was in high school;
15    is that correct?
16         A.    Yes.
17         Q.    So he was in high school, going
18    full-time to high school, in April 2011?
19         A.    Until he was named the super.
20         Q.    Did he go to high school -- by
21    the way, what year did he graduate high
22    school?
23         A.    He hasn't graduated yet.  He is
24    doing his GED.
25         Q.    When did he stop going to high
```

```
 1                    N. ALMONTE
 2    school?
 3         A.    A few weeks after having
 4    started being the super, because he
 5    couldn't do both things at the same time.
 6    So he had to leave school.
 7         Q.    I am going to ask you to
 8    produce his records, anything regarding
 9    high school and school records.  And please
10    tell us where he went to high school.
11              MR. VALLETTI:  Just put it in
12         writing, the request.  And, also, at
13         least one record has been produced
14         for you guys in the prior production.
15              MR. WEINBERGER:  I don't
16         believe that.
17         Q.    Tell us where he went to high
18    school.
19         A.    Columbus High School.
20    Different schools.
21         Q.    Where did he go to high school
22    in 2011?
23         A.    I don't have the name of the
24    school in my mind right now.
25         Q.    Can you tell us approximately
```

```
 1                    N. ALMONTE
 2   where the school is located?
 3         A.    It was around Third Avenue.
 4         Q.    In the Bronx?
 5         A.    In the Bronx.
 6         Q.    Can you be a little more
 7   specific than Third Avenue?
 8         A.    It was around 149th, around
 9   there.
10         Q.    Columbus High School.  Do you
11   know if Columbus High School is on Pelham
12   Parkway in the Bronx?
13         A.    Yes, yes.
14         Q.    That is not near 149th Street
15   in the Bronx, is it?
16         A.    No, no, no.  In 2011, he was at
17   that school which I don't recall the name.
18   After that, he moved to Columbus.
19         Q.    That was in 2012?  He moved to
20   Columbus in 2012?
21         A.    Yes.
22         Q.    So he went to Columbus in 2012
23   roughly?
24         A.    Yes, yes.
25         Q.    In 2012, did he go the whole
```

```
  1                    N. ALMONTE
  2    year to high school in Columbus?
  3         A.    No.
  4         Q.    When did he drop out of
  5    Columbus High School?
  6         A.    It was weeks, just weeks
  7    because he started to fail in school
  8    because of the work.
  9         Q.    In 2012, he started to fail in
 10    school because of the work?
 11         A.    Yes, yes.
 12         Q.    Do you have any records of
 13    this, of his dropping out of school in
 14    2012?
 15         A.    Yes.  Not with me, but yes.
 16              MR. WEINBERGER:  We would ask
 17           that these documents be produced and
 18           we will put it in writing.
 19              MR. VALLETTI:  Thank you.
 20         Q.    Did he go back to school in
 21    2013?
 22         A.    Yes, yes.
 23         Q.    Where did he go to school in
 24    2013?
 25         A.    I don't remember the name, but
```

```
 1                      N. ALMONTE
 2    it's a school that works in conjunction
 3    with Co-Op Tech, and it's on 96th in
 4    Manhattan on the east side, 96th and Second
 5    Avenue.  That is where he started his GED
 6    since he couldn't go back to high school.
 7    At the same time, he would be doing a tech
 8    school career.
 9         Q.   What hours did he do that when
10    he was -- I am just talking about this
11    school.  I didn't get the name.
12         A.    Co-Op Tech.
13         Q.    What days of the week did he go
14    to Co-Op Tech, and what were the hours he
15    was there?
16              MR. VALLETTI:  Objection.
17          If you can answer, that is fine.
18         A.    Monday through Friday.
19         Q.    What were his hours?
20         A.    In the mornings he would have
21    to attend the GED school, and then in the
22    afternoons he would do the technical
23    school.  To be specific, he was taking
24    classes, welding classes.
25         Q.    So he would start in the
```

```
 1                      N. ALMONTE
 2    morning around 9:00, to the best of your
 3    recollection?
 4         A.    When he returned to school
 5    after he had already left the job.  He was
 6    not -- he did not leave the job.  He was
 7    fired from the job.
 8         Q.    What date are you talking about
 9    in 2013 that he was fired from the job?
10         A.    Around June.
11         Q.    So he was fired from what job
12    in June?
13         A.    From April he changed from
14    being superintendent to a handyman, so the
15    time sheet was changed.  And then he worked
16    as a handyman for a month, more or less.
17         Q.    Do you have documents in your
18    possession showing that he worked as a
19    handyman?
20         A.    Yes.
21         Q.    What are those documents?  Can
22    you describe them?
23         A.    Some time sheets, time sheets.
24         Q.    We are going to get back to the
25    time sheets in a few minutes.
```

```
1                        N. ALMONTE
2                Do you have any documents in
3        your possession showing that he completed a
4        work order as a handyman, or anything like
5        that, to show that he did work as a
6        handyman, other than these time sheets?
7            A.    I am not sure.  It's possible,
8        I would have to check.  Because there are
9        the time sheets.
10           Q.    A question.  Did he get paid a
11       salary when he handed in that time sheet?
12       A wage, anything?
13           A.    No.
14           Q.    So it is your testimony that
15       there is a time sheet that you filled out
16       for the same month, and that Manuel filled
17       out for the same month, is that correct, in
18       2013?
19           A.    One that I filled out with my
20       name as a superintendent, and Manuel would
21       fill one out as a handyman.  A roving
22       employee time sheet.
23           Q.    He went to 1195 Sherman Avenue,
24       too?
25           A.    He would go there.  He didn't
```

```
 1                    N. ALMONTE
 2    work there steady, but he would go.
 3         Q.    I have a question.  Do people
 4    sign work orders after they do the work?
 5         A.    The work order that is given to
 6    you for the week, the super has to sign it
 7    accepting the work.
 8         Q.    Is it true, did Mr. Klahr give
 9    you work orders in -- let's start with
10    2013.  Did Mr. Klahr give you work orders
11    in 2013?
12         A.    Yes.
13         Q.    Now, on any occasion, did
14    Mr. Klahr give -- and I would like you to
15    specifically say when -- work orders to
16    your son?
17         A.    The work orders would be given
18    to me, even for other buildings, which I
19    would give to the supers.  And then to the
20    employees, I would then give them my own
21    work order.  I would write it out myself
22    and give it.
23         Q.    Do you have documents which say
24    that Manuel Almonte was the handyman, was
25    changed from a superintendent to a
```

```
 1                    N. ALMONTE
 2    handyman?
 3         A.    The time sheets, the time
 4    sheets.
 5         Q.    Other than the time sheets, do
 6    you have document that says that?
 7         A.    Some work orders that I would
 8    sign when they were done.
 9         Q.    That you signed?
10         A.    He would sign for the work that
11    he did.
12         Q.    Okay.  Do you have any work
13    orders that he signed, your son Manuel, for
14    the work that he did?  Yes or no?
15         A.    Many, many.
16         Q.    Do you have them in your
17    possession?
18         A.    I don't know if my lawyer may
19    have them.
20              MR. VALLETTI:  We produced
21         some, but if you have more, we can
22         produce more, make another
23         production.
24         A.    I have for the whole year.
25              MR. VALLETTI:  We will give you
```

1                    N. ALMONTE

2          more if we have them.  We will give

3          you that.

4          Q.    For the whole year when?

5          A.    Since he had worked, started

6   working.

7          Q.    Let's just go back to this,

8   just to clarify.  What hours did he go to

9   these schools on 96th Street, that co-op,

10  and then the tech school?  What were those

11  hours again?

12          MR. VALLETTI:  Just note my

13          objection.  If we could break it down

14          starting and giving a timeframe so we

15          can get this all.  Let's get it in a

16          timeline so he is not confused as to

17          what school you are talking about,

18          when he is going, things like that.

19          MR. WEINBERGER:  I am asking

20          him in 2013.  That is what I asked

21          him.

22          Q.    What time did he start to go to

23  school, and what time did he end?

24          A.    As I said before, when he went

25  back into school for the GED and Co-Op

```
 1                        N. ALMONTE
 2   Tech, he wasn't working anymore.  He had
 3   already been fired.  So his time there
 4   would be from 8:30, 9:00 in the morning
 5   until 3:30 in the afternoon.  Because he
 6   didn't have work anymore.
 7            Q.    Who fired him?
 8            A.    Mr. Charlie Klahr.
 9            Q.    Were you present when he fired
10   him?
11            A.    Yes.
12            Q.    What day was that exactly?
13            A.    That was, like, in June of
14   2013.
15            Q.    By the way, who were the other
16   handymen in June 2013 working in the
17   building?  Can you give us a list?
18            A.    Which dates again?
19            Q.    2013.
20            A.    I have the names.
21            Q.    Spanish, Spanish, Spanish.
22            A.    I don't have the names in my
23   mind right now for 2013, those employees.
24   I remember the porter.
25            Q.    What was his name?
```

```
 1                    N. ALMONTE
 2          A.    Jose Gonzalez.  I remember Juan
 3    Mendoza who was from Sherman and sometimes
 4    would do jobs at Morris Park.  William, I
 5    don't remember the last name.  Willie.  I
 6    don't remember his last name.
 7          Q.    Anybody else?
 8          A.    There are several, but I don't
 9    have the names right now because the
10    handymen would be moving from one building
11    to another.
12          Q.    Did your son move from one
13    building to the other in that timeframe
14    with these guys?
15          A.    No.  My son would be a shadow.
16    I would either be his shadow or he would be
17    mine.
18          Q.    When he became the handyman, he
19    became your shadow.
20          A.    Once he was the handyman, he
21    could do jobs on his own.
22          Q.    What did you mean by the phrase
23    "shadow"?
24          A.    When he was the super, the work
25    knowledge, I had it.  That is why he would
```

```
1                    N. ALMONTE
2    go do the jobs, but I would be present
3    there with him.  That was the agreement
4    between Mr. Klahr, my son, and myself.
5         Q.    When was that agreement done?
6         A.    Since starting as a super in
7    Morris Park Avenue in 2011.
8         Q.    We are going to request that
9    you produce, if we haven't already, all the
10   documents regarding the time he was in
11   Columbus High School in 2012.
12        A.    Yes, it's possible.
13        Q.    What hours did he go to high
14   school in 2012?
15        A.    It would vary because of the
16   job.  That's why he then had to leave
17   school.
18        Q.    I didn't ask that.  Please
19   listen to the question.  I am not arguing
20   with you.  If you don't understand --
21             MR. VALLETTI:  He said it
22        varied.
23        Q.    Is it your testimony that he
24   didn't start at 8:00, 9:00 in the morning
25   until he went to high school in 2012?
```

```
 1                    N. ALMONTE
 2         A.    It would vary.  He wouldn't be
 3    able to go, or he would get there late, or
 4    he would have to leave early because he had
 5    to come in to work.  It wasn't easy.
 6         Q.    Do you have a record of those
 7    hours that are, quote, varied?
 8         A.    The school has all the
 9    attendance for all the students.
10         Q.    Now Columbus High School is
11    about how far from 437 Morris Park Avenue,
12    if you know?
13         A.    Are you talking about bus,
14    walking.
15         Q.    How did he get there?
16         A.    In public transportation.
17         Q.    Buses?
18         A.    Yes.
19         Q.    How long did he tell you it
20    would take to get to high school and come
21    back?
22         A.    I never asked.  I don't think
23    it took more than 15 minutes, 15,
24    20 minutes.
25         Q.    Each way?
```

```
 1                      N. ALMONTE
 2          A.    Yes, each way, each way.
 3          Q.    So in 2011, just go back to
 4   that, you're not sure of the high school he
 5   was in; is that correct?
 6          A.    No, because I was just doing
 7   work, so his mother was the one who knew
 8   more about that.
 9          Q.    You were doing work at 437
10   Morris Park; is that correct?
11          A.    Yes.
12          Q.    You were doing the
13   superintendent's job at 437 Morris Park in
14   2011; is that correct?
15               MR. VALLETTI:  Objection, asked
16          and answered.  He can answer to the
17          extent he can.
18          A.    Yes.
19               MR. WEINBERGER:  Off the
20          record.
21               (Whereupon, an off-the-record
22          discussion was held.)
23               (Whereupon, a short recess was
24          taken.)
25          Q.    We ask you to produce any
```

```
 1                    N. ALMONTE
 2    documents relating to your son's being in
 3    high school in 2011.
 4         A.    I will let my lawyer know.
 5         Q.    Now, you testified that you did
 6    things like work orders, you answered
 7    calls?
 8         A.    Yes.
 9         Q.    Did you identify yourself to
10    anybody in 2011 as the superintendent at
11    437 Morris Park Avenue?
12         A.    Yes.
13         Q.    Who did you identify yourself
14    as a superintendent to in 2011?
15         A.    With anyone that had to do with
16    the business.
17         Q.    You stated that you were the
18    superintendent for 437 Morris Park?
19         A.    Yes.
20         Q.    Did you receive an apartment as
21    superintendent when you started to work at
22    437 Morris Park?
23         A.    When I was then made the super.
24    In the beginning, I was living in
25    Stratford, then I would go there.
```

```
1                    N. ALMONTE
2          Q.     When did you get an apartment
3    at 437 Morris Park?
4          A.     Ernesto Torres, when he left
5    the job, or he was fired or whatever, when
6    that happened.  But there needed to be some
7    repairs done to the apartment.  So I didn't
8    move immediately into the apartment.
9          Q.     Can you tell us approximately
10   when you moved into the apartment?
11         A.     Should be around the end of
12   April or beginning of May.  April, May.
13         Q.     Of what year?
14         A.     Of 2011.
15         Q.     Who was your supervisor when
16   you became the superintendent at 437 Morris
17   Park?
18         A.     Mr. Charlie Klahr, who is the
19   manager.
20         Q.     When did he become your
21   supervisor?
22         A.     Well, he is the one that gave
23   me the job, and he was always my
24   supervisor.
25         Q.     You testified about that you
```

```
 1                    N. ALMONTE
 2    received work orders?
 3         A.    Yes.
 4         Q.    Who did you get work orders
 5    from?
 6         A.    From Mr. Charlie Klahr.
 7         Q.    Why did Mr. Charlie Klahr give
 8    you the work orders from 437 Morris Park
 9    Avenue; if you know?
10         A.    Because they had needed to be
11    completed.
12         Q.    Normally, are work orders given
13    to a superintendent?
14         A.    Yes.
15         Q.    So he gave you the work orders
16    starting in 2011?
17         A.    Yes, yes, yes.
18         Q.    What language did you speak
19    with Mr. Klahr in?
20         A.    In English.
21         Q.    When you started at 437 Morris
22    Park Avenue, did you go over what you were
23    going to be paid with Mr. Klahr?
24         A.    Yes.
25         Q.    When was that?
```

```
1                        N. ALMONTE
2          A.     Around April of 2011 that I
3     said that in order for me to be super, we
4     needed to straighten out the salary.
5          Q.     Okay.  What did you say to him,
6     and what did he say to you?
7          A.     He asked me if I was ready to
8     be the super.  I told him, "Yes, but my
9     salary to start had to be $500 weekly."
10               He said it couldn't start at
11    $500, "Let's start at $400.  Once you have
12    a few months, as you know -- as you get to
13    know the building, then we will fix it.  To
14    be more specific, when you get your papers
15    in order."
16         Q.     So what was your salary as a
17    handyman at 437 Morris Park Avenue?
18         A.     $350 weekly.
19         Q.     When was that?  For what period
20    did you get that salary?  What period of
21    time?
22         A.     From February.  Starting
23    February 2011 when I started working on
24    1056 Boynton.  Until that point that day
25    that we spoke and he said that he would pay
```

1                    N. ALMONTE

2     me $400.

3          Q.     You were going to be paid $400

4     to perform what job?

5          A.     Work as a super.

6          Q.     Now what day did you become the

7     handyman after you became the

8     superintendent?

9          A.     I never become a handyman after

10    being the superintendent.

11         Q.     So you remained as a

12    superintendent from the time in April 2011

13    until you stopped working in December of

14    2013; is that correct?

15         A.     Yes.

16         Q.     Let's just start with 2011.  We

17    are going to go back to the salary in a

18    second.

19              When you started, were there

20    any other people working in the building in

21    2011?  When you started in at 437 Morris

22    Park Avenue?

23         A.     Yes.

24         Q.     Who was working there?

25         A.     Ernesto Torres as the super.

```
 1                    N. ALMONTE
 2         Q.    After you became the super.
 3         A.    Luis Colon.  I remember a
 4   William, I don't remember the last name
 5   right now.
 6         Q.    Do you remember their
 7   positions, by the way?  When you tell me
 8   their names, if you could, tell me their
 9   positions.
10         A.    Those were handymen.
11         Q.    Any porters?
12         A.    There was a porter.  There was
13   a porter, but I don't have his name because
14   there were many porters.
15         Q.    Did anybody else work in 2011
16   other than these muchos porters, Luis
17   Colon, and William?
18              MR. VALLETTI:  Note my
19          objection.
20          You can answer if you understand.
21         A.    I just don't recall the name of
22   a handyman, but they were all handymen.
23   Handymen, porter, and super.
24         Q.    That's it?
25         A.    That's it.
```

```
 1                    N. ALMONTE
 2         Q.    What about 2012?
 3         A.    The same.  The same.
 4         Q.    Luis, William -- Luis Colon,
 5    William, and those porters.
 6         A.     Porters, there were other
 7    handymen because they would move around, so
 8    I don't have their names right now.  I
 9    could provide afterwards.
10         Q.     You have documents with their
11    names?
12         A.     Yes.  I have time sheets, or a
13    copy of the time sheets.
14         Q.     By the way, you're responsible
15    for maintaining the time sheets, correct?
16                Do you understand the question?
17         A.     My own time sheet, and my
18    worksheet.  My own worksheet.
19         Q.     Go ahead.
20         A.     Worksheets for the workers
21    which had to be signed by my son under his
22    name.
23         Q.     It was signed under his name,
24    but was it required by your son?
25         A.     Yes, it was a requirement.
```

```
 1                    N. ALMONTE
 2        Q.    Who told you that requirement?
 3        A.    Mr. Charlie Klahr, the manager.
 4        Q.    Did you fill out a time sheet
 5   for your work?
 6        A.    No.
 7        Q.    So you have no time records at
 8   all about the hours you worked; is that
 9   correct?
10        A.    Between 2011, April of 2011 and
11   April of 2013, it was just time sheet as
12   super that was filled out and signed by my
13   son, because one was the shadow of the
14   other.  Just one person would receive the
15   -- would be on the sheet, would receive a
16   check.
17        Q.    I am going to ask you again.
18   Please, if you don't understand -- did you
19   submit a time sheet indicating your hours
20   for the period that you were the
21   superintendent from 2011 through May of
22   2013?
23             MR. VALLETTI:  Note my
24        objection, asked and answered, but he
25        can answer.
```

```
 1                    N. ALMONTE
 2         A.    If I would give the time sheets
 3    to who?
 4         Q.    Did you complete any time
 5    sheets indicating the hours you worked from
 6    April 2011 through May of 2013?
 7         A.    Yes.
 8         Q.    What years did you complete
 9    time sheets indicating the hours you
10    worked?
11         A.    The worksheets were being used
12    towards the end of 2012.  Before that,
13    worksheets were not being used.
14              MR. WEINBERGER:  Off the
15          record.
16              (Whereupon, an off-the-record
17          discussion was held.)
18         Q.    Your testimony is, there were
19    no worksheets in 2011 at all?
20         A.    No.
21         Q.    Let's just give an example.  I
22    am just pulling out one, just going to pull
23    out one.  Let's just pull out No. 4?
24              MR. VALLETTI:  What is the
25          Bates?
```

```
 1                      N. ALMONTE
 2              MR. WEINBERGER:  It's 4, 0004.
 3          That is the actual Bates.
 4          Q.    I would like you to take a look
 5      at that.
 6          A.    My error as to when they were
 7      being used, or being started.  It was my
 8      confusion.  I am sorry.
 9              MR. WEINBERGER:  We have to
10          Bates stamp that.
11              MR. VALLETTI:  Mark it.
12              MR. WEINBERGER:  Mark it.
13              (Whereupon, the aforementioned
14          Time Sheet was marked as Defendants'
15          Exhibit E for identification as of
16          this date by the Reporter.)
17          Q.    Now just looking at this sheet
18      just for a second.  We have this one out.
19      It says, "Sick 11/2."  Were you out sick
20      that day, can you tell?
21              MR. VALLETTI:  I'll make an
22          objection here.  You didn't specify
23          who filled out this document.  Who
24          was the one that was sick?
25              MR. WEINBERGER:  I don't have
```

```
 1                     N. ALMONTE
 2          to ask that.
 3               MR. VALLETTI:  If you are going
 4          to refer to a document asking if he
 5          is the one that is sick when it's not
 6          a document that he signed, ask him if
 7          he signed it first.
 8               MR. WEINBERGER:  I don't have
 9          to.
10               MR. VALLETTI:  All right, so --
11               MR. WEINBERGER:  You can
12          object.  He can answer.
13               MR. VALLETTI:  I preserve my
14          right.
15               MR. WEINBERGER:  You can
16          preserve it.
17          A.    In this case, I had to report
18     whether my son or myself were sick so that
19     they would know.
20          Q.   Do you have a record of the
21     number of hours that you -- as Nestor
22     Lopez, as Manuel, as anybody -- do you have
23     a record of the hours that you worked?
24               MR. VALLETTI:  Objection.
25          Q.   At 437 Morris Park Avenue?
```

```
1                    N. ALMONTE
2              MR. VALLETTI:  Objection.
3          Asked and answered, but you can
4           answer.
5         A.    The same records that you see
6    for Manuel Almonte, he is the one that
7    would receive the pay, but any hour that he
8    is down that he worked, I was there as his
9    shadow.
10        Q.    I am going to ask you to answer
11   the question.  Is there any record
12   indicating the number of hours that you
13   worked in 2011?
14        A.    Not separate.
15        Q.    Do you have a record of the
16   hours that you worked in 2011?
17             MR. VALLETTI:  Note my
18          objection.  It is asked and answered.
19          He said he can't produce that.  He
20          said no.
21             MR. WEINBERGER:  You can't do
22          that.  I going to object --
23             MR. VALLETTI:  Yes, I can.
24          That is his testimony.
25             MR. WEINBERGER:  That is almost
```

```
 1                    N. ALMONTE
 2        a signal.
 3              MR. VALLETTI:  You keep asking
 4         the same question over and over.
 5              MR. WEINBERGER:  Nope, nope.
 6         That's not the same.  It's almost a
 7         signal.
 8              MR. VALLETTI:  It is actually
 9         the third time you have asked it.
10              MR. WEINBERGER:  I don't
11         believe so.  I am asking him again.
12        Q.    Do you have a record, your
13    regard, indicating the time that you worked
14    in 2011?
15        A.    There isn't any record under my
16    name.
17        Q.    I didn't ask under your name.
18              MR. WEINBERGER:  I am going to
19         direct the witness again to please
20         answer the question.
21        A.    Under my shadow's name, Manuel
22    Almonte.
23        Q.    Those are the records of the
24    hours you worked?
25              MR. VALLETTI:  Objection.
```

```
 1                    N. ALMONTE
 2          A.    They are the same.
 3          Q.    So somebody got paid for the
 4   hours that were worked, correct?
 5          A.    Yes, of course.
 6          Q.    How did you get paid in 2011?
 7   While you were the superintendent in 2011,
 8   how did you get paid?  How did you receive
 9   payment?
10          A.    The pay would be given to my
11   son, and we would divide the check.  To be
12   more specific, it would be divided between
13   four people.
14          Q.    Which four people?
15          A.    My son Manuel Almonte, my
16   daughter Ashley Almonte, my wife Mildred
17   Munoz, and myself.  Because the four -- I
18   say this because the four of us worked.  If
19   something needed to be done, and I wasn't
20   available, I could send my daughter or my
21   wife, let's say, go clean the hallway.
22   "Clean up the hallway, there is something
23   dirty."  "Go clean the elevator, there is
24   something dirty."
25          Q.    When did your daughter or wife
```

```
1                    N. ALMONTE
2     clean the hallway?
3          A.    I don't have a record, but it
4     would be, like, by a call where they would
5     tell me, "Oh, someone vomited in the
6     elevator," and I would be occupied with
7     something else.  So then I would call my
8     daughter and say, "Please go to the
9     elevator of the building, clean it because
10    someone vomited."  Because, remember, we
11    lived in the same building.
12         Q.    Did Manuel, your son, get any
13    work orders from Mr. Klahr?
14         A.    I would always receive them.
15         Q.    Then you would divide up how
16    the work was done?
17         A.    I would divide the work with
18    the employees.
19         Q.    "Employees" meaning who?
20         A.    That would include me, the
21    handyman that would be there at that time
22    that they were there, including my son.
23    That the jobs that were mine, he would do
24    them with me.
25         Q.    Do you have that in writing,
```

```
 1                    N. ALMONTE
 2     that your son was supposed to do the job
 3     with you?
 4          A.    All of the work orders say the
 5     apartment and who did the job.
 6               MR. WEINBERGER:  Can you read
 7          back the question.
 8               (Whereupon, the referred to
 9          question was read back by the
10          Reporter.)
11          Q.    From any of the defendants.
12          A.    No.  That was all verbal
13     between Charlie Klahr, myself, and my son.
14               MR. WEINBERGER:  Please mark
15          this.
16               (Whereupon, the aforementioned
17          document was marked as Defendants'
18          Exhibit F for identification as of
19          this date by the Reporter.)
20          Q.    I would like to show you what
21     has been marked as Exhibit F.
22          A.    What can I help you with with
23     this?
24               MR. VALLETTI:  Which number?
25          Am I on the wrong number?
```

```
 1                    N. ALMONTE
 2             MR. WEINBERGER:  2011.
 3             MR. VALLETTI:  Thank you.
 4        Q.    Let's just go through the
 5   document first.
 6        A.    Can I ask if my lawyer had this
 7   document?
 8             MR. VALLETTI:  Yes.
 9        Q.    Unfortunately, you can't.
10        A.    I do recall this document, but
11   I don't recall it having this writing up
12   top.
13        Q.    Do you recall signing this
14   document?
15        A.    No.  I remember when it was
16   signed, but I didn't sign it.  It was
17   Manuel Almonte.
18        Q.    So is it your testimony that at
19   the age of 16 or 17 Manuel Almonte signed
20   this document?
21        A.    At 17 years of age.
22        Q.    He claims five dependants.  Is
23   that what this document says?  Including a
24   spouse?
25        A.    It was a suggestion that
```

```
 1                    N. ALMONTE
 2    Charlie Klahr had asked for taxes.  That
 3    this isn't a perjury or anything, that this
 4    is a way of getting less taxes.
 5         Q.    When did you see this document?
 6         A.    When it was signed at his car.
 7    We were on Lebanon Street on the other side
 8    of Morris Park.
 9         Q.    When was that signed?
10         A.    2011.
11         Q.    What month in 2011?
12         A.    It's here.  The date, it is
13    October of 2011.
14         Q.    Were you already the
15    superintendent at that building at that
16    time?
17              MR. WEINBERGER:  I will
18         withdraw it.  It is getting late.
19         Q.    With respect to time sheets,
20    did you have to sign off or approve the
21    time sheets that the other employees gave
22    you, the handymen?
23         A.    Yes.
24         Q.    Do you know why you had to sign
25    off on those sheets?
```

1                    N. ALMONTE

2        A.    It would be for their entering

3   or starting work and leaving work, and also

4   their lunch hour.  The whole time, the

5   super is the witness that the worker had

6   completed that time.

7        Q.    That is why you had to fill out

8   the sheet?

9        A.    That is why I would have to

10  sign it.

11       Q.    You signed those sheets in 2011

12  and 2012?

13       A.    Manuel Almonte would sign it.

14  As you recall, I couldn't sign anything.

15  Everything was Manuel Almonte.

16       Q.    But you were the one who

17  approved it?

18       A.    Yes.

19            MR. WEINBERGER:  Off the

20        record.

21            (Whereupon, an off-the-record

22        discussion was held.)

23            MR. WEINBERGER:  At this point,

24        we seem to have a problem with

25        weather-related issues.  The

1                    N. ALMONTE
2          translator has indicated that he must
3          leave.  We do not have an alternate
4          translator.  We have done the best we
5          can so far.  At this point, I do not
6          see how we can proceed without a
7          translator.  And given that the snow
8          is coming down fairly heavily now, we
9          are not likely to get anybody.  We
10         need to continue the deposition.  I
11         think both sides have agreed that we
12         will have to continue the deposition.
13         We do not have a translator.
14              I don't know if Plaintiff's
15         counsel wishes to say anything for
16         the record.
17              MR. VALLETTI:  Sure.  I agree
18         with Stewart's concerns, and, also,
19         we appreciate the time here the
20         translator gave us today, even though
21         it's been trying outside.
22              I do have to get home myself.
23         I am worried about the commuting
24         issues, and I live with my
25         grandmother that relies on me when

```
 1                    N. ALMONTE
 2          the weather gets bad.  Hopefully, the
 3          power doesn't go out.  So we all have
 4          families to be with and places to be
 5          to make sure that everything is taken
 6          care of.
 7              At this time, it is agreed to
 8          adjourn the rest of deposition with
 9          all of these concerns.
10              (Whereupon, at 1:23 P.M., the
11          Examination of this Witness was
12          adjourned.)
13
14
15                  _____
                            NESTOR ALMONTE
16
17    Subscribed and sworn to before me
18    this _____ day of _____ 20___.
19
20    _____
             NOTARY PUBLIC
21
22
23
24
25
```

```
 1                    N. ALMONTE

 2                 E X H I B I T S

 3

 4    DEFENDANT EXHIBITS

 5

 6    EXHIBIT    EXHIBIT                  PAGE

 7    NUMBER     DESCRIPTION

 8    A          Unidentified Document    07

 9    B          Unidentified Document    09

10    C          Unidentified Document    10

11    D          Unidentified Document    22

12    E          Time Sheet               59

13    F          Unidentified Document    65

14

15

16                 I N D E X

17

18    EXAMINATION BY                      PAGE

19    MR. WEINBERGER                      04

20

21

22

23

24

25
```

```
 1                    N. ALMONTE

 2      INFORMATION AND/OR DOCUMENTS REQUESTED

 3   INFORMATION AND/OR DOCUMENTS        PAGE

 4   Tax Records For 2001 and 2002       23

 5   Any Documents Referring to DEFO     23

 6   Manuel Almonte's School Records     36

 7   Records of Manuel Almonte's

 8   Withdrawal From School in 2012      38

 9   Columbus High School Documents

10   From 2012 For Manuel Almonte        47

11   High School Documents For 2011

12   For Manual Almonte                  49

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    N. ALMONTE
 2              C E R T I F I C A T E
 3
 4    STATE OF NEW YORK      )
                              :  SS.:
 5    COUNTY OF NEW YORK     )
 6
 7
 8          I, EVANGUELIA GALARZA, a Notary
 9    Public for and within the State of New
10    York, do hereby certify:
11          That the witness whose examination is
12    hereinbefore set forth was duly sworn and
13    that such examination is a true record of
14    the testimony given by that witness.
15          I further certify that I am not
16    related to any of the parties to this
17    action by blood or by marriage and that I
18    am in no way interested in the outcome of
19    this matter.
20          IN WITNESS WHEREOF, I have hereunto
21    set my hand this 9th day of February 2015.
22
23
24    _____
                 EVANGUELIA GALARZA
25
```

1

2      UNITED STATES DISTRICT COURT
       SOUTHERN DISTRICT OF NEW YORK
3      ----------------------------------------X
       NESTOR ALMONTE,
4
                                    PLAINTIFF,
5

6           -against-          Case No:
                               14-CV-5951(CKPF)
7

8      437 MORRIS PARK LLC d/b/a F&T MANAGEMENT
       CO., et al.,
9
                                    DEFENDANTS.
10     ----------------------------------------X

11

12                   DATE:  February 10, 2015

13                   TIME:  11:24 a.m

14

15            CONTINUED DEPOSITION of the

16     Plaintiff, NESTOR ALMONTE, taken by the

17     Defendants, pursuant to a notice and to the

18     Federal Rules of Civil Procedure, held at

19     the offices of Goldberg & Weinberger LLP,

20     630 Third Avenue, 18th Floor, New York, New

21     York 10017, before Scott Torrance, a Notary

22     Public of the State of New York.

23

24

25

1

2    A P P E A R A N C E S :

3

4    VALLI KANE & VAGNINI
        Attorney for the Plaintiff -
5    NESTOR ALMONTE
        600 Old Country Road
6    Garden City, New York 11530
        BY:  ROBERT P. VALLETTI, ESQ.
7    rpv@vkvlawyers.com

8

9    GOLDBERG & WEINBERGER LLP
        Attorneys for the Defendants -
10   437 MORRIS PARK, LLC i/s/h/a 437 MORRIS
        PARK d/b/a F&T MANAGEMENT CO., 1195
11   SHERMAN AVE., LLC, CHANINIA KLAHR, KALMAN
        TABAK, and ABRAHAM FINKELSTEIN
12   630 Third Avenue
        New York, New York 10017
13   BY:  STUART WEINBERGER, ESQ.

14

15   ALSO PRESENT:
        CHANINIA KLAHR
16   ANNETTE ALETOR
        JOSE LOPEZ, Spanish interpreter, Star
17   Interpreting and Translating, Inc.

18

19               *         *         *

20

21

22

23

24

25

1

2      F E D E R A L   S T I P U L A T I O N S

3

4

5      IT IS HEREBY STIPULATED AND AGREED by and

6    between the counsel for the respective

7    parties herein that the sealing, filing and

8    certification of the within deposition be

9    waived; that the original of the deposition

10   may be signed and sworn to by the witness

11   before anyone authorized to administer an

12   oath, with the same effect as if signed

13   before a Judge of the Court; that an

14   unsigned copy of the deposition may be used

15   with the same force and effect as if signed

16   by the witness, 30 days after service of

17   the original & 1 copy of same upon counsel

18   for the witness.

19

20     IT IS FURTHER STIPULATED AND AGREED that

21   all objections except as to form, are

22   reserved to the time of trial.

23

24                   *     *     *     *

25

```
 1                    N. ALMONTE
 2    J O S E   L O P E Z, a Spanish interpreter,
 3    solemnly swore to translate the following
 4    questions from English to Spanish and
 5    answers from Spanish to English:
 6
 7    N E S T O R   A L M O N T E, recalled as a
 8    witness, having been resworn, through an
 9    interpreter, by a Notary Public of the
10    State of New York, was examined and
11    testified as follows:
12    CONTINUED EXAMINATION
13    BY MR. WEINBERGER:
14         Q.    Please state your name for the
15    record.
16         A.    Nestor Almonte.
17         Q.    Please state your address for
18    the record.
19         A.    4536 Park Avenue, Apartment 12,
20    Weehawken New Jersey 07086.
21         Q.    Good morning
22         A.    Good morning.
23         Q.    I'm going to ask you some
24    questions again.  If you don't understand
25    the question, please tell me; I'll rephrase
```

```
 1                  N. ALMONTE
 2    the question.  If you answer the question,
 3    I'm going to assume that you understand the
 4    question.
 5              Are you taking any medication
 6    today that will affect your ability to
 7    answer questions?
 8         A.    No.
 9         Q.    Is there any reason why you
10    cannot tell the truth in response to the
11    questions I'm going to ask you today?
12         A.    I have no reason.
13         Q.    Did you discuss the testimony
14    you're about to give now with anyone, other
15    than your attorneys, prior to day?
16         A.    No.
17         Q.    What is -- I'm going to try not
18    to ask the questions again that I asked the
19    other time; however, we rushed out because
20    of the snow and we don't have a copy of the
21    transcript.  So, having said that, I'm
22    going to ask you to start here.  What is
23    the full name of your wife?
24         A.    Mildred Margarita Munoz Reyes.
25         Q.    When were you married?
```

```
 1                    N. ALMONTE
 2        A.    In December of 2012.
 3        Q.    And where were you married?
 4        A.    In the Bronx.
 5              (Whereupon, Chaninia Klahr
 6         entered the room.)
 7        Q.    And you have a marriage
 8    certificate?
 9        A.    Yes.
10        Q.    Okay.
11              MR. WEINBERGER:  I'm going to
12         ask that it be produced.
13              MR. VALLETTI:  And I'd ask that
14         all requests for production be put in
15         writing, please, and thank you.
16              MR. WEINBERGER:  Just taking a
17         one-second break.
18              Off the record.
19              (Whereupon, a discussion was
20         held off the record.)
21        Q.    Now, in May 2011, were you the
22    handyman at 437 Morris Park Avenue?
23        A.    It was around that time that I
24    was brought over to become superintendent.
25        Q.    Brought over from where, just
```

1                    N. ALMONTE
2    to clarify that?
3          A.    I mean from handyman to
4    superintendent.
5          Q.    Okay.  From handyman where?  At
6    437 Morris Park?  Were you the handyman
7    there?
8          A.    Yes.
9          Q.    Okay.  When did you become the
10   handyman at 437 Morris Park?
11         A.    At the end of February of 2011.
12         Q.    And when did you stop being the
13   handyman at 437 Morris Park?
14         A.    It was around May.  April or
15   May, I'm not sure.
16         Q.    Of what year?
17         A.    2011.
18         Q.    When you became the
19   superintendent in April or May of 2011, at
20   the same time you became superintendent,
21   did somebody else become the superintendent
22   as well, at 437 Morris Park?
23         A.    Yes.
24         Q.    Okay.  And who was that?
25         A.    Manuel Almonte.

```
 1                    N. ALMONTE
 2          Q.    Now, prior to him, Manuel,
 3    becoming the superintendent at 437 Morris
 4    Park, what jobs had Manuel Almonte had
 5    before he became superintendent?
 6          A.    He was a student and he had
 7    worked in the -- doing summer jobs,
 8    part-time summer jobs.
 9          Q.    Such as?
10          A.    Maintenance at a clinic.
11          Q.    What does that mean; sweeping,
12    mopping?
13          A.    Checking bulbs, lightbulbs,
14    checking toilets, bathrooms.
15          Q.    And doing what?
16          A.    Unclogging toilets that could
17    be clogged, fixing a leakage at some kind
18    of sink.
19          Q.    And he did that at what age?
20          A.    His age was since 15, 16 years
21    old, but he was doing that since he was a
22    child.  Since he was a child he was
23    learning these things, always working.
24          Q.    Where was he working since he
25    was a child?
```

```
 1                    N. ALMONTE
 2         A.    Not formally working, but
 3   working in the sense that he would help me
 4   and I would teach him.  He's my son.
 5         Q.    What were you doing prior to
 6   February 2011, where you were -- what were
 7   you doing prior to February 2011, where
 8   were you working?
 9         A.    I was self-employed and I was
10   doing handyman work.
11         Q.    Did you ever work at 1056
12   Boynton Avenue?
13         A.    Yes.
14         Q.    When?
15         A.    February of 2011.
16         Q.    Until when?
17         A.    Just up to February itself,
18   that February.  I just worked two, three
19   weeks there at 1056 Boynton.
20         Q.    Okay.  How many units,
21   apartments, were at 1056 Boynton Avenue?
22         A.    I don't recall exactly the
23   number, but it's 70.  Actually more than
24   70.
25         Q.    Is that building bigger than
```

```
1                    N. ALMONTE
2    437 Morris Park Avenue?
3         A.    They're more or less similar.
4         Q.    How many superintendents were
5    at 1056 Boynton Avenue?
6         A.    When I worked there there was
7    only one superintendent.
8         Q.    Well, did you ever work again
9    at 1056 Boynton Avenue after February 2001?
10        A.    2011?
11        Q.    2011.  Did I say 2001?  I'm
12   sorry.  I apologize.
13        A.    There were some occasions.
14   There were some days in which I had to go
15   there because of some emergency.
16        Q.    Now, on those occasions you had
17   to go there, was there more than one
18   superintendent working in that building?
19        A.    One superintendent.  Sometimes
20   that superintendent might be on vacation;
21   and, if so, then I would arrive there and
22   would try to do some job as -- because of
23   an emergency, some problem with an elevator
24   that would be stuck, whatever.
25        Q.    Okay.  So, there's generally
```

```
 1                     N. ALMONTE
 2    one superintendent was in charge of 1056
 3    Boynton Avenue, is that correct, at the
 4    time you worked there?
 5          A.   Yes.
 6          Q.   1195 Sherman Avenue, did you
 7    ever work in that building?
 8          A.   Yes.
 9          Q.   Okay.  How many units is that
10    building?
11          A.   40, 41.  I don't recall the
12    exact number right now.
13          Q.   Is it bigger or smaller than
14    437 Morris Park, in terms of units?
15          A.   It's much smaller.
16          Q.   How many supers were in that
17    building when you worked there, at a time?
18          A.   One.
19          Q.   What about 1101 Manor Avenue?
20    Did you ever work there?
21          A.   Yes.
22          Q.   How many units was that, if you
23    remember?
24          A.   It was more or less about 70 as
25    well.
```

```
 1                      N. ALMONTE
 2         Q.    Same size as --
 3         A.    More or less.
 4         Q.    How many superintendents were
 5    employed at a time at 1101 Manor Avenue?
 6         A.    There were many of them, but at
 7    a time there was always one.
 8         Q.    Now, who hired your son at
 9    1056 -- at -- excuse me, at 437 Morris Park
10    Avenue, to be the superintendent?
11         A.    The manager, Mr. Charley Klahr.
12         Q.    And he interviewed your son?
13         A.    Yes.
14         Q.    When?
15         A.    April, May of 2011.  I'm not
16    sure about the date.
17         Q.    So, you were the superintendent
18    before your son was hired at 437 Morris
19    Park Avenue?
20         A.    Yes.
21         Q.    Okay.  Do you have any
22    explanation why the company would a
23    17-year-old to be the superintendent when
24    you're the superintendent already doing the
25    work?
```

```
1                         N. ALMONTE
2          A.    Yes.
3          Q.    What's your explanation?
4          A.    I did not have my document, uh,
5     in order -- in order to work in the
6     United States.
7          Q.    So, Manuel Almonte was used in
8     order to -- name was used in order to pay
9     you; is that correct?
10         A.    Not exactly.
11         Q.    How is it not exactly correct?
12         A.    Because had it been so, he
13    would not have had to work, and he did have
14    to work.
15         Q.    As superintendent, Manuel
16    Almonte assigned work to you; is that
17    correct?
18         A.    No.
19         Q.    Who assigned work to Manuel
20    Almonte?
21         A.    I would.
22         Q.    Do you have any evidence that
23    you assigned work to Manuel Almonte?
24              MR. VALLETTI:  Just note my
25         objection to form.  He could answer.
```

```
 1                    N. ALMONTE

 2          All I was getting at was "evidence."

 3                    MR. WEINBERGER:  Okay.

 4          Q.    Do you have any documents,

 5    notes, records, anything that shows that

 6    you assigned work to Manuel Almonte?

 7          A.    Yes.  The workorders.

 8          Q.    Do you have any copies of

 9    workorders that you gave Manuel Almonte to

10    do?

11          A.    As I have many and as I have

12    said in the past, there would be an order,

13    a workorder to do a job, and where I was

14    working, he would work.  Many times I would

15    then move to some other place and he would

16    finish the job.

17          Q.    So, you told him what -- he was

18    shadowing you; correct?  You used the

19    phrase shadow, correct, last time?

20          A.    Yes, shadowed.

21          Q.    Do you have any, again,

22    explanation as to why the company would pay

23    two people to do the job that one person

24    was supposed to do?

25                    MR. VALLETTI:  Just note my
```

```
 1                    N. ALMONTE
 2        objection to form, but he could
 3        answer.
 4        A.    One of them had the
 5   documentation and the other one did not.
 6   But what the reason that the company would
 7   do it?  I don't know why they would do it.
 8              MR. WEINBERGER:  Off the
 9        record.
10              (Whereupon, a discussion was
11        held off the record.)
12        Q.    So, the company was paying two
13   people to do one job; is that correct?
14        A.    Yes.
15        Q.    You can identify to us the
16   workorders that were completed by Manuel
17   Almonte, by himself?
18        A.    Well, that went on for two long
19   years, so, exactly which ones were done
20   just by him and which ones were not, that's
21   difficult.  You remember that it was two
22   names and one employee.  Or, rather, two
23   employees, one name.
24        Q.    I'm sorry.  Say that again.
25   You gave two --
```

89

1                    N. ALMONTE

2              (Whereupon, the referred to

3         portion of the record was read back

4          by the reporter.)

5         Q.    Well, you had handymen in the

6    building, correct, for this period?

7         A.    What period?

8         Q.    The two long years.

9         A.    I was superintendent.

10        Q.    But you also had handymen in

11   the building for those two long years, is

12   that correct, at 437 Morris Park Avenue?

13        A.    Every superintendent is a

14   handyman in every building.

15        Q.    Were there handymen working at

16   437 Morris Park in the year 2012?

17        A.    Manuel Almonte, and Nestor

18   Almonte.

19        Q.    And that's it?  There were no

20   other handymen at 437 Morris Park Avenue in

21   2011; is that correct?  I'm just trying to

22   get it clear?

23        A.    If you check the question, the

24   question you had asked me was, was there

25   another superintendent.  I didn't say

```
 1                    N. ALMONTE
 2    anything about handymen.
 3                    MR. VALLETTI:  So, Stu just try
 4              and clarify, if you can.
 5         Q.    Were there handymen working --
 6    titled handymen, working in 2011 at 437
 7    Morris Park Avenue?
 8         A.    Yes.
 9         Q.    Do you know their names?
10         A.    By memory -- well, there were
11    several of them.  A handyman would come by
12    and he would last a week, he would last a
13    month.
14         Q.    Wasn't it the job of the
15    handyman to assist the superintendent?
16         A.    Yes, the superintendents, uh,
17    from the workorders, he would make an
18    extract of what each one would be able to
19    do according to his capacity.
20         Q.    So, is it your testimony --
21    who'd assign the work to the handyman?
22         A.    I was the one who assigned the
23    work.
24         Q.    Okay.  So, you assign the work
25    to everybody in the building?
```

                         N. ALMONTE

1

2        A.     With the exception of the

3    porter who already had a certain rule, a

4    certain pattern to follow.

5        Q.     I have a question for you

6    again.  Not again.  I have a question.   In

7    2012, wasn't everybody who worked in the

8    building supposed to submit a weekly

9    timesheet?

10       A.     Yes.

11       Q.     Okay.  So, where is your

12   timesheet for 2012?

13       A.     There is none because there

14   never appeared one with my name.

15       Q.     Is there a timesheet in

16   somebody else's name reflecting the hours

17   you worked?

18       A.     Every handyman, including my

19   son as a superintendent, had his own

20   timesheet.  I had no documentation, so I

21   had no timesheet.

22       Q.     Isn't it true that the

23   company's policy was: you couldn't be paid

24   unless you submitted a timesheet?

25       A.     That's how it is, yes.

```
1                    N. ALMONTE
2         Q.    Yes.  So, is it your -- how far
3    is the -- you had an apartment that was
4    given to you at 437 Morris Park Avenue as
5    the superintendent; is that correct?
6         A.    Yes.
7         Q.    Is there a company office at
8    437 Morris Park Avenue?
9         A.    At the beginning, that office
10   was located in the lobby; and afterwards,
11   it was moved over to the basement.
12        Q.    How far is your apartment from
13   the -- from the office in the basement?
14   How far was your apartment?
15        A.    It may be a hundred feet away.
16        Q.    How many times, in 2012,
17   staying with 2012, did you tell the company
18   the hours that you worked?
19        A.    When the timesheet would be
20   presented with the name of Manuel Almonte;
21   in other words, that would be the same time
22   in which Manuel Almonte and Nestor Almonte
23   were working.
24        Q.    So, you both worked the exact
25   same hours; is that correct?
```

1                    N. ALMONTE

2          A.    Yes.

3          Q.    So, in other words, the company

4    would -- your testimony is that the company

5    paid you and your son not only to do the

6    same task, but to work exactly the same

7    time doing the same task?

8          A.    Yes.

9          Q.    Do you have any explanation, by

10   the way, of how that could be possible if

11   your son spent time in school, in

12   high school?

13         A.    That was the reason why he had

14   to quit school.

15         Q.    I understand that, but you

16   testified that all the timesheets -- let's

17   say 2012 or 2011 or 2013, up until, let's

18   just say April, reflect exactly the same

19   amount of time that you worked that Manuel

20   worked?

21         A.    This is the way in which the

22   company, the manager demanded of me to do

23   it.  In fact, the hours shown on the

24   timesheets are not exactly the same exact

25   hours that were worked, but by order of the

```
 1                    N. ALMONTE
 2   manager, that had to be completed that way.
 3   There, the work was 24 hours a day, seven
 4   days a week.
 5         Q.    Okay.  So, you worked 24 hours
 6   a day, seven days a week, is that correct,
 7   in 2012?
 8         A.    In a certain way, yes, I did.
 9         Q.    Okay.  We're going to come
10   back.  We'll do this logically to the hours
11   that you worked.
12              So, your testimony is, you're
13   entitled to 168 hours of pay each week
14   which is the number of hours?
15              MR. VALLETTI:  Just note my
16         objection to mischaracterizes of the
17         testimony.
18              MR. WEINBERGER:  Okay.
19         Q.    Your claims, just so I
20   understand -- we're going to come back to
21   specifically each week and each hours -- is
22   that you worked every single hour of every
23   single day and that you're entitled to pay
24   for it?  Is that your claim?
25         A.    Well, for example, if I would
```

```
 1                     N. ALMONTE
 2      use as an example your own job, you work
 3      right here with a certain schedule in your
 4      office.  No one is going to assure me that
 5      during those eight to nine hours you're
 6      going to be each and every one of those
 7      minutes in fact busy, and I say that
 8      because in this company there's something
 9      which is called hotline in which -- on the
10      24 hours, seven days a week, which doesn't
11      mean every minute of every hour, but if for
12      each hour, if there's something like, let's
13      say a complaint, where the hotline would
14      communicate to us, the supers, that
15      something is happening, you have to run and
16      repair that.  There were occasions -- and
17      Mr. Charley Klahr can clarify to you if
18      this is true or not, but when I arrived in
19      those buildings to work, I, at night, would
20      be taking off my pants.  I would be leaving
21      it, sitting on my boots as if I were a
22      fireman.  When the hotline -- they would be
23      calling me on the hotline maybe at 2 a.m.
24      or 3 a.m., I would have to put my feet into
25      my boots, pull up my pants and just set off
```

```
 1                    N. ALMONTE
 2    running because that leakage had to be
 3    stopped before major consequences would
 4    come about.  Consequences such as the very
 5    firemen would come and they would turn off
 6    the water or turn off the electricity, they
 7    would break in the doors to the basement so
 8    as to come in if there was no one to
 9    receive them.  These were things which they
10    did several times --
11         Q.    Okay.
12         A.    -- because the hotline was not
13    calling on time.
14         Q.    We're going to get into the
15    hours in a little bit.
16              The hotline was calling you;
17    correct?
18         A.    I was the one who had the
19    telephone for the company.
20         Q.    Okay.  Your son didn't have a
21    telephone?
22         A.    No, only one was needed.
23         Q.    Okay.
24         A.    There would be an emergency and
25    it was just, "Manuel, let's go."
```

```
 1                    N. ALMONTE
 2        Q.    So, you took Manuel by
 3   yourself?  You decided, without calling the
 4   company, if there was an emergency, that
 5   you would take Manuel with you; is that
 6   correct?
 7               MR. VALLETTI:  Note my
 8          objection to form.
 9        A.    No.  The decision came from the
10   manager, Mr. Charley Klahr.  For each job,
11   since Manuel Almonte's name was there,
12   Mr. Manuel Almonte had to be present there
13   even if it were I who were doing the job --
14        Q.    Okay.  So --
15        A.    -- in front of him.
16        Q.    -- your testimony is in front
17   of -- by the way, do you understand this is
18   being given under oath, first of all?
19        A.    Correct.
20        Q.    You understand.
21               And you understand that you're
22   required to tell the truth?  I'm just
23   asking.
24        A.    I understand it.
25        Q.    So, we're going to, again, go
```

```
 1                    N. ALMONTE
 2    into more detail.
 3                  So, if we bring in -- if
 4    somebody from, for example, Aguila --
 5                  THE INTERPRETER:  Who?
 6                  MR. WEINBERGER:  Aguila,
 7          that's --
 8          Q.    What witness do you have --
 9    excuse me.  Aguila did work in the
10    building, right?
11          A.    Yes.
12          Q.    Who from Aguila, that you know
13    of, witnessed your son doing work in the
14    building?
15          A.    Two of them.
16          Q.    Who?
17          A.    Mr. Orlando -- I don't remember
18    his last name.
19          Q.    What about Soto?  Does that
20    ring a bell?
21          A.    I don't remember Soto to have
22    coincided, to have been there at the same
23    time with my son in any job.
24          Q.    Was he there when Soto -- Soto
25    ever see you work by yourself, without your
```

```
 1                    N. ALMONTE
 2     son?
 3           A.    Alone and --
 4           Q.    Yes.
 5           A.    -- without my son?
 6           Q.    Yes.
 7           A.    Soto didn't used to go that
 8     much to the building.  He was a supervisor.
 9     He was always outside.
10           Q.    I didn't ask.  You got to --
11     please listen to the question and answer
12     this.  It's going to take a long time if we
13     don't.
14                 Did Soto ever see you work with
15     your son, as far as you know?
16           A.    I don't remember.
17           Q.    Okay.  Orlando.  When
18     Orlando -- again, I have to go back to --
19     I'm going to try to do it in sequence here.
20                 When did Orlando see your son
21     working by himself -- let's start with by
22     himself -- in any time that you were at the
23     building, 437 Morris Park?  And please tell
24     us what job you were doing?
25                 MR. VALLETTI:  Just note my
```

1                    N. ALMONTE

2          objection, please.

3          Q.    He was doing.

4          A.    Almost always.

5          Q.    I didn't ask -- I said

6    specifically.  Give me a specific job and a

7    specific instance and a specific apartment,

8    a specific year, if you can.  One.

9               MR. VALLETTI:  Note my

10          objection.

11               If you can remember, to the

12          best of your recollection.

13          A.    I can't remember that.  He was

14   always there painting apartments with me.

15          Q.    What record did you hand into

16   the company -- I'm going to go back to

17   this -- showing Charley Klahr, anybody in

18   the company, showing that Manuel did the

19   work?

20          A.    He had -- he would receive

21   payment and -- a check for this job and he

22   had a timesheet for this job.

23          Q.    I didn't -- again, please

24   listen to the question.  If you don't

25   understand the question, I'll rephrase it.

```
 1                    N. ALMONTE
 2              What document, record, besides
 3    a timesheet, did you submit or Manuel
 4    submit showing that he did -- Manuel, not
 5    you, not --
 6         A.    It was the timesheet -- that
 7    was the only document that was there for
 8    the company -- in combination with the
 9    workorder.  I just know the term workorder.
10    I don't know what the term would be in
11    Spanish.
12         Q.    I'm asking a very simple
13    question.  What document -- and if you
14    don't understand it, again, I'm going to
15    rephrase it.  I'll try and rephrase it.
16              What document do you have that
17    you've -- that was submitted or, you know,
18    was submitted showing that Manuel Almonte
19    did work in an apartment?  We'll start by
20    himself.  By himself.
21              MR. VALLETTI:  Note my
22         objection.  Asked and answered.
23              MR. WEINBERGER:  It wasn't.
24              MR. VALLETTI:  He gave you two
25         answers.  He gave you timesheet and
```

1                    N. ALMONTE

2        workorders, Stu.

3            MR. WEINBERGER:  He's

4        not answered the workorders.

5            MR. VALLETTI:  He's answered

6        two.  Two things he gave you.

7            MR. WEINBERGER:  Okay.  He

8        hasn't answered the question.

9            MR. VALLETTI:  He has.  You've

10       asked it twice, so you move on to the

11       next question, not him.  He's given

12       you the best answer he got.

13           MR. WEINBERGER:  Okay.  We're

14       going to call the judge.

15           MR. VALLETTI:  Call the judge

16       then.

17       Q.    Answer the question.

18           MR. VALLETTI:  You've asked it

19       twice.

20           MR. WEINBERGER:  All right.

21       Rob, he hasn't answered the question.

22           MR. VALLETTI:  He said

23       timesheets and workorders.

24       Q.    What work --

25           MR. VALLETTI:  Read it back.

                    N. ALMONTE

1

2       Q.     What workorders did you -- did

3   he give to the company showing that he

4   himself did the job?  And please --

5       A.     It's very simple.  Every

6   workorder received every week or every two

7   weeks at the end of the description

8   indicating the -- the fixing that had to be

9   done in an apartment, you would write which

10  handyman did that work.  Many of them

11  simply said super.  They would just write

12  super and never -- never the name.  Never

13  Nestor Almonte or Manuel Almonte, just

14  super, when it was the super.

15      Q.     Who wrote the name super on

16  there?

17      A.     I myself would write it.

18      Q.     Is there any document that has

19  Manuel Almonte's name, any workorder that

20  has Manuel Almonte's name, signature,

21  anything on it, that you know?

22      A.     It may be, but normally,

23  regularly, what would be written would

24  be -- because this was understood between

25  the manager and us, but there may be one.

                         N. ALMONTE
1
2    I would have to go and check to see that.
3         Q.    We're going to go through the
4    workorders in a minute.  We're going to get
5    a chance.
6              Now, tell me, at 17 years old,
7    what experience did Manuel Almonte have as
8    a superintendent?
9         A.    He had the documents to work.
10   The experience was something that I had.
11        Q.    So, is it your -- what work
12   experience -- please answer the question.
13             What work experience --
14        A.    That's what I'm doing (in
15   English).
16        Q.    -- did Manuel Almonte have as a
17   superintendent before May of 2011 or
18   April 2011?
19        A.    None, and the manager knew it.
20        Q.    How did the manager know it?
21        A.    Because he asked me himself
22   what experience was it that my son had.  I
23   said the experience that my son has is
24   doing painting, simple construction work,
25   which he has learned from me.  It was then

1                          N. ALMONTE

2      that the manager suggested then it doesn't

3      matter; he is going to be doing the work

4      and you're going to be followed by him due

5      to your experience; that is, you will be

6      assuring yourself that the job is well done

7      because you do have the experience.

8           Q.    So, in other words, the

9      company -- again, just to be clear, the

10     company gave you the work because you had

11     the experience; correct?

12          A.    Correct.

13          Q.    You were supposed to be paid

14     because you didn't have the documents

15     through your son Manuel; is that correct?

16     Yes or no?

17          A.    You previously already asked me

18     that question already, and I answered that

19     if it had been so, he would have not had to

20     work.  If you check the record of what has

21     been written, you'll see that this is the

22     second time you asked me the same question

23     and I've given you the same answer.

24          Q.    Did your wife ever see you and

25     your son working together?

1                    N. ALMONTE

2          A.     No.

3          Q.     In all the two and a half --

4     two years or so, your wife never saw you

5     working together?

6          A.     No.  My wife was tending to the

7     home.  My wife was never in the building in

8     a place of work.

9          Q.     In two years, from 2011

10    through 2013 --

11               MR. VALLETTI:  Let him finish

12          the question.

13          Q.     She was not in the building at

14    all, other than your apartment?

15          A.     She would get -- she, at a

16    certain time, would get to the lobby so as

17    to see the mailboxes, check on that.  And

18    beyond the lobby she -- she never went, not

19    as far as I know.  My wife never used the

20    elevator so as to go up to any apartment.

21    She never knew anyone there.

22          Q.     You know we -- you -- you know

23    Wilton Munoz; correct?

24          A.     Wilton.

25          Q.     Did Wilton Munoz ever see you

```
 1                    N. ALMONTE
 2    and your son working in the building
 3    together, if you know?
 4         A.    He would see that we worked
 5    together, but he never was inside an
 6    apartment where we would be working.  He
 7    didn't work there.  Wilton never worked at
 8    Morris Park when I was the super.  I don't
 9    know if he did previously.
10         Q.    So, did you ever see -- did
11    Wilton ever see your son, if you know, work
12    in the building at 437 Morris Park Avenue,
13    if you know?
14         A.    He would see him wearing his
15    work clothes every day, but as for doing a
16    specific job, no, not that.
17         Q.    So, Wilton saw him wearing his
18    work clothes every day; is that correct?
19              MR. VALLETTI:  Note my
20          objection, please.
21              MR. WEINBERGER:  That's what he
22          just said.
23         A.    Not every day, because Wilton
24    didn't work at 437 Morris Park.  Wilton may
25    have gone to Morris Park every -- once a
```

```
 1                    N. ALMONTE
 2   month or every two months, to the offices.
 3         Q.    What work did your son do as a
 4   construction worker in 2012 or 2013?
 5              MR. VALLETTI:  Just note my
 6          objection as a construction worker.
 7          I don't even understand what you mean
 8          by construction worker.
 9              MR. WEINBERGER:  He
10          understands.
11              MR. VALLETTI:  You can -- all
12          right, if you can.
13         A.    Now, the work -- the jobs that
14   my construction -- that my son would do
15   would be the milder, easier kinds of jobs.
16   The harder kinds of jobs were my own, doing
17   painting, polishing.
18         Q.    Did your son do any
19   construction jobs outside of the building
20   in 2012 and 2013?
21         A.    Not that I know of.
22         Q.    Did he work for a construction
23   company or any other company -- let's
24   start:  In 2012, in 2013, did he work at
25   any other place, outside of the buildings
```

```
 1                    N. ALMONTE
 2   owned by these defendants?  And I'm saying
 3   it -- wait.  Before you -- okay.  Before
 4   you answer, I have another part to that.
 5                THE INTERPRETER:  Go ahead, go
 6         ahead.
 7        Q.    When I'm talking about
 8   buildings, I'm talking about 1101 Manor,
 9   1195 Sherman, 437 Morris Park, the
10   building.
11                THE INTERPRETER:  Can I have
12         that back?
13                (Whereupon, the referred to
14         portion was read back by the
15         reporter.)
16        A.    Not by himself.  He knew the
17   buildings.  He might accompany me to one of
18   those buildings to do some job.
19        Q.    I'm asking a different
20   question.  If you don't understand, again,
21   just please tell me.
22                Did he work at -- your son,
23   Manuel, in 2011, '12 or '13, work at any
24   jobs, having nothing to do with the
25   buildings I just mentioned; for example,
```

1                      N. ALMONTE
2    did he work in a candy store?  Did he work
3    anyplace else?
4            A.    Not while he worked as the
5    super for this company.
6            Q.    So, when did he get another
7    job?
8            A.    He worked temporarily for a UPS
9    job two, three weeks.
10           Q.    When was that?
11           A.    That was when things got a bit
12   tight at UPS, like December of 2012 or
13   2013.  I'm not too sure.  It was 2013.
14           Q.    What about, did he work at all
15   in 2012, at any other jobs?  I'm talking
16   about Manuel.
17           A.    No.
18           Q.    Were you given any tools for
19   work at 437 Morris Park Avenue, when you
20   started at Morris Park Avenue?
21           A.    When they gave me personally
22   any tools you're saying?
23           Q.    Yes.
24           A.    I brought in all my own tools.
25   What was there were some of these snake

```
 1                    N. ALMONTE
 2   things for the sewage.
 3        Q.    Did the company give Manuel
 4   Almonte any tools, for all the time that he
 5   worked there, directly?  Did the company
 6   directly give him any tools for all the
 7   time?
 8             MR. VALLETTI:  Just note my
 9        objection.  He could answer.
10        A.    The company never would give
11   anyone anything to work, outside of the
12   snakes.
13        Q.    Unfortunately I'm going to have
14   to ask you.  Do you have a driver's
15   license?
16        A.    No.
17        Q.    Did you ever provide a driver's
18   license to the company?
19        A.    No, sir.
20        Q.    Do you have anything on you
21   that has your handwriting, that you signed?
22        A.    My ID, of course.
23        Q.    Could I see that, by the way,
24   because I . . .
25        A.    (Handing.)
```

```
 1                  N. ALMONTE
 2            MR. VALLETTI:  Good luck with
 3         that (handing).
 4            MR. WEINBERGER:  Off the
 5         record.
 6            (Whereupon, a discussion was
 7         held off the record.)
 8       Q.    Did you have authority to go to
 9   stores to purchase items?
10       A.    No.  I would pass over the
11   orders to the manager and I would give him
12   the orders.  I would receive the -- the
13   merchandise.
14       Q.    Did you ever submit receipts to
15   the company that you were paid for?
16       A.    I don't understand.
17       Q.    Well, did you ever indicate at
18   some point that you had purchased items and
19   asked to be reimbursed?
20       A.    Yes.
21       Q.    And do you remember when that
22   was, if you remember?
23       A.    All the time I worked.
24       Q.    And that was submitted in what
25   name?
```

```
 1                    N. ALMONTE
 2        A.    Everything was managed under
 3   the name of Manuel Almonte.
 4        Q.    So you submitted your receipts
 5   under the name of Manuel Almonte?
 6        A.    No.   Receipts had no name on
 7   them.
 8        Q.    But you asked for payment under
 9   the name of Manuel Almonte?
10        A.    No.   The company would pay me
11   under the name of those -- of Manuel
12   Almonte; that is, it would pay for those
13   items.
14        Q.    Did you ever sign for items
15   that were received at the building?
16        A.    Of course.
17        Q.    And --
18        A.    Yes.
19        Q.    Okay.   And you signed in front
20   of people your name, correct, when you
21   signed for those receipts?
22        A.    No.   I followed the manager's
23   instructions:   "Everything that you sign,
24   if your son is not there, you would sign
25   using your son's name."   Those were the
```

1                    N. ALMONTE
2    instructions so that I would not lose my
3    job.
4         Q.    Okay.  So you signed the name
5    Manuel Almonte; correct?
6         A.    On many occasions.
7         Q.    Okay.  Tell us those occasions
8    when you would.  Not every single one, but
9    the ones you remember.  And when would you
10   sign the name Manuel Almonte?
11        A.    As I already have said to you,
12   when there would be a delivery that would
13   arrive, if my son were not there with me, I
14   would sign for the driver in order to
15   receive these items.  I would check to see
16   that everything was there.
17        Q.    Tell us the companies that you
18   signed for using the name Manuel Almonte.
19        A.    For example, Elmax; the
20   plumbing company, whose name I don't
21   remember.  The plumbing supply, I don't
22   remember the name of the company.
23        Q.    What other companies do you
24   remember?
25        A.    The one for paints.

1                    N. ALMONTE

2          Q.    What about exterminators, did

3    you sign?

4          A.    For exterminators?  There were

5    some occasions.  In many cases it was the

6    case managers who would go with the

7    exterminators to those jobs.

8          Q.    I'm asking:  Did you sign the

9    name Manuel Almonte?

10         A.    Yes.

11         Q.    What about if you did any work

12   with Aguila, Aguila, did you sign Manuel

13   Almonte's name?

14         A.    I had no job to do with Aguila.

15   I didn't work with Aguila.

16         Q.    What about furniture or

17   repairs, did you sign Manuel Almonte's

18   name?

19         A.    Furniture was not a part of my

20   job.  It was Aguila who did those jobs.

21         Q.    Okay.

22              MR. VALLETTI:  Off the record.

23              (Whereupon, a discussion was

24         held off the record.)

25         Q.    When did the company say that

1                    N. ALMONTE
2     you should sign your son's name to these
3     bills or invoices?
4          A.     Since it contracted us for the
5     job.
6          Q.     I asked you -- please listen to
7     the questions.
8                 When did the company tell
9     you -- not us, you -- that you could sign
10    your son's name?
11         A.     At the moment in which the
12    company decided that it would be my son's
13    name that would be appearing on everything.
14    That was something that was spoken about
15    very clearly there at a table.
16         Q.     When?  And where was the table?
17         A.     April or May of 2011.
18         Q.     And where was the table?
19         A.     The office's apartment which
20    was located in the lobby.
21         Q.     Who was there during this
22    conversation?
23         A.     Manuel Almonte, Charley Klahr,
24    and Nestor Almonte.
25         Q.     Did you sign Manuel Almonte's

```
 1                   N. ALMONTE
 2   name for invoices or bills involving
 3   Millennium Elevator Company?
 4        A.    For any company, if Manuel
 5   Almonte would not be present, I did sign.
 6   I would sign by order of Mr. Charley Klahr.
 7        Q.    Okay.  What companies, that you
 8   know of, did Manuel Almonte personally sign
 9   a bill or an invoice?
10        A.    For Elmax, for Millennium.  The
11   same companies that I signed for.  On many
12   occasions he also was the one who signed.
13        Q.    In their presence?
14             MR. VALLETTI:  Just, objection.
15        A.    Who are they?
16        Q.    In the company's presence,
17   Elmax, Millennium, all of these companies,
18   did he ever --
19             MR. VALLETTI:  Note my
20          objection.
21             MR. WEINBERGER:  I didn't
22          finish the question.
23        Q.    Did Manuel Almonte ever sign a
24   bill or an invoice in the presence of Elmax
25   plumbing, the painters, the exterminators,
```

1                    N. ALMONTE
2      Millennium?
3           A.    In the presence of the drivers
4      who would do the deliveries.
5           Q.    Do you have the name of any
6      specific driver?
7           A.    No.  That's impossible.
8           Q.    Do you have any specific
9      timeframe where this was done?
10          A.    From 2011 to 2013.
11          Q.    Did you ever go to Elmax?
12          A.    I think I did go once, one day,
13     for something having to do with a door, to
14     go get a door.
15          Q.    Do you know what year that was?
16          A.    No.
17          Q.    Any other times did you go to
18     Elmax?
19          A.    No.  I think for the whole
20     time, if I went, I went once, maybe on two
21     occasions.  Everything was done by
22     delivery.
23          Q.    And when you went to Elmax on
24     those occasions, what name did you sign?
25          A.    If the super was Manuel

```
 1                      N. ALMONTE
 2   Almonte, on those occasions he would sign.
 3   If I was the super, then I would sign under
 4   my name with my signature.
 5         Q.    I'm talking about the times you
 6   went to Elmax, what name did you sign
 7   under?
 8         A.    Under my name.
 9         Q.    Which name was?
10         A.    Nestor Almonte.
11         Q.    And that was the time -- did
12   you ever sign your name, Nestor Almonte,
13   while Manuel Almonte was the
14   superintendent, at Elmax?
15               MR. VALLETTI:  Note my
16          objection.
17         A.    No.
18               MR. VALLETTI:  You could
19          answer.
20         Q.    When did Manuel Almonte stop
21   working at 437 Morris Park?
22         A.    Approximately -- well,
23   completely so around June of 2013, more or
24   less.
25         Q.    Did Manuel Almonte submit
```

1                    N. ALMONTE

2    timesheets up until the time he stopped in

3    June of 2013, if you know?

4         A.    Yes.

5         Q.    Now, going back to the

6    submission of timesheets.  Isn't it true

7    that the superintendent would sign in the

8    employees in, let's say 2012?

9         A.    If he were present.  If not,

10   the security would sign in for the

11   employees, like a timesheet.

12              MR. VALLETTI:  Let's go off the

13          record for a second.

14              (Whereupon, a discussion was

15          held off the record.)

16         Q.    Would the superintendent sign

17   in the employees when they came in?

18         A.    If he were present.  If not,

19   the security would have to sign them in.

20   Somebody had to do that.

21         Q.    Did the superintendent have to

22   sign off on the timesheets in the presence

23   of the employees?

24         A.    Correct.

25         Q.    Okay.  Now, did you ever sign

121

1                    N. ALMONTE

2     Manuel Almonte's name -- the name Manuel

3     Almonte in the presence of these employees

4     in 2012?

5          A.    Of course I did.

6          Q.    What about 2011?  Did you sign

7     the name Manuel Almonte on all these

8     employees' timesheets in 2011?

9          A.    If Manuel were not present.

10          Q.    Is it your testimony that

11     Manuel Almonte signed these employees in in

12     the morning in 2011?  I'm talking about the

13     handymen.

14               MR. VALLETTI:  Just note my

15          objection to form.  He could answer.

16          A.    Manuel Almonte would sign.

17     Yes, of course he would.  I repeat as

18     previously: if Manuel Almonte were present,

19     he would sign.  And why would I be signing

20     if he were there?

21          Q.    Please answer the question.

22     I'm asking the question.  If you don't

23     understand, I'm going to ask you to

24     rephrase it.  It's yes or no.

25               Let's start in 2011.  There

```
 1                    N. ALMONTE
 2   were timesheets submitted, at least in
 3   2011, by various employees, the handyman,
 4   the porter, right?
 5        A.    Could you repeat the question?
 6        Q.    Okay.  Let's go slow.
 7              In 2011, let's say November and
 8   December, if you remember, employees,
 9   handyman, porter -- I'm not talking about
10   you or your son -- had to submit
11   timesheets, right?
12              MR. VALLETTI:  Just, objection.
13          Asked and answered.
14        A.    To the super.
15              MR. VALLETTI:  He could answer.
16        Q.    To you?
17        A.    To me.
18        Q.    And you signed off on them?
19        A.    I wouldn't receive those
20   documents, but, rather, every time they
21   would come in -- come in or out, they -- I
22   would sign.  At the end of the week they
23   had to hand over to me those timesheets
24   signed by them in order to then do a fax to
25   the paying company.
```

1                        N. ALMONTE

2          Q.     And you signed those sheets in

3     the name of Manuel Almonte, did you not, in

4     2011?

5          A.     If Manuel Almonte were not

6     present, yes, I would, by order of the

7     manager.

8          Q.     I didn't ask -- I'm asking --

9     okay.  Let's ask it this way.

10               MR. VALLETTI:  He already

11          answered, so --

12               MR. WEINBERGER:  No, it's fine.

13               MR. VALLETTI:  Go ahead.

14          Q.     Tell me, in the -- did you sign

15     the name Manuel Almonte on these timesheets

16     in the presence of employees in 2011?

17          A.     Yes.

18               MR. VALLETTI:  Wait till he

19          finishes the translation.  It's okay.

20          I know, he's asked a couple of times

21          the same question.  Just humor him.

22               MR. WEINBERGER:  Okay.  Thank

23          you.

24          Q.     In 2012, did you sign

25     employees' timesheets, handymen, porters,

```
 1                        N. ALMONTE
 2    in the name of Manuel Almonte?
 3          A.    Since 2011 up to 2013, all the
 4    time that Mr. Manuel Almonte was employee
 5    of --
 6          Q.    I'm going to ask that -- slow
 7    down, first of all.
 8                MR. WEINBERGER:  You might as
 9          well translate that.  And I'm going
10          to ask -- do you want to translate
11          that first?
12          A.    If Mr. Manuel Almonte were not
13    present, I would sign for Mr. Manuel
14    Almonte, by order of Mr. Charley Klahr.
15                THE INTERPRETER:  And by the
16          way, I have to have clarity in what I
17          do.
18                MR. WEINBERGER:  Agreed.
19                THE INTERPRETER:  So, I'm
20          sorry, sir, but he has -- he has to
21          control what he's saying so that I
22          get what he's saying.  If I have to
23          interrupt him, I'm going to begin
24          losing the witness, the testimony.
25          Q.    Just slow down.  Calm down,
```

1                          N. ALMONTE

2       please.

3                  Now, what employees, that you

4       know of, could be a witness that Manuel

5       Almonte signed his or her timesheet in

6       their presence in 2012?

7            A.    Jose Gonzalez, William Ramos,

8       Jonathan -- I don't remember his last name.

9       Jonathan Duran, and any of the employees

10      that the company had as employees and,

11      during that time, in its payroll.

12           Q.    What individuals, that you know

13      of, that you saw, in your presence -- your

14      presence, right?  In your presence, what

15      individuals were there, the employees --

16      we'll ask it 2012, signed a time -- had the

17      timesheet, when the employee was present

18      and you were present and Manuel was

19      present, signed by Manuel?

20                  MR. VALLETTI:  Just note my

21            objection.  I need clarification on

22            that question because I don't

23            understand it.

24                  MR. WEINBERGER:  Okay.  We'll

25            ask it a different way.

```
 1                    N. ALMONTE
 2            MR. VALLETTI:  Please do.
 3       Q.    In 2012 -- I'm talking about
 4   the year -- when, in your presence and in
 5   the presence of the employee, let's take
 6   any of those that you named, and your son,
 7   did your son sign his name on a timesheet
 8   of that employee?
 9       A.    Which is the question?  In
10   front of which employee or the date or
11   what?
12       Q.    I'm going to ask again.  I'll
13   ask it a different way.
14            MR. VALLETTI:  Do you
15        understand the question?
16       Q.    If you don't understand it --
17            MR. VALLETTI:  All right.  So
18        he doesn't understand it.
19       Q.    When, in 2013, were you present
20   with your son and with another employee
21   when your son signed his name as Manuel
22   Almonte on that employee's timesheet?
23            MR. VALLETTI:  Just note my
24        objection to form.  He could answer.
25       A.    I still continue without
```

```
 1                      N. ALMONTE
 2    understanding that question.  That has no
 3    sense, makes no sense.
 4         Q.    Why doesn't it make no sense?
 5         A.    Could it be clearer?
 6         Q.    Okay.  You testified your son
 7    signed timesheets in 2013 for employees
 8    other than you and your son; is that true
 9    or not?
10              THE INTERPRETER:  I'm sorry.  I
11         don't understand the question.  I'm
12         sorry.
13              (Whereupon, the referred to
14         portion of the record was read back
15         by the reporter.)
16         A.    Yes.
17         Q.    And in your presence, let's --
18    again, only in 2013 and only when you were
19    present, did you see your son sign a
20    timesheet with that other employee also
21    being present for that employee?
22         A.    Many times.
23         Q.    Tell us what employees in 2013
24    did you see this?  Again, we're just
25    referring to the situation where you were
```

1                          N. ALMONTE

2      present, your son was present, and the

3      employee was present and your son, not you,

4      signed the name Manuel Almonte.

5           A.    The only name I do remember was

6      Jose Gonzalez, because he was the porter

7      and he was there every day.  The porter

8      works only in one building.  Any other

9      employee that may have worked during the

10     week, if you check the company's record you

11     will find, and they can testify whether

12     Manuel Almonte signed the timesheet for

13     them at that time or not.

14          Q.    I'm not asking them.  Please

15     listen to the question.

16                Those employees, did they

17     see -- were they present when Manuel

18     Almonte, in your presence, signed his name

19     on the timesheets?

20                MR. VALLETTI:  Just note my

21           objection to form.

22          A.    Yes.

23          Q.    Besides Jose Gonzalez, who was

24     that?

25          A.    I don't remember the names

1                          N. ALMONTE

2    of -- I'm saying William Ramos.  I'm not

3    very familiar with names.  Somebody

4    mentions his name Tom and after a while I

5    don't remember.

6         Q.    Can you tell us why your son,

7    Manuel Almonte, would have to sign it if

8    you signed his name on other occasions?

9         A.    On the occasions in which I

10   would sign, it was because he was not

11   present, and that was by order of the

12   manager.  If he were present, I didn't have

13   to sign because he's there himself to do

14   his own handwriting with his own pencil.

15        Q.    How many times -- let's go to

16   2013, because that's closer.

17             How many times did you sign

18   Manuel Almonte's name, if you remember,

19   approximately, in 2014 -- '13, excuse me,

20   before you changed your name to Nestor?

21             MR. VALLETTI:  Note my

22             objection, first.  Can I have a

23             read-back on that?

24             (Whereupon, the referred to

25             portion of the record was read back

```
1                    N. ALMONTE
2        by the reporter.)
3             MR. VALLETTI:  Don't answer
4        that question because he never said
5        that.  Change your question if you
6        want an --
7             MR. WEINBERGER:  No, he could
8        answer it.  If he could answer it
9        never happened, it did happen --
10            MR. VALLETTI:  Okay.
11            You could answer.  You could
12        answer.
13       A.    I never changed my name (in
14   English).
15            MR. VALLETTI:  In English.
16       A.    I never changed my name.
17       Q.    Okay.
18            MR. VALLETTI:  You answered the
19        question.
20            MR. WEINBERGER:  Okay.
21            MR. VALLETTI:  Next question.
22       Q.    How many times in 2013 -- let's
23   ask it differently.
24            Did you sign these timesheets
25   in 2013, in Manuel's name, more than Manuel
```

131

```
 1                        N. ALMONTE
 2     did or less than Manuel did?
 3          A.     Less.
 4          Q.     By the way, did you submit any
 5     timesheets in 2013, before 2013, up until
 6     June of 2013?
 7                 THE INTERPRETER:  Again.
 8                 (Whereupon, the referred to
 9               portion of the record was read back
10               by the reporter.)
11          A.     Since April of 2013, when the
12     company named me super, Nestor Almonte,
13     super, because I then had already received
14     my Social Security and my documentation for
15     me to work legally in the United States.
16          Q.     So, after April of -- starting
17     in April 2013 till June of 2013, you
18     submitted a timesheet and Manuel Almonte
19     submitted a timesheet; is that correct?
20          A.     He would hand that over to me,
21     the same as all other employees.
22          Q.     And you submitted a timesheet
23     for Nestor Almonte and Manuel Almonte for
24     those two months; is that correct?
25          A.     For Nestor Almonte, as
```

```
 1                        N. ALMONTE
 2    superintendent; and as handyman, Manuel
 3    Almonte.
 4         Q.    So, the answer is yes or no.
 5    Did you submit two timesheets, one for
 6    Nestor Almonte and one for Manuel Almonte,
 7    from April 2013 to June 2013?  Yes or no?
 8              MR. VALLETTI:  Just note my
 9         objection to form.  I think it needs
10         clarification before he answers,
11         because he received Manuel's
12         timesheets and submitted them.
13         That's what he just testified to, so,
14         if you want to break it down --
15              MR. WEINBERGER:  I'm asking,
16         did he submit both timesheets.
17              MR. VALLETTI:  Okay.  So submit
18         to who?
19         Q.    Did you sign to the company,
20    from April 2013, a timesheet for you and a
21    timesheet for Manuel?
22         A.    Yes.
23         Q.    So you submitted two
24    timesheets?
25         A.    One as superintendent and the
```

```
 1                    N. ALMONTE
 2   other one as handyman, that was Manuel.
 3        Q.    And you have a record saying
 4   that Manuel was the handyman from
 5   April 2013 to June 2013; any record,
 6   document?
 7        A.    Yes, Mr. --
 8        Q.    You got to slow down.  Let him
 9   translate first.  Charley Klahr?
10        A.    Mr. Charlie Klahr --
11             THE INTERPRETER:  I'm sorry.  I
12        lost it.
13             MR. WEINBERGER:  Can you read
14        back the question, and go slowly,
15        please.
16        A.    From April of 2013, when Manuel
17   Almonte, as superintendent, went over to
18   become handyman, Mr. Charley Klahr asked me
19   to make a timesheet different from that of
20   the super as handyman, which are different
21   positions, or employer.  I don't know
22   exactly.
23             MR. VALLETTI:  Roving.
24        A.    Roving employees, that's what
25   it heads at the top of the timesheets.  But
```

```
 1                    N. ALMONTE
 2    that was something so as to fill out some
 3    space within the company, I don't know
 4    what, or to justify the transfer, Manuel
 5    Almonte's transfer from super to handyman.
 6    I never received for those timesheets, nor
 7    did Manuel Almonte receive a check for
 8    those hours that were worked as handyman in
 9    the name of Manuel Almonte.
10         Q.    Okay.  Let's break that down.
11    And do you understand -- again, I'm just
12    going to repeat the last time.  You're here
13    to tell the truth.  Do you understand that?
14    Right?
15              MR. VALLETTI:  Note my
16         objection.  Asked and answered.  You
17         could move on, Stu.  He's telling the
18         truth, so let's go.
19              MR. WEINBERGER:  He's telling
20         the truth?
21              MR. VALLETTI:  Yes, he's
22         telling the truth.
23              MR. WEINBERGER:  Absolutely he
24         is.
25              MR. VALLETTI:  Do you have
```

```
 1                    N. ALMONTE
 2         something to say on the record,
 3         Mr. Klahr?
 4              MR. WEINBERGER:  No, he's not
 5         allowed to say.
 6              MR. VALLETTI:  Well, he just
 7         said, yes, he is.
 8              Just let the record reflect
 9         that Charley Klahr said yes, he's
10         lying, or something to that effect.
11              MR. WEINBERGER:  He's not
12         supposed to comment.
13              MR. VALLETTI:  Okay.  That's
14         good.
15              MR. WEINBERGER:  No comments,
16         please.  We're doing this in a civil
17         way.  Everybody conducts themselves
18         civilly and that's the way it always
19         should be conducted.
20         Q.    Now, let's go back to this.
21              Is it your testimony that you
22    weren't given extra work, you, Mr. Nestor
23    Almonte, to do extra work at 1195 Sherman
24    avenue and other buildings, in 2013?
25         A.    Since December of 2011, with
```

```
 1                    N. ALMONTE
 2    Manuel Almonte as superintendent of 437
 3    Morris Park, a hundred dollars would
 4    also -- a hundred dollars the more were
 5    also given him so as to work at Sherman.
 6         Q.    A hundred dollars for who?
 7         A.    Manuel Almonte.
 8         Q.    So, Manuel Almonte worked at
 9    1195 Sherman Avenue?  Is that your
10    testimony?
11         A.    Yes.
12         Q.    Okay, keep going.  I'm -- but
13    I'm talking about 2013.  So, let's go back
14    to 2013.
15         A.    Okay.
16         Q.    You answered something, so
17    please try -- wait, wait, wait.  Calm down.
18    Let's go slow.  Easy.  Everybody -- I know
19    it's long.  You have to listen to the
20    question.  We're talking about the roving
21    timesheet in 2013, okay?  So, we're talking
22    about that time.  We're not talking about
23    2011.  We're going to get to that, if we
24    can, if we can finish this.
25                    Now, in 2013 you testified that
```

1                        N. ALMONTE
2    there was a roving timesheet for handymen,
3    for the time Manuel was a handyman.  Do you
4    have any copies of that roving timesheet
5    which shows that Manuel was the handyman?
6         A.    I don't have it with me.  I
7    would have to go and check and see some
8    documents that I have.  And you must
9    remember one thing.  I did not make a copy
10   of each document.  It's many of them, but
11   not to each of them.
12        Q.    Okay.  We're going to go
13   through -- we're going to go through this
14   in a second.  So, is it -- so on -- and
15   we're going to go through specific ones,
16   so, you can take a look at them.  So, your
17   testimony is just -- and let me break it
18   down, just so I understand.
19             From April through June or
20   in -- Mr. Manuel Almonte stopped working;
21   he would go to other buildings and fill out
22   a roving timesheet; is that correct?
23        A.    No, because he was no longer
24   working for the company.
25        Q.    I'm talking about from April --

```
 1                    N. ALMONTE
 2   you got to listen to the question, please.
 3                    From April 2013 through
 4   June 2013, was a roving timesheet filled
 5   out by you or anybody else, for work that
 6   Manuel did?
 7        A.    Yes.
 8        Q.    And that work was done on this
 9   roving timesheet, your testimony is you
10   didn't do the work, Manuel did the work?
11   And referring again to this April and
12   June 2013.
13        A.    No.  From April, Manuel did not
14   again return to Sherman.  That's in 2013.
15        Q.    Okay.  Did Manuel -- let's
16   clear this up again.
17                    Did Manuel work outside the
18   building in April 2013 through June of
19   2013?
20        A.    I don't remember exactly.
21        Q.    Did you work outside the
22   building from June -- April 2013 to
23   June 2013?
24        A.    Yes.
25        Q.    Did you keep a time record of
```

1                         N. ALMONTE

2      that?

3            A.    Of course.

4            Q.    And did you sign your name as

5      Manuel or Nestor Almonte when you kept the

6      record between April of 2013 and June of

7      2013?

8            A.    I would sign my own name,

9      Nestor Almonte.  I was already the super.

10           Q.    So, you signed on these roving

11     timesheets Nestor Almonte?

12           A.    Yes.

13           Q.    And Manuel Almonte never

14     completed a roving timesheet from April of

15     2013 through June of 2013?

16           A.    Yes, Manuel Almonte did

17     complete timesheets from April of 2013 to

18     June of 2013.

19           Q.    Was it a roving timesheet

20     completed by Manuel Almonte or a different

21     timesheet?  What timesheet was signed by

22     Manuel Almonte?

23                 MR. VALLETTI:  Just note my

24           objection.  He could answer.

25           A.    After April it was the roving.

1                    N. ALMONTE
2    I would do the super.
3          Q.    Did Manuel Almonte do the work
4    stated on these roving timesheets?
5          A.    Yes.
6          Q.    So, these roving timesheets
7    said there was work at buildings, like 1195
8    Sherman Avenue, right?  So, he did the work
9    there?
10          A.    It's possible.  But I don't
11    remember exactly, but it is possible.
12          Q.    So, if he did the work, Manuel,
13    you didn't do the work then in these
14    buildings that were stated on the roving
15    timesheet; correct?
16          A.    Not the same work.  He would do
17    one, I would do another.
18          Q.    And those were listed -- each
19    one was listed on a timesheet submitted
20    with Manuel, this roving timesheet, all the
21    work you did and he did were submitted on
22    these roving timesheets, correct, on the
23    same timesheet?  Let's reask the question.
24                All the work you did and all
25    the work that Manuel did were submitted on

141

```
 1                        N. ALMONTE
 2    one roving timesheet; is that correct?
 3         A.    No.
 4         Q.    So you submitted a roving
 5    timesheet in your name?
 6         A.    Yes.
 7         Q.    Do you have a copy of a roving
 8    timesheet, or copies, just for one period,
 9    that were produced, where you signed the
10    roving timesheet and Manuel has a roving
11    time sheet?  Do you have a -- and we're
12    talking again in April to June 2013.
13              MR. VALLETTI:  Hold on.  Let
14         him translate for you.
15              I'm going to note an objection.
16              You could answer.  It's okay.
17         Just let him translate that.
18              If we could have a read back
19         for all of that, please.
20              (Whereupon, the referred to
21         portion of the record was read back
22         by the reporter.)
23         A.    From April of 2013 to June of
24    2013, three timesheets would be filled out.
25    Nestor Almonte would fill out the 437
```

```
 1                    N. ALMONTE
 2    Morris Park as superintendent.  Nestor
 3    Almonte would fill out a roving timesheet
 4    and that Manuel Almonte would fill out
 5    another timesheet in his own name, so,
 6    there were three timesheets.  That's when I
 7    became superintendent.  I continued filling
 8    out one as super and one as rover.  It was
 9    demanded that Manuel would fill out one as
10    rover.
11         Q.    Okay.  I'm going to get --
12    demand it again.  I didn't -- you have to
13    listen.  We're going to be here forever.  I
14    asked if you had copies.  I didn't ask for
15    an explanation.  Please.  I'm not badgering
16    you.  Just answer the question.
17              I asked, do you have copies for
18    any one time week where you -- for any one
19    week where you submitted -- or withdrawn --
20    where you have a copy of a time -- roving
21    timesheet from Manuel, signed by Manuel, a
22    timesheet -- a roving timesheet that you
23    submitted and you have, and a timesheet for
24    the hours at 437 Morris Park?
25              MR. VALLETTI:  Note my
```

```
 1                    N. ALMONTE
 2          objection to form.
 3          A.    It's possible.  I'm not sure,
 4     but it is possible.
 5          Q.    Have you produced that to us?
 6          A.    You must check for that.  I
 7     don't know.  I handed over so many of them,
 8     I don't know.  If they're not there, I
 9     would have to go look for them.
10          Q.    When did -- in June did he --
11     did your son stop working?
12          A.    It was in June.  I don't know
13     the day.
14               MR. WEINBERGER:  Can we mark
15          this?
16               (Whereupon, Defendants' Exhibit
17          G, superintendent timesheet, was
18          marked for identification as of this
19          date by the reporter.)
20          Q.    I just want to show you that.
21     First of all, whose signature is that on
22     the bottom, if you recognize -- have you
23     ever seen it before?  Let's start there.
24          A.    Are you asking whether I've
25     seen it before?
```

                        N. ALMONTE

1

2        Q.     Yes.

3        A.     Of course I have.

4        Q.     Whose signature's that on the

5   bottom?

6        A.     That's my signature.

7        Q.     Now, who did --

8        A.     It's the same one that I have

9   in every document of my own.

10       Q.     Okay.  Who did the work below

11  there, in the bottom where it says -- I'm

12  doing it backwards -- "leaving the

13  premises"?

14       A.     Monday, May the 20th, I work

15  from 4 p.m. up to 8 p.m. at Manor, the

16  Manor building, at Apartment 4, 4B, and

17  Mr. Pedro Medina worked there with me.

18       Q.     Was there another roving

19  time -- do you know for that week -- I'm

20  just asking -- picking out a week.  Did you

21  have another roving timesheet for that

22  week?

23       A.     Of course I did.  Yes.

24       Q.     And you filled it out?

25       A.     Yes.

1                         N. ALMONTE

2           Q.    And there's another one for --

3     filled out by Manuel Almonte for that week?

4     Is that your testimony?

5           A.    Yes.  Me?  Yes.

6           Q.    Let's go through the

7     timesheets.  Manuel Almonte signed all of

8     the timesheets, is that correct, when he

9     was the superintendent?  Yes or no?

10              MR. VALLETTI:  Note my

11          objection.

12          A.    Yes.

13          Q.    Okay.  Thank you.  Let's just

14    start with the year 2011.  I'd like to

15    go -- it's Bates stamped 000 to 013.  Just

16    take a look at this.

17              (Whereupon, Defendants' Exhibit

18          H, 2011 timesheets Bates stamped 000

19          to 013, was marked for identification

20          as of this date by the reporter.)

21          Q.    First, have you ever seen these

22    timesheets?

23          A.    Yes, yes.  What is it that you

24    wish to know regarding this?

25          Q.    I just asked if --

```
1                    N. ALMONTE
2              MR. VALLETTI:  Can you just
3         repeat the question, Stu?  Maybe he
4         forgot.
5              MR. WEINBERGER:  I didn't ask.
6         I just asked did he ever see these
7         before.
8         Q.    Let's start at the front.
9    Whose signature is on the first timesheet?
10        A.    That's my signature.
11        Q.    So you signed the first
12   timesheet?
13        A.    I started to do it like that.
14   I wanted to be responsible about it and it
15   was then that the manager demanded this of
16   me.  If Manuel Almonte's name showed there,
17   it must be signed by Manuel Almonte.
18             MR. VALLETTI:  Just listen to
19         his question.
20        Q.    Let's just go through this.
21   You signed this timesheet, yes, the first
22   one, zero.  What about the second?
23        A.    Manuel Almonte.
24        Q.    Next.  What about the third?
25        A.    Manuel Almonte.
```

```
 1                    N. ALMONTE
 2         Q.    Well, how did you know who --
 3    when did you decide you would sign it and
 4    he would sign it?  How did you
 5    differentiate out when you would sign it
 6    and he would sign it?
 7              MR. VALLETTI:  Let him
 8          translate.
 9              Just note my objection that
10          that was asked and answered, but if
11          he wants to answer again, he can.  It
12          was asked and answered.
13              MR. WEINBERGER:  That was never
14          asked.
15              MR. VALLETTI:  That's your
16          opinion.  Go ahead.
17         A.    When Manuel was not present, I
18    would sign his name.  This is the proof of
19    it right here.  I signed my name when
20    Manuel's name was actually on the
21    timesheet.  I was told that I could not
22    repeat this, and so we went on to have
23    Manuel Almonte's name and Manuel Almonte's
24    signature.
25         Q.    Who told you you couldn't
```

```
 1                    N. ALMONTE
 2   repeat this?
 3        A.     Charley Klahr.
 4        Q.     What did he say to you and when
 5   did he say that, that you had to sign the
 6   timesheet in the name of Manuel?
 7        A.     When I made the error of
 8   signing it with my own name, putting down
 9   my own signature.  That's my signature.
10        Q.     And you never signed -- that
11   name never appeared again in any of those
12   timesheets?  You never signed another one
13   after the first one, is that correct, using
14   Manuel Almonte's name; is that correct?
15   Yes or no?
16             MR. VALLETTI:  Just note my
17          objection.  I don't understand the
18          question.  If he doesn't understand
19          it --
20             MR. WEINBERGER:  You can't --
21             MR. VALLETTI:  I don't
22          understand it.  I didn't get it.  So,
23          if I don't understand it --
24             MR. WEINBERGER:  Well, we could
25          read the question -- I think it's
```

```
 1                    N. ALMONTE
 2           pretty obvious, and you can't do
 3            that, but all right.
 4           Q.    In any event, you never signed
 5      your name again after the first timesheet;
 6      is that correct?  And you signed Manuel
 7      Almonte again after the first timesheet?
 8      Yes or no?
 9           A.    I don't remember.  It may be
10      that it was so, maybe not so.  If I did do
11      it again -- if I did repeat it, then once
12      again, they called it to my attention.
13           Q.    Who called it to your
14      attention?
15           A.    The manager.
16           Q.    So, the manager would go over
17      the timesheets for who signed it as long
18      as -- is that correct, as far as you
19      understand?
20           A.    Supposedly, yes.
21           Q.    Not supposedly.  I said to your
22      knowledge.
23           A.    I don't know because I don't
24      know what he does.  But if -- but if he
25      would call it to my attention on some
```

1                     N. ALMONTE

2    occasions, that's because he noticed that

3    detail.

4         Q.    Where did you submit these

5    timesheets?

6         A.    They would be sent by fax to

7    some fax number to the --

8         Q.    To the payroll company to be

9    paid; correct?

10        A.    (Witness nodding.)

11        Q.    So, the manager would not even

12   see this -- well, you're shaking your head.

13            Did the manager see the

14   timesheets before they were faxed to the

15   payroll company?

16        A.    Yes.

17        Q.    You continued to sign, in 2012,

18   on occasion, these timesheets; correct?

19        A.    Using my signature?

20        Q.    Using Manuel Almonte's name,

21   did you --

22        A.    Of course.

23        Q.    And you continued to do that in

24   2013?

25        A.    Whenever Manuel would not be

1                    N. ALMONTE

2    present, I would sign it.  I would sign it

3    by order of the manager.

4         Q.    Manuel was -- it's confusing.

5    Why wouldn't Manuel be present if he was

6    your shadow?

7         A.    Trying to gain time on the

8    work, he would be making progress on some

9    painting work or something in an apartment.

10        Q.    When were those pay sheets

11   supposed to be submitted, timesheets

12   submitted to the company?

13        A.    When the work would come to a

14   close, when it would be closed.

15        Q.    What date?

16        A.    That varied.  At the beginning

17   it was done on some day that I don't

18   remember; then later on it would be on

19   Tuesdays at night.  I think at the

20   beginning it was on Wednesday, then

21   afterwards it was Tuesday.

22        Q.    And you'd submit them at what

23   time at night?

24        A.    Different times.

25        Q.    After work -- after 5 o'clock?

```
 1                    N. ALMONTE
 2          A.    Yes.
 3          Q.    It may be 7, 8 o'clock at
 4    night?
 5          A.    Yes.
 6          Q.    So, Manuel, at 7, 8 o'clock at
 7    night, was unavailable because he was
 8    painting an apartment?  Is that your
 9    testimony?
10          A.    I never said that.  I never
11    said that he was not available in order to
12    send this fax.  I said if he was not
13    available in order to sign at the time in
14    which it -- they would be signed.  The fax
15    would be sent out at 8 p.m.  Many times it
16    would be sent out the next day because the
17    fax had defects with it and you would hear,
18    "I didn't receive it.  Send it again."
19          Q.    So, Manuel had plenty of
20    opportunity then to sign it, right, if it
21    was sent out at night or in the morning;
22    correct?
23              MR. VALLETTI:  Just note my
24          objection.
25          A.    In order to fax this, nothing
```

```
 1                    N. ALMONTE
 2    had to be signed.  It was just a matter of
 3    faxing.
 4         Q.    So, why couldn't Manuel sign
 5    these sheets at night if they didn't have
 6    to be faxed at night?
 7         A.    I repeat.
 8         Q.    Okay.
 9         A.    This did not have to be signed
10    in order to be faxed at night.  What was it
11    that he had to sign?  You tell me.
12         Q.    Weren't the signed timesheets
13    faxed at night -- yes -- to the company or
14    later -- the payroll company?  Yes or no?
15         A.    Yes.
16         Q.    Okay.  So why couldn't --
17         A.    But they didn't -- you -- they
18    didn't have to be signed.  That had to be
19    faxed.  Each timesheet had to be signed by
20    the time the scheduled time was finished.
21         Q.    Okay.  Why couldn't Manuel sign
22    the timesheets at night before they were --
23    or in the following morning, before they
24    were faxed to the payroll company if you
25    were told you shouldn't sign your name?
```

```
 1                  N. ALMONTE
 2              MR. VALLETTI:  Just note my
 3          objection.  Asked and answered.
 4          A.    Sir, this is a schedule to be
 5      followed and the timesheet is signed.  The
 6      timesheet of the superintendent did not
 7      have to be signed by anyone except by the
 8      super.  The rovers were signed by the
 9      super, but I did not have to have a witness
10      to sign my timesheet.  No one had to sign
11      it for me.  If Manuel --
12              MR. WEINBERGER:  What was the
13          translation for that?
14          A.    If Manuel did not sign a
15      timesheet, it was because he wasn't there.
16      Not the rovers.  The rovers, he signed
17      them.
18          Q.    Why couldn't Manuel sign the
19      timesheet and fax it?
20          A.    I don't understand.  I don't
21      understand.
22          Q.    I'm going to ask you to answer
23      the question.  What do you not understand
24      about this question?
25          A.    Nothing.
```

1                          N. ALMONTE

2          Q.    Nothing?

3          A.    Nothing.

4          Q.    You don't understand this

5    question, okay.  So you have no idea why

6    this could not have been signed by Manuel

7    and then faxed to the company?  You have no

8    idea why?

9          A.    Who said he didn't do that?

10               MR. VALLETTI:  Off the record.

11               (Whereupon, a discussion was

12          held off the record.)

13               (Whereupon, a brief recess was

14          taken.)

15          Q.    Did Manuel Almonte know how to

16    work a fax machine, if you know, in 2011?

17               MR. VALLETTI:  Just note my

18          objection.  He could answer, if he

19          knows.

20          A.    I told him how to use it and

21    he, many times, did send the faxes.

22          Q.    Okay.

23          A.    Many times.

24          Q.    So, he sent these fax -- did he

25    fax in the timesheets or did you fax in the

```
 1                    N. ALMONTE
 2    timesheets?
 3          A.    Both of us.  He and I.
 4               MR. VALLETTI:  Stu, I need a
 5          minute.
 6               MR. WEINBERGER:  Just, off the
 7          record.
 8               (Whereupon, a discussion was
 9          held off the record.)
10               MR. WEINBERGER:  Mr. Almonte
11          has indicated that he must leave and
12          we, you know, obviously cannot do
13          anything about that.
14               (Continued on next page to
15          include jurat.)
16
17
18
19
20
21
22
23
24
25
```

```
1                      N. ALMONTE
2              MR. WEINBERGER: He has agreed
3         to continue the deposition on
4         February 25th, at 2 o'clock in the
5         afternoon, in this office and
6         that's -- I guess we're off the
7         record until the next time.
8                 (Whereupon, at 2:30 p.m., the
9         examination of this witness was
10        adjourned.)
11
12
13        _____
                  NESTOR ALMONTE
14
15   Subscribed and sworn to before me
16   this _____ day of _____ 20___.
17
18   _____
           NOTARY PUBLIC
19
20
21
22
23
24
25
```

```
 1                      N. ALMONTE
 2                   I N D E X
 3
 4    EXAMINATION BY                        PAGE
 5    MR. WEINBERGER                        77
 6
 7       INFORMATION AND/OR DOCUMENTS REQUESTED
 8        INFORMATION AND/OR DOCUMENTS    PAGE
 9      Marriage certificate                79
10
11                   E X H I B I T S
12    DEFENDANTS' EXHIBITS:
13    EXHIBIT    EXHIBIT                    PAGE
14    LETTER     DESCRIPTION
15     G         Superintendent timesheet  143
16     H         2011 timesheets Bates
17               stamped 000 to 013         145
18
19          QUESTIONS MARKED FOR A RULING
20                 (NONE MARKED)
21
22
23
24
25
```

1                        N. ALMONTE

2                  C E R T I F I C A T E

3

4    STATE OF NEW YORK        )
                              :  SS.:
5    COUNTY OF BRONX          )

6

7         I, SCOTT TORRANCE, a Notary Public

8    for and within the State of New York, do

9    hereby certify:

10        That the witness whose examination is

11   hereinbefore set forth was duly sworn and

12   that such examination is a true record of

13   the testimony given by that witness.

14        I further certify that I am not

15   related to any of the parties to this

16   action by blood or by marriage and that I

17   am in no way interested in the outcome of

18   this matter.

19        IN WITNESS WHEREOF, I have hereunto

20   set my hand this 20th day of February 2015.

21

22

23

24   _____
                  SCOTT TORRANCE

25

1

2    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
3    ----------------------------------------X
     NESTOR ALMONTE,
4
                                  PLAINTIFF,
5
            -against-           Case No.:
6                               14-CV-5951

7    437 MORRIS PARK, LLC D/B/A F&T MANAGEMENT
     CO., 1195 SHERMAN AVE., SHERMAN MANAGEMENT
8    CO. D/B/A SHERMAN MANAGEMENT ASSOCIATES,
     LLC,  CHANINA KLAHR, KALMAN TABAK and
9    ABRAHAM FINKELSTEIN,

10                               DEFENDANTS.
     ----------------------------------------X
11

12              DATE: February 25, 2015

13              TIME: 2:12 P.M.

14

15              CONTINUED DEPOSITION of the

16   Plaintiff, NESTOR ALMONTE, taken by the

17   Defendants, pursuant to Request and to the

18   Federal Rules of Civil Procedure, held at

19   the offices of Goldberg and Weinberger,

20   LLP, 630 Third Avenue, New York, New York

21   10017 before Anita M. Trombetta, Registered

22   Professional Reporter and Notary Public of

23   the State of New York.

24

25

DIAMOND REPORTING   (718) 624-7200   info@diamondreporting.com

```
 1

 2    A P P E A R A N C E S:

 3


 4    VALLI KANE & VAGNINI, LLP
         Attorneys for the Plaintiff
 5       600 Old Country Road, Suite 519
         Garden City, New York 11530
 6       BY: ROBERT P. VALLETTI, ESQ.

 7


 8

      GOLDBERG & WEINBERGER, LLP
 9       Attorneys for the Defendants
         630 Third Avenue
10       New York, New York 10017
         BY: STUART WEINBERGER, ESQ.
11       and
         BY: ANNETTE ALETOR, ESQ.
12

13
      ALSO PRESENT:
14
      CARMEN CARBONELL
15    Spanish Interpreter
      Star Interpreting
16
      CHANINA KLAHR
17

18

19
                  *        *         *
20

21

22

23

24

25
```

1

2      F E D E R A L   S T I P U L A T I O N S

3

4

5      IT IS HEREBY STIPULATED AND AGREED by and

6      between the counsel for the respective

7      parties herein that the sealing, filing and

8      certification of the within deposition be

9      waived; that the original of the deposition

10     may be signed and sworn to by the witness

11     before anyone authorized to administer an

12     oath, with the same effect as if signed

13     before a Judge of the Court; that an

14     unsigned copy of the deposition may be used

15     with the same force and effect as if signed

16     by the witness, 30 days after service of

17     the original & 1 copy of same upon counsel

18     for the witness.

19

20      IT IS FURTHER STIPULATED AND AGREED that

21     all objections except as to form, are

22     reserved to the time of trial.

23

24                    *     *     *     *

25

```
 1                    N. ALMONTE
 2   C A R M E N    C A R B O N E L L, a Spanish
 3   interpreter, solemnly swore to translate
 4   the following questions from English to
 5   Spanish and answers from Spanish to
 6   English:
 7   N E S T O R    A L M O N T E, called as a
 8   witness, having been first duly sworn,
 9   through an interpreter, by a Notary Public
10   of the State of New York, was examined and
11   testified as follows:
12   EXAMINATION BY
13   MR. WEINBERGER:
14        Q.    Please state your name for the
15   record.
16        A.    Nestor Almonte.
17        Q.    What is your address?
18        A.    4536 Park Avenue, Apartment 12,
19   Weehawken, New Jersey 07086.
20        Q.    I'm going to ask you some
21   questions.  If you don't understand a
22   question, please tell me.  If you do not
23   understand a question, I will rephrase it.
24   If you answer the question, I'm going to
25   assume you understand the question.  Yes?
```

```
1                        N. ALMONTE
2          A.    Yes.
3          Q.    You can't nod.
4          A.    Okay.
5          Q.    Are you taking any medication
6     today which would prevent you from
7     answering questions?
8          A.    No.
9          Q.    Is there any reason why you
10    can't answer questions truthfully?
11         A.    No.
12         Q.    Who is Juan Diaz?
13         A.    I have no idea.
14         Q.    Is he an individual likely to
15    have knowledge of this case, anybody by the
16    name of Juan Diaz?
17               MR. VALLETTI:   Just note my
18          objection.
19         A.    Not that I know of.
20         Q.    Armando Diaz Hernandez, do you
21    know this individual?
22         A.    No.
23         Q.    Did Armando Diaz Hernandez ever
24    work at 437 Morris Park or 1195 Sherman or
25    any place that you worked in?
```

```
 1                    N. ALMONTE
 2              MR. VALLETTI:   Objection to
 3          form.
 4         A.    Not that I know of.
 5         Q.    Do you have any idea why he was
 6    identified in your initial disclosures as
 7    somebody who would have knowledge of this
 8    case?  I'm talking about Armando Diaz
 9    Hernandez.
10         A.    No.
11         Q.    Juan Diaz, did he ever work at
12    1195 Sherman or 437 Morris Park or any
13    other buildings you worked at?
14         A.    That I know of.  I've heard of
15    Juan Mendoza.  I haven't heard Juan Diaz.
16    I don't know if it's the same person.
17         Q.    Who is Juan Mendoza?
18         A.    He was an employee that worked
19    as a super at 1195 Sherman and he also
20    worked as a handyman in some of the
21    buildings of the company.
22         Q.    Did he ever work with you,
23    Juan Mendoza?
24         A.    Yes, of course.
25         Q.    Where?
```

```
  1                      N. ALMONTE
  2          A.     In different places.
  3          Q.     Did he ever work with
  4    Manuel Almonte?
  5          A.     I'm not sure.
  6          Q.     What employees, when you were
  7    employed at 437 Morris, 1195 Sherman, or
  8    1101 Manor Avenue, or 855 East Tremont,
  9    worked with Manuel Almonte, your son?
 10          A.     Various, various employees.
 11          Q.     Tell us who, name names, tell
 12    us when, and name names.
 13          A.     When?  All the time, and names,
 14    I could give you the names right now.
 15          Q.     Tell me the name of the
 16    employees that work with you.
 17          A.     Jose Gonzalez, William Fuentes,
 18    Jonathan Tavares, Bernadino Tavares,
 19    Jonathan Duran, Wilfredo Nuñez.  Those are
 20    the names I remember right now.
 21          Q.     Jose Gonzalez, what did he do
 22    at the building?
 23          A.     He was always the porter at
 24    437 Morris Park.
 25          Q.     So what work did he do with
```

1                    N. ALMONTE
2     your son, Manuel Almonte?
3                    MR. VALLETTI:   Just note my
4           objection, to the extent that he
5           knows.
6          A.    My son gave them orders of what
7     to do, like cleaning-wise and he signed his
8     time sheets.
9          Q.    Did you ever see your son give
10    Jose Gonzalez orders?
11         A.    No, because if I was at the
12    building, I was the one to give the orders.
13         Q.    So did you ever see your son
14    physically work with Jose Gonzalez?
15         A.    My son did not do cleaning.
16         Q.    William Fuentes, what did
17    William Fuentes do?
18         A.    Handyman.
19         Q.    Where was he a handyman at?
20         A.    In any building where it was
21    needed.
22         Q.    What work, if any, did you see
23    your son do, and I'm talking about Manuel,
24    with William Fuentes?
25         A.    The same type of jobs that I

```
 1                    N. ALMONTE
 2    did, Manuel was always there with me,
 3    helping me, following the work orders.
 4         Q.    So in other words, you and
 5    Manuel were always working together doing
 6    the same jobs; is that correct?
 7         A.    No.
 8         Q.    So who did the work, you or
 9    Manuel when you were working with
10    William Fuentes?
11         A.    There was some kind of job in
12    the building that was needed, you know,
13    whether it came to, you know, electricity
14    or plumbing, if William and Fuentes and
15    Manuel Almonte were painting or doing
16    plaster, or I would be fixing there, doing
17    the work to fix the pipe, they would paint
18    there and put the plaster.
19         Q.    Give me an apartment where this
20    was done or any occasion where this
21    happened where they worked together.
22         A.    That's not in my mind.  That's
23    in the work orders.  You would have to
24    check the work orders and you'll see who
25    did the work.
```

```
 1                    N. ALMONTE
 2        Q.    So if I look at these work
 3   orders.  I'm going to ask you to compare
 4   the exhibit work orders.
 5              (Whereupon, an off-the-record
 6         discussion was held.)
 7        Q.    Jonathan Tavares, what did he
 8   do?
 9        A.    Handyman also.
10        Q.    When did he work in the
11   building and which building did he work in?
12        A.    I all the people I mentioned to
13   you, they were all handyman and they were
14   always working at the, all the buildings,
15   437 Morris, 1101 Morris Manor [sic] and
16   1056 Boynton, they were always all working
17   in all the buildings.  They weren't set
18   employees except for the super and the
19   porter in each building.
20        Q.    So what work did your son do
21   with Jonathan Tavares that you saw?
22        A.    Basically, my son would always
23   just do work relating to painting, because
24   he's not a professional.  He's not a
25   professional in that field.  He's not a
```

```
 1                   N. ALMONTE
 2    plumber, he's not an electrician.  Any kind
 3    of work that needed to be done like that, I
 4    would solve it.  All the jobs that Manuel
 5    would do, as well as most of the handyman,
 6    it would be like cover any gaps or holes
 7    and paint.
 8         Q.    I'm going to ask the question
 9    again, what work did you see, see
10    personally, see Manuel Almonte, your son,
11    do with Jonathan Tavares?  And if you can,
12    be specific and give us an apartment.
13         A.    There were too many jobs during
14    two years, so that's not into my mind,
15    that's in the work orders.
16         Q.    So Jonathan Tavares worked
17    there for two years, is that your
18    testimony?
19              MR. VALLETTI:  Note my
20         objection.  He did not say that.
21              MR. WEINBERGER:  I think he
22         did, but we'll ask him that.
23              THE WITNESS:  What?
24         Q.    Did Jonathan Tavares work for
25    the company for two years?
```

```
1                    N. ALMONTE
2              THE INTERPRETER:  He's just
3         saying that I want to know what my
4         lawyer said.  He's asking me the
5         question, again.
6              (Whereupon, the referred-to
7         question was read back by the
8         reporter.)
9              THE WITNESS:  No, that's not
10         what I mean exactly.  Basically when
11         I said that he worked for two years,
12         he worked -- my son worked with all
13         of those people for two years with
14         William Fuentes, Bernadino Tavares,
15         Jonathan Duran, all the different
16         workers, some of them for six months,
17         some for other amounts.
18         Q.    So your son was limited to
19    doing the painting, the touchups, things
20    like that?
21         A.    Besides that, like a clogged
22    toilet, like a leaking faucet.  When it was
23    those kind of jobs most of the time he was
24    with me.  I would give him instructions on
25    how to do it.
```

1                    N. ALMONTE
2          Q.    And you would assign the work
3     to your son; is that correct?
4          A.    I would assign work to my son,
5     yes, the same as with all the other
6     employees.  I would receive the work order
7     and with the work order I would assign the
8     job to each one.
9          Q.    Did Mr. Klahr, to your
10    knowledge, ever assign work to your son
11    directly?
12         A.    Not Mr. Klahr, no.  It was
13    always with me.
14         Q.    Do you have anything in writing
15    where you assigned work to your son?
16         A.    It was notes that I would give
17    to each worker and whenever they were done,
18    I would check that with the work order and
19    then it was garbage.
20         Q.    I'd like to show you the work
21    orders, and I want you to tell me where on
22    any of these work orders, it says your son
23    did any work (handing), and it's Bates
24    stamped 123 through 328.
25              Do you understand what I'm

```
 1                        N. ALMONTE
 2    asking you, where it says on there that
 3    your son did any work?
 4                 MR. VALLETTI:  Let me see
 5           first.
 6           Q.    You identified another person,
 7    Bernadino Tavares?
 8           A.    Bernadino Tavares.
 9           Q.    What was his job?
10           A.    Handyman.
11           Q.    What work did your son do with
12    Bernadino Tavares?
13           A.    Again, I'd say all the jobs we
14    got would all, had to stay in an apartment,
15    would all stay there.  Each one would do a
16    certain job you, you know, you do the
17    painting, you do the plaster, I'll cover
18    this hole, and I will do the plumbing.
19                 Especially when they had the
20    DHS inspections, we would get a list of all
21    the apartments that were about to be
22    inspected, approximately ten apartments.
23                 MR. VALLETTI:  Is that
24           consecutive?  I just looked at the
25           first and the last.
```

1                    N. ALMONTE

2              MR. WEINBERGER:  I hope it's

3         consecutive.

4         Q.    Can you tell us where in there,

5    in these work orders where it says that

6    your son did the work?

7         A.    A lot of these jobs, like for

8    instance where it says, "the super," where

9    it says, "Two light bulbs needed," things

10   like that, you see it says, "super," simple

11   things like that, it was Manuel Almonte.

12        Q.    You don't know that you're just

13   saying, because it says the word "super,"

14   you don't know if --

15             MR. VALLETTI:  Objection.

16        Objection to form, you can answer.

17             MR. WEINBERGER:  He can answer.

18        A.    I know he did it, because

19   simple jobs, like, for instance, changing

20   light bulbs, you know, simple things like

21   that, I wouldn't do that.  I barely ever

22   did something like that and if it wasn't my

23   son who did it, the name of the handyman

24   who did do it would be there.  If it says

25   "super," it was because it was him.

```
 1                    N. ALMONTE
 2        Q.    Did your son ever sign any of
 3   these work orders?
 4        A.    Where?  The work orders don't
 5   need a signature, sign where?
 6        Q.    So there's no signature of your
 7   son on there?
 8        A.    Nobody.
 9             MR. VALLETTI:  Let the
10         translator finish so the whole
11         question can get recorded.
12        Q.    And the work that was assigned
13   on these work orders was assigned by you,
14   correct?
15        A.    Yes.
16        Q.    Jonathan Duran, who is Jonathan
17   Duran?
18        A.    He worked like as a porter,
19   like a porter/handyman.
20        Q.    What work did he do with your
21   son?
22        A.    Any job that would coincide.
23   Many times on certain occasions, I would
24   say Jonathan and Manuel fixed this
25   together.  Most of the time Jonathan Duran,
```

1                      N. ALMONTE

2    the short time he worked -- he worked in

3    Boynton.

4         Q.    Did you work with him on

5    Boynton Avenue?

6         A.    No.

7         Q.    Who is Wilfredo Nuñez?

8         A.    He was a handyman.

9         Q.    And when did he work for the

10   company and where did he work?

11              MR. VALLETTI:  Objection to

12          form.  He can answer.

13        A.    I don't have it in my mind

14   right now, but it was in the period between

15   2012 and 2013.

16        Q.    Have you spoken recently to

17   Jose Gonzalez?

18        A.    It's been over a year that --

19   no, that I know nothing about him.

20        Q.    Did you ever discuss this case

21   with him?

22        A.    No, impossible.

23        Q.    William Fuentes, when was the

24   last time you spoke to him?

25        A.    William Fuentes, when, maybe a

```
 1                     N. ALMONTE
 2    year.
 3          Q.    Did you discuss this case with
 4    Mr. Fuentes?
 5          A.    I think, yes.
 6          Q.    What did you say to him and
 7    what did he say to you?
 8                MR. VALLETTI:  Objection to
 9           form.
10          A.    He just asked me what happened
11    and I said, "No, I don't work with the
12    company anymore."
13          Q.    Did you discuss that you were
14    owed any money?
15          A.    That I owed money?
16          Q.    That you were owed money by the
17    company for the time you worked here?
18          A.    Yes.
19          Q.    What did you say to him?
20          A.    That if he could be a witness,
21    since he worked there, in case it was
22    needed, and he said yes.
23          Q.    What else did you say to him?
24          A.    In respect to that, nothing.
25          Q.    Anything else said in this
```

1                   N. ALMONTE

2      conversation?

3           A.      No.

4           Q.      And when was this conversation?

5           A.      Maybe at the beginning of 2014.

6      I don't know exactly.

7           Q.      Anything else happen in that

8      conversation?

9           A.      No, we were on the street.  We

10     just kind of, you know, met up there and

11     around the stores and we just spoke for

12     like five, ten minutes.

13          Q.      When is the last time you had a

14     conversation with Jonathan Tavares?

15          A.      When he left the company.

16          Q.      Did you discuss this case with

17     Jonathan Tavares?

18          A.      No.

19          Q.      What about Bernadino Tavares?

20     When is the last time you spoke to him?

21          A.      Also when he left the job.

22          Q.      Do you know when?

23          A.      I don't have the exact date,

24     no.

25          Q.      And have you had a conversation

1                         N. ALMONTE
2      with him about this case?
3              A.     No.
4              Q.     Jonathan Duran, when is the
5      last time you spoke to him?
6              A.     He's my nephew.  He lives
7      outside of here.  We speak over the phone
8      frequently, but nothing to do with this.
9              Q.     When did he work for the
10     company?
11             A.     That was in 2013, but I don't
12     know the exact time right now in my mind.
13             Q.     Was it after May of 2013?
14             A.     I'm not sure.  I'm not sure.
15             Q.     Do you know if it was in the
16     summer of 2013 that he worked at the
17     building?
18             A.     I don't remember exactly, but
19     it was not winter, not winter.  I don't
20     know if it was spring, summer, or fall, but
21     it was not winter.
22             Q.     Wilfredo Nuñez, when was --
23     well, let's go back to -- excuse me, Duran.
24     What, if anything, you have said to Duran
25     about this case?

```
 1                    N. ALMONTE
 2        A.    No, not about, this nothing.
 3        Q.    Okay.  Wilfredo Nuñez, when was
 4   the last time you spoke to him?
 5        A.    The last time I saw him, maybe
 6   two months ago.
 7        Q.    And did you speak to him about
 8   this case?
 9        A.    I haven't spoken to anyone
10   about this case.  The only person I've
11   spoken to about this case has been
12   William Fuentes.
13        Q.    Are you related to anybody else
14   on this list, Mr. Gonzalez, Mr. Fuentes,
15   Mr. Tavares, the two Tavareses, and
16   Wilfredo Nuñez?
17        A.    No.
18        Q.    Have you asked any of these
19   people, I just mentioned, plus Mr. Duran to
20   be a witness in this case?
21        A.    No, just William Fuentes.
22        Q.    Do you know Abraham
23   Finkelstein?
24        A.    Yes, I know him.
25        Q.    How do you know him?
```

```
 1                    N. ALMONTE
 2          A.    As the owner of the company.
 3          Q.    Have you had any conversation
 4    with Mr. Finkelstein about your work?
 5          A.    Various ones.
 6          Q.    Did Mr. Finkelstein ever assign
 7    work to you?
 8          A.    He tried a few occasions, yes.
 9          Q.    And you say "tried," what does
10    that mean?
11          A.    Well, even after I stopped
12    working for the company, while I was, you
13    know, in that process and I was fired and I
14    still lived in the building, on some
15    occasion he came to my house, he knocked on
16    the door, and he asked me if we could go to
17    the basement, because they were doing some
18    construction and he wanted me to do some
19    jobs.
20                I opened up a wall on an
21    occasion.  Yes, and I seen, told him, you
22    know, that I'm not working for the company
23    anymore, he said, "Don't worry.  This is
24    just for me personally."
25          Q.    All right.  For the time that
```

```
 1                    N. ALMONTE
 2    you were working, did Mr. Finkelstein
 3    assign work to you?
 4         A.    In one occasion in 420
 5    Morris Park, it's like a parking lot,
 6    before being a parking lot, it had like
 7    some kind of wooden bars or beams and the
 8    wind kind of knocked them down, everything
 9    was rolling around on the sidewalk and he
10    asked me to please pull -- put it all
11    inside, and at that moment it was my son
12    and I, and Jose Gonzalez also came and
13    helped us.
14         Q.    Did Mr. Finkelstein ever talk
15    to your son, as far as you know?
16         A.    Yes, various times.
17         Q.    And what did he say, when you
18    were there, just your personal knowledge?
19         A.    Once I found them during a
20    conversation, like, I would say in the
21    yard, the backyard.  And I asked my son,
22    "What is Abraham telling you?"  He said,
23    "Oh, he's giving me instructions on how to
24    use this machine to clean the boiler, it's
25    like a pressure machine."  And that if he
```

1                    N. ALMONTE

2    did it at work, to let him know so he that

3    he could tell the company so he could be

4    able to use it.

5              And my son first asked me if --

6    my son told me that he asked him if he was

7    the new super and I answered, yes.

8         Q.    When was this conversation?

9         A.    That was 2012, but I don't know

10   when.

11        Q.    So again, Finkelstein asked

12   your son if he was the new super when you

13   were there?

14        A.    I wasn't with them at that

15   moment.  I got there and they were having

16   the conversation working with that machine,

17   he was explaining to my son.

18        Q.    So Mr. Finkelstein was

19   explaining how to use what kind of machine?

20        A.    It's a machine that -- you use

21   to clean with pressure, like, it uses gas

22   and stuff.  It's -- it's to clean things

23   that have like grease, like it's like hot

24   water and gas.

25        Q.    And can you describe

1                  N. ALMONTE
2    Abraham Finkelstein.
3         A.    He's a man like about my
4    height.  He's got his beard, like -- his
5    age is, like, maybe around 60s.  I don't
6    know what else I could say.
7         Q.    All right.  Any other
8    conversations that you had, that your son
9    had with Mr. Finkelstein that you know
10   about?
11        A.    Well, basically it was that
12   conversation and then the other one, the
13   one they had at 420 Morris Park when we
14   were all picking up all that stuff they
15   were talking, they had various
16   conversations some, like pick this up or
17   pick that up, like that.
18        Q.    But that's at 420 Morris Park?
19        A.    Yes, across 437.
20        Q.    What is the name of this
21   machine that you were just describing?
22   What is the name?
23        A.    In Spanish, it's machine to
24   clean with pressure.
25        Q.    And is this the building's

1                    N. ALMONTE

2    machine?

3         A.    Yes, the building's.

4         Q.    And did Mr. Finkelstein bring

5    the machine out to the building, outside?

6         A.    Yes, it was in the basement in

7    the boiler and then he brought it out,

8    outside and first he asked my son are you

9    the super, when he said, yes, he said

10   "Here, let me show you how to use this."

11        Q.    Are you familiar with

12   Mr. Tabak?

13        A.    Kalman Tabak, yes.

14        Q.    How often did Mr. Tabak go to

15   the building, on average?

16        A.    There were occasions when

17   Kalman would go like twice a week.

18   Sometimes it would be like two months that

19   I wouldn't see him and sometimes in a week

20   I would see him like every day, it would

21   depend whether or not they were doing

22   something in the building.

23        Q.    How often did Mr. Finkelstein

24   visit the building?

25        A.    Almost the same as Kalman, but

1                    N. ALMONTE
2    less frequency, but when they were doing
3    the construction, like, for instance, when
4    they were doing the construction of when
5    there was a bodega before, like a store,
6    before they was there like daily.
7         Q.    And when was that?
8         A.    In 2013, like between October,
9    between October, November, and December.
10        Q.    Did Mr. Tabak ever have a
11   conversation with your son?
12             MR. VALLETTI:  Just note my
13        objection, but he can answer.
14        A.    Not in my presence.
15        Q.    Do you know if he had ever had
16   a conversation with your son?
17        A.    Not that I know of.  If they
18   did have one, it couldn't have been
19   anything important, because my son would
20   have told me about it.
21        Q.    When you say "they," you're
22   talking about who?
23        A.    Mr. Tabak and Manuel Almonte.
24        Q.    What about Mr. Finkelstein?
25   Other than that what conversation that you

```
 1                    N. ALMONTE
 2  identified with the pressure machine, did
 3  Mr. Finkelstein have any other
 4  conversations with your son?
 5       A.    Like I mentioned before, in
 6  420 Morris Park, when we were cleaning up.
 7       Q.    Other than those two
 8  conversations, any other conversations?
 9       A.    Yes, when we were doing the
10  ceramic in the apartment, we were going to
11  live in, we were working, putting the tiles
12  in the bedroom, Mr. Abraham arrived to the
13  building and I remember him asking, "How is
14  everything?  Is everything okay?  And how
15  long are you going to be living here?"
16            I was there, on that occasion
17  and I remember saying that, you know,
18  whenever this is done, possibly this
19  weekend, we're already going to be here.
20       Q.    Anything else besides that
21  conversation with Mr. Finkelstein?
22       A.    Not that I remember.
23       Q.    All right.  Switching topics
24  for a second here.  Do you have any time
25  records for yourself for the hours that you
```

1                     N. ALMONTE
2    worked in 2011?
3          A.    Records in paper with my name
4    on it, no.
5          Q.   I didn't ask that.  I asked, do
6    you have any records with anybody's name?
7          A.    I don't have records.
8          Q.    So you don't have any records.
9    I don't care if that's your name.  It could
10   be the name of anybody.  Do you have any
11   records indicating the hours that you
12   worked in 2011?
13         A.    Okay.  The time sheets that are
14   under the name of "Manuel Almonte," like I
15   said -- like I said, before, you know,
16   Manuel Almonte was the same as
17   Nestor Almonte.
18         Q.    What does that mean, "the
19   same"?
20         A.    "The same" means that
21   physically I was the person with the
22   experience for the job, but the
23   authorization to work in the United States
24   was my son, the one that it had, not me.
25         Q.    Okay.  I'm going to ask it

1                    N. ALMONTE
2    again and you have to answer the question.
3    This is really -- I've asked the
4    question --
5                 MR. VALLETTI:  But Stu, I think
6              he answered to best of his ability.
7                 MR. WEINBERGER:  That is
8              ridiculous.  We're going to call the
9              judge up if we do it again.  If --
10                MR. VALLETTI:  So call it
11             then --
12        Q.    Do you have a record of the
13   hours you work in anybody's name in 2011,
14   showing the hours that you worked?  Yes or
15   no?
16        A.    I never worked under the name
17   of anybody.
18        Q.    I didn't ask that.  I'm going
19   to ask it again.  Is there a record showing
20   the hours that you worked.  I don't care
21   what name it's in.  Is there a record, yes
22   or no, in 2011 showing the hours you
23   worked?
24                MR. VALLETTI:  Objection to
25             "yes or no," if he doesn't know.  He

116

```
1                        N. ALMONTE
2            can say or whatever answer he feels
3            is fit.
4            A.    It's confusing because we've
5       spoken about the same topic for various
6       times now.  Any timesheet that has the name
7       "Manuel Almonte," belongs to Manuel Almonte
8       and Nestor Almonte.
9            Q.    What does that mean, "It
10      belongs"?
11           A.    What do you mean "belongs"?
12           Q.    You used the phrase.
13           A.    Any timesheet that has the name
14      "Manuel Almonte," is the record of the
15      hours worked by Manuel Almonte and
16      Nestor Almonte.  Remember that they used to
17      pay a check that was divided among two
18      people.
19           Q.    When you say "it was divided,"
20      the company never told you to divide the
21      check, did they?
22           A.    No, but there was two people
23      working and only one would receive the
24      check.
25           Q.    Okay.  I'm going to ask you a
```

                           N. ALMONTE

1
2    question.  Again, let's just do it slowly.
3    Let's start with May of 2011, how much did
4    you get paid a week?
5         A.    May 2011, $400 a week was the
6    check made out every week to Manuel Almonte
7    and Nestor Almonte.
8         Q.    Okay.  I'm going to ask you
9    again, how much money did you receive --
10   I'll ask it differently, did you receive in
11   May of 2011 each week for working in the
12   building?
13        A.    If it was $400, it would be
14   $200 for Manuel and $200 for me, you know,
15   because the check was for 400, so half.
16        Q.    Who decided to pay the half?
17   Who decided to divide the money up in half?
18        A.    It was a decision made by both
19   of us, my son and -- Manuel Almonte and
20   Nestor Almonte, me.
21        Q.    Do you have any evidence that
22   the money was divided up between you and
23   your son that way?
24        A.    No.
25        Q.    Okay.  Now, let's go back

```
 1                     N. ALMONTE
 2    though the time sheets, let's do '12?
 3              MR. VALLETTI:  We're going to
 4         have two '12 time sheets.
 5              MR. WEINBERGER:  Yes.
 6         Q.   We're looking at Bates stamps
 7    14 through 62.  Have you seen those before
 8    (handing)?
 9         A.   That's '14.  It says 2012.
10         Q.   No, that's the Bates stamp
11    number -- ignore what we said.  That's the
12    Bates stamp number.  Ignore the bottom
13    part.
14              MR. VALLETTI:  He's referencing
15         what's up here.  These are the 2012
16         time sheets.
17              THE WITNESS:  Okay.
18         Q.   Have you ever seen these
19    before?  Did you want to go through and
20    see?
21         A.   Yes, they're copies of the
22    original time sheets of work.
23         Q.   So those reflect the hours that
24    you worked in 2012; is that correct?
25         A.   Not all the hours because
```

```
 1                    N. ALMONTE
 2    there's hours that were not written down
 3    there, because remember, we worked with a
 4    hotline and also Saturday, Sunday, you
 5    know, so none of that is there.
 6                I'm sorry to use this word in
 7    English.  I don't know how it say it in
 8    Spanish, these time sheets reflect the
 9    regular schedule between 40, 50 hours a
10    week.  We used to work, especially me,
11    approximately 70 hours a week and that's
12    like not exaggerating.
13         Q.    Okay.  You're not exaggerating,
14    you worked 70 hours a week?
15         A.    Yes.
16         Q.    And you have a record of you
17    working 70 hours a week?
18         A.    I can't have the record.  The
19    record was on the phone.  The calls that
20    were made for work.  And that -- that phone
21    is the company's.  When I was fired from
22    the company about a month after, they sent
23    for the phone, so I gave it back.  But the
24    company should have the record of the
25    hotline phone calls.
```

```
 1                    N. ALMONTE
 2        Q.    Hotline, by the way, stopped at
 3   12:00 at night; is that correct?
 4        A.    That never stopped.
 5        Q.    What is the "hotline"?
 6        A.    It's a -- it's something with
 7   like an emergency phone number, like 911.
 8   When there's an emergency in one of the
 9   buildings, regardless of what time, the
10   client would notify security.  Many times
11   if they didn't know the number, they would
12   notify the security.  And if they knew the
13   hotline phone number, they called directly.
14        Q.    So it's your testimony that you
15   wouldn't write down if you worked on
16   Saturday and Sunday, right?
17        A.    There was a time when the
18   manager -- the manager made it mandatory
19   that I write that I work three hours, like
20   an hour and a half in the morning, like an
21   hour and a half in the afternoon.
22        Q.    So --
23        A.    And I worked more than that,
24   but I would write down, no problem, I said.
25        Q.    You worked more than that,
```

```
 1                    N. ALMONTE
 2   right?  Weren't you in charge, by the way,
 3   of keeping accurate time sheets?  Wasn't
 4   that your job as the super to make sure
 5   everybody submitted an accurate timesheet?
 6        A.    Can you just repeat the
 7   question.
 8        Q.    Wasn't it the job of you, as
 9   superintendent, to make sure you submitted
10   an accurate timesheet?
11        A.    For the regular handyman.
12        Q.    And by the way, is it your
13   testimony, just so it's clear, that you
14   were told that, that you were told that you
15   had to write down time, yes or no, of all
16   the hours you worked?  Were you ever told
17   you had to write down all the times and all
18   the hours that you worked?
19             MS. ALETOR:  We didn't mark
20              these as an exhibit.
21        A.    Yes, once the manager told me,
22   you know, because I said, you know, we got
23   some call from the hotline, and he said:
24   "Okay.  Write down some certain amount of
25   hours we have to reach to at least
```

```
 1                    N. ALMONTE
 2   53 hours," or something like that.
 3        Q.    So you were told, by the way,
 4   you were told to write down, weren't you,
 5   every hour that you worked, were you not,
 6   by Mr. Klahr?
 7        A.    Yes, while I have the phone
 8   that is the company's, that means that I'm
 9   working with the hotline directly.  Any
10   calls coming through the hotline, I have to
11   answer.
12        Q.    And you were told after you
13   worked or when you worked, you were told to
14   write down your time like every other
15   employee was supposed to write down his or
16   her time they worked; is that correct?
17        A.    No, because when I complained
18   about this -- no, they told me, "No, you
19   have to be aware that you have an apartment
20   that you don't pay rent for.  The rent of
21   the apartment pays for those hours.  Just
22   like you don't have to pay a rent, you
23   can't complain about hours or claim hours,
24   because you're not paying rent."
25        Q.    Who said that and when was that
```

1                    N. ALMONTE
2    said?
3         A.    That was the manager,
4    Mr. Charlie Klahr and that was the manager
5    -- he was the manager.
6         Q.    When?
7         A.    Since I started working as a
8    super.
9         Q.    When?  Give me a date, a time.
10         A.    Since February 2011, February,
11    March.
12         Q.    By the way, wasn't it Mr. Klahr
13    who texted you the hotline calls?
14         A.    Yes, it's correct.
15         Q.    And no hotline company
16    contacted you directly; isn't that true?
17         A.    No, I'm saying hotline, because
18    there was a hotline, but the person who
19    sent me the text was Mr. Charlie Klahr.
20         Q.    Oh, so Mr. Klahr would then
21    have an idea of how many hours you worked
22    during the week; is that correct, of this
23    extra time?
24         A.    Of course.
25         Q.    Of course.  So let's just go

```
 1                      N. ALMONTE
 2    through the weeks, but before we do that,
 3    week by week, let's just do this:  Did you
 4    have a meeting in 2011 with Mr. Klahr at
 5    the end of 2011 about overtime hours and
 6    other pay, other monies that you may be
 7    owed for 2011?
 8         A.    No.
 9         Q.    And you never signed a letter
10    or handed anything in about monies that you
11    were owed for purchasing certain items, you
12    don't remember that?
13              (Whereupon, time sheets were
14         marked as Defendants' Exhibit I for
15         identification as of this date by the
16         reporter.)
17         A.    Things that I bought that they
18    had to reimburse me for that, I can say
19    that I was always reimbursed for whatever.
20              MR. VALLETTI:  By the way, did
21         we mark what was earlier, 2014?  What
22         about the one before that?
23              MS. ALETOR:  That wasn't marked
24         the one before that, you just showed
25         him.
```

```
 1                    N. ALMONTE
 2              MR. WEINBERGER:  The work
 3         orders, that would be Exhibit J.
 4              (Whereupon, work orders were
 5         marked as Defendants' Exhibit J for
 6         identification as of this date by the
 7         reporter.)
 8         Q.   I'd like to show what you 363,
 9    364, and 365.  We'll mark it as the next
10    exhibit.
11              (Whereupon, documents Bates
12         stamped 363, 364, 365 were marked as
13         Defendants' Exhibit K for
14         identification as of this date by the
15         reporter.)
16         Q.   Mr. Almonte, I'd like to show
17    you what has been marked as Exhibit K.
18              MR. VALLETTI:  Just let the
19         record reflect it's a three-page
20         document.  The first one is cut off,
21         I'm assuming it's 363, 364, and 365,
22         Bates stamp number.  And as far as
23         Exhibit I goes, we have Bates number
24         14 to Bates number 62.  And Exhibit
25         K, could you just read off those
```

```
 1                    N. ALMONTE
 2         Bates, Stu, just for the record.
 3              MS. ALETOR:  123 to 328.
 4         Q.    Have you seen those documents
 5    before?
 6         A.    Of course, yes.
 7         Q.    Did you sign your name to those
 8    documents?
 9         A.    My son's name, yes.  I was the
10    one who wrote it.
11         Q.    And did you discuss with
12    Mr. Klahr the issue of overtime?
13         A.    No, you have to see, you have
14    to see this, it's about work or what?  I
15    have to save my job.  I can't tell -- I
16    can't tell him, look, Mr. Charlie Klahr,
17    you owe me money because of the work,
18    because I don't have the documents to work
19    in the United States.  Every employee would
20    sign this to keep their jobs at the end of
21    the year.
22         Q.    Did Mr. Klahr tell you that?
23         A.    He didn't have to.  That was
24    already understood.
25         Q.    How was that understood?
```

```
 1                    N. ALMONTE

 2        A.    Anything the office asks you

 3   for, look, at the end of the year, like at

 4   the end of the year if the company owes you

 5   something, no, nothing is owed, because

 6   here it has been paid in the name of Manuel

 7   Almonte, you know, the conversation we had,

 8   my son, me, and Mr. Charlie Klahr, it was

 9   the, you know, a conversation that we said

10   under the table.

11        Q.    Under the table, your son was

12   present in that conversation?

13        A.    I don't remember if he was.  I

14   don't remember.

15        Q.    By the way, do you remember

16   getting an extra check for some additional

17   overtime after this conversation?

18             MR. VALLETTI:  Can we keep the

19        off-the-record conversations out of

20        this, Mr. Klahr.  That's the second

21        time in two trips.

22             THE INTERPRETER:  What was the

23        question?

24             (Whereupon, the referred-to

25        question was read back by the
```

```
 1                    N. ALMONTE
 2        reporter.)
 3        Q.    Or around the time of this
 4   conversation.
 5        A.    If there was anything, it's
 6   because when we check like every other
 7   employee, sometimes there were errors, you
 8   know, many times with the payment company.
 9             So you have to check, you know,
10   the time sheets with the paystub of the
11   check, because sometimes the time sheets
12   said a certain number of hours and the
13   company paid you a different number of
14   hours.  So I would complain to the manager,
15   we would check it together, and -- if that
16   was the case.
17        Q.    And they paid you for whatever
18   hours you were owed then, if that was the
19   case, you checked it with Mr. Klahr and
20   they would pay you for whatever hours that
21   were owed?
22        A.    Whatever the timesheet said, if
23   it wasn't like matching with a check, then
24   yes, they would pay us whatever was
25   missing.
```

1                    N. ALMONTE

2         Q.    So your testimony is you never

3    got paid for overtime in 2012 and 2013; is

4    that your testimony?

5         A.    Yes, correct.

6         Q.    You never got paid overtime?

7         A.    I said previously, in one

8    occasion Mr. Charlie told me we have to

9    write in the timesheet, we have to write at

10   least 53 hours.  It was like 45 hours, plus

11   like three hours like on Saturday.

12        Q.    So --

13        A.    That's what did it say.

14        Q.    Did you work less than the

15   53 hours that week?

16        A.    No, more than the 53.

17        Q.    And there were occasions you

18   got paid for more, right, more than

19   53 hours a week?  Yes or no?

20        A.    I don't think so.

21        Q.    Are you sure?

22              MR. VALLETTI:  Objection.

23        Asked and answered.

24        Q.    What about 2011?  Did you get

25   paid any overtime in 2011?

```
  1                     N. ALMONTE
  2          A.    No, the excuse always was that
  3     the apartment was for the overtime.
  4          Q.    So let's go back exactly week
  5     by week in 2011, and can you tell us, let's
  6     start from the day you started, and let's
  7     go each week, exactly how many hours you
  8     worked that week, starting in 2011, going
  9     forward for the whole year?
 10               MR. VALLETTI:  Stu, I'm going
 11          to object to the entire line of
 12          questioning as harassing.  If you
 13          want to call the judge, let's do it.
 14          That's a harassing question.  Call
 15          the judge.  That's a harassing
 16          question.  You're going to going back
 17          week by week since 2011?
 18               MR. WEINBERGER:  Yes, he said
 19          he worked then.  How are we supposed
 20          to know the damages if he doesn't --
 21               MR. VALLETTI:  Ask him what he
 22          worked.  Listen, first of all you had
 23          him get directives from Charlie
 24          Klahr.  This stuff is sanctioned.
 25          He's getting the orders from the
```

131

```
 1                    N. ALMONTE
 2        boss.  Ask him to get orders from the
 3        boss.
 4             MR. WEINBERGER:  No, I'm not
 5        getting orders from his boss.  I want
 6        to know how many hours he worked so
 7        he can calculate the damages.
 8        Q.    So tell me how many hours in
 9   2011 you worked, breaking it down to prove
10   that you worked those hours.
11             MR. VALLETTI:  And I'll object,
12        again, because as you know as well as
13        I do, it's the employer's job to keep
14        accurate records under the law, Stu,
15        so he can testify to his knowledge of
16        the hours he worked, but in terms of
17        the accuracy, that's going to be in
18        the province of your clients.
19             MR. WEINBERGER:  Unfortunately,
20        that's a great argument, I'll say on
21        the record, except for your guy was
22        responsible for filling out the time
23        record and keeping --
24             MR. VALLETTI:  Whose
25        responsibility is it ultimately --
```

```
 1                   N. ALMONTE
 2             MR. WEINBERGER:  His
 3        responsibility.  He was the employee
 4        who was in charge of it.  We're going
 5        to talk to the judge tomorrow, so
 6        we're going to have to leave this.
 7             MR. VALLETTI:  You can ask him
 8        to the extent he has knowledge about
 9        the hours he worked, the week, but in
10        terms of him going week by week, that
11        is harassing and way overbearing and
12        really, really out of line.
13             MR. WEINBERGER:  No, it isn't,
14        because there is no way to figure out
15        the hours he worked and to prove the
16        amount of hours.  If he said the
17        timesheet is wrong, we're going to go
18        through each timesheet and he'll tell
19        us what hours are wrong.
20             MR. VALLETTI:  Start with the
21        time sheets.  We'll go week by week.
22             MR. WEINBERGER:  I started in
23        2011.
24             MR. VALLETTI:  We don't have
25        the records from before that.  Do
```

```
 1                      N. ALMONTE
 2          you?  Maybe the employer has the rest
 3          of them, which is also their job.
 4                MR. WEINBERGER:  Let's start
 5          with 2012.  Let's start week one,
 6          we'll go to 14.
 7                MR. VALLETTI:  Do you have any
 8          further questions on Exhibit K, Stu?
 9                MR. WEINBERGER:  No.
10          Q.    How many hours did you work
11     that week?
12          A.    It's right there, adding it all
13     up, 41.30.
14          Q.    That's accurate, you didn't
15     work any more hours than that?
16          A.    I did work more, but, you know,
17     since they were paying basically, they were
18     giving me the apartment, so I can't really
19     write down any more hours.
20          Q.    So why didn't you write down
21     40 hours?  How did you come to 41.35?
22          A.    If you see that the schedule is
23     8:30 to 5:00, with half-hour for lunch,
24     which is not paid, but if you see
25     Wednesday, I worked, I worked until 6:30,
```

1                    N. ALMONTE

2    not 5:00, so that's an extra hour and a

3    half.

4          Q.     And you wrote it down?

5          A.     I wrote it, correct.

6          Q.     Let's do the following week.

7    So do you know exactly how many hours you

8    worked that day?

9          A.     The one that says in the

10   timesheet, besides the hours I worked at

11   night.

12         Q.     All right.  The hours you

13   worked at --

14         A.     And Saturday and Sunday.

15         Q.     So you would not write down if

16   you worked Saturday and Sunday; is that

17   correct?

18         A.     At first, no.

19         Q.     Okay.  So let's go to the

20   second one.  Does that mean the next week

21   you wrote down the hours on Saturday and

22   Sunday?  That's number, I'm sorry, that's

23   No. 15.

24         A.     Yes, here I have Saturday.

25         Q.     So then did you write down the

```
 1                    N. ALMONTE
 2    hours of Saturday in 2012?
 3          A.    Yes, I remember that day
 4    perfectly, and I know what job I did that
 5    day.
 6          Q.    You remember the job you did in
 7    2012 on that day?
 8          A.    Yes, yes.
 9          Q.    On the Saturday?
10          A.    Yes, I don't forget.
11          Q.    Okay.  What was it?
12          A.    When my daughter came out, came
13    out of the apartment, the yard was full of
14    water.  She called me, she said, "Dad, the
15    yard is full of water."  So I came, I
16    looked, I remember I said, "Manuel, get up,
17    because we have problems."
18                So we went, we stepped on the
19    water, we went to the basement to get water
20    to unclog the sewers, and I remember, I
21    told them Manuel, prepare the machine,
22    because I'm going to take all the cables to
23    take them through the top, because I don't
24    want them to touch the water.
25                So that day, I remember it was
```

1                    N. ALMONTE
2    9:00 A.M., we started with, you know, a
3    snake.  We stopped to eat something as
4    usual at 12:30, 1:00.  And then we
5    continued snaking it until we were able for
6    the water, the water to start leaving
7    again.  So I can't forget -- I can't forget
8    that.  There's a few things I don't forget
9    about a job.
10        Q.    What about in 2011, any
11   extraordinary events in 2011 that you
12   remember about work on the --
13        A.    That would happen all the time,
14   but very rarely it occurred on a weekend.
15   On the weekday it would happen all the
16   time.  Sometimes even Abraham himself would
17   be with us helping to us unclog a sewer,
18   and Kalman also, because the basement would
19   flood with water, black water.
20        Q.    Kalman, Tabak, and Abraham, in
21   what year would they help you unclog?
22        A.    Once it was a coincidence.  He
23   arrived at the building, I remember Abraham
24   himself asked me to take one of those long
25   pipes, the ones that are like bronze, so

1                        N. ALMONTE
2        that you -- so that can you find that hole,
3        because otherwise, you can't find it, so
4        that can you find the elbow for the snake,
5        you know, because that way, that would find
6        that hole on its own.
7                  And I am grateful for him for
8        teaching, teaching me that, because that
9        was almost right in front of the office
10       because the office was in the basement.
11            Q.    Okay.  Thank you.  What about
12       No. 16?  How many hours did you work, this
13       is Bates stamped 16 (handing)?
14            A.    It says, "39.50."
15            Q.    What about the bottom?  What
16       does that say down there?  What hours were
17       there?
18            A.    Where, at the bottom?
19            Q.    Oh, I'm sorry.  It doesn't have
20       it.  So you missed a day of week here,
21       correct?
22            A.    It could be, yes.
23            Q.    So how many hours did you work
24       this week?  Not 39, total, total with night
25       calls, everything?

                         N. ALMONTE

1
2        A.    That week I could have worked
3    maybe 60, maybe 70.
4        Q.    Do you know?
5        A.    I don't know exactly, because
6    we did not keep a record of the emergency
7    phone calls.  Supposedly all the emergency
8    calls were paid with, you know, the rent of
9    the apartment.  Later, all that started
10   changing little by little.
11       Q.    When did that change?
12       A.    I don't remember.  Mr. Charlie
13   and I once spoke to him about saying, look
14   the law says that when the super lives in
15   the building, you have to at least work --
16   it covers up to like 51, 53, 50-something
17   hours, something like that.  That's why
18   instead of eight hours of work, the
19   schedule changed.  First, I would start at
20   8:30 and later I started at 7:00 A.M.
21       Q.    And you were paid, you said
22   there was a change, so the company made
23   sure to pay you extra so it would include
24   all of your night calls; isn't that what
25   happened?

```
 1                    N. ALMONTE
 2        A.    It wasn't pay me extra.  It was
 3   that in the paper it would show more hours
 4   in the schedule, but it was the same hours,
 5   not more money.
 6        Q.    Not more money, but they paid
 7   you hours to make sure that you were
 8   covered for the night calls, correct, and
 9   that was explained to you?
10        A.    No.
11        Q.    So you never received overtime
12   besides these -- your overtime each week,
13   again in 2012 never varied, you never got
14   extra overtime?
15             MR. VALLETTI:  Objection.
16             You're talking about worked hours or
17             pay received?
18             MR. WEINBERGER:  I'm talking
19             overtime.  You know what overtime
20             means.
21             MR. VALLETTI:  I don't know if
22             you're talking about the pay or the
23             hours.  The hours he worked
24             fluctuated.  Can you clarify that?
25             MR. WEINBERGER:  We can clarify
```

1                       N. ALMONTE

2            it.

3            A.     When I got the job, you know,

4     when I started being the super, I was told

5     I would get paid $400 a week.

6            Q.     I'm not asking you that.  I'm

7     asking 2012, I'm not asking that.  Did you

8     get overtime for working, overtime beyond

9     extra hours when you worked beyond, let's

10    say, whatever hours you were scheduled to

11    work, did you get paid overtime?  Yes or

12    no?

13           A.     My check, my check was always

14    the same.  I was always the same amount

15    until April 2013.

16           Q.     Do you understand when you're

17    asked a question, just so that you answer

18    questions, it's supposed to be answered

19    truthfully, you understand that?

20                  MR. VALLETTI:  Objection.

21            Again, Stu.

22           A.     Ever since we started, I'm

23    under oath.

24           Q.     You're under oath.  What about

25    the next week.  Can you look at that, 17,

1                         N. ALMONTE

2    Bates stamped 17 (handing).

3         A.    What's the question?

4         Q.    Do you see that timesheet?

5    What does the bottom say, the bottom entry?

6         A.    It has the numbers, but it

7    looks dark.

8         Q.    I didn't ask that.  What does

9    that indicate?

10        A.    It says "12:30" right there.

11        Q.    Is that at night or during the

12   day?

13        A.    That's the day, I think.  I

14   don't know.

15        Q.    You don't know?  It could have

16   been at night?

17        A.    Because it doesn't say A.M. or

18   P.M.

19        Q.    Well, did you write down things

20   at night when you worked at night?

21        A.    No, that was the day.

22        Q.    So why did you write on top the

23   same hours?

24        A.    That's the normal schedule.

25   Okay?  If you look at another timesheet

```
 1                    N. ALMONTE
 2   where you can actually see the dark area,
 3   it says what time you left and what time
 4   you came back.
 5              So I put down that I left the
 6   building at 12:30 and I came back at 4:15.
 7   Here on top you can see the regular
 8   schedule, because even though I left the
 9   building, Manuel Almonte would stay right
10   in front of the building.
11        Q.    Did you ever write down at the
12   bottom that you left the building to go
13   work in another building?
14        A.    Yes.
15        Q.    So, do you know how many hours
16   you worked that week exactly?
17        A.    Supposedly the same 40 hours,
18   plus the date I stayed up to 6:30, so the
19   same, 41 and a half hours.
20        Q.    So you stayed up to 6:30 and
21   you got paid for that, as far as you know,
22   correct?
23        A.    Yes.
24        Q.    Let's quickly go through this.
25   This week, the next week, 19, we'll try and
```

1                    N. ALMONTE
2    go through this quickly.
3          A.    What's the question?
4          Q.    How many hours did you work
5    that week?
6          A.    Discounting because if you see
7    here, Monday, I was sick.  I felt sick in
8    the morning.  So I went back to work at
9    3:30 P.M. and I worked until 5:30.  I took
10   some medicine for the flu or something like
11   that.  I don't remember.
12         Q.    So how many hours did you work
13   that week, total that day, that week, I'm
14   sorry?
15         A.    You would have to add
16   whatever's there.
17         Q.    So you didn't work any more
18   including night calls or, that's the total
19   hours that you worked that week?
20         A.    The same question every week,
21   you worked up to the same time, it was
22   like, you know, a little bit, one hour or
23   two extra hours it would be written down in
24   the timesheet.  If I kept going, you know,
25   not five, you know, until 6:00, 6:30 I

```
 1                      N. ALMONTE
 2    would write that down in the timesheet, but
 3    when I stopped working at 5:30, and then
 4    there was a job like at 7:00 P.M., that
 5    would not be written down on any sheet.
 6              Every day you worked in the
 7    nighttime, it was like a miracle whenever
 8    there wasn't some kind of emergency.  I
 9    told you before I was like a firefighter, I
10    slept with the boots.
11         Q.    So you would stop writing it
12    down at 6:00 at night, right, 5:30, 6:00?
13         A.    It would depend when I stop,
14    like if it was straight without stopping, I
15    would put the time I finished.
16         Q.    Do you have any --
17         A.    And that was in the middle of
18    2012 that that started.
19         Q.    What started?
20         A.    That I would be asked to write
21    down if I worked straight, like an extra
22    hour or extra hour and a half, actually you
23    have to ask permission to work overtime.
24         Q.    Okay.  So it did change.  In
25    2012, you were told at some point that you
```

                          N. ALMONTE

1

2       had to write down hours if you worked after

3       the hours?

4              A.     If I worked like an hour or

5       half-hour after the finishing time, that

6       didn't matter, but that did not mean that I

7       would have to write down the hours that

8       they called me in an emergency.

9              Q.     You're saying if you work more

10      than a half-hour, an hour, you would write

11      down the time at night?

12             A.     If it kept going straight, like

13      if it was instead of 5:00, let's say I

14      worked an extra half-hour, it would be

15      5:30, then I would write it, but the

16      example is right there.

17             Q.     You said it, just said it

18      changed in 2012 --

19             A.     Before 2012, it wasn't like

20      that.

21             Q.     Okay.  In 2012, were you told

22      you had to write down all the hours you

23      worked?

24             A.     Minus the emergency hours,

25      because that would be paid with the

1                       N. ALMONTE

2    apartment.

3         Q.     Okay.  So your testimony is you

4    worked 30 emergency hours a week; is that

5    your testimony, every week?

6         A.     One week could be even over

7    40 hours and then one week could be over

8    20, so it would depend on the emergencies.

9         Q.     So how would we know what hours

10   you worked every single week?

11        A.     By, you have to suppose, there

12   is no written record.

13        Q.     Well, there is no written

14   record or did you ever tell anybody all the

15   hours that you worked?

16        A.     I didn't have to tell anybody,

17   the company knew, Mr. Charlie Klahr was the

18   one who was sending me the texts.  Even the

19   emergencies for other buildings I would

20   leave 2:00, 3:00 A.M. for the emergencies

21   in the other building.

22        Q.     This is interesting.  Mr. Klahr

23   is a religious Jew, correct?

24        A.     That's his personal life.

25        Q.     But he wouldn't call you on

1                    N. ALMONTE

2   Friday night, would he?

3         A.    Actually, there is a

4   coincidence, that he did call me, you know,

5   even Saturdays, after like 5:00, 6:00 P.M.

6   He could even tell you that himself, he

7   would call me, he would call me like, you

8   know, to speak to me, so we did have

9   conversations over the phone.

10        Q.    Again, did you ever write down

11   the time you worked on Saturdays and

12   Sundays, just in 2012?

13        A.    I was asked to write down that

14   I worked three hours, an hour and a half in

15   the morning, and an hour and a half in the

16   evening.

17        Q.    So that's all you wrote down, a

18   total of three hours for that day?

19        A.    Yes, because there was no

20   porter.  On Sunday there was no porter.  I

21   had to do the cleanup in the morning and

22   afternoon.

23        Q.    So what was your scheduled time

24   that you worked?

25        A.    I would start at 8:30 and then

1                    N. ALMONTE
2    I would finish at 5:00.  And then that
3    changed, that we started at 7:30 in the
4    morning and I would finish at 5:30.
5                    And that also you had to
6    include those three hours because the
7    porter would not work on Sundays and, you
8    know, it had to be cleaned up seven days a
9    week.
10        Q.    Who assigned you to work on
11    Sundays?
12        A.    Mr. Charlie Klahr.
13        Q.    Did you write down the time you
14    worked on Sundays?
15        A.     In some time sheets if you
16    check it says sometimes Sundays, let's say
17    from 8:00 to 9:30 and then in the
18    afternoon, another hour and a half.
19        Q.    Was there any weekend coverage
20    at the building at 437 Morris Park Avenue?
21        A.    What do you mean?  I don't
22    understand the question.
23        Q.    Did any porters work on the
24    weekend?
25        A.    Saturday, the porter would work

                          N. ALMONTE

1

2       hour and a half morning, hour and a half in

3       the afternoon.

4            Q.    Isn't it true that Sunday, the

5       porter worked?

6            A.    No.

7            Q.    Okay.  So there was no porter

8       assigned at 437 Morris Park on Sundays; is

9       that correct?

10           A.    I think I'm confused.  It was

11      Saturday that there was no porter.  Sundays

12      the porter did work.  It was Saturdays that

13      there was no porter.  I'm sorry about that.

14           Q.    Now, let's go to 2013, did you

15      ever meet with Mr. Klahr?  Did you ever

16      meet with Mr. Klahr -- when you were

17      working as Nestor Almonte, did Mr. Klahr

18      ever ask you again what overtime hours you

19      worked?

20           A.    No, not that I remember.

21                MR. WEINBERGER:  Let's mark

22          this as Exhibit L.

23                (Whereupon, document was marked

24          as Defendants' Exhibit L for

25          identification as of this date by the

```
1                      N. ALMONTE
2          reporter.)
3          Q.    By the way, when did Manuel
4    Almonte stop working in the building?
5          A.    When I started working as a
6    super, then he became a handyman, and he
7    worked like a month or two as a handyman.
8          Q.    And when was that?
9          A.    That was like April, May 2013.
10         Q.    That's when he stopped working
11   in the building?
12         A.    April, May, or June was that he
13   stopped.
14              (Whereupon, an off-the-record
15              discussion was held.)
16              THE INTERPRETER:  Had said
17              before, to be exact, he stopped
18              working in June 2013.
19         Q.    I'd like to show you what was
20   marked as Exhibit L (handing).
21         A.    What's the question?
22         Q.    Have you ever seen Exhibit L?
23         A.    Yes.
24         Q.    And Exhibit L is signed by you
25   in the name of Manuel Almonte, correct?
```

1                        N. ALMONTE

2          A.     Yes.

3          Q.     And at that time, you were

4   working as Nestor Almonte; is that correct?

5          A.     Well, this refers to these

6   thousand dollars that is saying is the

7   payment and that was a loan that was given

8   to me by the company.

9          Q.     The loan was to you when?

10         A.     I don't have the date, but I

11  never received a thousand dollars as a

12  bonus.

13         Q.     You said it was a loan?

14         A.     Not a bonus, though.  Like if

15  you check the reason that it says.

16         Q.     By the way, did you get two

17  loans from the company?

18         A.     Yes.

19         Q.     And you signed for those loans;

20  is that correct?

21         A.     Yes.

22         Q.     And do you claim you were

23  damaged in any way by receiving those

24  loans?

25                        MR. VALLETTI:  Just note my

```
 1                    N. ALMONTE
 2          objection to that.  I don't know you
 3          mean by "damaged."  He can answer if
 4          he understand.
 5      A.    I don't understand that, what
 6    do you mean claiming?  What --
 7      Q.    Are you aware, if you know,
 8    that you're suing, you have a cause of
 9    action, a lawsuit involving these two
10    loans, are you aware of that?
11      A.    This is included in the
12    lawsuit, but it's not like I'm claiming
13    this loan.  Only my lawyer knows how this
14    works.
15      Q.    With respect to this, it says
16    here, "There are no money owed for any
17    reason, not towards regular pay, overtime,
18    or reimbursements"; is that correct?
19      A.    Is it the same document you
20    showed me from another year, you know,
21    2011, 2012, every year, this was done.
22    Documents that you have to sign to keep the
23    job, like if I refused to sign something
24    like this, then my job ended right there.
25      Q.    Because you were an illegal
```

1                        N. ALMONTE
2      alien at that point, when you signed that;
3      is that correct?
4           A.    No, I wasn't an illegal alien.
5           Q.    So who told you your job was
6      going to end if you signed that, if you
7      didn't sign that?
8           A.    No, it wasn't -- I wasn't told
9      that.  They didn't have to, I understood
10     that.
11          Q.    Why did you understand that?
12          A.    It's like a sixth sense.
13          Q.    So again, were you paid
14     overtime in 2013?
15               MR. VALLETTI:  Objection, asked
16          and answered.
17               MR. WEINBERGER:  No, I didn't.
18               MR. VALLETTI:  You said
19          "again."  That's usually a hint --
20               MR. WEINBERGER:  I'll withdraw
21          the question.
22          Q.    Were you paid overtime in 2013?
23          A.    Not the emergency calls.  It
24     was always the same boss since I started
25     until I finished.

```
 1                    N. ALMONTE
 2        Q.    You got the same amount, your
 3   check was the same amount every week in
 4   2013; is that correct?
 5        A.    Before 2013?
 6        Q.    No, I asked 2013.
 7             MR. VALLETTI:  You have to
 8        listen to the question, Nestor.  He's
 9        asking you something very specific.
10        Listen to the question.
11        Q.    In 2013, were you paid for
12   overtime, just start there, were you paid
13   for overtime?
14        A.    The hours that I worked
15   immediately after 5:00, it was an hour or
16   two hours, an hour and a half, that, yes.
17        Q.    And by the way, weren't you
18   paid in 2013 hours for going to
19   Sherman Avenue?
20        A.    No, they paid me a salary of
21   $300 a week.
22        Q.    So let's just clear up how this
23   was.  Weren't you responsible for working
24   at Sherman Avenue in 2013 as well, besides
25   Morris Park?
```

```
 1              N. ALMONTE
 2         MR. VALLETTI:  Just note my
 3    objection.  You have to put a
 4    specific time frame on this.  Because
 5    in April --
 6         MR. WEINBERGER:  Just asking --
 7         MR. VALLETTI:  But there's a
 8    shift of how it worked in 2013.
 9         MR. WEINBERGER:  We'll --
10         MR. VALLETTI:  There's a
11    certain period of time you want to
12    talk, let's make it a certain period
13    of time, because that answer could go
14    two ways.  So let him rephrase it.
15    Let him put a time frame on it and we
16    can go there.
17    Q.    I'm just asking in general in
18 2013, did you work in 1195 Sherman Avenue?
19    A.    Yes.
20    Q.    Okay.  And were you scheduled
21 to work 20 hours in Sherman Avenue?
22    A.    No, if you look at the time
23 sheets, you'll see that none of them have
24 20 hours and either way, I received the
25 payment of $300.  That was just the
```

```
 1                    N. ALMONTE
 2   agreement of $300 a week.
 3         Q.    So how much do you claim you
 4   are owed, let's just break this down for
 5   2013, how much starting January 1st, 2013,
 6   through the time your employment ended, how
 7   much do you claim you're owed?
 8              MR. VALLETTI:  Just note my
 9         objection because this is a legal
10         conclusion as to how much he's
11         actually owed and he doesn't have the
12         ability to answer that question.
13              MR. WEINBERGER:  No, no, no, I
14         didn't say that.  I said "claimed."
15              MR. VALLETTI:  He doesn't have
16         the ability to answer that question,
17         Stu.
18              MR. WEINBERGER:  He absolutely
19         does.
20              MR. VALLETTI:  I disagree.
21         Q.    How much do you believe you are
22   owed?
23         A.    That's math.
24         Q.    Let's introduce this.
25              (Whereupon, document was marked
```

1                    N. ALMONTE
2          as Defendants' Exhibit M for
3          identification as of this date by the
4          reporter.)
5      A.    I don't know what this is.
6      Q.    You've never --
7            MR. VALLETTI:  Go ahead.  Let
8      him ask questions.
9            (Whereupon, a brief recess was
10     held at this time.)
11     Q.    Now, you're not claiming you're
12  owed any money after you started working on
13  Sherman Avenue from April 23rd, 2013,
14  correct?
15     A.    Can you just repeat the
16  question, again.
17     Q.    You're not claiming any money
18  for any period after April 23rd, 2013; is
19  that correct?
20     A.    No, I don't think so.
21     Q.    Now, did you get a wage
22  increase after you started working?
23     A.    What date?
24     Q.    Any wage increase?
25     A.    For more work hours.

1                       N. ALMONTE

2          Q.    I just want to show you -- the

3     Bates stamp is not clear.  It looks like

4     it's 342, 437, yes.

5                       (Whereupon, document was marked

6               as Defendants' Exhibit N for

7               identification as of this date by the

8               reporter.)

9          Q.    Let me show you what we marked

10    (handing).

11         A.    Okay.

12         Q.    Now, there was a paystub given

13    with the checks; is that correct?

14         A.    Yes.

15         Q.    So just looking at one -- where

16    it says would you see something that looks

17    like $40 regular, 15 overtime, and then

18    6.50.

19         A.    Yes, I see it.

20         Q.    Now, let's just skip down to to

21    where it says, "2/1/2013."  What does that

22    say for the amount of overtime paid there?

23         A.    I don't see what that date is.

24               MS. ALETOR:  The third column.

25         Q.    Let me show you. The third one.

DIAMOND REPORTING   (718) 624-7200   info@diamondreporting.com

```
 1                      N. ALMONTE
 2          A.     What is the question?
 3          Q.     How much overtime does it show
 4    on this pay record for that week?
 5          A.     This is 6.65.
 6          Q.     Now the first 11/17/2013, how
 7    much overtime does it show?
 8          A.     6.50.
 9          Q.     Anything else there above that?
10          A.     It says $15 overtime, extra
11    hours.
12          Q.     Going down where it says
13    "2/14/13" --
14          A.     Which column is that?
15          Q.     The overtime, how much overtime
16    does it say there?
17          A.     Where?
18          Q.     2/14/13, just go along.
19          A.     So 12 hours for $12.
20          Q.     How many hours?
21          A.     It says "12" right there.  It
22    says, "Overtime paid, no."
23          Q.     Does it say 6.65?
24          A.     Yes.
25          Q.     And 40?
```

```
 1                    N. ALMONTE
 2          A.    40, yes.
 3          Q.    So the hours, based on these,
 4    if these records are correct, the amount of
 5    overtime you received varied; is that
 6    correct?
 7          A.    Yes.
 8          Q.    And the amount of your paycheck
 9    changed; isn't that true?
10          A.    If you look at the pattern,
11    they all say, "6.65, 6.65, 6.65."
12          Q.    No, they don't, do they?  No,
13    they don't.  They say $15, 6.50, right?
14    You're reading the same thing?
15          A.    Basically, what's your
16    question?
17          Q.    Did your paycheck differ, yes
18    or no, each week?
19          A.    It would vary, yes, yes it
20    would vary.
21          Q.    And you did get paid for
22    overtime; isn't that correct?
23          A.    Some of the overtime.
24          Q.    Could you tell us what week --
25    let's just take this week where you got
```

```
 1                     N. ALMONTE
 2    this period.  Can you tell us how much
 3    overtime you're owed for that period
 4    (pointing).
 5         A.    For all of it?
 6         Q.    No, I just asked for that one
 7    period, just taking a random --
 8         A.    One week, you mean?
 9         Q.    Yes, for one week.
10         A.    It's that here -- it says 40
11    plus 6.50, so like 46 hours.  That week, I
12    could have worked 60.  I could have worked
13    55.
14         Q.    You could have worked 35,
15    because you were out sick.  I'm not saying
16    that week, any week?
17         A.    Oh, yes, there were weeks I was
18    sick.
19         Q.    So could you tell me, could you
20    break down, again, let's just say for the
21    year 2013 for the beginning of the week
22    January 1st to April 23rd, 2013, how many
23    hours do you claim you worked, taking into
24    account that you were sick or whatever
25    happened, can you tell us?
```

1                      N. ALMONTE

2          A.     I don't understand that

3     question.

4          Q.     Can you tell us how many hours

5     you claim in -- again from January 1st,

6     we're sticking with 2013 through

7     April 23rd, '13, how many hours do you

8     claim you worked where you didn't get paid,

9     if you know?

10         A.     I don't have that in my mind.

11    You would have to calculate with the time

12    sheets of the job.  The payments and the

13    hours that I worked.  The ones I really

14    worked.

15         Q.     Well, how would we know that?

16    How would we be able to calculate that?  Is

17    it all on the time sheets?  How would I

18    know what hours you worked from

19    January 1st, 2013 through April 23rd, 2013?

20    And if you can't tell me, tell me who would

21    know.

22              MR. VALLETTI:  Just note my

23         objection to the form of the

24         question.

25         A.     I would say if the manager

1                        N. ALMONTE

2     checks the hours and the calls that were

3     made, because he's the one that received

4     the hotline phone calls, you could

5     calculate that.

6          Q.     So if he says that you got paid

7     properly, then you would have to agree with

8     that, correct, the correct number of hours?

9               MR. VALLETTI:  Note my

10              objection to that characterization.

11         A.     Do I have to answer that?

12         Q.     Yes, if you can.

13              MR. VALLETTI:  If you know.

14         A.     Then he's lying.  If he says he

15     paid me in full, he's lying.

16         Q.     Okay.  So tell us, what again,

17     how can we know, I don't want to use the

18     word "again," how can somebody tell us or

19     calculate, or maybe you can instruct us,

20     how do we calculate how much you claim is

21     owed from January 1st, 2013 through

22     April 23rd, 2013?

23              MR. VALLETTI:  Just note my

24              objection in terms of it being a

25              calculation.  He's not here to do

```
 1                         N. ALMONTE
 2          that, he's here to testify to facts.
 3               MR. WEINBERGER:  Actually, on
 4          the record can you ask.
 5               MR. VALLETTI:  You can ask if
 6          you want.  He doesn't have a
 7          calculator in front of him.
 8               MR. WEINBERGER:  No, no, no,
 9          I'm asking him to tell me how you get
10          to this number or how we can get to
11          this number and then instruct me how
12          to do it.
13               MR. VALLETTI:  Is there a
14          question pending there?
15               MR. WEINBERGER:  Yes.
16               (Whereupon, the referred-to
17          question was read back by the
18          reporter.)
19          A.    I personally, the way I
20     calculate, is because I would get a
21     payment, half of that payment was for
22     Manuel Almonte and half for me.  Whatever
23     half was given to him for my job, I guess
24     that would be the way to calculate, there
25     is no other way that I can actually do the
```

1                      N. ALMONTE

2    calculation.

3           Q.     Okay.  So whatever the time

4    shows on the time sheets for that period

5    January 1st, 2013, would be the amount of

6    hours you worked or that you're claiming

7    you worked; is that correct?

8                      MR. VALLETTI:  Just note my

9              objection that before he testified

10             that the hours reflected in time

11             sheets weren't accurate for the whole

12             time.

13                     MR. WEINBERGER:  Well, I'm

14             asking him.

15                     MR. VALLETTI:  Well, I'm just

16             noting my objection.

17          A.     The time sheets reflect the

18    regular work hours.

19          Q.     So how -- go ahead.

20          A.     I asked -- answered this

21    question various times.  The night hours,

22    the emergency calls are not anywhere there

23    in the time sheets.  I don't know how to

24    calculate that.  I leave that to the law.

25          Q.     Is there any way for us to know

                           N. ALMONTE

1

2    what hours you worked that you weren't paid

3    for from January 1st, 2013 through April

4    23rd, 2013?

5              MR. VALLETTI:  I'm going to

6         object as asked and answered.  He has

7         already answered that question.

8              MR. WEINBERGER:  No, he hasn't.

9              MR. VALLETTI:  It's the last

10        question you asked and he told you an

11        answer.

12             MR. WEINBERGER:  He hasn't.

13        That's not an objection.

14             MR. VALLETTI:  Just note my

15        objection.  And if you can answer,

16        you can answer.

17        A.    I can't answer that.  How am I

18   going to calculate that?

19        Q.    Well, tell us, how can anybody

20   calculate this, then?

21        A.    Well, you can calculate because

22   you have a radio 24 hours a day.  That, of

23   course, doesn't mean that you're working

24   all 24 hours every day.  Like I said, you

25   know, like, when you're in an office you

```
 1                    N. ALMONTE
 2    take a break few minutes here, few minutes
 3    there, but you're there.  It doesn't mean
 4    you're working all the time.
 5                    But, you know, the
 6    firefighters, you know, are -- they could
 7    be sitting, this waiting for an emergency
 8    but they're working because they're there.
 9        Q.    It's called "on-call," right?
10    Do you know that phrase?
11                    Let's withdraw the question.
12    Just to show this quickly, because we want
13    to move on 63 to 78.
14                    (Whereupon, superintendent's
15                    time sheets were marked as
16                    Defendants' Exhibit O for
17                    identification as of this date by the
18                    reporter.)
19        Q.    Let me ask you a question.
20    While you're looking through that, where it
21    says after Friday, it's Saturday and
22    Sunday, these copies are blocked out.  But
23    actually you can read Saturday and Sunday,
24    correct?
25        A.    Yes, yes.
```

```
 1                   N. ALMONTE
 2        Q.    And in fact on the first one
 3   just to be clear, on 63, you in fact worked
 4   on this Saturday; is that correct?
 5        A.    Yes, it's right there.
 6        Q.    Are these the time sheets for
 7   that period, January 1st, 2013, through
 8   April 23rd, 2013?
 9        A.    What do you mean, if these are
10   the time sheets?
11        Q.    Are you familiar, are these the
12   superintendent time sheets?
13        A.    Yes.
14        Q.    Okay.  Just looking at the last
15   one, by the way, it said you worked late on
16   the sewer with Pedro Medina?
17        A.    Yes.
18        Q.    And when you worked late at
19   night in apartments, you actually wrote
20   that down; is that correct?
21        A.    There were occasions, yes.
22        Q.    So there were occasions you
23   wrote down for the night calls, correct?
24        A.    At some point I started writing
25   them down, because I wasn't -- I didn't
```

```
 1                    N. ALMONTE
 2   feel like I was satisfied, so I started
 3   writing it.
 4        Q.    So what was the point you
 5   started writing down the night calls?
 6        A.    I don't remember.
 7        Q.    Was --
 8        A.    Exactly.
 9        Q.    Was it 2012, 2011, just
10   roughly?
11        A.    I would say like towards the
12   end of 2013.
13        Q.    Are you sure it wasn't 2012?
14        A.    I'm not sure.  That's why I
15   said I'm not sure.
16        Q.    Okay.  Just a few more
17   questions.  2012, the time sheets.
18             (Whereupon, an off-the-record
19          discussion was held.)
20             MR. WEINBERGER:  All right.
21          Let's pull it quickly, 2012 and 2011.
22             MR. VALLETTI:  Real quick, off
23          the record.
24             (Whereupon, an off-the-record
25          discussion was held.)
```

1                    N. ALMONTE

2              MR. WEINBERGER:  Let's just put

3         the time sheets in for 2011 which is

4         000 through 13.

5              (Whereupon, time sheets were

6         marked as Defendants' Exhibit P for

7         identification as of this date by the

8         reporter.)

9         Q.    So let's just look at

10   Exhibit P.  Do you know what Exhibit P is

11   (handing)?

12        A.    Time sheets.

13        Q.    Can you tell us based on these

14   time sheets how many hours you worked in a

15   week?

16              MR. VALLETTI:  Just do me a

17         favor, I don't want to get these

18         things confused.

19              MR. WEINBERGER:  Did we take

20         the exhibits back?

21              MS. ALETOR:  We're going back

22         and forth.

23              MR. VALLETTI:  Hold on, this is

24         I, there's I.  Sorry about that.

25              THE WITNESS:  What was the

```
 1                    N. ALMONTE
 2        question?
 3             (Whereupon, the referred-to
 4        question was read back by the
 5        reporter.)
 6        A.    Some have 40, most of them is
 7   the original schedule.  That's what I would
 8   get paid, that amount of money.  You could
 9   see that it started 8:30 and it would end
10   at 4:30.  And even the half-hour of lunch
11   was included in the eight hours.  That's
12   how it started.  Then it changed and
13   changed, but with the same payment.
14        Q.    So could you tell us based on
15   these time sheets, again -- not again, can
16   you tell us how many hours you claim you
17   worked in 2011 that you were not paid for?
18        A.    Well, in my calculations, I
19   would approximately work 70 hours a week,
20   you know, some weeks could be 60, some
21   weeks could be 80, that's what I would
22   calculate, approximately 70 hours a week.
23        Q.    Could it be 30 or 40 if you
24   were out sick?
25        A.    It could be, of course.
```

1                    N. ALMONTE

2          Q.    So how would we know in 2011

3    what you worked in a given week?

4                    MR. VALLETTI:  Note my

5           objection.  He can answer.  He just

6           gave you an average of hours a week.

7           He can answer, if he can.  Go ahead.

8          A.    That's an average.  In every

9    timesheet if I was sick, it would be down

10   there, you know, "sick," or whatever.

11         Q.    So in those weeks where you

12   were sick or whatever, you worked 30 hours

13   40 hours?

14         A.    It could be, but I'm not sure.

15         Q.    Are you sure of any hours that

16   you worked in any given week, are you sure

17   in 2011 of the hours you worked?

18         A.    Never one week was the same as

19   another.  It was never one day exactly the

20   same as another day, never.

21         Q.    And just to be clear, there's

22   no record of hours that you worked?

23         A.    Those calculations I leave to

24   my lawyer and the law.

25         Q.    Okay.  What about 2012?  Can

```
 1                    N. ALMONTE
 2    you tell us what your claim is for the
 3    number of hours that you worked in 2012 and
 4    if it changed, because you said there may
 5    have been a change of how you were paid,
 6    maybe, can you tell us what the change was?
 7              MR. VALLETTI:  Just note my
 8         objection to form.  Can you just be
 9         clear.  I don't want him to have to
10         go through the same spiel again.  Ask
11         him, if you can, a pointed
12         question --
13         Q.    Do you understand the question?
14    If not, we'll rephrase.
15         A.    No, I don't.
16         Q.    Okay.  How many hours do you
17    claim you're owed for overtime or for pay
18    in the year 2012?
19         A.    Those calculations I leave to
20    my lawyer.  That's why I have a lawyer.
21    He's the one that knows the law.  I don't
22    know the law.
23         Q.    So your lawyer would know the
24    hours that you worked?
25              MR. VALLETTI:  Well, just note
```

1                        N. ALMONTE

2            my objection.  You asked him for how

3            much he is claiming and he's right to

4            say it's his lawyer's calculation.

5                  If you want to ask him how many

6            hours he worked, Stu, that might be a

7            better question.

8                  MR. WEINBERGER:  I think that

9            is the question.

10       Q.    How many hours did you work in

11   2012 where you didn't get paid?

12       A.    70 hours a week.

13       Q.    Each week?

14       A.    I just said some weeks it could

15   have been 80 and some weeks could have been

16   90, some weeks could have been 50.

17       Q.    About 30?

18       A.    Impossible.  Because there is

19   no timesheet that would say that, that I

20   worked 30 hours.  With the exception of the

21   sick day, maybe those hours I didn't work.

22       Q.    Okay.  So there could be weeks

23   that because you were out sick or you went

24   someplace else, vacation or something?

25       A.    One whole week, never.

1                      N. ALMONTE

2          Q.     Let's go back to some other

3     stuff.

4                      MR. WEINBERGER:   375.

5                      (Whereupon, document was marked

6              as Defendants' Exhibit Q for

7              identification as of this date by the

8              reporter.)

9          Q.     Have you seen this document

10    before (handing)?

11         A.     Yes, I remember this.

12         Q.     And what is this?

13         A.      This is a list that Mr. Charlie

14    Klahr gave me.  That this is what we had to

15    ask each employee all the tools that they

16    needed to have, but no one ever really had

17    them.

18         Q.     Did you sign that list?

19         A.     I signed as if I had those

20    tools personally, I did have that.

21         Q.     Thank you.

22                Did you ever work under the

23    name of Ernesto Lopez?

24         A.      I would be called that in the

25    company many times.  That's my mother's

```
 1                     N. ALMONTE

 2   last name.  I've said that before.  I'm

 3   Nestor Almonte Lopez.

 4         Q.    I'd like to show you, it's 385,

 5   Bates stamped 385 to 387 (handing).

 6              (Whereupon, document was marked

 7          as Defendants' Exhibit R for

 8          identification as of this date by the

 9          reporter.)

10         Q.    Have you ever seen these

11   documents before?  And while you're doing

12   this, by the way, doing two things at

13   once --

14              MR. VALLETTI:  No, no, we're

15          not going to have him review

16          documents and answer the questions at

17          the same time.

18              MR. WEINBERGER:  Fine, go

19          ahead.

20         A.    What was the question?

21         Q.    Have you ever seen those

22   documents before?

23         A.    Yes.

24         Q.    And who were they given to?

25         A.    What do you mean?  Who were
```

1                    N. ALMONTE
2    they given to?
3         Q.    Who was being written up, given
4    those warning letters?
5         A.    Manuel Almonte.
6         Q.    So Manuel Almonte was the one
7    who was guilty of these things, not you?
8         A.    No, in this case, it was me.
9         Q.    So the company wrote to you,
10   gave you a warning letter in the name of
11   Manuel Almonte; is that correct?
12        A.    Yes.
13        Q.    Did the company ever refer to
14   you as "Manuel Almonte"?
15        A.    The "company" is who?
16        Q.    Charlie.
17        A.    No.
18        Q.    Charlie Klahr?
19        A.    No.
20        Q.    So Charlie wrote that letter,
21   who is Charlie writing that letter to?
22        A.    To me personally.
23        Q.    And what name is on that
24   letter?
25        A.    Manuel Almonte.

```
 1                     N. ALMONTE
 2          Q.    So did Charlie refer you to as
 3     Manuel Almonte?  Yes or no?
 4          A.    He never referred to me as
 5     Manuel Almonte.  He called me "Lopez."
 6          Q.    Is anyplace in this, any letter
 7     that says Lopez?
 8          A.    This type?
 9          Q.    Yes.
10          A.    It says "Manuel Almonte."  Two
11     of them are signed with the name
12     Manuel Almonte and one of them has my
13     personal signature as Nestor Almonte.
14          Q.    And you signed the other ones
15     as Manuel?
16          A.    Of course.  Manuel was the
17     super's name.
18          Q.    So is it, the warning, given to
19     you or to Manuel Almonte, your son, just
20     tell me yes or no, those three warnings --
21     did they go --
22          A.    For the third time, these
23     warnings were given to me, personally.
24               (Whereupon, document was marked
25                as Defendants' Exhibit S for
```

```
 1                    N. ALMONTE
 2          identification as of this date by the
 3          reporter.)
 4                  MS. ALETOR:  What page is that?
 5                  MR. WEINBERGER:  397.
 6          A.    What's the question?
 7          Q.    Have you seen this document
 8    before?
 9          A.    Yes.
10          Q.    Is that your signature on
11    there?
12          A.    It was signed by me in the
13    Manuel's name.
14          Q.    Okay.  So the company referred
15    to you again in this document as
16    "Manuel Almonte"; is that correct?
17          A.    The whole time in paper.
18          Q.    In paper, so every document in
19    paper referred to you as Manuel Almonte,
20    correct, from the company, until you
21    changed to Nestor?
22                  MR. VALLETTI:  Just note my
23          objection as to, "changed to Nestor."
24                  MR. WEINBERGER:  All right.
25          Withdraw the question.
```

```
 1                        N. ALMONTE
 2         Q.      Every document referred to you
 3    from the company that you received from the
 4    company referred to you as Manuel Almonte;
 5    is that correct?
 6         A.      Until April of 2013.
 7         Q.      And then it changed to what?
 8         A.      No, I didn't change, what
 9    happened was that I was authorized to work
10    in the United States legally, so I handed
11    him my Social Security card and my
12    residency card, and then I put myself down
13    as a super and Manuel Almonte, the
14    handyman.
15         Q.      Where did you put Manuel
16    Almonte down as a handyman?  Where did you
17    put that down?
18         A.      No, because of the time
19    sheets -- Manuel Almonte started writing
20    the time sheets down as Manuel Almonte and
21    I was doing the time sheets as the super.
22         Q.      Well, what time sheets did
23    Manuel Almonte write down?
24         A.      I don't understand.
25         Q.      Well, you started writing down
```

1                    N. ALMONTE
2    time sheets as Manuel Almonte, right, as
3    the handyman, when was that?
4           A.    Yes.
5           Q.    When was that?
6           A.    That was April, May 2013.
7    April, April 2013.
8           Q.    How long did that going on for?
9           A.    Until June.
10          Q.    Okay.  But you're not claiming
11   any money from that period, correct?
12          A.    After April 2013, I have
13   nothing that I'm claiming.
14          Q.    Okay.  That's fine.  The money,
15   it says -- well, maybe it doesn't say.  How
16   was the money divided in 2011 through 2013?
17   How is it divided between you and Manuel
18   each week?
19          A.    Half and half.
20          Q.    Well, how much did your wife
21   get of that money?
22          A.    Whatever she needed.  She's my
23   wife.  I support the family.
24          Q.    Did you testify that you divide
25   up the money among -- in this deposition

1                          N. ALMONTE

2     among your wife, your daughter, yourself

3     and your son, because your wife, daughter

4     and son worked in the building?

5          A.    No, that's like a comment, a

6     way of saying it, because I would support

7     the family.  It's not like it was divided

8     in four equal parts.  My wife and my

9     daughter never work, like, they would help

10    me, let's say, please mop the elevator, I

11    can't do it now, they would go and do it,

12    but they didn't work there.

13         Q.    By the way, speaking of people

14    you took up to the apartment, did you ever

15    take a kid up, nine, ten, eleven years old

16    up in the apartments?

17         A.    Yes, of course.

18         Q.    And who is that?

19         A.    Alexander Castro.

20         Q.    And who was that?

21         A.    My wife was his babysitter.

22         Q.    And you took the kid up to the

23    apartment with you while you were doing

24    work?

25         A.    Yes, every time, all the time I

1                    N. ALMONTE

2     had permission from his mother.

3     Mr. Charlie knew it.  I had permission to

4     show him how to do the job.  One day on one

5     occasion I said to Alexander, "There's a

6     toilet to be unclogged."  I said,

7     "Alexander, go do it."  He said, "Are you

8     sure?"  I said, "Yes, he knows how to do

9     it."

10          Q.    Who said, "Are you sure"?

11          A.    On occasions Mr. Charlie Klahr

12     asked me, "Are you sure he could do it?"

13     And I said, "Yes, I'm sure."  He was

14     surprised many times because of that.  That

15     boy was always there after school with me.

16          Q.    Who else did you bring up to

17     the apartment, besides the people who

18     allegedly worked in the building and this

19     kid, who else went up with you to the

20     apartments to do the work?

21               MR. VALLETTI:  Just note my

22          objection.  Where it this going, Stu?

23          The time is up, Stu.  If you have,

24          you have one question pending --

25               MR. WEINBERGER:  We're going to

```
 1                    N. ALMONTE
 2        finish Mr. Almonte in a little while.
 3             MR. VALLETTI:  Note in a little
 4        while.  You have three minutes after
 5        the five-minute break.
 6             MR. WEINBERGER:  We will tell
 7        the judge tomorrow.
 8             MR. VALLETTI:  We can tell the
 9        judge everything.  You had three
10        cracks at him.  I know we had
11        circumstances.  He's here for another
12        three hours today.  Let's wrap it up.
13             MR. WEINBERGER:  He'll be here
14        until we finish it.  If not, we can
15        call the judge --
16             MR. VALLETTI:  You can make an
17        application.  I'm not going to expose
18        him to more than seven hours --
19             MR. WEINBERGER:  Okay.  Fine.
20        I think that's not the case here.
21        We'll explain to the judge the breaks
22        because of the snow --
23             MR. VALLETTI:  You don't think
24        he sat for seven total hours?
25             MR. WEINBERGER:  I don't know
```

```
 1                    N. ALMONTE
 2       if he sat for --
 3            MR. VALLETTI:  We have the
 4       transcripts.
 5            Let me take my turn then.
 6       First, we can look at the other
 7       transcripts for the time we started
 8       and the time we ended for each of
 9       them, add those, and add the three
10       hours we sat today and see if it adds
11       to seven.
12            MR. WEINBERGER:  We're not
13       necessarily bound by that.
14            MR. VALLETTI:  If you're not
15       bound by it, then you can ask the
16       judge if you want more and compel him
17       for more, but I think you've had more
18       than enough time.
19            MR. WEINBERGER:  Okay.  If he
20       stops testifying, he stops.  I'm
21       continuing on.
22            MR. VALLETTI:  After we're done
23       with this next question, then we're
24       going to wrap up, and I have my turn
25       to ask some questions.
```

```
1                    N. ALMONTE
2              Was there a question pending?
3              (Whereupon, the referred-to
4         question was read back by the
5         reporter.)
6              THE WITNESS:  My job was sacred
7         to me, nothing, never.
8              MR. VALLETTI:  All right.
9              MR. WEINBERGER:  Next --
10             MR. VALLETTI:  That's it.
11             MR. WEINBERGER:  Okay.  He
12        leaves, I'm going to ask the
13        questions, then we'll decide tomorrow
14        with the judge whether it's finished.
15             MR. VALLETTI:  What are you
16        going to ask the question for?  The
17        time we've allotted for is up.
18             Can we note the time, please,
19        in the transcript if he's going to be
20        petty like this.
21             (Time noted, 5:05.)
22             Did we have this schedule from
23        2:00 to 5:00 today, Stu?
24             MR. VALLETTI:  What time is it?
25             THE COURT REPORTER:  It's 5:05.
```

```
 1                    N. ALMONTE
 2              MR. VALLETTI:  You got another
 3         question?  Let's go.
 4         Q.    Who were the eyewitnesses to
 5    the hours that you claimed you worked and
 6    didn't get paid?
 7         A.    Who could be my witness?  My
 8    daughter, my wife, they're the only ones
 9    that live with me.  Those are night hours,
10    so -- and who else could know that?
11         Q.    Did your son live with you?
12         A.    Of course, yes.
13         Q.    Did your son work in a
14    construction job at all near the building?
15         A.    No, not that I know of.
16         Q.    What does that mean, not --
17         A.    No.
18              MR. VALLETTI:  It means not
19         that he knows of.  That's what it
20         means.
21         Q.    Do you have any evidence or
22    documents that you did these night calls?
23         A.    In writing there were none,
24    because like I said, I was told that the --
25    me living there would cover that, so that
```

                          N. ALMONTE

1
2   that, that's what I said.  So there is no
3   evidence in writing.  If I didn't live
4   there, I would have claimed I would have
5   written it down, but I lived there.
6           Q.    Did there come a point where
7   you said that you did claim those hours?
8                 MR. VALLETTI:  Just note my
9            objection.  I don't get that.  I
10           don't understand that.
11          A.    I don't understand.
12          Q.    You testified that sometime,
13  you don't remember when, that you started
14  to write down the hours that you worked on
15  the night calls; is that correct?
16          A.    Yes, in the regular time sheets
17  I would write down some stuff.
18          Q.    Did you write down all the
19  stuff?
20          A.    No.
21          Q.    So when did you start writing
22  down some of the stuff?
23          A.    Maybe when, maybe when I
24  personally started being the super, Nestor
25  Almonte, maybe before, I don't remember.  I

```
 1                    N. ALMONTE
 2   told you that previously the same thing.
 3              MR. WEINBERGER:   Okay.   We may
 4         take a two-minute break and that may
 5         be it, maybe the ballgame is over for
 6         us.
 7              (Whereupon, a brief recess was
 8         held at this time.)
 9         Q.    Did anybody from the company
10   tell you to divide the money between you
11   and your son, Manuel, that was received for
12   pay in 2012 or 2013?
13         A.    No.
14         Q.    You and Manuel Almonte and for
15   all the time you claimed that Manuel worked
16   there, made a decision without the company
17   to divide the money?
18         A.    Yes.
19              MR. WEINBERGER:   Okay.   I don't
20         have anymore questions.
21   EXAMINATION BY
22   MR. VALLETTI:
23         Q.    Stuart just referenced there
24   was a time period that you were dividing
25   the money 2012 and 2013.  I'm going to look
```

1                      N. ALMONTE
2    at 2011 first, how was it that your son
3    came to work for the company?
4         A.    That I remember, my son came
5    into the building and then it was a
6    coincidence that Charlie Klahr also came as
7    the manager, you know, not that he came
8    into the building, but he arrived at that
9    moment.  He said, hi, hello, how are you,
10   to me.  I said the same thing.  I
11   introduced him, I said, "Charlie, this is
12   my son.  Son, this is Charlie."
13        Q.    So did you guys have a
14   conversation at that point, all three of
15   you?
16        A.    Just about introducing them,
17   that's my son, like that.
18        Q.    So at what point did Charlie
19   Klahr hire your son?
20        A.    When he told me that the checks
21   could not keep coming, they had to be in my
22   name.  They couldn't pay me in cash.  I
23   don't know what problem was in the company.
24        Q.    So it was the three of you
25   speaking at that time, you were part of

```
 1                    N. ALMONTE
 2    that conversation?
 3         A.    No, just Mr. Charlie Klahr and
 4    me, at that point.
 5         Q.    Was there a conversation
 6    between you, Charlie Klahr, and your son?
 7         A.    No, we just -- just the two of
 8    us spoke, he asked me what about your son,
 9    how old is he.  And I told him he's
10    17 years old, but he can work already at
11    17, but he's studying so, so what are you
12    insinuating?
13         Q.    Did you say anything to him or
14    did he say anything back to you after that?
15         A.    So then he said, "Why don't we
16    put your son down as the super so that the
17    checks come under his name."
18         Q.    And from that point on, did
19    Manuel work for the company?
20         A.    No, for like a week later,
21    that's when I analyzed it, I spoke to my
22    wife, I spoke to Manuel.  So I told Charlie
23    if he was okay with that, it was okay with
24    me too, but I told him my son did not have
25    the experience to be the super, not like
```

```
 1                    N. ALMONTE
 2    me.  So he said, "Okay.  Call your son.
 3    We'll get all the documents.  We'll make
 4    the copies and everything, you know, in
 5    paper."
 6          Q.    So when was the first time your
 7    son started working for the company and by
 8     "working," I mean performing duties?
 9          A.    It was like starting the end of
10    February 2011.
11          Q.    And was your son working for
12    what building?
13          A.    437 Morris Park.
14          Q.    And when did he become the
15    super on paper?
16          A.    I think it was around then, you
17    know, the end of February, beginning March,
18    I'm not sure.  You would have to check the
19    time sheets, whenever the time sheets
20    started, with Manuel Almonte as the super,
21    when he started, that's because the company
22    already had the copy of the, his license,
23    the copy of his documents, all like that.
24    He brought the original ones to Charlie in
25    his office and he, Charlie, made copies.
```

1                    N. ALMONTE

2          Q.     If you know, and to your

3     knowledge, in 2011, how many hours a week

4     did Manuel work?

5          A.     Out of the regular 40 hours,

6     Manuel out of that, at the beginning the

7     first few weeks he was there at least 30,

8     because he was going to school.  Later, you

9     know, it was more work.  I needed him more,

10    so that's when he started to do poorly in

11    school.

12         Q.     Did he stay in school?

13         A.     He had to leave school.  There

14    came a time where he had to leave school.

15         Q.     Do you know when he left

16    school?

17         A.     It was in 2011, but I don't

18    know exactly.  Maybe a month or two months

19    after that, like April, May, like towards

20    the end of the year.

21         Q.     Wait, towards the end of the

22    year or the month?

23         A.     At the end of the month -- the

24    school year, not the end of the year,

25    because, you know, the school ends, May,

```
 1                    N. ALMONTE
 2   around then.
 3        Q.    So at that point, if you know,
 4   how many hours a week was Manuel working?
 5        A.    I would calculate like around
 6   40 hours, because let's say if he didn't
 7   work, adding it up, then he would have to
 8   work after school, like until 6:30, 7:00
 9   and every call that would come in, he would
10   have to come in with me.
11        Q.    I'm focusing on the period
12   where he dropped out.  After he stopped
13   going to school, how many hours a week was
14   he working, if you know?
15        A.    40 hours -- when he left school
16   he worked 40 hours.
17        Q.    You testified earlier,
18   something about this hotline.  Do you
19   remember when we were talking earlier today
20   about the hotline, that you were getting
21   text messages from Charlie Klahr?
22        A.    Yes.
23        Q.    And you said that you were
24   receiving text messages from Charlie Klahr,
25   was it something long those lines?
```

```
 1                    N. ALMONTE
 2        A.    Yes.
 3        Q.    Did he communicate in any other
 4   way?
 5        A.    It was always through text when
 6   it was like, already at night.
 7        Q.    So Charlie was giving you
 8   directives to work at night?
 9        A.    Of the calls that he got
10   through the hotline, he would pass them to
11   me.  Many of the messages that he received
12   from the hotline, he would just forward
13   them to me directly, the same message.  And
14   I know that because many times it said who
15   was the person who complained.
16        Q.    I want to ask you a question
17   about the time sheets, generally.  Do the
18   time sheets generally reflect all of the
19   hours you worked, including your emergency
20   calls, your weekend calls and any other
21   hours?
22             MR. WEINBERGER:  Object to the
23         form, but again --
24        A.    No.
25        Q.    Was there a punch-in or
```

```
1                    N. ALMONTE
2     punch-out system available where you could
3     use your card or use your hand or something
4     of that nature?
5          A.    No.
6                MR. VALLETTI:  Off the record.
7                (Whereupon, an off-the-record
8             discussion was held.)
9          Q.    So the only way that they could
10    tell what hours you were actually working
11    would be the time sheets?
12         A.    So far, that's all there is.
13         Q.    So there were no other records
14    that could show your actual hours worked?
15         A.    Just the calls, I mean, where
16    the calls, this should be a record of those
17    calls.
18         Q.    So let me rephrase the
19    question.  There is no other company
20    records that could show accurately what
21    hours you were working and when?
22         A.    I don't know any.  We're
23    talking about night hours, right, the
24    calls?
25         Q.    I'm talking about all the hours
```

1                    N. ALMONTE

2    in total, but do please wait until I ask

3    you a question to answer.

4                    MR. VALLETTI:  Can I have

5            Exhibit L.

6            (Whereupon, an off-the-record

7            discussion was held.)

8            Q.    Have you seen this before when

9    Stu was asking questions about it?  I'm

10   talking about Defendant's Exhibit N.

11           A.    Yes.

12           Q.    This is for the time period

13   from January 2013 to March 1st of 2013,

14   correct?

15           A.    It says January 17th.  Yes, up

16   to March 1st.

17           Q.    Were both you and your son

18   working for the company at that time?

19           A.    Yes.

20           Q.    To your knowledge, did you

21   receive any paychecks in your name at that

22   time?

23           A.    No.

24                    MR. VALLETTI:  Can I see

25           Exhibit P, please.  It's a group of

```
 1                    N. ALMONTE
 2         time sheets from 2011.  This is
 3         what's been marked as Defendant's
 4         Exhibit P.  The Bates number here is
 5         000000, just for identification
 6         purposes.
 7         Q.    Can you read for me the date
 8    that is listed on the top right where it
 9    says, "Begin date."
10         A.    It says it starts
11    September 30th, 2011.  It ends October 7th,
12    2011.
13         Q.    Nestor, you testified earlier
14    that you were paid based on time sheets
15    that you were turned in; is that correct?
16         A.    Yes.
17         Q.    Do you see any time sheets from
18    before September of 2011 there?
19         A.    No.
20         Q.    You testified earlier you
21    started working for the company in February
22    of 2011?
23         A.    Yes.
24         Q.    You started working at 437
25    Morris Park specifically in or about, was
```

```
 1                    N. ALMONTE
 2    it March of 2011 or April, somewhere around
 3    that time?
 4          A.    Yes.
 5          Q.    So from April of 2011 to
 6    September of 2011, there were no time
 7    sheets?
 8          A.    What was the date again?
 9          Q.    From either February or April
10    of 2011 to September 2011, there were no
11    time sheets?
12          A.    There was always time sheets.
13          Q.    So these are just the first
14    that the Defendants have, at least to your
15    knowledge, produced for this?
16          A.    I don't know.  I haven't seen
17    any from before that date.
18          Q.    Okay.  Did you still receive
19    payment along with Manuel in his name for
20    the time period of February 2011 to
21    September of 2011?
22          A.    It was like March 2011, March,
23    April 2011.  I don't know the exact date.
24          Q.    So that's when you started
25    receiving payments in Manuel's name for the
```

```
 1                    N. ALMONTE
 2    both of you working for the company?
 3         A.    Yes.
 4              MR. VALLETTI:  Can I have
 5         Exhibit S, please.
 6              MS. ALETOR:  (Handing).
 7         Q.    I'm showing you what's been
 8    marked as Defendant's Exhibit S. Can you
 9    read for me this box over here.  It's
10    entitled, "Employer information," what the
11    names of the companies are.
12         A.    Okay.  It says, "437 Morris
13    Park Avenue, doing business as -- D/B/A
14    names, F&T Management."
15         Q.    That's all I needed from that.
16    Thank you.
17              MR. VALLETTI:  Can I have
18         Exhibit R, please.
19              MS. ALETOR:  Yes, can I get
20         that back.
21              MR. VALLETTI:  (Handing).  Can
22         I have something marked, please.
23              (Whereupon, an off-the-record
24         discussion was held.)
25              MS. ALETOR:  Can we just do A.
```

```
 1                   N. ALMONTE
 2              (Whereupon, superintendent and
 3         roving employee time sheets were
 4         marked as Plaintiff's Exhibit A for
 5         identification as of this date by the
 6         reporter.)
 7              MR. VALLETTI:  These are
 8         superintendent and roving employee
 9         time sheets, but the Bates numbers
10         are 80 through 92.  It's 80 through,
11         I think, 92.
12         Q.    Nestor, these are a series of
13    the both superintendent time sheets and
14    roving employee time sheets.  Take a look
15    at these and let me know when you're
16    finished.
17         A.    (Witness complies.)
18         Q.    Have you had a chance to review
19    those, Nestor?
20         A.    Yes.
21         Q.    I'm going to draw your
22    attention to the first two pages.  The
23    first one says, "Superintendent timesheet."
24    The second is a roving employee timesheet.
25              Whose name is on the
```

```
 1                    N. ALMONTE
 2  superintendent timesheet?
 3        A.    "Nestor Almonte."
 4        Q.    Is that your signature?
 5        A.    Yes.
 6        Q.    And whose name is on the roving
 7  employee timesheet?
 8        A.    "Manuel Almonte."
 9        Q.    Is that his signature?
10        A.    That's Manuel Almonte's
11  signature.
12        Q.    What's the date on both of
13  those documents, the begin date?
14        A.    May 1st, 2013.
15        Q.    Why in May were there now two
16  time sheets, one for your name and one more
17  Manuel's name?
18        A.    Because now I was the
19  superintendent, you know, my name,
20  Nestor Almonte and his name, Manuel Almonte
21  was the handyman was what I used to fill
22  out before -- he filled out before.  Now I
23  filled it in and he filled out the other
24  one.
25        Q.    So these records don't reflect
```

1                    N. ALMONTE

2    the hours of one person worked?

3          A.    No, here's the work of two

4    people.

5          Q.    And why in May, or thereabouts,

6    the end of April, did you become the

7    superintendent at 437 Morris Park?

8          A.    That was the date when I

9    received my work authorization card and

10   also I got my Social Security card.

11         Q.    You testified earlier that

12   Charlie Klahr knew you as Lopez?

13         A.    Yes.

14         Q.    So Charlie Klahr knew there was

15   two different people, one named Nestor and

16   one named Manuel?

17              MR. WEINBERGER:  Objection as

18         to form, but all right.

19         A.    Yes.

20         Q.    And on most documents, I would

21   say, you often appear as Manuel Almonte?

22         A.    Just repeat that question.

23         Q.    Sure.  On most documents while

24   you worked from the company from April 2011

25   to April 2013, you were known as Manuel

1                        N. ALMONTE

2     Almonte due to the arrangement you had to

3     work with the company?

4                   MR. WEINBERGER:  Objection as

5             to form, but go ahead.

6          A.    But he also worked.

7          Q.    Right.  Can I have this marked

8     as Plaintiff's Exhibit B, please.  It's

9     Bates number 749.

10                  (Whereupon, warning document

11            was marked as Plaintiff's Exhibit B

12            for identification as of this date by

13            the reporter.)

14         Q.    Just take a look at this

15    document, let me know when you're done.

16         A.    (Witness complies).

17         Q.    Have you seen this document

18    before?

19         A.    Yes.

20         Q.    Can you read for me the name

21    that's listed in, "Manager?

22         A.    "Manager, Ernesto Lopez."

23         Q.    Is that you?

24         A.    Nestor Almonte Lopez, but then

25    they would also call me Nestor Lopez, so I

```
 1                     N. ALMONTE
 2   would imagine they were referring to me.
 3        Q.    Can you tell me, is that your
 4   signature on the bottom of that document?
 5        A.    Yes, that's my signature.
 6        Q.    Whose signature is above it?
 7        A.    That's Charlie Klahr.
 8        Q.    By the way, what is this
 9   document?
10        A.    This is a document of --
11   advising, letting you know, about the
12   employee Justino Rivera, when they're
13   giving him a warning.
14        Q.    So it's a warning?
15        A.    Yes.
16             MR. VALLETTI:  You had the work
17        orders entered.  Can I have those.  I
18        don't know if it was for --
19             MS. ALETOR:  Yes, you have the
20        set, they're for 437 Morris Park,
21        Exhibit J.
22        Q.    I'm going to turn your
23   attention to Bates number 171, it's part of
24   Exhibit J.  I'm going to turn your
25   attention to this name here, which appears
```

```
1                    N. ALMONTE
2    a couple of times on the paper.  Can you
3    read the date for me on that document.
4          A.    The document is May 15th, 2012.
5          Q.    And this name that appears here
6    on the first line that is completing the
7    work order on the top there.  Whose name is
8    that?
9          A.    Lopez.  That's me -- written by
10   me.
11         Q.    Thank you.
12         A.    Can I say something about that?
13         Q.    I didn't ask a question.
14              MR. VALLETTI:  I have no
15         further questions.
16              MR. WEINBERGER:  I have one
17         follow-up.  Just one more question
18         for you.
19              MR. VALLETTI:  It's my turn to
20         question him.
21              MR. WEINBERGER:  Yeah, but I
22         can ask one more question.
23              MR. VALLETTI:  Your time is
24         finished, Stu.
25              MR. WEINBERGER:  I'm asking him
```

```
 1                    N. ALMONTE
 2         one more question, that's it.
 3              MR. VALLETTI:  You've reached
 4         your limit, Stu.  I'm going to
 5         exhibit --
 6    CONTINUED EXAMINATION BY
 7    MR. WEINBERGER:
 8         Q.    I'm going to do this.  I have
 9    one more question.  I'm going from 00736,
10    just related to this, one question, 00736
11    to 00746.
12              (Whereupon, document was marked
13         as Defendants' Exhibit T for
14         identification as of this date by the
15         reporter.)
16         Q.    Quickly look through this, one.
17         A.    Can I ask my lawyer --
18         Q.    Sure, sure.  I have one
19    question, and then we're done.
20              MS. ALETOR:  In the interest of
21         time, why don't you look at this,
22         it's the same, so he can look at
23         this.
24              MR. VALLETTI:  What's the one
25         question, Stu?
```

```
 1                    N. ALMONTE
 2        Q.    In these documents, did you
 3   sign your name there as Manuel Almonte?
 4   That's it.
 5        A.    Yes, all these papers were
 6   signed by me with the name Manuel Almonte.
 7              MR. VALLETTI:  I have
 8         follow-ups.  I'm sorry.
 9              MR. WEINBERGER:  Go ahead.
10   CONTINUED EXAMINATION BY
11   MR. VALLETTI:
12        Q.    At 736, this is the first one,
13   can you take a look at this signature
14   there.  And can you then switch to the page
15   743.
16        A.    (Witness complies).
17        Q.    Are these the same signatures?
18        A.    No.
19        Q.    So did you sign one, your son
20   signed the other?
21              MR. WEINBERGER:  Objection as
22         to form, but --
23        A.    Looking at it clearly, yes.
24              MR. VALLETTI:  I have nothing
25         further.
```

```
 1                    N. ALMONTE
 2              MR. WEINBERGER:  Which one did
 3          your son sign and which one did you
 4          sign?
 5              THE WITNESS:  The one -- 36.
 6              MR. VALLETTI:  Correction.  By
 7          Counsel, it's 736.
 8              THE WITNESS:  That one was
 9          signed by my son and the one ending
10          in 43.  I just put down his name.
11              MR. WEINBERGER:  Okay.
12              MR. VALLETTI:  All right.
13          We're finished.
14              (Whereupon, at 5:54 P.M., the
15          Examination of this Witness was
16          concluded.)
17
18                   _____
                         NESTOR ALMONTE
19
20     Subscribed and sworn to before me
21     this _____ day of _____ 20___.
22
23
       _____
24         NOTARY PUBLIC
25
```

```
 1                      N. ALMONTE
 2                  E X H I B I T S
 3    DEFENDANTS' EXHIBITS:
 4    EXHIBIT    EXHIBIT                PAGE
 5    LETTER     DESCRIPTION
 6    I          Time sheets            124
 7    J          Work orders            125
 8    K          Documents Bates        125
 9               Stamped 363, 364, 365
10    L          Document               149
11    M          Document               157
12    N          Document               158
13    O          Superintendent's       167
14               time sheets
15    P          Time sheets            170
16    Q          Document               175
17    R          Document               176
18    S          Document               178
19    T          Document               207
20
21
22
23
24
25
```

1                    N. ALMONTE

2      PLAINTIFF'S EXHIBITS:

3      EXHIBIT     EXHIBIT                    PAGE

4      LETTER      DESCRIPTION

5      A           Superintendent and        201

6                  roving employee time

7                  Sheets

8      B           Warning document          204

9

10                    I N D E X

11

12     EXAMINATION BY                        PAGE

13     MR. WEINBERGER                        89, 296

14     MR. VALLETTI                          189, 212

15

16

17

18

19

20

21

22

23

24

25

```
 1                    N. ALMONTE

 2            C E R T I F I C A T E

 3

 4    STATE OF NEW YORK      )
                             :  SS.:
 5    COUNTY OF KINGS        )

 6

 7          I, ANITA M. TROMBETTA, a Notary

 8    Public for and within the State of New

 9    York, do hereby certify:

10          That the witness whose examination is

11    hereinbefore set forth was duly sworn and

12    that such examination is a true record of

13    the testimony given by that witness.

14          I further certify that I am not

15    related to any of the parties to this

16    action by blood or by marriage and that I

17    am in no way interested in the outcome of

18    this matter.

19          IN WITNESS WHEREOF, I have hereunto

20    set my hand this 2nd day of March 2015.

21

22

23    _____

24            ANITA M. TROMBETTA

25
```