# EXHIBIT F

[Page 1]

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - -x

NESTOR ALMONTE,

                 Plaintiff,

      -against-

4376 MORRIS PARK, LLC d/b/a F&T MANAGEMENT

CO., INC.,


                Defendants.

- - - - - - - - - - - - - - - - - - - - - - - -x

             600 Old Country Road

             Garden City, New York


             February 26, 2015

             1:45 p.m.


    DEPOSITION of CHANINA KLAHR, a witness on behalf of the Defendant herein, held at the above time and place, taken before Karen Zammit, a Shorthand Reporter and Notary Public of the State of New York, pursuant to Rule 26 et seq. of the Federal Rules of Civil Procedure and stipulations between Counsel.


         *    *    *

[Page 2]

1

2    APPEARANCES:

3

        VALLI KANE & VAGNINI, LLP
4            Attorneys for Plaintiff
             600 Old Country Road
5            Garden City, New York 11530

6       BY:  ROBERT P. VALLETTI, ESQ.

7

8       GOLDBERG & WEINBERGER, P.C.
             Attorneys for Defendant
9            630 Third Avenue
             New York, New York 10017

10

        BY:  STUART WEINBERGER, ESQ.

11

12

13

                  *     *     *

14

15

16

17

18

19

20

21

22

23

24

25

[Page 3]

1

2                    STIPULATIONS

3        IT IS HEREBY STIPULATED AND AGREED, by and

4    among counsel for the respective parties hereto,

5    that the filing, sealing and certification of the

6    within deposition shall be and the same are

7    hereby waived;

8        IT IS FURTHER STIPULATED AND AGREED that all

9    objections, except as to form of the question,

10   shall be reserved to the time of the trial;

11       IT IS FURTHER STIPULATED AND AGREED that the

12   within deposition may be signed before any Notary

13   Public with the same force and effect as if

14   signed and sworn to before the Court.

15

16                *     *     *

17

18

19

20

21

22

23

24

25

[Page 4]

1

2    C H A N I N A   K L A H R, the Witness herein,

3    having first been duly sworn by the Notary

4    Public, was examined and testified as follows:

5    EXAMINATION BY

6    MR. VALLETTI:

7         Q       What is your name?

8         A       Chanina Klahr.

9         Q       What is your address?

10        A       730 East 7th Street, Brooklyn, New

11   York 11218.

12        Q       Good afternoon, Mr. Klahr.

13        A       Good afternoon.

14        Q       I know you have met me before, but

15   my name is Robert Valletti and I am from Valli

16   Kane and Vagnini.

17               We represent plaintiff Nestor

18   Almonte in this case who has instituted a lawsuit

19   to recover lost wages in the form of overtime,

20   minimum wage and spread of hour pay.

21        A       Yes.

22        Q       I will be asking you some questions

23   today.  If you don't understand anything that I

24   ask, let me know.  I will be more than happy to

25   repeat or rephrase.  If you answer a question we

[Page 5]

C. Klahr

1
2    will assume that you understood it and that the
3    answer is responsive to the question.
4                    Please answer all questions
5    verbally.  As you know, we have a court reporter
6    here and she cannot take down hand gestures or
7    nods of the head or things of that nature.
8        A       Yes.
9        Q       Also, please let me finish my
10   question before you answer and I know that you
11   might know where I am going with the question
12   before I complete it, but please do let me finish
13   before you answer.
14                   I will give you all the time you
15   need to answer.  If you would like to take a
16   break, please let me know.  If a question is
17   pending, answer that question and then we can
18   take the break.  There are no breaks while a
19   question is pending.
20       A       Okay.
21       Q       Are you currently taking any
22   medications?
23       A       No.
24       Q       Is there any reason why you cannot
25   tell the truth today in response to my questions?

```
                                          [Page 6]
 1                      C. Klahr

 2        A        No.

 3        Q        How long have you lived at your

 4   current address?

 5        A        Maybe ten years.

 6        Q        Do you have any other residences?

 7        A        No.

 8        Q        What is your highest level of

 9   education?

10        A        High school.

11        Q        No secondary schools?

12        A        I did take  -- I did take some

13   other degrees.  I didn't finished.  My highest

14   level that I finished was high school.

15        Q        You started other education but

16   didn't complete it?

17        A        Yes.

18        Q        You attended college or a different

19   school?

20        A        A different school.

21        Q        What kind of school?

22        A        An academy that they give different

23   equivalency degrees.

24        Q        Are you currently employed?

25        A        I am in the process of opening a
```

1                    C. Klahr

2   business, private business.

3        Q       Does that business have a name yet?

4        A       Yes.

5        Q       What is the name of the business?

6        A       Challenge Pest Control.

7        Q       Is it currently operational?

8        A       No.

9        Q       Other than this employment who were

10  you last employed by?

11       A       Prior to this?

12       Q       Yes.

13       A       Chai Lifeline.

14       Q       What was your position there?

15       A       Office administrator.

16       Q       What was the time period that you

17  worked for them?

18       A       Approximately two years.

19       Q       What was the beginning and end

20  year?

21       A       Probably 2002 or 2004..

22       Q       For the period of 2004 up until the

23  beginning of the pest control company you were

24  unemployed?

25       A       No, I worked for F&T Management.  I

[Page 8]

```
 1                    C. Klahr

 2    I worked at F&T Management from 2004 until

 3    recently.

 4         Q       When did your employment with F&T

 5    Management end?

 6         A       I left in September, the end of

 7    August of 2014.

 8         Q       You said you worked for F&T

 9    Management.  Is that its own entity?

10         A       That's the name of the group.

11         Q       Could you explain what you mean by

12    the group?

13         A       That's what we called ourselves.

14    It may not be an official business name, but

15    that's how the vendors knew us, the initials of

16    the owners, Finkelstein and Tabak.  That's how

17    they knew us.

18         Q       Meaning the vendors?

19         A       Any business relationships that we

20    had with anyone referred to us as just -- it was

21    a lot easier than saying Finkelstein and Tabak

22    each time.

23         Q       It was your understanding from 2004

24    to 2014 that you worked for F&T Management?

25         A       Yes.
```

[Page 9]

```
 1                    C. Klahr

 2       Q       Did you work for any other

 3  companies during that time period?

 4       A       No.

 5       Q       You were not employed by 437 Morris

 6  Park?

 7       A       No, but that would just be part of

 8  F&T Management.  Each building has its own  --

 9  each site has its own legal entity.  I was not

10  technically paid from 437 Morris Park LLC.

11       Q       Who paid you?

12       A       855 East Tremont LLC for

13  approximately eight years.  Then I was paid by

14  New Hope Funding Transitional Housing.

15       Q       Is that the name thing as the New

16  Hope Funding LLC?

17       A       Yes, new Hope something.

18       Q       What was your position with F&T

19  Management?

20       A       I was hired to be a site manager at

21  several of the buildings that they  -- several

22  residential apartment buildings that were being

23  turned into homeless shelters.

24       Q       How many buildings were you hired

25  to be the site manager for?
```

[Page 10]

```
 1                    C. Klahr

 2      A       Between four and six buildings, it

 3   varied at different times.

 4      Q       Four and six?

 5      A       Yes.

 6      Q       Can you name the four to six

 7   buildings, please?

 8      A       Sure.  1056 Boynton, 1101 Manor,

 9   437 Morris Park, 1195 Sherman, 855 East Tremont

10   and 1011 Walton Avenue.

11      Q       Was that simultaneously?

12      A       Yes.

13      Q       That was continuously from 2004 to

14   2014, you were the site manager?

15      A       Except for the last two that I

16   mentioned.  For the last three or four years it

17   was only the first four on the list.

18      Q       As a site manager what were your

19   responsibilities?

20      A       It was my responsibility to oversee

21   the staff that would be doing repairs in the

22   buildings.

23      Q       What do you mean by oversee?

24      A       I have to make sure that they are

25   doing their job.
```

[Page 11]

1                          C. Klahr

2       Q       Can you tell me specifically what

3   authority you had?

4       A       I had authority to hire and fire

5   and maybe choose vendors.

6       Q       Before when you said that you were

7   overseeing the staff you gave the direct orders

8   to the staff?

9       A       Yes.

10      Q       What was the composition of the

11  staff, what types of positions were there?

12      A       Exclusive to each site would be one

13  superintendent and one porter.  In addition to

14  that we supplied on a roving basis, on an

15  as-needed basis, a handyman to support the

16  superintendent to be able to expedite the work.

17  He might at my discretion get a helper or two

18  helpers depending on my discretion.

19      Q       One or two handymen and a porter

20  and a superintendent was a typical composition of

21  one building?

22      A       Yes.

23      Q       What determined if you needed one

24  or two handymen, the size of the building or

25  something else?

[Page 12]

                              C. Klahr

1

2        A       The nature of the workload.  It was

3    in our interests to expedite and finish as soon

4    as possible.  We gave him helpers to help him get

5    it done in a more timely fashion.

6        Q       How was the workload amassed

7    typically?

8        A       I would give the superintendent

9    printed work orders.  In the last five years

10   those work orders were actually generated by a

11   Social Service agency named Aguila, which was an

12   in-house Social Service agency.

13              Prior to them it was our own Social

14   Service department or actually a lot of it was

15   myself.  We would go through the apartments and

16   create lists between myself and the social

17   workers.

18       Q       Who is Aguila?

19       A       These sites are all homeless

20   shelters and there is an on-site Social Service

21   department that assists the families there and

22   the various needs that they have.  That's what

23   they are.

24       Q       Aguila performs that service?

25       A       Yes, they are a Social Service

[Page 13]

```
 1                    C. Klahr
 2  agency.
 3      Q       Who does Aguila perform that
 4  service for specifically?
 5      A       To the resident.
 6      Q       Does Aguila have an office at a
 7  particular building like 437 Morris Park?
 8      A       They have rooms in every building.
 9  They have offices, but executive offices, no,
10  that's elsewhere, not our premises.  Each site
11  has a dedicated or several offices with several
12  staff members, but that's not their executive
13  office.  Their executive office is somewhere
14  else.
15      Q       Have you ever given testimony
16  before?
17      A       I don't think so.
18      Q       You never sat for any other
19  depositions?
20      A       No.  I just sat through so many
21  recently with this case, but I don't recall
22  others, no.
23      Q       You mentioned other depositions
24  that you sat through for this case.  You were
25  present at the deposition of Nestor Almonte,
```

[Page 14]

1                          C. Klahr

2    correct?

3         A      Yes.

4         Q      That was in three segments and you

5    attended all of them, correct?

6         A      Yes.

7         Q      Wilton, you sat through his

8    deposition as well, Wilton Munoz?

9         A      Yes.

10        Q      The deposition of Mildred Munoz as

11   well?

12        A      Yes.

13        Q      Have you ever appeared in front of

14   the unemployment appeal board before and given

15   testimony?

16        A      For Nestor Almonte.

17        Q      Prior to that?

18        A      No.

19        Q      Who is Nestor Almonte?

20        A      Nestor Almonte is this case that

21   you are referring to that we are involved in.

22        Q      He is a person?

23        A      Yes, the case that we are involved

24   in.  He is the person bringing this case.

25        Q      The plaintiff?

[Page 15]

1                         C. Klahr

2         A       Yes.

3         Q       Did you know him before he was a

4    plaintiff in this case?

5         A       Yes.

6         Q       When was the first time that you

7    met Nestor Almonte?

8         A       The first time I met him was, to

9    the best of my recollection, was in February of

10   2011.

11        Q       Does he go by any other names?

12        A       Yes, Lopez.

13        Q       Was he ever employed by one of the

14   companies that you were the site manager for?

15        A       Yes.

16        Q       What companies did Nestor Almonte

17   or Lopez work for?

18        A       437 Morris Park LLC and 1195

19   Sherman LLC.

20        Q       When you met him in 2011 how did he

21   introduce himself?

22        A       He was introduced to me by Wilton

23   Munoz as the superintendent at 1056 Boynton.  I

24   was looking to hire a super at the time.  Wilton

25   introduced me to him.

[Page 16]

1                         C. Klahr

2        Q       Who is Wilton Munoz?

3        A       He is the superintendent at 1056

4    Boynton LLC.

5        Q       Currently?

6        A       No, but until recently.

7        Q       Is there a relationship between

8    Lopez and Wilton Munoz?

9        A       Yes.

10       Q       What is that relationship?

11       A       They are brother-in-laws.

12       Q       At some point Lopez became employed

13   by 437 Morris Park first; is that correct?

14       A       He was a handyman, which all

15   handymen worked under 1195 Sherman, that's our

16   management umbrella.  He worked under 437 Morris

17   Park after a short trial period.

18       Q       The trial period was under 1195

19   Sherman?

20       A       I don't recall.

21       Q       When he first started working where

22   was he working?

23       A       He worked for  -- I like to have my

24   guys give me a trial basis of an at least two

25   weeks.  After two days he walked away.  He worked

[Page 17]

```
 1                        C. Klahr

 2    at 1056 Boynton for several days and then we then

 3    put him onto 437 Morris Park.  It was a very

 4    short period. I am not sure if it was those two

 5    days at 1056 Boynton.  It was a very short period

 6    of time he was at 1056 Boynton.

 7         Q        While he was at 1056 Boynton he was

 8    a handyman, correct?

 9         A        Yes.

10         Q        What kind of work was he doing as a

11    handyman?

12         A        They would assist the

13    superintendent by doing general repairs of the

14    apartment which is some plumbing repairs, some

15    electrical repairs.

16         Q        Painting?

17         A        Of course plastering and painting.

18         Q        Fixing leaks?

19         A        Yes, that would be plumbing.

20         Q        That's the first time that Lopez or

21    Nestor Almonte began working, at 1056 Boynton as

22    a handyman, correct?

23         A        Yes.

24         Q        You said you put him on at 437

25    Morris Park, what did you mean by that?
```

```
                                              [Page 18]
  1                    C. Klahr

  2      A       I had a superintendent that was

  3  leaving at 437 Morris Park.  He was being

  4  terminated and we put him there to take over that

  5  position.

  6      Q       Who was the superintendent being

  7  terminated?

  8      A       Ernest Torres.

  9              MR. VALLETTI:  Off the record.

 10              [Whereupon, a discussion was held

 11      off the record.]

 12      Q       When Nestor Almonte was employed as

 13  a handyman at 1056 Boynton for that short period

 14  of time how was he paid, if at all?

 15      A       He would have gotten a check.

 16      Q       Are your employees paid by checks

 17  in their name?

 18      A       Yes.  Once they get a designated

 19  job, yes.

 20      Q       There should be pay stubs or checks

 21  in Nestor Almonte's name while he worked at 1056

 22  Boynton, correct?

 23      A       There should be.

 24              MR. VALLETTI:  I will make a demand

 25      for the pay stubs for Nestor Almonte for
```

[Page 19]

```
1                         C. Klahr

2          the time period that he worked at 1056

3          Boynton.

4          Q       What was your intention when you

5    first moved him to 437 Morris Park, what position

6    was he going to hold?

7          A       Superintendent.

8          Q       He was being promoted from handyman

9    to a superintendent?

10         A       No.  That's the way I try out a

11   candidate to become a superintendent.  I first

12   use them as a handyman for a while.  When I see

13   that they can handle the work and they can

14   actually do what they say they can do then I

15   would consider them for a superintendent

16   position.

17         Q       How long did he work at 1056

18   Boynton?

19         A       I believe two or three days.

20         Q       Is that the normal period that you

21   test someone's skills before determining if they

22   can handle a superintendent job?

23         A       No.  He completed that at a later

24   time.  He gave me a few weeks at 437 Morris Park.

25   There was a couple of weeks at 437 Morris Park
```

[Page 20]

1                          C. Klahr

2    before he became a superintendent that he had to

3    work there as the handyman.

4         Q       He was first transferred to 437

5    Morris Park as a handyman and he continued his

6    test period; is that correct?

7         A       Yes. The existing outgoing

8    superintendent may have already not been working

9    so we may have called him a super at that time,

10   but he was not designated as the super yet.

11        Q       At the time that he was transferred

12   to 437 Morris Park to become super, maybe called

13   a handyman, how was he paid at that time?

14        A       He was paid by check.

15        Q       Was the check in his name?

16        A       It should be in his name.

17               MR. VALLETTI: For the period that

18          Nestor Almonte worked at 437 Morris Park as

19          a handyman I will make a demand for any pay

20          stubs and checks that were in his name.

21               MR. WEINBERGER:   Please put

22          everything in writing.

23               MR. VALLETTI:  I will.

24        Q       The two to three-week period that

25   he was there as a handyman, at what point did he

[Page 21]

```
 1                    C. Klahr

 2   officially become the superintendent?

 3        A      I would have to find out when the

 4   outgoing person vacated.  When he moved into the

 5   the super's apartment that's when he was the

 6   super.

 7        Q      Do you know when he moved into the

 8   super's apartment?

 9        A      I believe it was the end of April,

10   but I would have to check records.

11        Q      You mean in 2011, correct?

12        A      Yes.

13        Q      Where in 437 Morris Park did he

14   move into?

15        A      We have a superintendent's

16   apartment in the basement of 437 Morris Park.

17        Q      Is there anything else in the

18   basement of 437 Morris Park?

19        A      Yes.

20        Q      What is there?

21        A      There is an office, some offices,

22   like a group of three offices.

23        Q      One group of three offices.  What

24   were they for?

25        A      There are three habitable parts to
```

[Page 22]

```
 1                         C. Klahr
 2   the basement besides the rough areas, the super's
 3   apartment, the offices, and then there was
 4   another vacant apartment that was used for
 5   storage.
 6        Q        The office that was in 437 Morris
 7   Park's basement, was that your office?
 8        A        Recently it became my office.  It
 9   used to be Aguila's office.
10        Q        When did that become your office?
11        A        I would have to estimate last 2012.
12        Q        Before late 2012 that office was
13   used by Aguila?
14        A        Yes.
15        Q        What was that office used for?
16        A        Social Service staff.
17        Q        Before 2012 did you have another
18   office elsewhere?
19        A        Yes, upstairs in the lobby for a
20   short time.
21        Q        When was the first time that you
22   had an office in 437 Morris Park?
23        A        I would say it was approximately
24   six to eight months prior to when I moved down,
25   but I don't know the dates.
```

[Page 23]

                              C. Klahr

1

2      Q       We can put it as possibly the

3   spring of 2012 or a little earlier?

4      A       Whatever.  We will say that was

5   late 2012, that was early 2012.  I have to find

6   out somehow.

7      Q       The office in the basement, was

8   there anything written on the door of that

9   office?

10     A       No.

11     Q       Could you please describe the

12  distance away from the office the super's

13  apartment in the basement is?

14     A       The exterior entry doors are

15  approximately 25 feet apart from each other.

16     Q       The entrance to the basement

17  apartment where the super lived was 25 feet away

18  from the office?

19     A       The office, however, has two doors,

20  one on the exterior and one inside facing the

21  rough area of the basement.

22     Q       Was there anything separating the

23  basement apartment from the door of the office?

24     A       Yes, there is a yard.

25     Q       What do you mean by a yard?

[Page 24]

1                           C. Klahr

2         A       The building has three sections.

3   Imagine three towers.  The superintendent's

4   apartment is in the basement of one tower.  The

5   office would be the basement of middle tower and

6   the other vacant apartment that was a storage

7   area was in the last tower.

8                   On the outside there is a yard.

9   All that separated us was this yard that was

10  approximately a 12 or 15-foot yard.  The doors

11  are not near each other, they are in the center

12  of each of them, so they are 25 feet apart.

13        Q       Nestor Almonte took possession of

14  the basement apartment in 437 Morris Park at or

15  around April of 2007, correct?

16        A       I believe so.

17        Q       Did he move in with anyone?

18        A       Yes.

19        Q       Who did he move in with?

20        A       He moved in with his family.

21        Q       He moved in there with his wife and

22  his son and his daughter?

23        A       I am not familiar with the

24  occupants.

25        Q       When he moved in in April of 2011

[Page 25]

```
 1                    C. Klahr

 2   you had an office at least in the lobby of 437

 3   Morris Park beginning in early 2012.  Did you

 4   ever become familiar with his family at all?

 5        A       There is a lot of people coming and

 6   going out of his apartment.  Yes, I know now who

 7   is wife is and who is son is.  I didn't know.

 8                It is not like he introduced them

 9   to me when he moved in.  You have a building with

10   several hundred people coming and going and we

11   didn't  -- they do not access their apartment

12   through the lobby.  They have a dedicated

13   entrance through the exterior of the building in

14   the rear of the building, all outdoors.

15                They don't utilize the lobby except

16   if they want to retrieve the mail from the

17   mailbox.  That's the only time they go to the

18   lobby.  I don't know who is who.  I have been

19   puzzled many times exactly who is who in that

20   apartment.

21        Q       When you say you have been puzzled

22   many times, what do you mean by that?

23        A       There were many people there.

24        Q       How many people were there?

25        A       A lot more than the three you
```

[Page 26]

1                          C. Klahr

2    mentioned.

3         Q        Are you saying that he lived there

4    with more than three people?

5         A        A lot of people coming and going.

6    I don't know who was sleeping there, but there

7    was a lot more people coming and going on an

8    ongoing basis than just Mr. and Mrs. and one son

9    or one daughter.

10        Q        You are the manager of the

11   building, right?

12        A        Yes.

13        Q        Your super has an apartment 25 feet

14   away from you; correct?

15        A        Yes.

16        Q        You are not familiar with who

17   really lives in that basement apartment?

18        A        That is correct.  He has a private

19   life and I don't mingle in his private life.  The

20   nature of our building is there are a lot of

21   people coming and going all the time.

22        Q        Did you ever see Nestor Almonte get

23   his mail?

24        A        Ever, yes.  Probably less than five

25   times.

[Page 27]

1                     C. Klahr

2        Q        Did you ever see his wife get the

3   mail?

4        A        No.

5        Q        Did you ever see his daughter get

6    the mail?

7        A        No.

8        Q        Did you ever see his son get the

9   mail?

10       A        Yes, only after they moved out of

11   the apartment.  After he moved out, that's when I

12   noticed his son coming to get the mail.

13       Q        The first time you noticed his son

14   was after  --

15       A        Picking up the mail.

16       Q        When was the first time that you

17   saw his son not picking up the mail?

18       A        He had shown me who his son was

19   after a short while that he worked there.

20       Q        May of 2011, April of 2011, when

21   was it?

22       A        I don't recall.

23       Q        It could have been between April

24   and May of  -- in 2011 he took the job?

25       A        Yes.

[Page 28]

```
 1                         C. Klahr

 2      Q        May or June of 2011?

 3      A        Yes, May or June.

 4      Q        Did you ever speak to his son at

 5  that time?

 6      A        Just hello and greeting and

 7  probably the handful of times I have met him in

 8  the next two years, just a nod of the head, no.

 9      Q        The hello and the greeting was

10  sometime in May of 2011?

11               MR. WEINBERGER:   Objection.   He

12          didn't say that.

13      A        The introduction that he introduced

14  me, at that time and beyond that there would just

15  be an occasional glimpse of him or seeing him and

16  there would just be a nodding of the head

17  greeting.

18      Q        Nestor Almonte took the job as a

19  superintendent in April of 2011.  What are the

20  responsibilities of a superintendent?

21      A        The superintendent is responsible

22  to make sure that all of the work that he was

23  given is done, is repaired correctly.

24               Correctly means that the workers

25  that he has doing it, the handymen, should have
```

[Page 29]

```
 1                        C. Klahr

 2   finished the work.  He has to acknowledge that

 3   they finished the repairs and didn't just start

 4   the repair and it is not complete, that they did

 5   a satisfactory job so that we don't have to come

 6   back and fix it again.

 7                  He is responsible to maintain those

 8   employees hours and he also submits their time

 9   sheets once per week for payroll processing.  Let

10   me think for a moment.

11                  MR. VALLETTI:  Sure.

12      A       Beyond managing the workers that I

13   described he has to  -- he is the go-to person

14   for anything going on in the building, any kind

15   of complaints.

16                  He will be familiar with the

17   operation of the boiler which supplies heat and

18   hot water in the building and the elevator in the

19   building.  The cleaning of the building, which

20   was done by the porter, he is also responsible to

21   see that is done.

22                  He would also be responsible if we

23   had any outside company come in to do repairs,

24   whether it is a welding company to do some kind

25   of welding or a door repair, gate repair, or
```

[Page 30]

1                          C. Klahr

2    anything like that, he is responsible to make

3    sure that they do what they were ordered to do as

4    well as any deliveries of materials that come to

5    the building.  He has to oversee that delivery

6    and sign for it and make sure it is as was

7    ordered.

8                    MR. WEINBERGER:   Off the record,

9         please.

10                   [Whereupon, a discussion was held

11        off the record.]

12                   MR. VALLETTI:  Let's take a quick

13        break.

14                   [Whereupon, after a short recess

15        was taken, the following was had:]

16   CONTINUED EXAMINATION

17   BY MR. VALLETTI:

18        Q        When you say that the super's

19   responsibility is to make sure that the work

20   given was done right, did you give the

21   superintendent that work at 437 Morris Park?

22        A        Yes.

23        Q        You were giving Nestor Almonte his

24   orders?

25        A        Yes.

[Page 31]

                              C. Klahr

1

2       Q        How would you do that typically?

3       A        Print the work order.

4       Q        Would you print the work order or

5   would they come printed or something else?

6       A        I gave him a printed work order.

7   If you want to know who created it, in the time

8   that Aguila was operating the Social Service end

9   they created it.  Prior to that I created it.

10      Q        When did you start creating the

11  work orders?

12      A        Probably in 2005 I created work

13  orders until probably  -- I don't know when

14  Aguila started, let's say 2008, maybe.  Maybe

15  2007, whenever Aguila took over the Social

16  Service agency they were tasked with going

17  through the apartments and creating a repairs

18  list, so they took over that part from me.

19      Q        In 2007 or 2008 Aguila began?

20      A        I don't remember the dates.  It was

21  six years ago.

22      Q        So six years Aguila ago took over

23  creating the work orders they gave it to you?

24      A        Yes.

25      Q        You gave it to 437 Morris Park, you

[Page 32]

                              C. Klahr

1

2    gave it to Nestor Almonte?

3        A      Yes.

4        Q      Then Nestor Almonte, what did he do

5    with that work order?

6        A      Between him and his helpers he

7    completed those repairs.  I would ask for them

8    back the following week.  This is a weekly work

9    order.

10       Q      Did you get them back in the same

11   form or with notations?

12       A      I would get what I call completed

13   work orders, which means that the superintendent

14   was instructed to write the completion date by

15   each apartment, so for arguments sake if there

16   are 15 apartments on the list I want to know when

17   the apartment was completed.

18              Also, the superintendent was

19   instructed to record the name of the person

20   working in that apartment for various reasons

21   including that there are sometimes,

22   unfortunately, acquisitions of theft and whatnot

23   by the employees and that would relieve the super

24   of that responsibility because he has keys to the

25   apartment that he was always the first to be

[Page 33]

1                    C. Klahr

2    accused.  The super is very happy to have

3    somebody else's name there because he was not in

4    that apartment.

5         Q      Do you give the work order to him

6    incomplete and he completes it and writes the

7    names.  How does he get it back to you, does he

8    hand it to you physically or fax it to you or

9    something else?

10        A      At 437 Morris Park generally he

11   hands them to me.  That would be the rule, in

12   person.

13        Q      Is that in the office?

14        A      In my office.

15        Q      What do you do with a work order

16   that is completed after you receive it back?

17        A      I have to inform Aguila that all of

18   these were completed by this one date and note

19   anything that was not completed and the schedule

20   of when to answer completion.

21        Q      Did you do anything with the names

22   that were annexed to the completed work order

23   list?

24        A      I didn't do anything with them.  I

25   saved them.  I saved that actual sheet submitted

[Page 34]

                              C. Klahr

1

2    by the superintendent and I maintained that file

3    necessary to hold onto.

4         Q       After you were done informing

5    Aguila of what was completed and not anything

6    that was not what did you do with the physical

7    paper?

8         A       I have a file drawer and I filed it

9    away.

10        Q       This required you to basically go

11   line by line through these and report which ones

12   were completed and which ones were not?

13        A       I was doing that for a time.

14   Eventually we were able to just say what was not

15   done and they worked with that arrangement, but

16   for a year or two I was literally reporting line

17   by line.

18        Q       Do you recall which years you were

19   reporting line by line, was that 2010, 2011,

20   something else, do you remember the period?

21        A       That would be when Aguila first

22   took over, the first year or so, year or two.

23        Q       Was this the process that was the

24   same for basically every building, the super

25   would receive the work order incomplete and

[Page 35]

```
 1                    C. Klahr

 2    return it to you completed?

 3         A        In my buildings that I supervised,

 4    yes.

 5         Q        The same practice applied to 1195

 6    Sherman?

 7         A        Yes.  I am not sure what you mean

 8    by that.  In other words, yes, I would send the

 9    work order and get it back.

10         Q        You would send it to who, it was

11    the super?

12         A        At 1195 Sherman when there was a

13    super the super got it.  When there was no super

14    it was Lopez that got it.

15         Q        You instructed him to do the same

16    thing with the work orders for 1195 Sherman that

17    he was doing for 437 Morris Park?

18         A        Meaning I would get back a

19    completed work order.  He didn't do it.  He had

20    to make sure that the worker did it.

21         Q        He would receive the work order for

22    1195 Sherman and give that work out to the

23    handyman or the porter or whoever was at 1195

24    Sherman?

25         A        Yes.
```

[Page 36]

1                          C. Klahr

2        Q        When did you start giving him the

3    work orders for 1195 Sherman?

4        A        Sometime in 2013 when we started

5    having a problem with the super over there.

6        Q        Lopez didn't work in 1195 Sherman

7    prior to 2013?

8        A        He may have gone occasionally.

9        Q        Can you give a frequency as to how

10   often he was at 1195 Sherman?

11       A        It would be on his time sheet, I

12   don't know.

13       Q        During that time that he was still

14   the super at 437 Morris Park?

15       A        Yes.

16       Q        While he was the super he would

17   also report to 1195 Sherman, receive your work

18   orders and ensure that those were completed?

19       A        I don't know what you mean by

20   report.  He would oversee the handyman that was

21   doing the repairs there.

22       Q        Did he do work himself?

23       A        On occasion he had to do it

24   himself.  When I say on occasion, it is because

25   there are handymen, people who are supposed to be

[Page 37]

```
 1                    C. Klahr

 2    handled by somebody.  If it wasn't, then for some

 3    reason he would do it.  We had the personnel that

 4    he oversaw.

 5                    MR. VALLETTI:  Please read that

 6         back.

 7                    [Whereupon, the requested portion

 8         of the record was hereby read by the

 9         reporter.]

10         Q       When you say that the people were

11    supposed to be handled by someone, what do you

12    mean by that?

13         A       Let me correct that.

14                    MR. VALLETTI:  I am a little

15         confused.

16         A       Okay.  There are people.  I mean as

17    employees, handymen, that are supposed to handle

18    that work.  They are supposed to handle  -- we

19    will designate people there to handle all of the

20    work.  He was supposed to allocate a person to do

21    that job.

22                    If it was neglected for some reason

23    it became his and if it was something urgent he

24    may have to go down there and do it himself,

25    which happened on occasion.
```

[Page 38]

1                         C. Klahr

2        Q        He was ultimately responsible for

3    the work at 1195 Sherman when it wasn't

4    completed?

5        A        When there was no super, correct.

6    Also, the building at 1195 Sherman is a very low

7    maintenance building.  Even when we did have a

8    superintendent that super also moonlighted as a

9    handyman for us at other locations.

10                         He was very familiar with the

11   staffing and whatnot.  In other words, there was

12   not enough work at 1195 Sherman to support

13   somebody full-time, there was just nothing to do

14   there.  It is a new building.  It is a gut rehab

15   building, very little maintenance there besides

16   clogged toilets.  No real repairs.

17                         When we had a super there he would

18   be paid to work somewhere else, many times in 437

19   Morris Park.

20        Q        The super at 1195 Sherman will also

21   work at 437 Morris Park?

22        A        Yes, and other locations.  Maybe a

23   lot at 437 Morris Park.

24        Q        Why would they work a lot at 437

25   Morris Park?

[Page 39]

                              C. Klahr

1

2       A       Every super likes certain kind of

3    people. They like the way a certain guy works.

4    He liked him.

5       Q       When there was a super at 1195

6    Sherman would he do work at 437 Morris Park while

7    Lopez was the super there?

8       A       Yes, that's what I was trying to

9    bring out, yes.

10      Q       You handle the payroll for 437

11   Morris Park, correct?

12      A       I distributed the payroll.

13      Q       When you say you distributed the

14   payroll, what do you mean?

15      A       I gave out the checks on Friday.

16   The payroll is handled by an office that

17   generates the payroll that sends it to the

18   payroll company which I review for accuracy and

19   then give out the checks.

20      Q       When you say you review for

21   accuracy, what do you mean by that?

22      A       I have to make sure that the

23   clerical workers that entered the payroll entered

24   everything properly, so I would get a copy of the

25   time sheets that they got with some kind of

[Page 40]

```
 1                    C. Klahr

 2   spread sheet, blah blah blah, and make sure that

 3   they entered it properly.

 4        Q       What is blah, blah, blah?

 5        A       I have to match the spread sheet to

 6   the handwritten time sheet and see that they  --

 7   it is a lot of paperwork.

 8        Q       The spread sheet is created by

 9   whom?

10        A       Clerical office workers.

11        Q       For 437 Morris Park?

12        A       Yes.

13        Q       Are they located in the office?

14        A       No.

15        Q       Where are those located?

16        A       New Jersey.

17        Q       Does 437 Morris Park have an office

18   in New Jersey?

19        A       No.  The management company  -- I

20   am not familiar how it works.  The way I

21   understand is they use a service, so this is some

22   company that that's what they do.  They do either

23   payroll or they do different office work.  They

24   do office work.

25        Q       Then you said you had to compare
```

[Page 41]

C. Klahr

1

2    handwritten sheets.  Are you talking about time

3    sheets?

4        A        Yes.  I didn't get the time sheets

5    directly.  The super faxed them to the payroll

6    company, but it was these clerical workers who

7    prepared it for the payroll company.

8                    After they completed it it would be

9    E-mailed to me for me to look at.  I actually

10   occasionally would retrieve from the

11   superintendent the original signed time sheets

12   because what they were submitting were faxes.

13       Q        They would receive the fax and then

14   you would get the original from the supers?

15       A        To get the paycheck, to generate

16   the payroll the superintendent would fax it in.

17   I don't necessarily see that.  It is prepared for

18   payroll processing.  When it is sent to the

19   payroll company I am cc'd on that and I look at

20   it and review it.

21                    At a later time once a month or

22   something like that I would call the super and

23   say to give me the original time sheets, because

24   he was instructed to keep them until I got there.

25       Q        You instructed the super to hold

[Page 42]

```
 1                    C. Klahr

 2   onto all of the time sheets after he faxed them

 3   to you so you could collect them once a month?

 4        A       Yes.

 5        Q       You said that the super's

 6   responsibility, Lopez' responsibility, was to

 7   maintain employee hours.  Can you explain what

 8   you meant by that?

 9        A       He had to make sure that the person

10   recorded the time sheets properly.  He was

11   instructed in that by me personally how that

12   works.

13                He is familiar with exactly what

14   has to be done so that the payroll company can

15   read it and he also has to sign it.  He has to

16   sign the comings and goings of those employees

17   under him, which he may have in any given week

18   between four and six employees.

19                We are talking about Nestor Almonte

20   as opposed to the other supers, he had between

21   four and six workers in his building.

22        Q       What were the names of the workers?

23        A       I would have to submit to you a

24   list.  It is not something that I know by heart.

25   They are on the payroll.  It is not something
```

[Page 43]

```
 1                    C. Klahr

 2    that I know by heart.  I can give you several

 3    names, but there are many, many more.

 4                 They are not always the same

 5    workers.  These are roving people.  One exception

 6    was the super at 1195 Sherman who was Mr. Munoz,

 7    he always liked to work at 1195 Sherman.  That

 8    was his choice place.

 9                 Other workers that were there, if

10    there were another three that week there were

11    people that were all over the place, one day here

12    and one day there on an as-needed basis.

13                 You asked about the instructions of

14    the time sheets.  He had to make sure that they

15    recorded their hours properly.  He is supposed to

16    sign to that and he has to get permission, if

17    they would stay overtime past 5:00 then he would

18    have to call me and ask me permission.

19        Q       These were weekly time sheets; is

20    that correct?

21        A       These were weekly time sheets, yes.

22        Q       Lopez signed weekly time sheets for

23    his employees at 437 Morris Park?

24        A       We can show you a time sheet.  The

25    employee would sign on the bottom at the end of
```

[Page 44]

1                          C. Klahr

2    the week that it was complete and final, but

3    Lopez would have to sign twice a day, coming and

4    going, entering and leaving, maybe several times

5    a day if they went out to lunch.  He is supposed

6    to sign and make  -- he was instructed to make

7    eye contact with the employee and record the time

8    that he is making that eye contact.

9          Q      Is there any particular reason why

10   you would instruct him to make eye contact with

11   an employee?

12         A      Yes.

13         Q      Please explain.

14         A      We have had prior experience where

15   somebody would say we are looking for an employee

16   because we don't see him and we went to an

17   apartment that he was working for and he went to

18   lunch.  It is after lunch and we didn't see him.

19                When we called him he said he was

20   there in the apartment.  There was a gap of half

21   an hour or two hours that the guy was lost and he

22   is claiming that he came at an earlier time.  We

23   instituted that the superintendent has to see

24   him.

25         Q      He has to see the employee before

[Page 45]

```
 1                    C. Klahr

 2   he signs the time sheet?

 3        A        He has to see him.

 4        Q        As the witness to the work that was

 5   done he had to see that employee?

 6        A        No.  To witness that this employee

 7   came to work.  That's a different story about

 8   work being done.  The employee came and it is

 9   like being clocked in.  He has to personally

10   witness that this person arrived when he is

11   claiming to have arrived and left when he is

12   claiming to have left.

13        Q        Was there a punch in or punch out

14   system at 437 Morris Park?

15        A        This was our system.

16        Q        There was no machine that you used

17   for a punch card?

18        A        Not for us.  Aguila has one.  It

19   had nothing to do with us.  Not for us.  Is there

20   one, yes, but it is not ours.

21        Q        Your employees were instructed to

22   maintain all of their time by handwriting?

23        A        Yes.

24        Q        For your employees there was no

25   hand scan or punch card?
```

[Page 46]

                              C. Klahr

1

2       A       No machines of any kind.

3       Q       At 437 Morris Park that's the same

4    as at 1195 Sherman, no punch card system for your

5    employees, nothing of that nature?

6       A       Correct.

7       Q       What about at 1101 Manor, any

8    machine for that purpose?

9       A       No.

10      Q       1056 Boynton?

11      A       No.

12      Q       Was this the procedure that was in

13   place starting in 2011, referring to the time

14   when Lopez took the job as the superintendent at

15   437 Morris Park?

16      A       I believe so.

17      Q       Was that the same procedure at the

18   time until he ended his employment, whenever that

19   occurred?

20      A       Yes.

21      Q       Were there any other sheets that he

22   was responsible for maintaining other than the

23   work orders and the time sheets?

24      A       What kind of other sheets?

25      Q       Are there any other sheets besides

[Page 47]

1                              C. Klahr

2    the work orders and time sheets, any other sheets

3    that list job directives or company payroll or

4    something that he was personally responsible for?

5                    MR. WEINBERGER:   Objection to the

6         form.

7         A       I don't believe so.  His own time

8    sheet is included in that thing.  I don't believe

9    there is any other paperwork, but I may be

10   mistaken.

11        Q       How many time sheets are there?

12        A       Every type of employee has their

13   own type of time sheet.  Off the top of my head

14   there is a superintendent's time sheet,

15   handyman's time sheet, a porter's time sheet.

16        Q       There are three different types of

17   time sheets?

18        A       At least.  The superintendent also

19   has an additional time sheet which we instituted

20   at some later more recent time which they may

21   have used the roving handyman.

22        Q       Roving employees were the

23   handymen's time sheets?

24        A       Yes.

25        Q       Would a superintendent fill out

[Page 48]

1                         C. Klahr

2      just the superintendent time sheet or could he

3      also fill out a roving employee time sheet if he

4      needed?

5           A       He could fill out a roving time

6      sheet as well.

7           Q       Why would he fill out a roving time

8      sheet as opposed to a superintendent's time

9      sheet?

10          A       If he worked outside of the

11     designated property that he lived at. That was

12     created because on the bottom of the super's time

13     sheet there was an area that I had reserved for a

14     specific purpose called leaving the building and

15     they would start writing things in there because

16     they wanted to record their time.

17                  I just instructed them not to do

18     that, to start using a handyman time sheet to

19     record anything that -- any work time that they

20     are leaving the premises area.

21          Q       Was that a confusing part such that

22     you had to change the protocol to let them fill

23     in roving employee time sheet?

24          A       The payroll company pointed it out.

25     For their clerical people, it was confusing to

1                       C. Klahr

2    them, I don't know.

3         Q        When did you institute the new

4    policy that no more work on the leaving the

5    premises section, just to fill out the separate

6    roving employee time sheet?

7         A        I don't know.  You have to look

8    when it started.

9         Q        I am just asking from your

10   recollection.  When is the first time you

11   remember telling Lopez this is no longer to be

12   used to record his time?

13        A        I don't recall.

14        Q        Was it in 2013?

15        A        It is possible.

16        Q        Was it in 2012?

17        A        I don't know.

18        Q        When did the clerical worker

19   approach you with a problem?

20        A        I don't recall.  The same time.

21        Q        A super could fill out a

22   superintendent's time sheet and a roving employee

23   time sheet?

24        A        The incident was that the clerical

25   worker missed the hours that one of the supers

[Page 50]

```
                              C. Klahr
```

1

2    put down and we tell the super not to do that,

3    they are not looking there, they are causing

4    their own grief, if they didn't get paid or

5    whatever it is, not to put it over there.

6         Q       The incident that caused you to

7    change that was somebody's failure to get paid

8    for hours that they had written down?

9         A       It was a correction that had to be

10   made.  Corrections could happen.  An adjustment,

11   an adjustment to the pay could have been made.

12        Q       Who determined how much an employee

13   at 437 Morris Park was going to get paid?

14                MR. WEINBERGER:  Objection to

15        form.  You can answer it if you can.

16        A       What do you mean?

17        Q       Who decided how much a porter was

18   going to get paid for the job that they were

19   doing?

20        A       When I started working for the

21   company I inherited a policy of whatever it was

22   and I just maintained it.

23        Q       It was you who decided to pay the

24   porter how much they were getting paid?

25        A       I continued it.

[Page 51]

                              C. Klahr

1

2       Q       The same goes for the handymen?

3       A       I made the decision based on what

4    they wanted to get paid and what I was able to

5    afford to pay and we would hammer out an

6    agreement.

7       Q       Were you given a budget?

8       A       No, I was not given a budget, but

9    some of the workers have tremendously varying

10   differences in what they want to get paid.

11      Q       What did you use to determine how

12   much someone was going to get paid?

13      A       I knew from  -- I know what is in

14   the ballpark of what we have gotten in the past,

15   what is available.  I know what is available.  It

16   would have to be reasonable to that area.

17      Q       Did you use the person's experience

18   to determine their pay rate?

19      A       Yes.

20      Q       Did you use the fact that they had

21   worked for the company before  --

22      A       No.

23      Q       Did you have repeat employees, ones

24   who left and came back?

25      A       Yes.

[Page 52]

1                          C. Klahr

2        Q        Did that affect how much they were

3    paid?

4        A        Generally they just came back

5    because they wanted the work and they got the

6    same rate.  Sometimes they left because they were

7    unhappy with the pay and now I am willing to give

8    them a little more.

9        Q        For 437 Morris Park you handled the

10   hiring, correct?

11       A        Yes.

12       Q        Could you explain to me the process

13   of how you hired people to work at 437 Morris

14   Park?

15       A        Could you be more specific.

16       Q        You get somebody who wants a job.

17   Say they spoke to somebody in the building and

18   they said you have to talk to Charlie and they

19   talk to you.  What happens?

20       A        They would meet with me.  I would

21   give them an application for employment.  It

22   basically asks them a couple of generic

23   questions, et cetera, et cetera, whatever is on

24   the form.  They would then sign it.

25                    It also asked if they were arrested

[Page 53]

```
 1                        C. Klahr
 2   for any reason, which I had to ask due to the
 3   nature that we had -- as shelters we had
 4   accessibility to the apartments to enter at any
 5   time, so we had to be a little sensitive and make
 6   sure that there would be proper respect, not
 7   somebody barging in on people because they feel
 8   that they can do whatever they want.
 9              They had to sign that application
10   that whatever was there was truthful and then we
11   would at that point discuss the wages.  If we
12   mutually agreed to move forward then this was a
13   set of rules that I would read to them and
14   actually many of these applicants were not
15   English speaking people.
16              Lopez would be my translator and he
17   had to sign that form, that consent form that the
18   perspective employee was now going to become an
19   employee and Lopez would sign as a witness
20   translator so that they don't say later they
21   didn't understand the rules.  I would say Lopez
22   did that nine out of ten times.
23       Q      If Lopez was not available did you
24   have someone else you could turn to for that?
25       A      In the time that Lopez was the
```

[Page 54]

```
 1                      C. Klahr
 2   superintendent he was the man.
 3       Q       He was always available?
 4       A       I would arrange a meeting when he
 5   could do it.  I would ask him when he was
 6   available.
 7       Q       You didn't have to run the decision
 8   to hire any particular employee by anyone else,
 9   that was your ability to hire?
10       A       Correct.
11       Q       Is this how the process went with
12   Lopez?
13       A       Meaning?
14       Q       When he was first hired did he do
15   this?
16       A       Yes, I believe so.
17       Q       He filled out an application?
18       A       Correct.
19               MR. VALLETTI:  I will make a demand
20          for that.
21               MR. WEINBERGER:   You have it.
22               MR. VALLETTI:  The employment
23          application bearing the name of Nestor
24          Almonte.
25               MR. WEINBERGER:   You didn't ask
```

[Page 55]

```
 1                      C. Klahr

 2        that.  You have an application.

 3                 MR. VALLETTI:  Hold on, there is no

 4        question pending.

 5                 MR. WEINBERGER:   There is no

 6        question pending.

 7                 MR. VALLETTI:  Give me a minute.

 8        Let's go off the record.

 9                 [Whereupon, a discussion was held

10        off the record.]

11        Q       Off the record you said that you

12   had wanted to wipe out everything that you just

13   said.  Why is that?

14        A       In the beginning of this proceeding

15   you had said clearly that all references to

16   Nestor Almonte is Lopez, okay?

17                 All references I made are to this

18   face, regardless of the name that he goes by.

19   When we talk about an application for employment,

20   this person filled out an application.

21        Q       Who is that person?

22        A       Lopez.  You said you are calling

23   him Nestor.

24        Q       It is Nestor Almonte Lopez.  It

25   doesn't make the difference to me because that's
```

[Page 56]

1                          C. Klahr

2    his name, that's what he goes by?

3         A       Lopez filled out an application and

4    that is the application that we are talking

5    about, which was the beginning of his employment.

6         Q       When was the beginning of his

7    employment?

8         A       February of 2011.

9         Q       He filled out an application in

10   2011?

11        A       Yes.

12        Q       What name did he use on that

13   application?

14        A       Manuel Almonte.

15        Q       Why?

16        A       That's his name.

17        Q       His name is Nestor Almonte, is it

18   not?

19        A       That became evident in -- way after

20   working maybe a year and-a-half or two years

21   after working.  That was not his name.

22        Q       What was not his name?

23        A       His name is Lopez.  He is called

24   Lopez.  His name is Manuel Almonte.

25        Q       Why was he called Lopez if his name

[Page 57]

```
 1                    C. Klahr

 2   was Manuel Almonte?

 3        A       I would like to allude to the

 4   testimony he gave and said several times.  He

 5   maintained that story from day one.  I asked him

 6   that question.  He said to me that's his mother's

 7   family name.  I believe it is on some documents,

 8   too.

 9        Q       What was his mother's family name?

10        A       Lopez.

11        Q       What was his first name?

12        A       Whatever he wrote on the

13   application, I believe Manuel.

14        Q       Nestor Almonte used Manuel Almonte?

15        A       No, Lopez.  I don't know what

16   Nestor Lopez you are talking about.

17        Q       You said you don't know who I am

18   talking about when I say Nestor?

19        A       After the course of his employment

20   of quite many months or maybe more than a year or

21   so he came up with a new name.

22        Q       What do you mean he came up with a

23   new name?

24        A       Exactly what I said.

25                MR. VALLETTI:  I will mark this.
```

[Page 58]

```
 1                          C. Klahr

 2                  [Whereupon, the document was

 3          hereby marked as Plaintiff's Exhibit 1 for

 4          identification, as of this date, by the

 5          reporter.]

 6          Q       I will show you what was marked as

 7     Plaintiff's Exhibit 1 for your deposition.  I

 8     will show it to you and your attorney.  What is

 9     that document?

10          A       This is known as a warning notice

11     that would be generated if an employee would be

12     doing something that needed reprimanding, which

13     in case of somebody who doesn't speak English

14     fluently, it would be done in front of a witness.

15          Q       It is a warning notice?

16          A       Yes.

17          Q       What is the company on top?

18          A       Sherman Management Company, also

19     known as 1195 Sherman.

20          Q       What does the body of that say on

21     the bottom?

22          A       "Nestor Almonte witnessed this

23     topic being discussed in person with Albert."

24          Q       Who is Nestor Almonte?

25          A       We know who he is at this time.
```

[Page 59]

```
 1                          C. Klahr

 2        Q        At what time did you become aware

 3   of who he was?

 4        A        I told you for many months or a

 5   year and-a-half or so after his employment.

 6                 MR. VALLETTI:  Please mark this as

 7        Plaintiff's Exhibit 2.

 8                 [Whereupon, the document was

 9        hereby marked as Plaintiff's Exhibit 2 for

10        identification, as of this date, by the

11        reporter.]

12        Q        I will show you Plaintiff's

13   Exhibit 2, April 20th work orders that go back in

14   time.

15                 MR. WEINBERGER:   Bates numbers 317

16        to 327.

17        Q        Take a look through it and see if

18   you are familiar with that document.

19        A        Yes.

20        Q        What do you know that document or

21   those several documents to be?

22        A        This is a completed work order.

23        Q        In the right-hand margin of this

24   document the name Lopez appears several times?

25        A        Yes.
```

[Page 60]

1                        C. Klahr

2      Q        Who do you know Lopez to be?

3      A        I know Lopez to be the face of the

4   super.

5      Q        The face of the super?

6      A        I don't know how to refer to him.

7      Q        Did you know his first name at this

8   time?

9      A        He was always called Lopez.

10      Q        You said before he filled out and

11   employment application?

12      A        Yes.

13      Q        What name did he use?

14      A        Manuel Almonte.

15      Q        Up until whatever time later you

16   sound you found out  --

17      A        He was always called Lopez until

18   today.

19      Q        You are the manager of the

20   building, correct?

21      A        Yes.

22      Q        You don't know your employee's

23   names?

24      A        Yes, I do.

25      Q        His name was only Lopez, he didn't

[Page 61]

```
 1                        C. Klahr

 2     have a first name?

 3          A       I have many employees, and this is

 4     customary, where everybody has a name.  His name

 5     is Tony, but that's not the name on his check.

 6     Everybody has a name, sorry to tell you.

 7          Q       You don't know the names that are

 8     on the checks of the employees?

 9          A       Yes, I do.

10          Q       The names on the checks of your

11     employees don't match up with the people that

12     they actually are?

13                  MR. WEINBERGER:   Objection.

14          A       They don't match the nickname that

15     they are called.  This is Buddy or this is Lopez

16     or this is Tony.  That's not the name on the

17     check.

18          Q       You pay people on names that you

19     don't know?

20          A       I do know their names.

21          Q       What is his name?

22          A       Manuel Almonte.

23          Q       You never had a first name from

24     him?

25          A       Manuel Almonte also known as Lopez.
```

[Page 62]

1                          C. Klahr

2         Q       What about on this document, Nestor

3    Lopez, who is that?

4         A       At a later time he disclosed this

5    whole thing with the name change.

6         Q       Earlier you testified that you got

7    work orders from Aguila, correct?

8         A       Yes.

9         Q       You gave those work orders out?

10        A       Yes.

11        Q       You specifically gave work orders

12   to Lopez?

13        A       Yes.

14        Q       You specifically gave work orders

15   to Lopez when he first started his employment,

16   correct?

17        A       When he became the super.  Prior to

18   the time he was a super, no.

19                MR. VALLETTI:  Please mark these as

20        Plaintiff's Exhibits 3 and 4.

21                [Whereupon, the documents were

22        hereby marked as Plaintiff's Exhibits 3 and

23        4 for identification, as of this date, by

24        the reporter.]

25        Q       I will show you what was marked as

[Page 63]

```
 1                         C. Klahr

 2   Plaintiff's Exhibit 4.  What is that document?

 3        A       A forwarding notice.

 4        Q       Did you write that document?

 5        A       I hand wrote it, yes.

 6        Q       Is this your signature here?

 7        A       Yes.

 8        Q       Whose signature is that down there?

 9        A       Lopez' signature.

10        Q       I will show you what was marked as

11   Plaintiff's Exhibit 3.  What is this?

12        A       A work order, completed work order.

13        Q       What is the date?

14        A       April 27, 2011.

15        Q       What name is written up here?

16        A       Nestor Lopez.

17        Q       That's your handwriting, isn't it?

18        A       Yes, it is.

19        Q       On a document from April of 2011

20   you wrote Nestor Lopez received?

21        A       I wrote it at a different time.

22        Q       When did you write it?

23        A       I explained that I filed these work

24   orders and I keep them.  When I had to review

25   something at the end of the year I make a lot of
```

```
                                                    [Page 64]
 1                         C. Klahr

 2     notes.

 3          Q        I believe your testimony was you

 4     would collect them at the end of the month.  Can

 5     you tell me whose name appears on the margin

 6     here?

 7          A        Nestor.

 8          Q        That's from April of 2011?

 9          A        Yes.

10                   MR. WEINBERGER:   Could I see that,

11          please.

12                   MR. VALLETTI:  Sure (handing.)

13          Q        In April of 2011 you knew his name

14     was Nestor Lopez?

15          A        What I knew is that his name is

16     Lopez.

17          Q        Here it is written that you had a

18     Nestor in the margin, correct?

19          A        Yes.

20          Q        You testified that you received

21     these completed work orders, correct?

22          A        I need to clarify that it is not

23     somebody else, but maybe it is him.

24          Q        Maybe it is him working in April of

25     2011, it is Nestor Lopez?
```

[Page 65]

1                      C. Klahr

2        A        The super usually writes super or

3    something.  The procedure was to write super.

4    He was not the super at that time.  It is a

5    little  --

6        Q        Does that say "now super" on the

7    top?

8        A        Yes, "new super."

9        Q        "New super Nestor Lopez received"?

10       A        Yes.  We review  --

11                MR. VALLETTI:  There is no question

12           pending.  Please mark this as Plaintiff's

13           Exhibit 5.

14                [Whereupon, the document was

15           hereby marked as Plaintiff's Exhibit 5 for

16           identification, as of this date, by the

17           reporter.]

18       Q        Are there any other work orders

19    that bear Nestor Lopez' name from 2011?

20       A        I am not sure.  It is common for me

21    to make notes.  I make notes occasionally on the

22    top or sides of the page.  As a matter of fact, I

23    always write notes.  They are cut off.

24       Q        That one says "new super"?

25       A        Yes.

[Page 66]

```
 1                      C. Klahr

 2        Q        Again, you reviewed these work

 3    orders; is that correct?

 4        A        Yes.

 5        Q        You testified that at some point

 6    you were reviewing them line by line, correct?

 7        A        Yes, not necessarily in that year,

 8    but go ahead.

 9        Q        I will show you what was marked as

10    Plaintiff's Exhibit 5.  Take a look at that.

11        A        Okay.

12        Q        Do you recognize this document?

13        A        It is a work order, completed work

14    order.

15        Q        Where is that from?

16        A        437 Morris Park, August 10, 2011.

17        Q        At this point there is a name that

18    appears as the super?

19        A        The name super appears.

20        Q        Who was that at that time?

21        A        Lopez.

22        Q        Is he Nestor Lopez at this point?

23        A        It is the father that we were

24    referring to.  There is only one super, the

25    super.
```

[Page 67]

```
 1                      C. Klahr

 2        Q        If he is writing his name in as the

 3   super why on the same work order does he also

 4   write Manuel?

 5        A        Maybe somebody named Manuel did the

 6   work.

 7        Q        Do you have any other employees

 8   named Manuel?

 9        A        I don't know.

10                 MR. WEINBERGER:   What exhibit is

11        that?

12                 MR. VALLETTI:   It is Plaintiff's

13        Exhibit 5.

14        Q        Did Manuel Almonte complete that

15   work?

16        A        I don't know.  I would like to

17   clarify I don't know who Louis is either, I don't

18   know these names.

19        Q        But you wrote in your own

20   handwriting Nestor Lopez at the top; is that

21   correct?

22        A        Yes.  It appears here again.

23                 MR. VALLETTI:  There is no question

24        pending.  Move to strike.  Off the record.

25                      [Whereupon, a discussion was held
```

[Page 68]

```
 1                      C. Klahr

 2          off the record.]

 3          Q        Going back to Plaintiff's Exhibit

 4     3, it said Lopez was hired to be the super at 437

 5     Morris Park in about April of 2011, correct?

 6          A        Yes.

 7          Q        Is that when he would be the new

 8     super?

 9          A        It looks like it.

10          Q        He would not be the new super two

11     years later?

12          A        No.  This appears to be that this

13     is when he became the super if that's what you

14     are asking.

15          Q        Earlier you testified that the

16     super's responsibility, he was the go-to person

17     for any complaints.  Can you elaborate on what

18     you meant by complaints?

19          A         If anybody in the building,

20     residents, occupants, shelter clients, would have

21     a complaint they would tell him and he was

22     instructed to tell them to report to the office

23     as every job needs to come through a work order

24     unless there was an active emergency such as a

25     big leak with water flowing or the Fire
```

[Page 69]

1                          C. Klahr

2    Department entering the building.

3        Q       What was the regular schedule of

4    437 Morris Park's super?

5        A       The super's schedule  --

6        Q       Let's start with 2011 because it

7    might have changed later.  In 2011 what was the

8    super's schedule, Lopez' schedule at 437 Morris

9    Park?

10       A       Generally the super would work

11   approximately 8:30 to 5:00 with a half hour break

12   in the middle.  As you mentioned, it later

13   changed to 7:30 a.m. to start.

14       Q       When, approximately, did that

15   change occur?

16       A       I don't recall, but it might have

17   been in 2013.

18       Q       The half an hour break, that was

19   unpaid?

20       A       Correct.

21       Q       Lopez, did he answer emergency

22   calls at night?

23       A       Yes.

24       Q       How would he find out about those

25   calls?

[Page 70]

```
 1                    C. Klahr

 2        A        I would text him.

 3        Q        What did you text him on, his

 4   personal phone or the company phone?

 5        A        Company phone.

 6        Q        Was that your normal method of

 7   communication with him generally?

 8        A        At night.

 9        Q        What about during the day, did you

10   maintain contact with him throughout the day?

11        A        Yes.  We had a combination two-way

12   radio cell phone.  You can talk on radio or call

13   him.

14        Q        Is that sort of like a Nextel?

15        A        Yes.  It changed, so I don't know

16   how long he had that arrangement.  Probably in

17   2012 it became no radio, but I am not sure of the

18   date.  Originally there was a radio attached to

19   it.  It was a company phone.

20        Q        Did any other employees have

21   company phones other than supers?

22        A        No.

23        Q        No handymen had company phones?

24        A        Correct.

25        Q        No porters had company phones?
```

[Page 71]

```
 1                         C. Klahr

 2       A        Nobody but the super, the one super

 3   in the building.

 4       Q        You had said before that you would

 5   text Lopez at night if you had received an

 6   emergency call.  Can you explain how you received

 7   the emergency calls?

 8       A        We have what we call a hotline,

 9   which basically is and answering service.  We

10   post the phone number throughout the building so

11   if somebody has an after hours emergency we can

12   know about it before the building burns down or

13   floods six floors.

14                That answering service E-mails or

15   texts the specific complaint.  It could be a very

16   detailed complaint.

17       Q        Can you give me an example of what

18   would be a detailed complaint received just from

19   the hotline?

20       A        Yes.

21       Q        Please.

22       A        For this building it would say 437

23   Morris Park, Apartment B, 53, leak coming down

24   from upstairs."

25       Q        Do you know how these hotline calls
```

[Page 72]

1                          C. Klahr

2     are generated, was it through the City, through a

3     direct line from the residents or something else?

4         A        It was one of two ways.  The

5     resident themselves can call, we posted signs

6     everywhere asking them to call.

7                          Aguila, which maintains 24 hour

8     security, a security supervisor, that supervisor

9     who works off site would get the call from the on

10    site security guard and that person would often

11    call the hotline.

12        Q        The Aguila off site supervisor

13    would put in a call into the hotline?

14        A        Correct.

15        Q        Or a resident can call the hotline

16    correct?

17        A        Yes.

18        Q        Do you know where the resident

19    calls went?

20        A        It goes to the answering service

21    and the answering service would send to to me.

22        Q        Did Abraham receive those calls as

23    well?

24        A        No.

25        Q        Did Kalman send these types of

```
                                              [Page 73]
 1                      C. Klahr

 2   complaints or hotline calls to Lopez?

 3       A        I believe not.

 4       Q        You were responsible for that,

 5   correct?

 6       A        Yes.

 7       Q        It is safe to say that all of those

 8   hotline calls went through you before they were

 9   given to any of the supers including Lopez?

10       A        Correct.  That's the way it works.

11   That's the only way it works.

12       Q        Let's go on a weekly basis.  How

13   often would you get hotline complaints, how often

14   in a week?

15       A        Anywhere between three and six.  I

16   would like to add something.  There were

17   additional calls made by day which were not sent

18   to the super.  They sent to Aguila.  I would

19   submit it to Aguila.

20                I am talking about only calls to

21   our hotline that went to the super, that's how it

22   worked.  A resident would call and say their

23   toilet is overflowing and that's the middle of

24   the day.  That call would actually, the E-mail

25   would be forwarded to Aguila to be aware that
```

```
                                              [Page 74]
 1                    C. Klahr
 2    there is such a call.  I would tell the super,
 3    but at nighttime, the nighttime calls were not
 4    sent to Aguila.  It was just me straight to the
 5    super.
 6         Q       The daytime calls, did Aguila give
 7    them directly to the super or did they go to you?
 8         A       If it was a clogged overflowing
 9    toilet type of thing I would call the super.  The
10    nature of a lot of those calls were not really
11    urgent and, therefore, we left it at that.  They
12    would handle it.  They would follow up on it and
13    generate a printed work order for a later date,
14    tomorrow, next day, whatever.
15         Q       The hotline calls might have been
16    handled immediately or they might have become
17    part of a work order?
18                 MR. WEINBERGER:   Objection.
19         A       I would like to clarify.  If it is
20    at nighttime and it is an emergency that I deem
21    an emergency I would send it to the super.
22                 If I deemed it was not an emergency
23    like somebody said their light bulbs are not
24    working I would just forward it to Aguila the
25    next day.
```

[Page 75]

1                    C. Klahr

2              Not every call is an emergency.  It

3    was just a service that we provided for them

4    because though Aguila was responsible to make the

5    work orders the residents would complain to

6    Kalman, they would say they have made a complaint

7    and it was four days and nobody attended to it.

8    We would get ahead of the printed work order some

9    time because it may be an emergency and it may

10   not be.

11        Q      Were there instances where

12   something had been completed but still showed up

13   on a work order?

14        A      Yes.

15        Q      They would have to be filled out?

16        A       They would have to write down the

17   date that it was completed even though it was

18   prior completed.  Frequently that would happen.

19   If I knew that I would have removed it from the

20   work order.

21              The super would not get that part,

22   I would take it out.  It was a very common -- I

23   only got these once a week and the hotlines are

24   every day.  It was very common that they were

25   printing stuff that we took care of two days

[Page 76]

```
1                          C. Klahr

2    before.

3         Q       If the hotline was coming in every

4    day could you describe the frequency of the calls

5    on a daily basis?

6         A       It would vary on the weekends.  On

7    the weekends you can have two to three calls, not

8    always, but that would be common.  During the

9    week you could have maybe two or three out of the

10   whole week, weekends being different.

11        Q       Weekend calls were more frequent?

12        A       Yes.  We have this data, so it was

13   something that we looked at and we know.

14   Sometimes on the weekends you could have two or

15   three calls.  If it was a holiday weekend it

16   would be another call or two.

17                During a general work week not

18   including weekends you could have two to three

19   calls.  On the weekends additional.

20                Generally it is safe to assume four

21   to six calls a week, sometimes less and just two

22   calls during the weekend and nothing during the

23   week.

24                MR. VALLETTI:  I will make a demand

25        for the data that he just said he had.
```

[Page 77]

                         C. Klahr

1

2                MR. WEINBERGER:   No problem.

3      Q      Did that come by way of E-mail?

4      A      Yes.

5                MR. VALLETTI:  I will make a demand

6         for the E-mails from the hotline for the

7         relevant period, for 437 Morris Park and

8         for 1195 Sherman.

9                MR. WEINBERGER:   Let's go off the

10        record.

11               [Whereupon, a discussion was held

12        off the record.]

13      Q      Mr. Clarke, there is something that

14   you would like to add?

15      A      Yes.  When that I texted the super,

16   those hotline calls at night, it was at my

17   discretion.  They were limited to approximately

18   11:00 to 11:15.  Calls may come at other hours,

19   which I didn't forward unless the Fire Department

20   was in the building, which was very uncommon.

21      Q      You could send a text to Lopez

22   about a call at 11:00 at night?

23      A      Yes.

24      Q      You could send that same message up

25   to 11:15 p.m.?

[Page 78]

1                    C. Klahr

2        A        Yes.

3        Q        We had some testimony from you

4    before that the face that you knew as Lopez

5    filled out an employment application?

6        A        Yes.

7        Q        You testified that he used what

8    name on that employment application?

9        A        I believe it was Manuel Almonte.

10                 MR. VALLETTI:  Please mark this as

11        Plaintiff's Exhibit 6.

12                 [Whereupon, the document was

13        hereby marked as Plaintiff's Exhibit 6 for

14        identification, as of this date, by the

15        reporter.]

16        Q        I will show you Plaintiff's

17    Exhibit 6 for identification.  Are you familiar

18    with that document?

19        A        Yes, I am.

20        Q        What do you know that document to

21    be?

22        A        This is an application for

23    employment for Lopez.

24        Q        This is your handwriting?

25        A        The top half is mine and he signed

[Page 79]

```
 1                    C. Klahr

 2    and dated it on the bottom.

 3        Q       He didn't fill this out up here?

 4        A       That is correct.  I filled out

 5    everything  -- he just signed it and dated it

 6    (indicating).

 7        Q       What is the date on this form?

 8        A       February 21, 2011.

 9        Q       In April of 2011 where you

10    handwrote that Nestor Lopez is the new super at

11    437 Morris Park did you ask him why he used a

12    different name on his employment application?

13        A       No.

14        Q       Why not?

15        A       First of all, I don't have these

16    papers at the same time in front of me.  I am not

17    bothered by somebody who goes by a nickname of

18    one name and gets a check through another

19    version, I am just not.

20        Q       When you hire an employee do you

21    ask for any documentation from them?

22        A       Now I do.

23        Q       You didn't at the time?

24        A       At that time we didn't do what we

25    do now.
```

[Page 80]

                              C. Klahr

1

2        Q        What is it that you do now?

3        A        We demand lots of documentation,

4   filling out forms, signing forms, providing photo

5   ID, which at that time we didn't have.

6                 MR. VALLETTI:  Please mark this as

7           Plaintiff's Exhibit 7.

8                 [Whereupon, the document was

9           hereby marked as Plaintiff's Exhibit 7 for

10          identification, as of this date, by the

11          reporter.]

12       Q        How did you determine what name you

13  would use for Lopez in various documents?

14       A        I don't understand the question.  I

15  don't determine  -- everybody calls him a certain

16  name, that's his name that we refer to him on a

17  regular basis.

18       Q        You would only refer to him as

19  Lopez?

20       A        Yes.

21                MR. VALLETTI:  Please mark this as

22          Plaintiff's Exhibit 8.

23                [Whereupon, the document was

24          hereby marked as Plaintiff's Exhibit 8 for

25          identification, as of this date, by the

[Page 81]

```
  1                        C. Klahr

  2        reporter.]

  3        Q       I will show you what was marked as

  4    Plaintiff's Exhibit 8.  You are familiar with

  5    this document?

  6        A       Yes, employee warning.

  7        Q       Is this your signature here?

  8        A       Yes, it is.

  9        Q       Did you write this document?

 10        A       I typed it.

 11        Q       Under manager you have listed what

 12    name?

 13        A       Nestor Lopez.

 14        Q       In this document you refer to him

 15    as Nestor Lopez, correct?

 16        A       Yes.

 17        Q       The next document, what is this

 18    document?

 19        A       A warning notice.

 20        Q       This is your signature down here?

 21        A       Yes.

 22        Q       You wrote this document?

 23        A       Yes.

 24        Q       The manager listed here is what?

 25        A       Lopez.
```

[Page 82]

```
 1                    C. Klahr

 2        Q        Finally, the same real issue here,

 3   it is an employee warning?

 4        A        Yes.

 5        Q        You wrote that?

 6        A        Yes.

 7        Q        Your signature is on the bottom?

 8        A        Yes.

 9        Q        Who is the manager listed?

10        A        Lopez, Nestor Lopez.

11        Q        In these documents you list him as

12   Nestor Lopez?

13        A        Yes.

14        Q        In a document like Plaintiff's

15   Exhibit 3 in June of 2012 he is Manuel Almonte.

16   How did you determine what to refer to him as in

17   various documents?

18        A        He came to us at some time period

19   and told us that his -- that he needs a loan

20   because he is involved with an immigration lawyer

21   or something and he has to fix his immigration

22   problem, which I don't know about.  He has papers

23   and this is the name that he is going to be

24   working under.

25                    At that time period he became  --
```

[Page 83]

```
 1                    C. Klahr

 2  he didn't work under Manuel Almonte anymore.

 3       Q       When did that conversation occur?

 4       A       There is paperwork and a loan and

 5  that would determine the time, 2012, I believe.

 6       Q       What name appears on the loan?

 7       A       Manuel Almonte, the ones he always

 8  got, the same check that he always got.

 9       Q       Plaintiff's Exhibit 6, this is

10  again the application for employment, we had you

11  testify that you filled out the top?

12       A       Yes.

13       Q       What documentation did he present,

14  if any, when he filled out this document?

15       A       I don't know that he provided any

16  documentation, but a Social Security card he

17  would have had to have provided in order to get

18  paid.

19       Q       Do you remember the Social Security

20  card that he presented?

21       A       No.  It should be noted by me.  I

22  am sure there are notes on it.

23       Q       How did you determine personally

24  what you were going to refer to him as in

25  whatever documents we were looking at?
```

[Page 84]

1                              C. Klahr

2          A        To answer your question you are

3    looking at two different periods where at that

4    time he stopped using that name and he had

5    provided ID and whatnot that he is this name

6    (indicating).

7          Q        What ID did he provide?

8          A        That's a good question.  It has to

9    be in the file.  I don't know by heart.

10         Q        What would you ask for?

11         A        I would ask for a valid photo ID

12   and Social Security card or other work eligible

13   proof from the government.

14         Q        Did Nestor Almonte or Lopez ever

15   present to you this?

16         A        Yes, he did.

17         Q        Is that the face that you know as

18   Lopez?

19         A        This is what he presented at the

20   time that he switched documentation.

21         Q        Did that occur in December of 2012?

22         A        This was provided at that time.

23   This is when this was provided.

24         Q        Does your company give loans to

25   employees?

[Page 85]

```
                             C. Klahr
 1
 2       A       Yes.

 3       Q       Does your company give loans to

 4  employees who provide the documentation of a

 5  different person than the face that they have?

 6       A       We pay the people that they say

 7  they are.

 8       Q       When Lopez presented to you an ID

 9  that does not have his own face on it for a loan

10  you gave him the loan?

11       A       We gave him the loan to settle with

12  his immigration lawyer and move on with his life

13  to become a citizen.

14       Q       At that time he told you that he

15  was not a citizen?

16       A       Whatever he told us.  I believe he

17  said it was a citizen issue.  I don't remember

18  exactly the words that he used.

19               At that time when he asked for the

20  loan he had shown me paperwork from the lawyer.

21  It may be in his file, I don't know.

22       Q       At least at that point you knew he

23  had no papers to work in this country?

24       A       That is correct.

25       Q       He remained employed?
```

[Page 86]

                              C. Klahr

1

2       A       Yes.  He had the papers, he was in

3   the process.  I saw the process.

4       Q       What were your hours on the

5   premises of 437 Morris Park?

6       A       From the time that I maintained an

7   office my hours when I was there, which could be

8   three or four days a week, would be 11:30 to 4:30

9   p.m., but my job is to go from building to

10  building, so I am not always there.

11              I was definitely not there every

12  day and I go and pick up supplies and deliver

13  them to different buildings every day.  It is not

14  a firm time.  It is a general thing when I was

15  there.

16      Q       In 2011  --

17      A       I was not there in 2011.

18      Q       In 2012?

19      A       At some point in 2012 we opened the

20  office there.

21      Q       That was the office in the lobby?

22      A       Yes.

23      Q       You are testifying now that you

24  were there about three to four days a week,

25  correct?

[Page 87]

```
 1                      C. Klahr

 2       A       Yes.

 3       Q       For about four or four and-a-half

 4   hours?

 5       A       Yes.

 6       Q       That's daily?

 7       A       A couple of times a week, not every

 8   day.

 9       Q       When you moved the office to the

10   basement did you maintain the same hours?

11       A       Yes.

12       Q       It was about three to four days a

13   week?

14       A       When I moved downstairs maybe it

15   became four days a week, three to four days a

16   week.  When I was there, I am an in-and-out

17   person.  The nature of the job is I get called

18   and I have to drop and run, pick up supplies,

19   plumbing issues, I have to analyze the situation,

20   whether it is that building or a different

21   building.

22               I am not necessarily sitting there

23   at that time.  However, any time between 11:30

24   and 4:30 p.m. is when I would be there if I was

25   there.
```

[Page 88]

                          C. Klahr

1

2       Q        In April of 2011 when you filled

3   out the application for employment for Lopez did

4   you ever have a conversation with him about his

5   son?

6       A        No.

7       Q        What about in the months after?

8       A        No conversation that I can recall

9   about his son.  You asked in the beginning if I

10   met his son.  That would have been the only time.

11      Q        You never discussed with Lopez

12   hiring his son to work in the building?

13      A        No, absolutely not.

14      Q        You never discussed with Lopez his

15   son's legal status in the country?

16      A        Absolutely not.

17      Q        You never discussed with him the

18   fact that his son being born here could use his

19   identity to justify paying Lopez?

20      A        Absolutely not.  I would never do

21   such a thing and never did such a thing.  I am

22   smarter than that and had I know that I would

23   have looked and seen that the math does not add

24   up to anything that he claimed.  I would

25   absolutely not do such a thing.

[Page 89]

                              C. Klahr

1

2        Q        You didn't ask him for

3   documentation when he filled out the application

4   for employment?

5        A        We didn't do that in those days.

6   We substituted the application for employment

7   right before that.  There wasn't even such a

8   thing a few years before.  We just made a

9   photocopy of the Social Security card.  We moved

10  on and this is what it became.

11       Q        The entirety of your hiring process

12  before this application of employment was getting

13  a Social Security card?

14       A        And making a copy, a photo ID,

15  whatever they had in their wallet.

16       Q        What if they could not give you

17  anything?

18       A        No such thing.

19       Q        Nobody ever told you that they can

20  not provide you with a Social Security number to

21  work?

22       A        That's right.

23       Q        You don't employ anyone that does

24  not have a Social Security number?

25       A        That's right, it can't be.

[Page 90]

```
 1                    C. Klahr

 2      Q       Why can't it be?

 3      A       Because they have to get paid.

 4      Q       Have you ever paid an employee

 5  through the name of another employee?

 6      A       For a couple of days.

 7              MR. WEINBERGER:   Off the record.

 8              [Whereupon, a discussion was held

 9      off the record.]

10      Q       Could you explain what you mean by

11  for a couple of days you paid one employee

12  through the name of another?

13      A       Yes, there have been people who

14  started work and either voluntarily quit,

15  disappeared or whatnot, so we never got their

16  paperwork.  Let me back track.

17              It has happened on occasion where

18  the super would not wait for me to meet the

19  person and would start work with this potential

20  employee, just take somebody and start working

21  with them.  If that person didn't survive, he

22  left or we got rid of him or whatever it is, then

23  I would give the super money to pay him.

24      Q       You don't mean he died?

25      A       No, he claimed to be able to do
```

[Page 91]

                           C. Klahr

1

2    work and the super got rid of him after one day

3    because he could not do the work.

4         Q       You would pay the super  --

5         A       I don't know the guy's name.  It

6    was just this guy or whatever, give him $50,

7    that's it.  I added $50 to the check and he paid

8    him and he left.

9         Q       You would pay your super under

10   their name for the work of another employee?

11        A       I would give him a petty cash

12   check.

13        Q       You would give him a check in the

14   super's name for the pay of another employee?

15        A       A check that he cashes to pay the

16   guy, petty cash check.  The super cashed the

17   check because we had no way to find the guy.  If

18   I knew the guy's name we did.

19        Q       Was the payment you are talking

20   about right now wages for days worked?

21               MR. WEINBERGER:  What is the

22        relevance to this in this case?  There is

23        no relevance.  I object.

24               MR. VALLETTI:  You still have to

25        answer.

[Page 92]

1                    C. Klahr

2       A       I don't know how you would classify

3    that.

4       Q       You said somebody would work,

5    correct?

6       A       Yes.

7       Q       If they had not survived for

8    whatever reason you would pay the super a check?

9       A       He showed up for work and left

10   before he finished.

11      Q       That's not the question.  The

12   person would work and you would pay the super a

13   check in the super's name, correct?

14      A       Yes.

15      Q       That was for the wages of that

16   employee, correct?

17      A       It was a goodwill gesture that he,

18   you know  --

19              MR. VALLETTI:  Move to strike that

20       portion that is not responsive.

21      Q       The pay that you gave to the super

22   in his name was for the wages of the other

23   employee, correct?

24      A       It was to pay the guy.  He didn't

25   provide us with any means to give him money.

[Page 93]

```
1                         C. Klahr

2        Q        Was that a yes?

3        A        It is what I said it was.  We had

4    no way, sometimes we didn't find the guy.  It

5    would take a week to find the guy.

6        Q        You would give the super a check?

7        A        Yes.

8        Q        The check was in the super's name?

9        A        Yes, that's right.

10        Q        It was not for the work performed

11   by the super?

12        A        That is correct.

13        Q        It was for the work performed by

14   the employee?

15        A        He is not an employee of mine.

16        Q        You had employees that were not

17   employees of yours?

18        A        The super took an employee.

19        Q        The super could hire an employee?

20        A        He is not supposed to.  It has

21   happened back then.  When I started this it

22   didn't happen because I would not let them hire

23   anybody.

24                 MR. VALLETTI:  Please mark these as

25        Plaintiff's Exhibit 9.
```

[Page 94]

1                    C. Klahr

2                    [Whereupon, the documents were

3          hereby marked as Plaintiff's Exhibit 9 for

4          identification, as of this date, by the

5          reporter.]

6          Q      I will show you what was marked as

7     Plaintiff's Exhibit 9 for identification with

8     today's date.  It is Bates numbers 80 through 92.

9     Do you recognize these documents?

10         A      Yes, time sheets for the super.

11         Q      What else do you have there, the

12    second page?

13         A      Time sheet for super.  It is the

14    time sheet that I referred to earlier that they

15    filled out when they worked elsewhere.

16         Q      The first page, that's a

17    superintendent time sheet, correct?

18         A      Yes.

19         Q      The employee's name is Nestor

20    Almonte?

21         A      Yes.

22         Q      Who do you know Nestor Almonte to

23    be?

24         A      Lopez.

25         Q      He is the super at 437 Morris Park?

[Page 95]

```
 1                    C. Klahr

 2        A       Yes.

 3        Q       What is the time period on that

 4   document?

 5        A       May 1, 2013.

 6        Q       This is May of 2013?

 7        A       Yes.

 8        Q       If we can look at the second page,

 9   what is the date on this one?

10        A       The same time period, May 1, 2013.

11        Q       What is the employee's name?

12        A       Manuel Almonte.

13        Q       Is it your testimony that this is

14   the same person as Nestor Almonte here?

15        A       Yes, I believe so.  If not, then

16   the super would have asked for another check.

17        Q       The handwriting on the employee

18   name, does that match the handwriting on the

19   employee name here?

20        A       Yes.

21        Q       How about the signature, whose

22   signature do you know that to be right there?

23        A       Lopez.

24        Q       Whose signature do you recognize

25   that to be?
```

1                          C. Klahr

2        A        Lopez.

3        Q        He has two different signatures?

4        A        One that he writes the first name

5    and one that he writes the second name, yes.  We

6    know what this is.  This is what he was doing.

7        Q        What do you mean by that?

8        A        He did this.

9        Q        He did what?

10       A        He fabricated stuff.  This is not

11   his usual papers that he sent in.

12       Q        What do you mean by that?

13       A        He usually sends everything under

14   one name, I don't know.  I can't answer that.

15       Q        At this point he just randomly

16   decided to use two names instead of the one?

17       A        I believe that he knew  -- we now

18   know that he knew what he was doing in concocting

19   a scheme, but nobody caught it.  That's what it

20   was.  Nobody caught it.

21                  In addition, he collected a check

22   for those hours.  Somebody collected a check for

23   these hours, if it was submitted.  I don't even

24   know that this was submitted.

25       Q        How do you tell if a time sheet was

[Page 97]

```
 1                    C. Klahr

 2    submitted?

 3         A        It would come through on an E-mail

 4    or fax or something.

 5         Q        He collected a check on this,

 6    correct?

 7         A        He must have.

 8         Q        That means he submitted it?

 9         A        If it was submitted he collected a

10    check for it.  This is the guy who is in charge

11    of submitting time sheets and submitted many,

12    many time sheets.  What he sent in they just knew

13    that he was an authorized person and took what he

14    said and processed it.

15         Q        You said you became aware that he

16    had a different name, correct?

17         A        Yes.

18         Q        That was sometime in 2012?

19         A        When he asked for the loan, yes.

20         Q        These papers are five months after

21    that time that you allegedly found out that he

22    had different names?

23         A        Yes.

24         Q        He perpetrated a scheme, you are

25    saying, for all of that time and nobody found
```

[Page 98]

                              C. Klahr

1

2    out, that's your testimony?

3         A       That is correct.

4         Q       Are you the person that is in

5    charge of reviewing the time sheets?

6         A       Yes, that is correct.

7         Q       You are saying that he pulled this

8    scheme on you personally?

9         A       Yes, that is correct.

10        Q       You didn't catch this?

11        A       No, I didn't.

12        Q       You kept paying?

13        A       Every sheet that I got that went

14   through the system was paid.  It was just

15   generated, you know.

16        Q       You just kept paying?

17        A       We pay all the time.

18        Q       It didn't even matter, just keep

19   paying?

20        A       The answer is yes, we paid anything

21   on the time sheet.

22        Q       If I filled out a time sheet for

23   you would you pay me?

24        A       No.

25        Q       Why not?

[Page 99]

```
 1                      C. Klahr

 2        A        If you were an employee by me and

 3   you filled out extra hours and whatever, yes, you

 4   would get paid.  Until we catch it and  --

 5        Q        Nestor Almonte was an employee?

 6        A        He was the super in charge of the

 7   time sheets.

 8        Q        Manuel Almonte was also an employee

 9   for you?

10        A        No, Nestor Almonte is the person

11   delegated by the company to handle the time

12   sheets.

13                 MR. VALLETTI:  That wasn't my

14        question.

15                 THE WITNESS: That's the fine.

16                 MR. VALLETTI:  I'll get an answer

17        if I want one.

18                 MR. WEINBERGER:   Ask the question.

19        Q        Nestor Almonte was an employee of

20   the company?

21        A        Yes.

22        Q        Manuel Almonte was an employee of

23   the company?

24        A        Lopez was the one employed by the

25   name Almonte.
```

[Page 100]

                            C. Klahr

1

2       Q       At this point he is using two

3   different first names and scheming the company

4   the whole time?

5       A       Yes, that is correct.

6       Q       You didn't catch that?

7               MR. WEINBERGER:   Objection.

8       A       That is correct.  I never knew this

9   until now that he did this.  I saw on one time

10  sheet.  I was aware of one.  This is the first

11  time I am seeing this.

12      Q       You never saw these time sheets

13  before?

14      A       I never looked at them to see that

15  this guy did this more than one time, that is

16  correct.

17      Q       Your testimony earlier is that you

18  received time sheets and reviewed them?

19      A       Yes.

20      Q       You are telling me now that you

21  didn't receive these particular time sheets and

22  you didn't review them?

23      A       If I add up the hours it means I

24  reviewed them.  You are right, it went over my

25  head.

[Page 101]

```
 1                    C. Klahr

 2       Q        You know you are under oath here

 3    today, correct?

 4       A        Yes.

 5       Q        What you are telling is the truth,

 6    right?

 7       A        Correct.  There are more of these.

 8                 MR. WEINBERGER:   He is entitled to

 9          answer the question.

10                 MR. VALLETTI:  He finished the

11          answer and I am moving on.

12       A        This roving employee time sheet

13    that you are presenting, he has presented it

14    before, which is common for him to present,

15    except that you are pointing out now that he

16    changed the name on me.

17       Q        He changed the name on you?

18       A        Yes.

19       Q        It wasn't two people doing the work

20    here?

21       A        Absolutely not.

22       Q        Is it possible that two people did

23    this work, one for Nestor and Manuel?

24       A        Absolutely not.

25       Q        Maybe you missed that, no?
```

[Page 102]

1                         C. Klahr

2        A        No.

3        Q        You missed one thing but not

4   another?

5        A        No.  This is a guy submitting here

6   the time sheets to pay me and you are talking

7   about somebody doing work that I never authorized

8   such a work.  Nobody would do that.  Nobody would

9   work for nothing.  That's ridiculous.

10       Q        Mr. Klahr, I am showing you what

11   has been marked as Plaintiff's Exhibit 7. Could

12   you identify this document, please.

13       A        Yes, this is an employment

14   acceptance form.

15       Q        What is the name on the bottom?

16       A        Nestor Almonte.

17                MR. VALLETTI:  That's all I have

18            for now.  We are going to continue this

19            deposition at a later time.  Thank you very

20            much.

21                Continued on following page to

22            allow for signature line and jurat.]

23

24

25                [Whereupon, the examination of the

[Page 103]

1

2          witness was concluded at 5:00 p.m.]

3

4          _____

                    CHANINA KLAHR

5

6

    Subscribed and sworn to

7   before me this _____ day

    of _____, 2015.

8

    _____

9          Notary Public

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

[Page 104]

```
 1
 2              I N D E X
 3  WITNESS        EXAMINATION BY        PAGE
 4  C. Klahr    Mr. Valletti            4
 5
 6              E X H I B I T S
 7  PLAINTIFF'S  DESCRIPTION            PAGE
 8
        1        one-page document     58
 9
        2        one-page document     59
10
        3        work order            62
11
        4        multi-page document   62
12
        5        work order            65
13
        6        one-page document     78
14
        7        one-page document     80
15
        8        multi-page document   80
16
        9        multiple documents    94
17
    *Exhibits were retained by counsel
18
19              REQUESTS
20          Page        Line
21          18          24
            20          17
22          54          20
            76          25
23          77           6
24
25          *        *        *
```

[Page 105]

1

2                        CERTIFICATION

3    STATE OF NEW YORK )

                   : SS.:

4    COUNTY OF NASSAU  )

5        I,  KAREN ZAMMIT, a Notary Public for and

6    within the State of New York, do hereby certify:

7        That the witness(es) whose testimony as

8    herein set forth, was duly sworn by me; and that

9    the within transcript is a true record of the

10   testimony given by said witness(es).

11       I further certify that I am not related to

12   any of the parties to this action by blood or

13   marriage, and that I am in no way interested in

14   the outcome of this matter.

15       IN WITNESS WHEREOF, I have hereunto set my

16   hand this 3rd day of March, 2015.

17

18

                   _____

19                    KAREN ZAMMIT

20

21                 *      *      *

22

23

24

25

[Page 106]

```
 1
 2      NAME OF CASE:
 3      NAME OF WITNESS:
 4      DATE OF DEPOSITION:
 5
 6           E R R A T A   S H E E T
 7
 8   -------------------------------------------------
 9   PAGE: LINE: CHANGE:
10   -------------------------------------------------
11
     ----:-----:------------------------------------
12   ----:-----:------------------------------------
     ----:-----:------------------------------------
13   ----:-----:------------------------------------
     ----:-----:------------------------------------
14   ----:-----:------------------------------------
     ----:-----:------------------------------------
15   ----:-----:------------------------------------
     ----:-----:------------------------------------
16
17               -----------------------
                  Signature of Witness
18
19   Sworn to before me this _____
     day of ____, 2015.
20
21   _____
     NOTARY PUBLIC
22
23
24
25
```

[Page 107]

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

----------------------------------------X

NESTOR ALMONTE,

                           Plaintiff,


     - against -


437 MORRIS PARK, LLC, D/B/A F&T MANAGEMENT CO.,

INC.

                           Defendants.

----------------------------------------X

                           600 Old Country Road
                           Garden City, New York
                           April 15, 2015
                           10:30 a.m.


     CONTINUED EXAMINATION BEFORE TRIAL OF CHANINA
KLAHR, a Defendant herein, taken by the attorney
for the Plaintiff, Pursuant to Order, and held at
the above-mentioned time and place, before Kimberly
Dean, a stenographer and Notary Public within and
for the State of New York.

[Page 108]

```
 1
 2    A P P E A R A N C E S:
 3
      VALLI KANE & VAGNINI, LLP.
 4    Attorneys for the Plaintiff
      600 Old Country Road
 5    Garden City, New York 11530
 6    BY:  ROBERT P. VALLETTI, ESQ.
 7
      GOLDBERG & WEINBERGER, P.C.
 8    Attorneys for the Defense
      630 Third Avenue
 9    New York, New York 10017
10    BY:  STUART WEINBERGER, ESQ.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

[Page 109]

1                S T I P U L A T I O N S

2

3     IT IS HEREBY STIPULATED AND AGREED, By

4   and between the attorneys for the respective

5   parties herein, as follows:

6   That the sealing and filing of the within

7   deposition be waived.

8

9

10    IT IS FURTHER STIPULATED AND AGREED that

11   such deposition may be signed and sworn to

12   before any officer authorized to administer

13   an oath, with the same force and effect

14   as if signed and sworn before the officer

15   before whom said deposition is taken.

16

17    IT IS FURTHER STIPULATED AND AGREED that

18   all objections, except as to the form are

19   reserved to the time of the trial.

20

21

22

23

24

25

[Page 110]

1                    CHANINA KLAHR

2    C H A N I N A   K L A H R,

3    called as a witness, after first having been

4    duly sworn by Kimberly Dean, a Notary Public in and

5    for the State of New York, was examined and

6    testified as follows:

7    DIRECT EXAMINATION BY ROBERT VALLETTI, ESQ.

8             COURT REPORTER:  State your name and

9         address for the record, please.

10            THE WITNESS:  Chanina Klahr.  730 East

11        7th Street, Brooklyn, New York 11218.

12            MR. VALLETTI:  Morning, Mr. Klarh.

13        I'm Robert Valletti, as you know.  I

14        represent Mr. Almonte in this matter.  This

15        is a continued deposition.  Originally it

16        sat on February 26th, and we are going to be

17        picking up, hopefully, where we left off.

18            I will just remind you of some of the

19        ground rules.  First, I need all verbal

20        responses.  As you know, we have a court

21        reporter here and she has to take down

22        everything that is said, so refrain from

23        non-verbal cues.

24            Also, if you don't understand a

25        question that I ask you, tell me and I will

[Page 111]

1                       CHANINA KLAHR

2          be happy to rephrase it for you.  If you do

3          answer, we will assume that you understood

4          the question and your answer is your attempt

5          at being responsive to that.

6               If you need a break, tell me.  I just

7          ask if any questions are pending that you

8          finish answering the question first before

9          we take the break.

10         A.    Okay.

11         Q.    I want to touch first on the

12    responsibilities and duties that you had.  We

13    covered some earlier.  As a manager at F&T

14    Management, which was responsible for the

15    maintenance or upkeep of 437 Morris Park and 1195

16    Sherman, were you able to discipline employees?

17              MR. WEINBERGER:  Objection to form.

18         A.    Yes.

19         Q.    What kind of discipline are you talking

20    about?  Would you give written warnings, verbal

21    warnings, or something else?

22         A.    Verbal warnings and occasionally written

23    and signed.  Written means I write it up and I ask

24    the employee to sign it.  Sometimes if there was an

25    objection to signing, I would have a witness that

[Page 112]

1                    CHANINA KLAHR

2    would sign it, which in most cases was Mr. Almonte.

3    He was my witness for the majority of all cases.

4        Q.    Any particular reason why it was

5    Mr. Almonte who was the witness?

6        A.    Yes.

7        Q.    Can you explain?

8        A.    He generally I would feel if there was a

9    language barrier, since I don't speak Spanish and

10   let's say it was Spanish-speaking people, so I

11   wanted to make sure they understood what our

12   complaint was, what we are dissatisfied with, how

13   we are going to move forward, if we are not going

14   to move forward what the repercussions would be, so

15   therefore, I would have to make sure that someone

16   would translate, and he would serve as a

17   witness/translator, which many times on those

18   sheets would be marked as either translator or

19   witness, even if the person would sign, even if

20   that employee that we were disciplining would sign,

21   but still I knew they didn't understand my English,

22   written complaint.

23        So, he would act as the interpreter, signer,

24   and also because this generally was in later years

25   when I had an office in 437 Morris Park as opposed

```
1                    CHANINA KLAHR

2    to I would assume that office was there

3    approximately two years or so, prior to that we

4    didn't have an office and I was working out of the

5    car.

6        So it would be the super of whatever building

7    I was at would be that person.  Since I was there

8    and he was the super there, so he was mine.  He was

9    my interpreter.

10       Q.   And served as a witness too just in

11   case?

12       A.   Yes.  He was a witness, yes.  Would be a

13   witness if I felt that I needed a witness, if it

14   was something that we -- if I had an employee that

15   needed -- it wasn't the first offense.  It is a

16   repeat, you know, even if I felt that he did

17   understand English, I want the witness to witness

18   that the guy shouldn't say that I was terminated

19   for no reason.

20       Q.   Was it a progressive discipline system

21   typically?

22       A.   I don't know what you mean.

23       Q.   I will explain.  Would it start with a

24   verbal warning and progress to a written warning if

25   something was not taken care of and eventually
```

[Page 114]

1                         CHANINA KLAHR

2      maybe a second warning?

3          A.    Something like that.  I believe so.  I

4      can't say exactly.  Usually.

5          Q.    It was determined based on what the

6      offense might have been.  You could skip the

7      verbals and written and go straight to termination

8      if something grievous had happened?

9          A.    I doubt that ever happened.

10         Q.    How many of the employees to your

11     knowledge that you were responsible for had

12     difficulty either speaking or understanding

13     English?

14         A.    How many number or what percentage?

15         Q.    You can give me what you are comfortable

16     with.

17         A.    Many, which would be 50 percent of the

18     employees.  So over time that's many.  Over an

19     actual work period in any given month, it is not

20     that many, but over a year when I have -- we had a

21     revolving door of employees because they wouldn't

22     keep up with the work.  So those employees, you

23     could have a dozen employees in a calendar year and

24     only four or five actually on the payroll actually

25     working.  The rest of them not there.

[Page 115]

1                    CHANINA KLAHR

2       Q.    I was confused by the last thing you

3   said.  You had a dozen employees but four or five

4   on the payroll?

5       A.    On the payroll record, if you look at

6   what kind of tax returns that I gave that year, I

7   may have had a dozen employees work for me but some

8   of them only worked two weeks and then left or we

9   fired or terminated them because they couldn't do

10   the work.  Or in other words, many people have

11   worked for me in a calendar year, but it was never

12   more than four or five, maybe six, per month.

13       Q.    While the employees might have changed,

14   it was about six?

15       A.    Correct.

16       Q.    That was in 437 alone or did that

17   include 1195 Sherman?

18       A.    That includes the whole 1195 Sherman,

19   everything.

20       Q.    Before you had testified --

21       A.    Roving employees.  They are all over.

22       Q.    You had testified in your previous

23   portion of the deposition that you were first

24   responsible for was it six or eight buildings, and

25   that was reduced?

[Page 116]

                        CHANINA KLAHR

1

2       A.    Yes.

3       Q.    The time that you are talking about was

4   after the reduction?

5       A.    Which time?  In general that's always

6   the way it worked.

7       Q.    No matter how many buildings that you

8   had at any given time, there were only about six

9   employees that you were responsible for as the

10  manager?

11      A.    No, that was in the four buildings.

12      Q.    In the four.  That is what I was asking.

13      A.    It would have been more.

14      Q.    In the four buildings it was six, and

15  that included the supers at the four buildings, the

16  handyman, and porters?  Explain to me what it

17  included.

18      A.    At each building, independent of those

19  six people, at each building at each site there was

20  a super and a porter.  So we are not talking about

21  the super and porter dedicated to the building.  We

22  are talking about roving employees that worked at

23  1195 Sherman, at 437 Morris Park, and possibly

24  elsewhere.

25      Q.    These were essentially when you say

[Page 117]

1                         CHANINA KLAHR

2     roving employees, you mean handymen?

3         A.    Yes.

4         Q.    Did that include any other positions?

5         A.    No.  If you want I can elaborate.  We

6     call them handymen.  Handymen.

7         Q.    As the manager for 437 and 1195, among

8     others, did you set schedules for the workers?

9         A.    Yes.

10        Q.    Which workers did you set the schedules

11    for, and you can go by position?

12        A.    I set schedules for everybody.  All

13    employees.

14        Q.    To be clear, it was the supers that you

15    set schedules for and handymen?

16        A.    Yes.

17        Q.    Porters?

18        A.    Yes.

19        Q.    Were there other employees with

20    different titles that you set schedules for?

21        A.    I believe not.

22        Q.    When Mr. Almonte was first hired, he

23    worked at 1056 Boynton, correct?

24        A.    Yes.

25        Q.    What was his rate of pay when first

```
 1                    CHANINA KLAHR
 2   hired?
 3        A.    I have to look at the payroll.
 4        Q.    To your recollection, you don't recall
 5   right now what he was paid when he was first hired?
 6        A.    I would assume it was on the -- that job
 7   agreement or whatever we call it, application or
 8   something like that.  It should be there.
 9        Q.    Is this the application that you are
10   referring to, what has been previously marked as
11   Plaintiff's Exhibit 6?  This was marked on 2-26-15.
12   Do we need to remark that?
13             MR. WEINBERGER:  No.
14        A.    It's a following page, which usually is
15   attached to the backside.  It says agreement,
16   maybe.  It looks like that.
17             MR. VALLETTI:  This one is not the
18        same thing, okay.  To the extent that I
19        don't have it in front of me, I will make a
20        demand.
21        A.    I would have given it to you.  Something
22   has to be there.
23             MR. VALLETTI:  I don't have all of the
24        discovery in front of me for now.
25        I will ask what would it be called?
```

[Page 119]

```
 1                    CHANINA KLAHR

 2      A.    It looks like it's an employment

 3  acceptance form.

 4      Q.    Something along the lines of what was

 5  previously marked as Plaintiff's Exhibit 7, but now

 6  this is a different piece of paper that doesn't

 7  correspond to the time Mr. Almonte was hired at

 8  1056 Boynton.  Which if you can recall, when was he

 9  hired at 1056 Boynton?

10      A.    In early 2011.  I'm not sure if it was

11  the end of March or early April.  The work orders

12  show it.

13      Q.    Would it refresh your recollection if I

14  said that on Plaintiff's Exhibit 6 it was sometime

15  in February 2011?

16      A.    That is just an application.

17      Q.    Okay.

18      A.    I do know clearly that he applied for

19  the job, which could explain a previous -- you have

20  to show a two-week trial period of work.  And he

21  consented to do that but walked off after two days.

22  So that didn't culminate in real work because he

23  walked away after two days and came back at a later

24  period, which I believe was in March, to start

25  work.  I don't have -- the work orders would show
```

[Page 120]

1                        CHANINA KLAHR

2    it, but I don't have it in my head.

3        Q.    When you say he walked off after two

4    days, can you explain what happened during that

5    time period, why that occurred, if you know?

6        A.    Okay.  The super called me.  I had

7    called the super to ask how is this new fellow

8    doing, and he said that he is not coming back.  So,

9    I said "Why?"  And he said, "There's some problem.

10   He said he can't work."

11       Q.    Who was the super?

12       A.    Wilton Munoz.  He is the one that

13   introduced me to him.

14       Q.    Him meaning?

15       A.    Wilton introduced me to this guy,

16   Mr. Almonte.  He brought him on board.

17              MR. WEINBERGER:  One thing.

18              (Whereupon, a discussion was held off

19               the record.)

20              (Whereupon, the requested portion was

21               read back by this reporter.)

22       Q.    For the two-day period that he worked,

23   did he receive payment?

24       A.    Of course.

25       Q.    How did he receive payment?

[Page 121]

1                    CHANINA KLAHR

2       A.    A check would have been issued to the

3    super.  A check would have been issued to the super

4    to forward it to Mr. Almonte, for someone that

5    doesn't work a week.

6       Q.    It was a check issued to Wilton Munoz?

7       A.    Correct.

8       Q.    That was for the pay of Mr. Almonte?

9       A.    Right.

10      Q.    So, after two days he walked off.  When

11   did he return, Mr. Almonte?

12      A.    The work orders would show.  I was

13   actually pursuing him.  I believe that the time

14   frame happened during some vacation period that I

15   had.  Maybe Passover holiday, but I don't remember.

16   It was something that I was not there in the

17   buildings for those bunch of days.  It rode a

18   little bit.  It took a little while.  I was

19   interested in having him on board, so I was

20   pursuing him.

21      Q.    Any particular reason why?

22      A.    Because I was very satisfied with my

23   initial interview with him and I wanted to have him

24   work for me.

25      Q.    When you rehired him, where was he

1                    CHANINA KLAHR

2    working?

3        A.    I don't know.  I don't know what you

4    mean.

5        Q.    You don't understand?

6        A.    He was -- I don't know where he was

7    working.  He may have been unemployed.

8        Q.    I'm talking about the time that you

9    brought him back on.

10       A.    A couple of weeks later.  We just got

11   together.  What happened was he had told me -- when

12   I got together with him, so, he told me that he

13   can't work for me because he can't take a check to

14   his name.  I said "Okay.  Have a nice day.  Call me

15   back when you are ready to work."

16       Q.    You said he cannot take a check to his

17   name.  Can you explain what he meant or what you

18   took that to mean?

19       A.    He cannot be paid on the books.  Or he

20   wanted to be paid off the books.

21       Q.    Did he say why?

22       A.    If I recall, he said that he was getting

23   unemployment or something like that, which was to

24   be finished soon.  I don't remember how soon that

25   he said.  A couple of weeks or month.  I don't

[Page 123]

```
 1                    CHANINA KLAHR
 2   remember what it was.
 3       Q.   I have to ask to clarify, he said he
 4   wanted to be paid off the books because he was
 5   receiving unemployment at that time?
 6       A.   When I met up with him, he said he has a
 7   problem.  So I said, "Let's talk about your
 8   problem."  And we met in person back outside of the
 9   building at my car.  He said, "I would like to work
10   for you and I know you want whatever, but I have a
11   problem.  And if the way you are going to pay is to
12   write me a check, then I can't do it."
13       I had asked him why, and he told me that he is
14   collecting unemployment and that's going to be
15   finished soon, and right now he is not available.
16   He cannot do it unless I pay him another way, and I
17   said no, that is the way that goes.
18       Q.   You said that you wouldn't pay him in
19   another fashion because he had this particular
20   problem where he couldn't be on the books?
21       A.   That's correct.
22       Q.   When you initially hired him, he didn't
23   present you with this issue?
24       A.   No.  I believe that we have to -- I
25   believe he may have started working directly that
```

[Page 124]

1                        CHANINA KLAHR

2    the super put him in not with a face-to-face

3    interview.  That may have been those two days.

4    Again, I believe it was the Passover holiday or

5    some other.  I don't remember what it was.

6    Whatever it was, he actually -- I was not there and

7    he tried him out without me interviewing him.

8         Q.    When he was first working at 1056

9    Boynton, Mr. Almonte, you had not met with him and

10   had not interviewed him and had not had him fill

11   out paperwork?

12        A.    I believe so.

13        Q.    Mr. Munoz hired him to work in the

14   building?

15        A.    You can call it that.  He took him to

16   try him out.

17        Q.    The building that Mr. Munoz was the

18   super for was 1056 Boynton?

19        A.    Yes.

20        Q.    Did you review Mr. Almonte's work for

21   the period at 1056 Boynton?

22        A.    Not those two days.  At a later period.

23        Q.    When was that later period?

24        A.    That is the question.  The work orders

25   would show whatever that later period was that he

[Page 125]

1                    CHANINA KLAHR

2    made him fill out the paperwork.  He then contacted

3    me and said that he would be available at this

4    date, which I believe was in March.  And at that

5    time I started checking up on him, which was

6    after -- which is after the interview and after the

7    application and after the time that he told me "I

8    can't work right now."  When he started, that is

9    when we started looking at the work.

10        Q.    That's March of 2011?

11        A.    I believe so.

12        Q.    Just clarifying the years because you

13   said March.

14        A.    March 2011.  I believe it was early

15   March.

16        Q.    At the time now we are speaking about

17   the period where you had him fill out the

18   application and you started checking his work.

19   Let's focus on that time period first.  Did he

20   raise any issues with his ability to be paid on the

21   books at that time?

22        A.    Yes.  And when he said he resolved it,

23   that is when he began work.

24        Q.    Did he tell you how he resolved it?

25        A.    He called me on the phone and said that

1                        CHANINA KLAHR

2    he resolved it.

3        Q.    Did he tell you how he resolved it?

4        A.    I don't believe that he -- I assumed

5    that he made the decision, which was part of our

6    conversation at the time, made the decision that he

7    is going to work and stop collecting unemployment.

8        Q.    When was the first time that you spoke

9    to Wilton Munoz about Mr. Almonte?

10       A.    When Wilton called me, which would be I

11   believe February of 2011.  I'm not sure of the

12   dates.  Very early 2011.  I don't know.  It could

13   have been earlier.  The only reason I say February

14   was because that was the paperwork that we had.  I

15   know that Wilton says the same thing, but I don't

16   know.

17       Q.    We will call it February 2011 for now

18   based on your testimony.  How did Wilton introduce

19   Mr. Almonte to you?

20       A.    He called me, said, "I have someone for

21   you."

22       Q.    What did he say about that someone?  Did

23   he say anything in particular, he is a handyman or

24   has experience?  What did he say if you could?

25       A.    The language that he would have used is

```
 1                    CHANINA KLAHR

 2   "he is a good guy, good worker."  That is what.

 3   That is how they speak.

 4        Q.    When you say that's how they speak, who

 5   are you referring to?

 6        A.    Wilton Munoz.  He would have said "he is

 7   a good guy."  Our communication we understand that

 8   he is a capable person as opposed to someone who is

 9   just looking for work and not very capable and

10   maybe just a painter and not capable of much else.

11        Q.    Did he mention his name?

12        A.    Wilton?

13        Q.    Did Wilton mention Mr. Almonte's name?

14        A.    Yes.

15        Q.    What did he say his name was?

16        A.    He always called him Lopez.

17        Q.    Did you talk to Mr. Almonte, as Wilton

18   referred to him as Lopez, did you speak with him

19   before he began working at 1056 Boynton?

20        A.    Again, I told you, there was a period

21   that Wilton put him in because I was not there for

22   let's a say a week or so.  That was the time that

23   he began and then walked off the job, so to speak.

24   That is when I had no way to pay him.  Gave the

25   super the money to forward him the cash for those
```

1                    CHANINA KLAHR

2   two days.  I had no way to reach him.

3       Q.    The conversation where Mr. Almonte told

4   you he cannot take a check to his name, was that

5   after he started at 1056 Boynton?

6       A.    Yes.  This was a face-to-face meeting

7   in my car.  Yes.

8       Q.    So, at the time that he began working,

9   what was the understanding from your perspective as

10  handling payroll as to how you were going to pay

11  Mr. Almonte for the time that he was working at

12  Boynton?

13      A.    Again, he told me that when he worked --

14  let's backtrack a little bit.  When he told me

15  that, I said, "Come back when you are ready to get

16  paid."  So that is when he started getting paid.

17  That's when he started work.  He didn't work in

18  between.  That is why there is a gap from then.

19  There is a big gap in time of a couple of weeks or

20  whatever it was until he came back to work at

21  Boynton.

22      Q.    Right.  My question focuses more on the

23  time when he actually was working.  He worked for

24  two days.  At that time he is an employee and he is

25  entitled to pay.

1                          CHANINA KLAHR

2        A.    But he was not around.  He disappeared.

3        Q.    What I'm asking you is, how was it that

4    he was going to get paid hypothetically if he had

5    stayed working?  You managed the payroll, correct?

6        A.    Okay.  I will explain to you.  Generally

7    if that would happen and very rarely it happened

8    where the super didn't wait for me and took someone

9    and when I came to meet the guy, I would come meet

10    the guy.  I would come to meet the new employee and

11    I would collect all of his identification and set

12    up payroll with him.

13        Occasionally the person disappeared, the super

14    would get rid of the guy after a day or two because

15    he can't do anything.  If we couldn't find the guy

16    or he wouldn't talk to me, the guy wouldn't talk to

17    me because he is not wasting his time to talk to me

18    for an hour because he is not working there

19    anymore, just give the super the money to give to

20    me.  That would happen sometimes.

21        Q.    Did employees often ask to have the

22    super paid their own wages?

23            MR. WEINBERGER:  Objection.

24        A.    No.  It was only when they disappeared.

25    Two and a half days of work, whether he told him

1                          CHANINA KLAHR

2    goodbye, the super told him, or they themselves

3    walked off the job because they saw they couldn't

4    handle the work.

5         Q.    How often did this occur where an

6    employee would work a short period of time and you

7    would not have established a payroll for that

8    person by the time they were beginning work?

9         A.    Before I had an office there, even a

10   little bit before that, the supers would really do

11   it without my permission.  I wouldn't necessarily

12   know about it.  In other words, if they had a

13   backlog of work, they would call me and say, "I

14   need helpers.  I need helpers.  I have a big job."

15   And I said "Okay.  I will send you someone from

16   another building."

17        But if they decided they didn't like the guy

18   or they couldn't wait or it didn't materialize and

19   help didn't come, they would take someone off the

20   street or wherever they got them from.

21        Q.    Let's try and get a frequency on this.

22   At this point we have workers performing work at

23   your buildings without being on payroll, correct?

24        A.    It has happened, I explained to you, on

25   rare occasions, very infrequently.  I probably only

1                    CHANINA KLAHR

2    know of three such employees, where one of them

3    lasted a long time.  And again, the super -- I

4    didn't even know about the guy for a while.  The

5    super, sometimes the supers hired the people and

6    paid them out of their own pocket or something.  I

7    don't know about them.

8         You can come to the building and I would say

9    "Who is that guy?"  "My cousin."  "What is he

10   doing?"  "Nothing."  "You sure?"

11        Q.    It would be the super's responsibility

12   at that point to pay that person?

13        A.    If the guy was really working for me, I

14   would always say I have to talk to the guy.

15        Q.    How did you determine if someone was

16   working for you?

17        A.    If I see the guy is working there and I

18   would catch the guy working and someone told me the

19   guy is working there, there were reasons that I was

20   very -- business reasons that I was very sensitive

21   to make sure that I didn't hire any criminals that

22   could get -- that could make trouble for me.

23   Generally some supers, including Wilton Munoz

24   himself, learned that slowly by making that mistake

25   and getting accused of a theft, which his worker

[Page 132]

1                      CHANINA KLAHR

2    did, some guy did, and then they said you are

3    right, we have to be careful.  We cannot just take

4    anyone.  We have to check the guys out.  Something

5    like that.

6        Q.    If you saw a person working, you would

7    basically make a demand to the super that that

8    person now has to be on payroll?

9        A.    It was very, very rarely.  Probably

10   three times that I'm aware of such a thing

11   happening.

12       Q.    You said before there were times when

13   people would last two or three days and be gone

14   without even you knowing it?

15       A.    Right.  And it was probably all Wilton

16   Munoz.  Of all the buildings, it was probably all

17   Wilton Munoz.

18       Q.    Okay.  Fast forwarding past that

19   three-week period where there was a gap after

20   Mr. Almonte walked off the job, you spoke to him

21   again about now another position doing something

22   for your management company, correct?

23       A.    The purpose of having him work at

24   Boynton was just to see if he really knows the work

25   that I need to become a super elsewhere.

[Page 133]

1                    CHANINA KLAHR

2        Q.    Was he hired as anything else before

3    becoming a super at 437 Morris Park?

4              MR. WEINBERGER:  Objection to form.

5              If you can answer.

6        A.    The purpose was to be a super.  However,

7    I would tell them that I'm not making you a super

8    until I decide you are qualified to be a super, so

9    it would be called a handyman.

10       Q.    He eventually became hired as a

11   handyman.  At that time what was his rate of pay?

12       A.    His rate of pay was probably $8 an hour.

13       Q.    How were they paid generally, weekly or

14   biweekly, something else?

15       A.    They collect a check every week for all

16   the hours they worked.  The hours could vary,

17   especially a new employee and handyman, I have to

18   be very flexible with them.  Sometimes they were

19   giving me limited hours.  Not necessarily eight

20   hours a day.

21       Q.    What was the standard workweek for a

22   handyman at that time?

23       A.    A regular handyman is a regular 40-hour

24   week.  But a perspective super is somebody that I

25   was sensitive to him possibly having another job

1                    CHANINA KLAHR

2   and he was leaving the other job and I would have

3   to accommodate that I need to see many different

4   types of duties done.  Plumbing, electric, and I

5   needed to see many, many different types of work, a

6   new tile floor in a bathroom.  I don't have them

7   all lined up.  I would be flexible in saying:

8   "Hello, are you available?  Now I have a job."  And

9   he says, "I can come and give you four hours

10  tomorrow and I can give you two hours the next

11  day."  And he would be there maybe every day in a

12  week but very limited hours.  Or I would

13  accommodate the hours in different ways.

14      Q.    That was generally how you handled

15  prospective supers with flexible hours?

16      A.    Yes.

17      Q.    What about with Mr. Almonte, at his rate

18  of pay of $8 an hour, did you discuss with him what

19  his workweek was going to be at the time he was a

20  handyman first?

21      A.    When I discussed with them, I tell them

22  that they have to give me ten days to two weeks

23  consecutively.  I knew it would happen and I would

24  give them -- I would be flexible with it, but it

25  was common that the people would tell me, no, I

```
 1                    CHANINA KLAHR

 2  can't give it to you and I would say goodbye.  If

 3  you can't commit to it, I will not waste my time

 4  with you.

 5      But if you commit to it and if I see the guy

 6  was good, and he told me I really can't give you

 7  eight hours a day for ten days, I can give you a

 8  couple of hours today and tomorrow, I would be

 9  flexible with them.

10      Q.    Let's talk about Mr. Almonte

11  specifically.

12      A.    Okay.

13      Q.    When he was hired as a handyman, what

14  was your expectations of his workweek?

15      A.    I would assume that he had told me that

16  he wasn't working -- I believe he told me he was

17  not working elsewhere, so we didn't have that

18  problem.

19      Q.    At the time that he was hired, a

20  handyman, $8 dollars an hour, 40 hours a week?

21      A.    Should have been close to 40 hours a

22  week unless he had an excuse that he couldn't come.

23  When you take someone like that, I have to take my

24  kid to the babysitter, I have an appointment with

25  food stamps, it was common that I had to be
```

[Page 136]

1                     CHANINA KLAHR

2    flexible.  I know it was not a job flexibility

3    issue.  I remember it was not.  It was not a job

4    conflict.

5        Q.    At the time that you hired him to be the

6    handyman, what did the hiring process consist of?

7    And I will be pointed, was there an interview, an

8    application, and other paperwork that was filled

9    out?  Explain a little bit about how he became

10   hired at 437 Morris Park as a handyman.

11            MR. WEINBERGER:  You said two

12       different addresses.

13       Q.    I will clarify the question.  At the

14   time that he became hired as a handyman at 437

15   Morris Park, this is after that two-week period or

16   three-week period, some weeks that he had missed,

17   what was the hiring process for him to become that

18   handyman?

19            MR. WEINBERGER:  Objection.

20            You can answer, if you know.

21       A.    Whatever the paperwork is we would have

22   given you.

23       Q.    I'm asking you from your recollection.

24       A.    I can't say.  I don't remember.

25       Q.    Do you remember if he had filled out an

```
 1                    CHANINA KLAHR

 2   employment application at that time?

 3            MR. WEINBERGER:  Are we asking him as

 4       a handyman?  I'm confused.  To clarify, are

 5       we asking as a handyman at Boynton or where

 6       else?

 7            MR. VALLETTI:  I have been very

 8       specific.  This is hired as a handyman at

 9       437 Morris Park.

10       Q.    At the time that he came back, we had

11   passed that couple week period where he is no

12   longer employed and then he comes back and becomes

13   a handyman at 437 Morris Park.

14       A.    That is the same job.  The same job.

15   That one, when he became a super, there would have

16   been paper.  It wouldn't have changed.

17       Q.    Explain to me how he became a handyman

18   at 437 Morris Park.

19       A.    Whatever interview and paperwork process

20   there was earlier, we just -- he said, "Now, I'm

21   ready to work."  And I said "Okay."  Every day I

22   could send him somewhere else.

23            MR. WEINBERGER:  You are confusing

24       what he is saying.  That's the problem.  You

25       are confusing.
```

[Page 138]

                          CHANINA KLAHR

1

2      A.    Clarify.  In other words, I can put the

3  guy wherever I want.  He was not designated to work

4  at 1056 Boynton.  It was a couple of days we needed

5  him there, so he started over there.  And I would

6  move him anywhere.  A handyman is a roving

7  employee.  They are not building specific.

8      Q.    At the time Mr. Almonte become a

9  handyman, where did he work?

10     A.    Either Boynton or Morris Park.

11     Q.    For the time period before he became a

12  super, he was a handyman who could work almost

13  anywhere of the buildings that you were responsible

14  to manage?

15     A.    That's correct.

16     Q.    To your recollection, what buildings did

17  he work at during that time period?

18     A.    Only the work orders would tell us the

19  truth, but from what I recall, I was pushing him to

20  get into -- if I had a job at 437 Morris Park, I

21  would send him there.  I wanted him to be super

22  there and I wanted him to see the nature of the

23  building there.

24     Q.    Were you satisfied with his work during

25  that time period?

[Page 139]

1                          CHANINA KLAHR

2        A.    Yes.

3        Q.    At some point Mr. Almonte becomes the

4    superintendent of the building, correct?

5        A.    Yes.

6        Q.    When was that?

7        A.    We had terminated the previous super we

8    will call him.  The super that was -- we were

9    trying to terminate.  At the termination process of

10   that one, he became the super.

11       Q.    At that point, was there a hiring

12   process?  And I will be specific.  Was there now

13   another interview or was there paperwork filled

14   out, things of that nature?

15       A.    There was not what we call an interview,

16   but there may have been a paper, an employment

17   acceptance form or something like that.

18       Q.    You had a conversation with Mr. Almonte

19   about becoming a super prior to him becoming a

20   super, correct?

21       A.    Yes.

22       Q.    What was that conversation about?  What

23   was discussed at that point?

24       A.    The responsibilities of being a super.

25       Q.    Could you elaborate?

1                    CHANINA KLAHR

2     A.    The job description of a superintendent

3  is very different of a handyman.  And I would

4  clarify, that he understands the responsibilities

5  and all that entailed and is agreeing to do that

6  before I put him in.

7     Q.    At that point did you discuss his pay

8  for that specific position, the superintendent at

9  Morris Park?

10    A.    Most likely.

11    Q.    Do you recall what was discussed?

12    A.    No.  But should have been a paper.

13    Q.    How did you typically pay your supers?

14    A.    Could you specify?

15    Q.    Sure.  Let's say during 2011, if you

16  hired someone to be a super at a building, what was

17  the typical compensation package?

18    A.    Okay.  He would get an apartment to live

19  in rent free.  We would explain to him that

20  although he has increased responsibility and he

21  will be paid for his time, but he will then earn

22  some time off.  We can call it there is sick days,

23  vacation days, personal days.  Something that only

24  the superintendent received not a handyman.

25    Q.    You said sick days, vacation days,

1                    CHANINA KLAHR

2    anything else?

3        A.    No, just leave it there.

4        Q.    He earned time off.  Would these be

5    treated as paid days off?

6        A.    Paid days off.

7        Q.    You had this discussion with Mr. Almonte

8    when he became super, correct?

9        A.    At a point prior to him becoming the

10   super.  In other words, it was not the date of the

11   guy that left.  It was when we were sure that we

12   are ready to make the move, which let's say would

13   have been we are going to do this in a week, I

14   would have already had the conversation with him

15   and I'm comfortable that he is ready to take the

16   reigns of the building.

17       Q.    At that time you said a paper had been

18   filled out.  Was that the application that we had

19   referenced earlier?

20       A.    I believe so.

21       Q.    Plaintiff's Exhibit 6?

22       A.    No, not this one.

23       Q.    It was not Plaintiff's Exhibit 6?

24       A.    No, I think this is the first

25   application.

[Page 142]

                         CHANINA KLAHR

1

2       Q.     When you say the first application, how

3   many applications did he fill out?

4       A.     It was not -- it is the back kind of

5   paperwork.  Not an application.  Something like

6   that.

7       Q.     Closer to what, Plaintiff's Exhibit 7?

8       A.     Yes.

9       Q.     This was filled out at the time period

10  we are now discussing, which is sometime in April

11  of 2011?

12      A.     This is the form that we discussed, the

13  responsibilities of being a super as opposed to

14  being a handyman, and he is ready to take that job

15  and we are ready to give him the job.

16             (Whereupon, a discussion was held off

17              the record.)

18             MR. VALLETTI:  Back on.  I'm going to

19         make a demand for the employment acceptance

20         form that we are discussing currently during

21         the time period, let's put it as sometime

22         from February to April of 2011 for Nestor

23         Almonte, Lopez, or whatever name he had used

24         at that point.  And we will get to those

25         questions.  But for now I will make the

[Page 143]

1                        CHANINA KLAHR

2         demand for the employment acceptance form.

3         A.    His name would be -- we knew him as

4    Manuel Almonte.  His nickname was Lopez.

5         Q.    So, at the time that he filled out the

6    employment acceptance form, you said that you knew

7    him as Lopez but that his name was Manuel Almonte?

8         A.    Correct.  His nickname was Lopez.

9         Q.    He didn't mention to you he had any

10   issues at that point being paid on the books,

11   correct?

12        A.    When?  There was only one such

13   conversation.

14        Q.    At the time that he filled out the

15   employment acceptance form, he never said to you, I

16   have a problem getting paid on the books?

17        A.    No.

18        Q.    At that point, what did you use in terms

19   of putting him on the payroll to pay him his wages,

20   at that time we are talking?

21        A.    To my knowledge his name was Manuel

22   Almonte and that is how he was paid.  And,

23   actually, I referred to him as that.  It was only

24   the boys, all of the workers and handymen called

25   him Lopez, but I called him Almonte.

1                    CHANINA KLAHR

2        Here and there you will see some reference to

3    Lopez, but, you know, I know him as Manuel Almonte.

4        Q.    You previously testified that you knew

5    him as Lopez, correct?

6        A.    Correct.

7        Q.    You don't know him as Almonte?

8        A.    Again, his nickname is Lopez.  Like I

9    have many of my workers go by different names than

10   their legal name, whether it is Chucky or whatever

11   it is.  I have a guy Billy and his name is not

12   Bill.  I don't know where they get these names

13   from.  That is how I am introduced to them and

14   that's what they are called.

15       Q.    Your testimony today is that you knew

16   him as Almonte during this time period, 2011 on?

17       A.    Right.  When we started doing the

18   paperwork, that is how he said my name is this.  I

19   asked him about it.

20       Q.    What did you ask him?

21       A.    I asked him why are you called Lopez?

22       Q.    What did he reply?

23       A.    He said the exact same thing that he

24   said in testimony here, that's his mother's

25   family's name and that is his name, nickname,

[Page 145]

1                        CHANINA KLAHR

2    whatever.

3         Whatever it is he spelled it out exactly on

4    his own testimony.

5         Q.    What documents, if any, did he produce

6    for you at the time that he accepted the position

7    as a super at 437 Morris Park?

8         A.    Whatever I have copies of.

9         Q.    Did he present to you a Social Security

10   card?

11        A.    Probably.  I would assume so.

12        Q.    Did he present to you an identification

13   card?

14        A.    Should have.

15        Q.    Are you sure that he did?

16        A.    No.  I'm not sure what he supplied.  I

17   do know that we are looking at a problem where he

18   came to me at a later period with the license,

19   which he did not obviously give me in the

20   beginning.

21        Q.    In the beginning he didn't give you --

22        A.    Not the license, right.  I don't know

23   what he showed me.

24        Q.    If he told you that his nickname is

25   Lopez, did you ask him why he went by Manuel

[Page 146]

```
 1                    CHANINA KLAHR

 2   Almonte on his documents?

 3      A.    That's what I asked him.  I mentioned to

 4   him when he filled out the application, which is to

 5   start work, I said, "What is this?"  It was Lopez.

 6   He said, "That is my mother's name," whatever.

 7   Exactly the little paragraph that he said on the

 8   previous testimony, which is funny to me that he

 9   said it.  That's exactly what he said.

10      Q.    By the way, did you review any documents

11   before testifying today?

12      A.    No.

13      Q.    You just said that you read his

14   testimony.

15      A.    No, no, no.  I didn't read the

16   testimony.  I know that he said it.

17      Q.    You were at his deposition?

18      A.    Yes.

19      Q.    Other than being in the depositions

20   before, did you speak to anyone today about your

21   testimony other than your lawyer?

22      A.    No.

23      Q.    Are you on any medication today?

24      A.    No.

25      Q.    Is there any reason why you cannot tell
```

[Page 147]

1                      CHANINA KLAHR

2    the truth today?

3        A.    No.

4        Q.    At the time Mr. Almonte became the super

5    at 437 Morris Park, how was he personally going to

6    get paid?

7        A.    Same way that he always got paid.

8        Q.    What was the same way that he always got

9    paid?

10        A.    He received a check in the name Manuel

11   Almonte.

12        Q.    You said later that he gave you an ID

13   bearing the name Manuel Almonte?

14        A.    Right.

15              (Whereupon, a discussion was held off

16               the record.)

17              MR. VALLETTI:  Mark that Plaintiff's

18        Exhibit 10.

19              (Whereupon, the above-referred to

20               document was marked as Plaintiff's

21               Exhibit 10 for identification, as of

22               this date.)

23        Q.    Mr. Klahr, I'm showing you what's been

24   marked as Plaintiff's Exhibit 10 for

25   identification.  It's a copy of a conditional

[Page 148]

1                    CHANINA KLAHR

2    driver's license.  What name is on that conditional

3    driver's license?

4        A.    Manuel Almonte.

5        Q.    Is this the license that Mr. Almonte,

6    Mr. Lopez, whoever it was at the time, is that the

7    ID that that person had presented to you when you

8    filled out the paperwork as he became the super at

9    437 Morris Park?

10       A.    No.  He provided it to me at a later

11   date.

12       Q.    At the time that he was hired as the

13   super at 437 Morris Park, he didn't provide you

14   with any license?

15       A.    It was missing.  He was supposed to

16   produce it.

17       Q.    There came a point later when he did

18   give it to you?

19       A.    Right.

20       Q.    When was that?

21       A.    This is my handwriting, and it is marked

22   December 13, 2012.

23           MR. VALLETTI:  Let the record reflect

24       that he indicated on Plaintiff's Exhibit 10

25       that was his handwriting on top and what he

1                    CHANINA KLAHR

2        said speaks for itself.  Thank you.

3        Q.    Is this the face you knew as the super

4    at 437 Morris Park?

5        A.    This is the face that I know as the

6    super at Morris Park, yes.

7        Q.    That's Manuel Almonte.

8        A.    This is Manuel Almonte.

9        Q.    On Plaintiff's Exhibit 10?

10       A.    If you look at it now, knowing other

11   information, you can say maybe it is his son.  But

12   when I took it, when he gave me the copy, I didn't

13   question it.  I see characteristics.  It looked to

14   me.  You have got to see the licenses that I look

15   at.  Faces are not perfect.  Very poor photos.

16       Q.    You believe that that face was the face

17   of the super, was that in 2012 or in 2011 when the

18   employment acceptance form was filled out?

19       A.    In 2012, when I badgered him for some

20   reason that you are missing your ID, you are

21   missing the photo identification.  When he provided

22   it, I just threw it in the file.  I didn't really

23   critique it.

24       Q.    Did you look at it?

25       A.    I glanced at it.  I saw it said Manuel

[Page 150]

1                    CHANINA KLAHR

2    Almonte.

3        Q.    Did you ask if it was his license?

4        A.    No.

5        Q.    Could he have provided you with a

6    different license and with the same name and you

7    still wouldn't have looked at it?

8        A.    That makes no sense.

9        Q.    Could anyone with the name Manuel

10   Almonte pass for the super of the building 437

11   Morris Park during that time period?

12       A.    I don't know what you are getting at.  I

13   would say no.  I don't know what you are talking

14   about.

15       Q.    Did you discuss with Mr. Almonte at the

16   time that he became the super at 437 Morris Park

17   what his hours were going to be?

18       A.    Yes.

19       Q.    What did you discuss with him about

20   hours at that time?

21       A.    I discussed with him that as a

22   superintendent our experience in that building had

23   shown that the hours that he would work are this

24   group of hours.  And that is what he would be

25   expected to do, which I needed his consent to

1                    CHANINA KLAHR

2   understand that he is going to do that before I put

3   him in as a super.

4       Q.    Okay.  I didn't hear any numbers in

5   there.  I want to, let's try and get some

6   specificity on what you mean by that.

7       A.    Probably a 47-hour workweek, roughly.  I

8   don't know.  You would have to look at what -- his

9   payroll would reveal that.

10             MR. VALLETTI:  Mark that Plaintiff's

11         Exhibit 11.

12              (Whereupon, the above-referred to

13               document was marked as Plaintiff's

14               Exhibit 11 for identification, as of

15               this date.)

16      Q.    I'm going to show you what's been marked

17   as Plaintiff's Exhibit 11 for identification.  It's

18   a six-page document that are the payroll records

19   for 437 Morris Park turned over by defendants.

20   Looking at the first page, we should be able to

21   discern his hours as you just testified.

22      A.    Okay.

23      Q.    You testified that looking at his

24   payroll records you would be able to tell what

25   hours he was working, correct?

[Page 152]

                    CHANINA KLAHR

1

2      A.    Yes.

3      Q.    On the first page, we will go page by

4   page, if you would like, on the first page, are you

5   able to tell what hours that he worked?

6      A.    It has pay for 46 hours each week, the

7   formula, but it is not broken down to a later page.

8   On the first page you don't see it.

9      Q.    Are there any hours listed on the first

10  page?

11     A.    I don't see any.

12     Q.    How about the second page?

13     A.    Yes.  Bottom of the page.

14     Q.    At this time period, this is May 2011,

15  correct?  The payroll was being given out on a

16  biweekly basis?

17     A.    Yes.

18     Q.    The amount here listed is $800?

19     A.    Right.

20     Q.    That's for two weeks, correct?

21     A.    Yes.

22     Q.    Why are there no hours listed on the

23  first page for the weeks that are listed, May 13,

24  2011 through 7-29-2011?

25     A.    I don't know.  They should be listed.

[Page 153]

1                    CHANINA KLAHR

2       Q.    You were in charge of payroll, correct?

3       A.    Yes.

4       Q.    On the second page, this is from August

5    15, 2011 until 9-29-2011, still no hours appear on

6    the payroll records, correct?

7       A.    Right.

8       Q.    The first time hours do appear is in

9    October of 2011; is that correct?

10      A.    Yes.

11      Q.    Why are these hours missing?

12      A.    I don't know.

13      Q.    On the right-hand side going back to

14   page 1, there is an indication of either normal or

15   manual at some points throughout these payments.

16   At least let's go on the first page first.  Can you

17   explain what it means by normal or manual or

18   something along those lines?  Right down here.

19      A.    I believe those are payroll company

20   codes, but I believe looking at it that manual

21   means a check that came not from the payroll

22   company, a manual check.

23      Q.    That was authorized by you?

24      A.    I assume so.

25      Q.    What would the check that was manual be

[Page 154]

1                      CHANINA KLAHR

2   for, if it weren't for --

3       A.    I don't know.  I don't know now.  We

4   have to pull up a copy of the check or a record or

5   whatever it was.

6       Q.    In June of 2011, do you remember giving

7   Lopez or Manuel Almonte a check in the amount of

8   $2,077 approximately?

9       A.    I don't recall.

10       Q.    The first time we do see the hours

11   October 12, 2011, there's hours listed here, you

12   said it was approximately a 47-hour workweek, so

13   this reflects a 46.6-hour workweek?

14       A.    That is usually what they worked.

15       Q.    Did Mr. Almonte work a roughly 46-, or

16   47-hour workweek every week during this time

17   period, let's say from May 2011 through September

18   2011?

19       Because at that point we need some explanation

20   as to the hours, is it your testimony that he

21   worked a 46.6- or 47-hour workweek all of those

22   weeks?

23       A.    Yes, otherwise it would have changed,

24   based on the hours.

25       Q.    How do you know these are based by the

1                      CHANINA KLAHR

2    hour if there is no hours listed on the payroll?

3        A.    I don't know.  You get paid based on the

4    hour.  The same way that you know on there without

5    looking at the hours.  He had to produce a demand

6    for a check.

7        Q.    If we don't look at the hours, we can't

8    look at the hours here, you readily can't know

9    whether he worked 50 hours this week, 60 hours that

10   week, 20 hours this week, correct?

11       A.    You don't see it, but that is not what

12   it was.

13       Q.    You can't tell from these documents,

14   correct?

15       A.    Maybe.

16       Q.    Can you tell from these documents what

17   the actual hours worked were?

18       A.    No, I'm assuming that that was his

19   paycheck.

20       Q.    You really don't know what hours that he

21   worked because they are not indicated on the

22   records, correct?  They get there later, but for at

23   least this time period, you can't tell, I can't

24   tell, nobody can tell?

25       A.    You don't see it.

1                    CHANINA KLAHR

2       Q.   At some point according to these

3   records, the pay switches from biweekly to weekly,

4   correct?

5       A.   Correct.

6       Q.   Let's say, does it accurately reflect

7   that that occurred sometime in August and September

8   of 2011?

9       A.   It appears that way.

10      Q.   Drawing your attention to April of 2011

11  here, there is a deduction of $250.  Do you know

12  what that was for?

13      A.   No.

14      Q.   You are in charge of the payroll,

15  correct?

16      A.   Right.

17      Q.   Why would he get less than the money

18  that he worked that particular week?

19      A.   The payroll -- we can ask the payroll

20  company for what reason there is for that.

21      Q.   The payroll company wouldn't make a

22  deduction without your authorization, correct?

23      A.   Right.  It would be something they

24  received documentation to make these checks.

25      Q.   The documentation they received came

```
 1                    CHANINA KLAHR
 2    from you?
 3         A.    Probably.
 4         Q.    On average, regular week that you want
 5    to do the payroll?
 6         A.    At that time, I don't know.  You know,
 7    whatever.  It is me, Mark Sherman.  I don't know.
 8    Let's see whose handwriting is on it.  I'm hesitant
 9    to say it definitely was me.
10         Q.    Mark Sherman was someone else who
11    handled payroll?
12         A.    He has an office that handled the
13    payroll company.  They dealt with the payroll
14    company.
15         Q.    They dealt with them.  Is the payroll
16    company Mark Sherman's company?
17         A.    No, they are an outside company.  Mark
18    Sherman works for F&T Management, and he had an
19    office staff.  And I leaned on the office staff for
20    many things.  There was a period where I took over
21    myself dealing with the payroll company but
22    probably much later.
23         Q.    Do you recall when you took over
24    payroll?
25              MR. WEINBERGER:  Objection.  He didn't
```

[Page 158]

1                    CHANINA KLAHR

2      say that.  All right.  If you can answer.

3      A.    I believe that I started dealing with

4  the payroll company directly when I moved into an

5  office at 437 Morris Park.  I'd have to look up the

6  dates.  I'm not sure.

7      Q.    Was it sometime in 2012 that you had an

8  office at 437 Morris Park?

9      A.    Yes.

10     Q.    The office was first located in the

11 lobby?

12     A.    Yes.

13     Q.    And moved down to the basement?

14     A.    Yes.

15     Q.    You don't recall when that lobby office

16 was created?  I believe your prior testimony puts

17 it at early 2012.

18     A.    Whatever time it was, this wouldn't have

19 happened exactly that day.  It was a process.  It

20 was some time period before I was gradually taking

21 stuff away from them and doing it myself.

22          MR. VALLETTI:  So, I'm going to make a

23     demand now for actually the third time, this

24     demand, for the pay stubs that are Manuel

25     Almonte's.  To let you know, those demands

1                    CHANINA KLAHR

2       were made in our original demands and

3       haven't been answered.

4            MR. WEINBERGER:  That's absolutely not

5       true.  You have every single document we

6       have.  I think we gave you what the pay

7       records are.

8            MR. VALLETTI:  These are pay records.

9       These are not pay stubs.  And there is

10      testimony that there are pay stubs that

11      accompany these.  Those demands have been

12      made.

13           MR. WEINBERGER:  We will look again.

14      If we have them, we have them.  We will turn

15      it over.

16           Do you want to go off the record?

17      A.   No.  Whatever this is, this is, what's

18   attached to it.  The check comes with the pay stub.

19   Until he got direct deposit and it became a

20   different pay stub.

21           MR. WEINBERGER:  Okay.

22      Q.   Pay stubs exist before direct deposit,

23   correct?

24      A.   Some form of something.

25           MR. WEINBERGER:  Take it under

1                    CHANINA KLAHR

2      advisement.

3           MR. VALLETTI:  I will be specific

4      about these.  I will demand the pay stubs

5      for Manuel Almonte and/or Nestor Almonte or

6      Nestor Lopez for the time period where he

7      started working to the time that his

8      employment was separated.

9           MR. WEINBERGER:  Okay.  We will look

10     again.  Whatever it is we will produce.  If

11     we have it, we will produce it.

12     Q.   Going back to, I guess we will look at

13  first, let's go page by page here.  The amounts

14  Mr. Almonte received in pay, what were the amounts?

15  Let's go paycheck by paycheck.

16     A.   Paycheck, it shows $800.  The second one

17  shows $550 that he received.  Next one is $800.

18  Fourth one is $800, and the fifth one shows

19  $2,077.37.

20     Q.   That is a manual entry, though, correct?

21     A.   Yes.  Whatever that means.  The next two

22  on the page show $800 as well.

23     Q.   Continuing on the second page here.

24     A.   The first two paychecks are $800 each.

25  The rest of them are $400.

[Page 161]

                           CHANINA KLAHR

1

2        Q.    That time period was when it switched

3   over to the weekly paychecks, correct?

4        A.    Yes.  That's what it shows.

5        Q.    During at least this time period we are

6   going through on the first two pages, the payroll

7   records reflect there was no fluctuation in

8   Mr. Almonte's hours, correct?

9              MR. WEINBERGER:  Objection to form.

10             Go ahead.

11       Q.    Let's say based on his pay, there was no

12   fluctuation in the hours worked, correct?

13       A.    Usual hours, you know, unless he was --

14   it shows otherwise.  There was a formula.  There

15   was also I would like to remind you that I

16   explained that they were paid for, I don't know if

17   you want to call it on call.  We told them we know

18   that the hours are this, we are going to pay you to

19   be available.

20       Q.    Is that in addition to the payroll

21   records that are in front of you?

22       A.    What do you mean in addition?  That is

23   the pay.  The pay.

24       Q.    I need some clarification.  I really

25   don't understand what you answered there.

[Page 162]

                    CHANINA KLAHR

1

2              MR. VALLETTI:  Can I have a read back

3       on the last question.

4              (Whereupon, the requested portion was

5              read back by this reporter.)

6       Q.    My question is this, those hours reflect

7    the 46-and-change-hour workweek, correct?

8       A.    The estimated what we know was a safe

9    number he has to be available for.

10      Q.    His pay was based on that workweek,

11   correct?

12      A.    Correct.

13      Q.    It wasn't --

14      A.    His pay was based on the actual hours.

15   Now, if he worked more, he would get paid more.

16   And he would usually have to ask for consent for

17   overtime.  But if not, I paid it.  That's just the

18   way it went if I liked my employees; if not I would

19   say we can't do that, you signed the paper that

20   says you are not allowed to work overtime.

21   Generally, this was a formula of hours that we

22   figured out between being in the building and there

23   could be weekend calls or something, weekend

24   emergencies that he has to attend to.

25      So the regular work hours were probably

1                    CHANINA KLAHR

2    roughly 40 or less hours.  Probably 37 hours, if I

3    recall correctly.  The rest was time that was used

4    for nights and weekends.

5        Q.    Could you clarify what you said before,

6    that Mr. Almonte's pay was going to be based on

7    roughly a 47-hour workweek as opposed to now his

8    regular hours being 40 or less?

9        A.    Yes.  It is one and the same.  The super

10   is paid to -- we know in each building we learned

11   how much time they need.  And that became something

12   we had to get him to agree to be available those

13   hours.

14       And we would pay him those hours unless he

15   would be absent without leave.  He was not there

16   and he wasn't available, then we would talk about

17   missed work and how we will deduct that.  If he did

18   more work, extra overtime, meaning an example, I

19   had reserved hours for night and weekend calls in

20   my 47 hours, if during a regular day I ask them to

21   extend their day to finish a job and not leave it

22   for the next day, that was not part of the reserve

23   hours for emergencies, they got paid extra for it.

24       Q.    Based on the records that are in front

25   of you, the two sheets that we have in front of you

[Page 164]

1                        CHANINA KLAHR

2    right now that are part of Plaintiff's Exhibit 11,

3    while they don't list the hours, would it be your

4    testimony that Mr. Almonte didn't work any hours

5    not even one hour beyond his regularly scheduled

6    46.6- or 47-hour workweek?

7        A.    That's correct, yes.

8        Q.    During this time period, would it then

9    also be your testimony there were no emergency hot

10   line calls that he had to respond to?

11       A.    No, that is not what I said.

12       Q.    I'm asking you if it is.

13       A.    No, just the opposite.  There may very

14   well have been.  And that's why he -- that's why we

15   pay that amount of money because he was supposed to

16   be working or be on call in case it happens.

17       Q.    Other than the irregularity of the

18   manual check, which we don't know what that is

19   about, but for these weeks in front of you, do

20   these weeks reflect any overtime that you paid

21   Mr. Almonte?

22       A.    No.  There was no overtime requested

23   over here.

24       Q.    When you say requested, did he have to

25   request overtime?

[Page 165]

1                    CHANINA KLAHR

2        A.    He would have to ask to be paid for

3    overtime.  He didn't say that he worked overtime.

4        Q.    Is it a policy when you were employed

5    with 437 Morris Park or rather with F&T Management

6    that the supers had to request overtime before they

7    worked it?

8        A.    Yes.

9        Q.    Does that include the times that you

10   gave orders to work beyond the regularly scheduled

11   hours?

12       Q.    Or would that consent be implicit there?

13       A.    It would be implicit there.

14       Q.    If you gave a directive to a super,

15   Mr. Almonte or perhaps a super at a different

16   building, to work hours beyond that which you

17   allotted in these pay records, it should be

18   reflected in his pay, correct?

19       A.    That's correct, by increased pay, yes.

20   You should see an increase in pay.

21       Q.    During this time period, were there any

22   hot line calls that Mr. Almonte received that go

23   beyond his 46.6- or 47-hour workweek during this

24   time period?

25       A.    No, absolutely not.

[Page 166]

```
 1                      CHANINA KLAHR
 2              (Whereupon, a discussion was held off
 3              the record.)
 4              (Whereupon, the requested portion was
 5              read back by this reporter.)
 6      A.    Could I elaborate on that?
 7      Q.    Is there something that you would like
 8  to add to your last answer?
 9      A.    Perhaps.  All of the hours that he was
10  -- all the hours over 40 hours were paid at the
11  overtime rate.  That was our agreement.  That was
12  the policy.  That was what was done.
13      Q.    Is that all?
14      A.    Yes.
15      Q.    Looking at page 3 of Plaintiff's Exhibit
16  11, this is again a piece of the payroll.  At this
17  point, there is weekly payments, correct?
18      A.    Yes.
19      Q.    Those payments are each $400 and down
20  there there's $400.40?
21      A.    Sick pay or whatever.  The bottom line
22  is the full check was there, yes.
23      Q.    During this time period, which is
24  reflected from October 2011 to November 2011, would
25  it also be your testimony that Mr. Almonte did not
```

```
                        CHANINA KLAHR
 1
 2   have to respond to calls after the scheduled
 3   workweek hours were finished?
 4        A.    Could I rephrase that a little?
 5        Q.    If you don't understand the question, I
 6   will rephrase it for you.  If you want to explain.
 7   I will do the work.  You said you want me to do the
 8   work.  During the time period we are looking at
 9   here, October 2011 to November 2011, the check
10   amounts other than the 40 cents on these last
11   three, they are the same, 400 throughout, correct?
12        A.    Yes.
13        Q.    Do these records reflect that
14   Mr. Almonte had to work beyond the regularly
15   scheduled hours of the 46.6- or 47-hour workweek?
16        A.    He didn't work any additional hours.
17        Q.    Is it also your testimony that during
18   this time period there would have been no calls
19   made after the regularly scheduled hours were
20   worked?  I'm referencing the hot line calls that
21   you would send to him via text message or email.
22        A.    There was no additional calls beyond
23   that we planned for and paid for.
24        Q.    The payment that we are looking at in
25   these records is what was planned for, correct?
```

```
 1                    CHANINA KLAHR

 2      A.    Correct.

 3      Q.    It was planned before he worked those

 4  hours, correct?

 5      A.    It was an agreement before he took the

 6  job as super.

 7      Q.    You paid him based on an agreement

 8  before he took the job as super?

 9      A.    We paid him based on that there was X

10  amount of work hours that he's expected to do

11  during the daytime hours.  And there's expected --

12  there is an anticipated amount of emergency service

13  calls that he has to attend to nights and weekends.

14      And our experience was that since they tended

15  to not always record them because it's 3:00 in the

16  morning, whatever it was, so we did have ways of

17  recording them because we had the hot line calls

18  and we would verify the incident, and we worked it

19  out over time how much was the most that he could

20  have worked.  And we told him that as long as you

21  do your work, you will get paid.  If you don't

22  work, then you won't get paid.  Which would be

23  reflected.

24      Q.    The pay was based on the agreement?

25      A.    The agreement of hours worked.
```

1                        CHANINA KLAHR

2        Q.     The agreement was made when he took the

3    job as super?

4        A.     Yes.

5        Q.     The pay was based on that agreement?

6        A.     The pay was -- this is the hours that he

7    has to work to get paid.

8        Q.     It was based at the time on the

9    conversation that you had with him that when you

10   take the job as super, you will get paid this?

11       A.     It was based at the time prior to his

12   starting as super that that's going to be the

13   agreement, and if there is more, we will pay more.

14   Which we did.  And we also asked him verbally and

15   then again in writing if we owe you any money.  And

16   he would produce a list and we paid him for it at

17   the end of every year.

18       Q.     Is it your testimony from May 13, 2011,

19   to November 23, 2011, Mr. Almonte never worked one

20   hour beyond what the agreement was when he took the

21   job as super?

22       A.     He did not tell us that if he did.  So,

23   we assumed he didn't, and we would ask and I gave

24   time sheets.  Again, we would ask him, in addition

25   to this, we would ask him prior to the end of the

1                    CHANINA KLAHR

2     year, usually it was October or Thanksgiving,

3     before Thanksgiving, we would ask our supers, or

4     all our employees, we asked him is there -- we want

5     to close out the payment for the year.  Do we owe

6     you money for anything?  Did you buy something that

7     you didn't get cash receipts?  Sometimes it will

8     get lost and he produced a receipt, even though he

9     should have handed it in.  Do you have any requests

10    for money which on the form it says specifically

11    overtime, whatever it lists there.  And he would

12    produce a list and we would pay it.

13         Q.    You made the employees request or

14    question or demand any money they felt was owed to

15    them in overtime?

16         A.    No, that's wrong and a horrible way of

17    putting it.

18         Q.    I will rephrase the question.  You asked

19    the employees if you as the employer, F&T or 437

20    Morris Park or 1195, owed them anything at the end

21    of the year, correct?

22         A.    Yes.  In addition to what they were

23    getting every week, which was a fluctuating amount,

24    if they -- if the amount fluctuated.  If they did

25    more work, they got paid more.  If they were absent

[Page 171]

1                         CHANINA KLAHR

2    without leave, whether it was an extended sick

3    period beyond their sick days or taking personal

4    days or whatever it was that they didn't do the

5    work, then they had deductions taken off their

6    check, which is reflected on their payroll.  Not on

7    this page.

8         Q.    Was the agreement that you had with

9    Mr. Almonte to pay him a flat salary every week?

10        A.    No, no such agreement with anybody ever.

11        Q.    Those records, do they show that it was

12   an unwavering amount every week?

13        A.    No, they don't.  If you look at only one

14   page out of the 52-page week, you will see several

15   of them.

16        Q.    Do you want to look at more?

17        A.    Yes.  I would like to look at more.

18        Q.    Take a look at these.

19        A.    Is this the whole calendar year?

20        Q.    It's a portion.

21        A.    I would like you to look at the whole

22   calendar year and tell me.  I will say that he did

23   a very good job of knowing how many hours he is

24   supposed to work and he was a very good employee,

25   that he stuck to it, if that was the case, but it's

1                        CHANINA KLAHR

2   not the case.  It varied.

3      Q.    Is that why 437 Morris Park or 1195

4   Sherman Avenue keeps getting sued for not paying

5   overtime?

6      A.    That is why people who have some kind of

7   misconception and are told things by people to

8   mislead them, probably, to think they can collect

9   moneys they don't deserve.  The answer is no.  They

10  get paid for every single hour they worked.

11      Every single hour.  As a matter of fact, I'm

12  very proud to say that I paid for additional hours

13  beyond what they worked.

14      Q.    Now, you paid employees for hours they

15  didn't work?

16      A.    I was generous and didn't deduct when I

17  could have deducted.

18      Q.    What would you make deductions for?

19      A.    Extra sick days beyond the agreed upon

20  time.  Personal days they were told they can't, if

21  they are not there they will not get paid or

22  whatever it was.

23      Q.    It's your testimony that you overpaid

24  employees rather than underpaid them?

25              MR. WEINBERGER:  Objection.

[Page 173]

1                          CHANINA KLAHR

2       A.    It is my testimony that I never

3   underpaid any employee.  Never.

4       Q.    Did you overpay any employees for time

5   that they were not entitled to?

6            MR. WEINBERGER:  Objection as to

7       relevance.

8       A.    I believe so.  And I asked them that and

9   offered them that at the end of the calendar year.

10      Q.    Did you tell Abraham Finkelstein or

11  Kalman Tabak that you had overpaid employees?

12      A.    They know what I was doing.  They don't

13  look at it that way, you overpaid employees.  We

14  make them happy.  We try and make them happy.

15      Q.    Looking again here, we are at November

16  2011 through December.

17      A.    Okay.

18      Q.    At this time could you read for me the

19  weekly paychecks for Mr. Almonte.

20      A.    $400 until you get to the last one.  For

21  some reason it is $176.  It is not the regular

22  check.

23      Q.    If we want to go --

24      A.    That is not the regular check.  The next

25  check there is $400.

1                    CHANINA KLAHR

2      Q.    Again, weekly through that time

3   period he didn't have extra hours?

4      A.    He did not work extra overtime.

5            MR. VALLETTI:  Mark this Exhibit 12.

6            (Whereupon, the above-referred to

7                document was marked as Plaintiff's

8                Exhibit 12 for identification, as of

9                this date.)

10     Q.    I will show you what's been marked as

11  Plaintiff's Exhibit 12.  They are Bates numbered

12  593 through 598.  Defendant's exhibit Bates

13  numbering.

14     Could you take a look at these and tell me

15  when you are done.  Could you tell me what those

16  are?  Have you ever seen them before?

17     A.    Yes.

18     Q.    What are they?

19     A.    This is a request for pay that Mark's

20  office received to pay -- request from a payroll

21  company to get a check.  This is how a check was

22  requested.

23     Q.    Who would that request come from?

24     A.    From me.

25     Q.    You created those documents?

[Page 175]

1                        CHANINA KLAHR

2        A.    Yes.

3        Q.    You sent that to who in particular?

4        A.    I believe I sent it to Mark's secretary.

5        Q.    Do you remember his or her name?

6        A.    No.  Any one of several people.  I don't

7    know who is the designated person.

8        Q.    After you sent that to Mr. Sherman's

9    secretary, do you know what would happen with this?

10       A.    I believe the payroll company received

11   the information in some fashion, which I didn't

12   see, and the check was given to me at the end of

13   the week to hand out.

14       Q.    This is the payroll period this

15   indicates at the top 2011, correct?

16       A.    Yes.

17       Q.    Part of it goes into 2012, when it turns

18   into January?

19       A.    Yes, 2012.  Yes.

20       Q.    When you created these, did you use a

21   program to create them or was this in Microsoft

22   Word or something else?

23       A.    I don't know.  I probably received it

24   from them as a format and entered it.

25       Q.    Who did you receive it from?

1                    CHANINA KLAHR

2      A.    Someone in Mark's office.

3      Q.    I'm confused.  I thought you sent those

4    to Mark's office?

5      A.    I understand.  They asked me to give

6    them the data a certain way.  I used the format

7    they wanted.

8      Q.    Was it a program that generated it or

9    was it a --

10     A.    I don't think it was a program.

11     Q.    You controlled creating these documents

12    which were sent out for payroll purposes?

13     A.    Yes.  I put in the numbers.  I would

14    have to give them the hours the guys worked in

15    order for them to know what to request from the

16    payroll company.

17     Q.    What were those documents based on?

18     A.    On the employees' hours.

19     Q.    What would you use to determine what an

20    employee worked for the time period?

21     A.    I deal with them all the time.  They

22    have time sheets and all the regular records same

23    as always.

24     Q.    Anything else other than the time sheets

25    that you used to calculate hours?

[Page 177]

                        CHANINA KLAHR

1

2      A.    Unless there is holidays or something

3  like that.  I use my personal calendar or notebook.

4  I had notes what was there and I modified.  What

5  the employees would write down is that he worked

6  every day, including the holiday.  So I would have

7  to check if he worked on the holiday, did he have

8  hot line calls or did he not.  Then I adjusted it

9  accordingly.  If he didn't work, he got paid as

10  holiday pay; and if he did work, he got paid

11  regular way.  He got paid the full amount at the

12  end of the week.

13      Same thing for sick days until you maxed out

14  sick days and then we started deducting.

15      Q.    You were referencing holiday before.

16  Was that something that you just testified to on

17  the first page here?  Is there a holiday noted on

18  there?

19      A.    No, I noticed a different one.

20  Different page.

21      Q.    On the first page here, the week

22  reflects two weeks, Week 1 and Week 2.  The first

23  week is 10-27 to 11-02 and Week 2 is 11-03 through

24  11-09; correct?

25      A.    Yes.

[Page 178]

1                          CHANINA KLAHR

2       Q.    During this time period you have what is

3    written in the middle Manuel Almonte both weeks?

4       A.    Yes.

5       Q.    Can you explain what this line means

6    here?

7       A.    This divides up his hours.

8       Q.    Manuel Almonte super both weeks and then

9    it gives a calculation.  What does "both weeks"

10   mean?

11      A.    Each week.  They have to issue two

12   checks for the thing.

13      Q.    The absences is to be recorded down

14   here.  You recorded these absences?

15      A.    Yes.

16      Q.    Where did you get the absences from?

17      A.    From my notebook.  In other words, the

18   super calls in sick, so I would write it down.

19   This is where it went.

20            MR. VALLETTI:  I will make a demand

21       for the notebook.

22            MR. WEINBERGER:  Okay.

23      A.    I don't know that I have it.  You can

24   have it.

25      Q.    When did you start keeping the notebook?

[Page 179]

1                      CHANINA KLAHR

2        A.    I always have notebooks.

3        Q.    During the time period Mr. Almonte

4   worked for 437 Morris Park and 1195 Sherman, you

5   maintained a notebook?

6        A.    Yes.

7              MR. VALLETTI:  Just for the basis of

8        the demand, that particular notebook is the

9        one that I'm referencing for the demand.

10             MR. WEINBERGER:  Okay.

11       Q.    Are the absences at the bottom here, are

12   these like cumulatively kept?  What I mean by that

13   is, would these appear on another sheet so that you

14   knew for future reference that these are the sick

15   days that had been used?

16       A.    Yes.

17       Q.    On the next page here, which shows two

18   different weeks, 11-10 through 11-16 and 11-17

19   through 11-23, the page looks very similar in that

20   it is essentially the same thing except notes the

21   same absences, correct?

22       A.    Yes.

23       Q.    The next sheet here is again two weeks,

24   11-24 through 11-30 and then 12-1 through 12-7.

25   The notation in the middle differs this time.  Can

[Page 180]

1                    CHANINA KLAHR

2    you explain why it differed here?

3        A.    Because he -- we paid him holiday pay.

4    Even though he didn't work, he got paid for that

5    time.

6        Q.    That was a paid holiday during the first

7    week, which is 11-24 through 11-30?

8        A.    Yes.

9        Q.    On the next page here, weeks reflected

10   are 12-8 through 12-14 and 12-15 through 12-21.

11   Again, it's 2011.  There's also a two-week

12   breakdown, correct?

13       A.    Yes.

14       Q.    It shows the same amount of hours as

15   reflected on the other weeks?

16       A.    Right.

17       Q.    On the next page it shows weeks 12-22

18   through 12-28 in 2011 and 12-29 through 12-31.

19   This has more of an annotation in the middle.  Take

20   your time to review that so we can have a question

21   about it.

22       A.    Okay.

23       Q.    In the middle there, there's a plus

24   section.  Can you read what it says after the plus?

25       A.    This is for the end of the calendar

```
 1                     CHANINA KLAHR

 2   year.  It says, "End of year bonus of one week pay

 3   of $400.  Applied all of it to overtime.  I suggest

 4   a separate check.  Additional check for $42 toward

 5   reimbursements for supplies, plus $250 to replace

 6   Check Number 686 for Cablevison."

 7        Q.    It says an end-of-year bonus.  Are

 8   bonuses typical?

 9        A.    No.

10        Q.    What is the policy behind giving

11   employees a bonus?

12        A.    No policy.

13        Q.    Is it at your discretion?

14        A.    Yes.

15        Q.    Why would you give someone a bonus in

16   your discretion?

17        A.    If we want to make the super feel good,

18   we have something extra for the holidays.

19        Q.    When you say the super, are you

20   referencing here Manuel Almonte or Nestor Almonte?

21        A.    Manuel Almonte.

22        Q.    When you say there that the bonus is one

23   week pay $400, apply all of it to OT, what does

24   that mean?

25        A.    That means they have to know how to
```

[Page 182]

                        CHANINA KLAHR

1

2    apply the check.  This is my instructions to them

3    to put it towards overtime hours.

4       Q.    This is a bonus that appears on a check

5    as overtime?

6       A.    I hope so.  Supposedly.  You have a

7    check for $400.

8       Q.    Why wouldn't you have made it a bonus

9    check?

10      A.    Because it is a very big problem to have

11   different employees get.  We don't want -- there's

12   too many complaints amongst employees that we pay

13   different amounts to different people, so we didn't

14   want them to -- so they didn't see that.  They knew

15   they got a check and they didn't -- it wouldn't say

16   bonus on it.

17      Q.    It was a bonus paid in the form of

18   overtime?

19      A.    Yes.  I'm not sure what you mean.  They

20   got a bonus.  Extra money.  This is the result of

21   the signed sheet requesting of the superintendent

22   what we discussed earlier, do we owe you money, did

23   you find any cash receipts that were never

24   reimbursed.  Even though they are not supposed to

25   buy anything, but whatever it is.  Do you feel that

[Page 183]

1                          CHANINA KLAHR

2    we owe you money?  We want to give you everything

3    and put it all on this year's calculations and say

4    we are starting the year new.

5        Q.    You are talking about the $42 towards

6    reimbursement and the 250 for Cablevision, right?

7        A.    Yes.

8        Q.    That does not apply to the $400 bonus,

9    correct?

10       A.    That's an additional check.  It was $42.

11       Q.    I wanted to clarify because there were

12   two different lines.

13       A.    That is where those -- that's where that

14   information stems from.  It was generated from

15   actually like a document that was submitted, signed

16   that we are requesting it, and another document

17   that he supplied making lists and supplying

18   receipts and writing down calculation for hours,

19   which he didn't make, other supers did, but he

20   didn't.

21       Q.    The final page of Exhibit 12 is for the

22   pay period now into 2012 of 1-1 through 1-4 and 1-5

23   through 1-11.  This one is indicating that Manuel

24   Almonte has received a different amount.

25       Why does this particular pay sheet show a

[Page 184]

1                      CHANINA KLAHR

2    different amount there?  Did he receive a raise?

3        A.    Yes.

4                (Whereupon, a discussion was held off

5                 the record.)

6                  (Whereupon, the above-referred to

7                   documents were marked as Plaintiff's

8                   Exhibits 13 through 20 for

9                   identification, as of this date.)

10               (Whereupon, the requested portion was

11                read back by this reporter.)

12       Q.    Earlier I made a demand for the

13   employment acceptance forms and I want to ask you a

14   clarifying question.

15       I'm showing you what's been marked as

16   Plaintiff's Exhibit 15.  For your note, it is

17   application for employment.  Does that coincide

18   with Plaintiff's Exhibit 7, so that we have clarity

19   as to the two documents, that usually go together

20   when an employee fills out an application?

21       A.    Yes.

22       Q.    Plaintiff's Exhibit 6 from the previous

23   deposition, this bears the name of Manuel Almonte

24   for an application employment, correct?

25       A.    Yes.

[Page 185]

                        CHANINA KLAHR

1

2       Q.    In the section that lists down there,

3   "Please list beginning from most recent your

4   previous experience."

5       A.    Right.

6       Q.    That references a company there that is

7   called Defoe Construction?

8       A.    Yes.

9       Q.    The dates of employment listed there are

10  1995 to 2002, correct?

11      A.    Yes.

12      Q.    This is your handwriting?

13      A.    Yes.  Based on an interview, what he is

14  telling me.

15      Q.    At the time, this is when you were

16  talking to Manuel Almonte, which was also referred

17  to as Nestor Lopez or Lopez, whatever you knew him

18  as, correct?

19      A.    Yes.

20      Q.    The date on that application is February

21  21, 2011?

22      A.    I knew him as Manuel Almonte.  He was

23  called Lopez.

24      Q.    In April of 2013, I will show you

25  Plaintiff's Exhibit 15.  This is another

[Page 186]

1                          CHANINA KLAHR

2    application for employment, correct?

3        A.    Yes.

4        Q.    The name on this is Almonte Nestor,

5    correct?

6        A.    Yes.

7        Q.    Noting the date is April 29, 2013?

8        A.    Yes.

9        Q.    Here the previous employment lists a

10   company named Defoe, except it is spelled

11   differently at this point, correct?

12       A.    Here he filled it out in his on

13   handwriting.

14       Q.    He being who?

15       A.    Nestor, who had told us that he was

16   using -- he told us that he received citizenship

17   papers and the name that he was working up until

18   now was not his real name, and he verified this was

19   the documentation that he gave us, lawyer letters

20   and all kind of things to substantiate this.  So we

21   had him fill out a new application.

22       Q.    What was the purpose of filling out that

23   application in Plaintiff's Exhibit 15?

24       A.    We needed documentation for him.

25       Q.    When he was first hired, though, he had

1                     CHANINA KLAHR

2    not presented you with any documentation, correct?

3         A.    You are supposed to.

4         Q.    He didn't?

5         A.    He didn't give everything and we know

6    that the license came later.  I don't know what it

7    was that generated that incident.  I asked for it

8    and got it at that time.

9         Q.    I will ask the question again.  At the

10   time that he filled out the prior application, he

11   didn't present you with documentation?

12        A.    Not the license, correct.

13        Q.    At this time he did present you with

14   documentation, correct?

15        A.    He presented documentation from the

16   lawyer stating that his -- at this stage it was

17   final already.  We knew this was a period of going

18   on for a little while because he had informed us of

19   this and given us the documentation.  But I'm not

20   sure this date coincides with when he got his

21   Social Security card or something that he was going

22   to start getting paid.  It was a process.

23        Q.    Why did you require documentation in

24   April of 2013 but not in February of 2011?

25        A.    I asked for it.  I don't know what

[Page 188]

```
                        CHANINA KLAHR
```

1

2  happened over there why we didn't get it.  I don't

3  know why I didn't get it.  It was an oversight.

4  Or I got some things and not the license.  I don't

5  know.

6      Q.    Is there any particular reason why you

7  filled out the application in 2011 in your

8  handwriting?

9      A.    No real reason.  This was in my car.

10  And I had a clipboard, and this is done with a

11  table with him in front of me at a desk.

12      Q.    Is there any particular reason why he

13  filled out the later application?

14      A.    Because he was at a desk where he can

15  sit down and do it.

16      Q.    How come you didn't just hand him the

17  clipboard when you had it the first time in

18  February of 2011?

19      A.    There's no rhyme or reason.  That's the

20  way that it varied.

21      Q.    Do you often fill out paperwork for your

22  employees?

23      A.    No.  Except for the application.  For

24  part of the application.  The only thing that you

25  fill out is the application.

[Page 189]

1                    CHANINA KLAHR

2        You can ask me what -- I don't believe there

3   is any other kind of paperwork.

4        Q.    How about employment acceptance forms,

5   do you usually fill those out too?

6        A.    The whole document is my document.

7        Q.    What about your handwriting as to

8   portions of it?

9        A.    The whole document is my document, and

10   they sign an agreement.

11        Q.    In Plaintiff's Exhibit 7, it is your

12   handwriting everywhere except the signature, and

13   print name, and the date on Exhibit 7?

14        A.    That is correct.

15        Q.    For the employment acceptance form, you

16   write on it and fill it out for the employee.  On

17   the employment application there are times where

18   you filled it out for the employee, correct?

19        A.    On the employee acceptance form, that is

20   my -- that is the place for me to write not for

21   anyone else.  On the application for employment,

22   it's flexible.  Anyone could write over there.

23        Q.    Do you instruct your employees on how to

24   fill out forms?

25        A.    I don't even know of any forms they fill

```
 1                    CHANINA KLAHR

 2   out.  Again, I'm usually doing them.  You would

 3   have to ask me or enlighten me what you are

 4   referring to.

 5        Q.    You said that you are usually filling

 6   out the forms then, correct?

 7        A.    I'm creating those forms that we have

 8   been talking about.  I don't know of any other

 9   forms that they do except for things they do

10   without my authorization, which we found out about.

11        Q.    What did you find out that employees do

12   without your authorization?

13        A.    I found in the buildings, like in the

14   basements, a letterhead or something from the

15   company, which I never made, and says they are an

16   employee and this, that, in a whole letter.

17        Q.    Employees have falsified documents

18   coming from the company?

19        A.    They would say they created their own,

20   you know, document.  They needed employment

21   verification for some kind of public assistance and

22   that's what the guy did.  On two occasions, I

23   caught two different people with that.

24        Q.    Did you ever instruct your employees on

25   how to properly fill out tax forms?
```

1                    CHANINA KLAHR

2      A.    What kind of tax forms?

3      Q.    W2s, W4s, 1099s, I9s, things of that

4   nature?

5      A.    Yes.  A W4 and I9s, yes.  That I'm aware

6   of.

7      Q.    I will show you what's been marked as

8   Plaintiff's Exhibit 13, a two-page document.  It is

9   bearing Bates numbers 357 and 374.  Defendant's

10  exhibit Bates numbers.  I will ask you to take a

11  look at those and tell me when you are finished.

12     A.    I'm familiar with this.

13     Q.    What do you know that to be?

14     A.    The first page is a paycheck or the pay

15  stub that the super gets.  You are referencing the

16  note on the bottom.  And the second one is a

17  notice, which is a management notice that I

18  occasionally would inform the supers of certain

19  instructions, especially if there is a change to

20  something that they have been doing.  This one in

21  particular is about cleaning the sidewalks.

22     Q.    Okay.  I guess I will turn your

23  attention now first to the line on the bottom,

24  which if you could read that slowly for the court

25  reporter, please.

[Page 192]

1                           CHANINA KLAHR

2        A.     "Effective Monday, June 24, 2013, super

3    has to do the cleaning of the sidewalks and curbs

4    before 8:00 a.m.  Any summonses received after

5    6-24-2013 will reflect the penalty for negligence

6    which is deducted from paycheck."

7        That's what it says.  I never did it.  That's

8    what it says.

9        Q.     There is a policy in place as of June of

10   2013, that the super can be penalized with a

11   deduction from pay for not properly cleaning the

12   sidewalks, correct?

13       A.     No.  It was a means of they were very --

14   they were very resisting to take on this job, which

15   before they used to do and we were getting tickets

16   all the time and the super would say, "It's not my

17   problem," and we would say, "The porter is only

18   there to help you.  And if you are not going to

19   enforce the porter's times that he is saying that

20   he is saying he's in the building doing the work

21   and he's not there, then we are going to give it

22   back to you."  And the manager -- that warning just

23   didn't materialize into any kind of positive.  We

24   are still continuing getting summonses, so we told

25   them we are going to do this.

[Page 193]

1                    CHANINA KLAHR

2        However, we never, ever did it to them.  It

3    was a means of making them understand it is a

4    serious responsibility and we are not going to look

5    away.

6        Q.    It was a threat to your employees that

7    if they don't clean the sidewalks or not the

8    employees, the super, they would be penalized by

9    deduction from their pay, correct?

10       A.    It was a means of making them

11   understand.  We had many conversations.  They

12   didn't treat it with seriousness.  And it was a

13   means of getting them to understand it is part of

14   their job and they have to do it.

15       Q.    This was basically a change in the

16   super's duties, correct?

17       A.    This was a modification in the super --

18   our supers used to have to do it and then we made

19   porters do it.  And now we went back to it.

20       Q.    Did any of your supers ever have to take

21   care of these summonses in court?

22       A.    Yes.

23       Q.    Who had to do that?  What were the names

24   of the supers?

25            MR. WEINBERGER:  Objection as to

[Page 194]

1                        CHANINA KLAHR

2       relevance.

3       A.    I don't know the names.  What I did

4    instruct the supers, if a summons did come, we

5    didn't deduct from his paycheck ever.  No such

6    thing ever transpired.  But we explain to him he

7    will have to deal with it and go down on the court

8    date on the summons and explain to the judge

9    whatever the situation was.  Sometimes the summons

10   was unwarranted and they had pictures to prove it.

11      So, they would go down and discuss it with the

12   judge, and whatever happened happened.

13      It was a pay day.  They even got extra money

14   if they had to go down.  They got extra money to --

15   carfare and whatnot.

16      Q.    They received extra money if they had to

17   show up in court?

18      A.    Yes.  It was a paid day plus they got

19   extra money.  That's correct.

20      Q.    It's your testimony that the supers

21   would not have to use either a sick or a personal

22   day to tend to this occurrence?

23      A.    Yes.

24      Q.    Do you have any evidence of that?

25      A.    Yes.

```
 1                    CHANINA KLAHR

 2      Q.    What evidence do you have?

 3      A.    I would have that I know of one time

 4  that Mr. Almonte had to do that and it's on his pay

 5  stub.

 6      Q.    Do you remember when he had to do that?

 7      A.    I don't know in my head.  There should

 8  be paperwork there.

 9      Besides what's on the pay stub, there may be a

10  paper.

11           MR. VALLETTI:  I demanded the pay

12      stub, so I'm not going to do it again.  But,

13      any other piece of paper that may evidence

14      Mr. Almonte having to go to court to handle

15      a summons issued, I will make a demand for

16      that.

17      A.    When I say pay stub, it would be on

18  those things that you have.  It would be an item

19  listed, extra money.  It would not be the hourly

20  fee.  It is not in addition to his regular hours

21  and money.  There would be another item there.

22      Q.    A manual entry in the payroll records?

23      A.    No.  An additional -- not necessarily.

24  Maybe.  I believe that the incident that I'm

25  talking about, the one time that I recall, I
```

[Page 196]

                          CHANINA KLAHR

1

2    believe the payroll company did it.  I submitted to

3    them give extra $25 for I forget what I called it,

4    but it was for going to court.

5         Q.    It was the amount that you recall was

6    $25?

7         A.    Yes.  I believe I called it lunch money

8    or carfare.  I gave them something for it.

9         Q.    While Mr. Almonte was employed with 437

10   and 1195, you also gave him orders to work at

11   different buildings, correct?

12        A.    He requested to work additional hours.

13   So, the agreement for that would be at different

14   buildings.

15        Q.    When did that begin?  When was the

16   request made to work additional hours?

17        A.    Probably in 2013.  I would have to

18   review the payroll records or something to get kind

19   of the idea of what it was exactly about.

20        Q.    Is it your testimony that Mr. Almonte

21   didn't work at 1056 Boynton, excluding that time

22   period in the beginning, let's focus 2011, 2013,

23   your testimony is that Mr. Almonte didn't work at

24   1056 Boynton or perform work at 1056 Boynton while

25   he was the super at 437 Morris Park?

```
 1                    CHANINA KLAHR

 2       A.    I'm not saying that.

 3       Q.    Did Mr. Almonte perform work at 1056

 4  Boynton during that time period when he was the

 5  super at 437 Morris Park?

 6       A.    It is possible.  Yes.  And other sites,

 7  yes.  To my recollection, 1101 Manor.

 8       Q.    And 1056 Boynton?

 9       A.    I didn't say that.  I'm not sure of

10  that.

11       Q.    You are sure of the 1101?

12       A.    Yes.

13       Q.    What kind of work was he performing at

14  those?  Was it the same or similar types of tasks?

15       A.    Yes.  Some kind of assisting the super

16  or maybe there was no super and instead of working

17  here we asked him to go there if possible.  He had

18  a car, so we asked him.

19       Q.    Was that a regular occurrence or was it

20  frequent?  What kind of frequency did he do that?

21       A.    Very infrequent.  I would say it's

22  possible, again, if there was no super, which is

23  not a common thing, but it did happen or if the

24  super went on vacation or something and the

25  handymen that were covering the building had a
```

```
 1                    CHANINA KLAHR

 2   problem, either they called them directly or I

 3   asked him to go look over what they are doing to

 4   make sure they have the right idea.

 5        It is not something that would have been

 6   clocked, something that you considered many hours.

 7   It was an in-and-out job.  Going there and time

 8   travel or probably equal to some time spent.

 9        Q.    So he didn't actually go over there and

10   perform work while there?

11        A.    Right.  He may have assisted but not

12   that he was doing the job himself.

13        Q.    If he was assisting, who was he

14   assisting?

15        A.    There were handymen there.

16        Q.    What kind of things would he assist in

17   doing?

18        A.    If there was a job that the workers

19   weren't confident that they are doing it right or

20   something like that or know how to do it, he would

21   go and show them how to do it.

22        Q.    Could you give me examples?

23        A.    Some kind of plumbing job, let's say.

24   Not everybody knows plumbing.  I'm talking about

25   not just changing a faucet.  Some plumbing whether
```

1                         CHANINA KLAHR

2    it's soldering and the guy knows this and he knows

3    that.  But I need someone who is confident.  If you

4    are not sure what you are doing, you don't want to

5    mess things up.

6        Q.    You would send Mr. Almonte because you

7    were confident in his work that he could do a good

8    job or at least instruct some others?

9        A.    Both.

10       Q.    While he was out at 1101 Manor, who was

11   in charge at 437 Morris Park?

12       A.    He wasn't always in the building.  He

13   was in charge.

14       Q.    Let's say if he wasn't always in the

15   building, who would be taking care of the

16   activities that were going on at 437?

17       A.    He supervised them.  In other words --

18       Q.    Who?

19       A.    Mr. Almonte, the super, was tasked with

20   making sure that maybe six or a dozen different

21   jobs are going on at the same time.  He is not

22   doing them all.  He doesn't have to do all of the

23   jobs himself.  He did not do all of the jobs

24   himself.  We know he was not in the building many

25   times.

[Page 200]

1                        CHANINA KLAHR

2       Q.    You testified earlier about some work

3    orders that you got and directed them to

4    Mr. Almonte, correct?

5       A.    Yes.

6       Q.    For instance, if there was some work

7    orders that were more substantive, like the

8    plumbing jobs or the electrical jobs that might

9    need to be done, Mr. Almonte testified and you

10   heard that testimony, he would tend to those jobs

11   himself, correct?

12      A.    Yes.  But the work orders speak for

13   themselves.   It lists who did the jobs.

14      Q.    So if he was the one that was taking

15   care of the heavier jobs, whether it is at 1195,

16   437, 1101 Manor, and perhaps 1056 Boynton, somebody

17   had to be in the building at that time, correct?

18      A.    Yes.

19      Q.    Who was it that was in the building?

20      A.    We have several roving handymen.  He

21   always had at least one to average of one to two

22   and many times three full-time handymen at his

23   disposal in his own building.  I'm not talking

24   about people that he so called oversaw elsewhere.

25      I want to correct an assumption that you made

[Page 201]

1                    CHANINA KLAHR

2   about him being at 1195 Sherman.  He did not go

3   much during his daily activities to 1195 Sherman.

4   Our agreement was that he was supposed to go there,

5   and he got paid separately for that in addition to

6   the regular wages, and that was supposed to be

7   after hours.

8        It would be a very rare type of emergency, if

9   there was no super or that type of thing, that we

10  would allow him to go elsewhere because that

11  building is far away.

12       Q.   Give me an example of something that

13  would require him to go to 1195 Sherman?

14       A.   An active leak flooding down that either

15  there is no super there and we found out about it

16  from someone in the building, a porter, or the

17  handyman that was there saying he can't resolve it,

18  he needs help.  So, it was very rare that he went

19  there during business hours.

20       Q.   So he went to 1195 Sherman after his

21  regularly scheduled hours, that is your testimony?

22       A.   Yes.  That was our agreement that he was

23  supposed to be doing, yes.

24       Q.   What was the other sum and substance of

25  that agreement with respect to his work at 1195

[Page 202]

                              CHANINA KLAHR

1

2    Sherman?

3        A.    It stemmed out of that we lost the super

4    at that time period when this happened.  He had

5    asked us recently around that period prior to that

6    that he wanted more money.

7        Q.    Could I ask you what time period you are

8    talking about?

9        A.    The time period of that super.  I would

10   have to look it up.

11       Q.    Do you remember?

12       A.    No.  I believe it was mid-2013.  Maybe

13   early 2013.

14       Q.    Continue.

15       A.    I can verify.  Super was stabbed and

16   there was a whole incident over there.  Not

17   Mr. Almonte, the super was stabbed, and he was --

18   it was a major fiasco.  You don't want to know

19   about it.

20       The handyman that I was sending there I was

21   not so confident.  He said that he had wanted more

22   money, so I said, "You know what, I will give you

23   an additional job to supervise and be responsible

24   for that person's work," which meant he was to go

25   there at the end of his day and make sure that the

[Page 203]

1                         CHANINA KLAHR

2     jobs the guy said that he did were really done and

3     to make sure that the job was done properly.

4         It has happened on rare occasions that he

5     actually had to spend a couple of hours there.

6     Usually it was an in-and-out thing under an hour.

7     In and out checking jobs in the building takes

8     time.  He would usually be there under an hour.

9         Q.    Who was the handyman that wasn't cutting

10    it over there?

11        A.    I would have to look.

12        Q.    You don't remember the name?

13        A.    At that time I don't remember.  Right

14    after we put in someone we still needed him to

15    oversee.  His name was Digno DeLo Santos.

16        Q.    Could it be DeLos Santos?

17        A.    He says his name DeLo.

18        Q.    For his work at 1195 Sherman, those

19    orders came from you, correct?

20        A.    Yes, came from me.  Yes.  No one else.

21        Q.    1195 Sherman has principals that are

22    Mr. Tabak and Mr. Abraham Finkelstein, correct?

23        A.    Yes.

24        Q.    The type of work again that Mr. Almonte

25    was going to be doing over there was the same as

[Page 204]

1                    CHANINA KLAHR

2    his work or similar as what was going on at 437

3    Morris Park?

4        A.    I don't want to belittle his work at 437

5    Morris Park.  437 Morris Park is a bigger building,

6    with older structure that needed work.  Over there

7    didn't need much work.

8        Q.    You testified it was a gut and replace

9    and it was a newer building?

10       A.    Yes.

11       Q.    I'm talking about the tasks were

12   similar, that it was maintenance, it was sometimes

13   plumbing?

14       A.    He didn't do it.  I don't want you to

15   think that he was busy doing that work.  There was

16   one period where I told him, "Listen, I'm paying

17   you all this."  The process was going on.  The guy

18   didn't do the work he said he was going to and I

19   made him go do it.  I made him go spend actual

20   several hours to go do the jobs himself and not --

21   because the fellow there was unreliable.  It was

22   not done the way it was supposed to be done.

23       Q.    The fellow is the one DeLo Santos or was

24   it the one before that?

25       A.    It could have been.  He was familiar

[Page 205]

1                         CHANINA KLAHR

2    with that building because he was overseeing roving

3    employees in general.  He was familiar with the

4    building.

5         Q.    You testified I believe previously that

6    Mr. Almonte had received a loan or maybe even two

7    loans from the company, correct?

8         A.    Yes.

9         Q.    Did you know what those loans were for?

10   I believe you testified earlier it was for some

11   immigration issue.

12        A.    Right.  He had come to us saying that he

13   was stuck in a rut.  He had processed immigration

14   and he showed me the paperwork and now he needs

15   money that he didn't have in order to do the next

16   phase.  I'm not sure if they were holding him

17   hostage saying they will not give it to you.  The

18   bottom line is he needed the money.  So we gave him

19   the loan so he could finish the process.

20        Q.    I will show you what's been marked as

21   Plaintiff's Exhibit 17.  Here, this is a paper with

22   the letterhead of 437 Morris Park, LLC.  And if you

23   could, take a minute to review that.

24        A.    Okay.

25        Q.    This is a check for $3,000, 500 of which

[Page 206]

```
 1                    CHANINA KLAHR

 2   was for a vacation, and the other 2,500 was to be a

 3   loan?

 4        A.    Yes.

 5        Q.    It is going to be repaid in 2013 in

 6   installments of $48 each week, correct?

 7        A.    Yes.

 8        Q.    Mr. Almonte, Manuel Almonte's signature

 9   appears on this document, correct?

10        A.    Yes.

11        Q.    What is the date on the document?

12        A.    12-31-2012.

13        The document is dated 12-14, and he signed it

14   on 12-31.

15        Q.    So it was done in December of 2012?

16        A.    Yes.

17        Q.    What's been marked as Plaintiff's

18   Exhibit 20, there is a part of this that's a pay

19   stub on the bottom.  It shows a deduction in March

20   here of $48.  That coincides with this document,

21   correct?

22        A.    This is my handwriting.  A note that we

23   stapled there.  That is complicated.  I need an

24   hour to figure that out next.

25        Q.    I'm asking about on the right-hand side,
```

[Page 207]

1                        CHANINA KLAHR

2    you see a loan?

3        A.    Yes.  That would be the repayment that

4    he agreed to.

5        Q.    These documents also reflect in these

6    times also there is a loan here for $48

7    reimbursement repayment and $48 repayment over

8    here.  These documents reflect what was made as a

9    result of that agreement, correct?

10       A.    Yes.  And you see the year-to-date

11   amount is growing there.

12       Q.    On the right, yes.  Year to date.

13       A.    It became that by this time period.

14       Q.    April of 2013, just to be clear.

15       A.    Yes.  And that.

16       Q.    On the bottom here, is this the loan

17   balance?

18       A.    I believe so.  Look at the pay stub.

19       Q.    It says balance.  On Bates 356.

20       A.    This is probably the last paycheck.

21   This is possibly his last pay check and that is why

22   I noted that.

23       Yes.

24       Q.    The next week is deducted 48 and it

25   shows on Bates 356 that there is a balance of 1780,

[Page 208]

1                      CHANINA KLAHR

2    correct?

3         A.    Yes.

4         Q.    I will now show you what's been marked

5    as Plaintiff's Exhibit 19.  Bear with me on the

6    numbering here.  It is a document bearing the Bates

7    numbers Plaintiff's Exhibit 003 through Plaintiff's

8    Exhibit 0020.  And the first two pages are

9    Plaintiff's 001 and 002.  They have been placed in

10   the back solely because of the dates that are on

11   the checks.  I wanted to keep it sequential.

12        Have you seen those documents before?

13        A.    I'm familiar with them.  I didn't

14   necessarily see them.  I know what they are.

15        Q.    What do you know those to be at least?

16        A.    This is in lieu of a pay stub.  If you

17   have direct deposit, the employees get this.

18        Q.    Whose name is on that?

19        A.    This is Nestor Almonte.

20        Q.    Could you please tell me what dates

21   appear in the middle for the check date?

22        A.    The week starting and end dates.  The

23   start is August 7, 2013 and ends August 13, 2013.

24        Q.    I will clarify.  What date was the check

25   date?

[Page 209]

1                    CHANINA KLAHR

2        A.    The check is August 15.

3        Q.    That's the 8-15-2013 check?

4        A.    Yes.

5        Q.    If you flip to the last page.  What is

6    the check date on that particular check?

7        A.    December 6, 2013.

8        Q.    If you would notice, please, I will

9    point out something.  On these direct deposit stubs

10   there are loan deductions, correct?

11       A.    Yes.

12       Q.    It also reflects a balance on this is

13   the first page, a balance of $545?

14       A.    Yes.

15       Q.    This continues throughout these,

16   correct?  On the first two pages under the company

17   name of 437 Morris Park for Nestor Almonte, there

18   were deductions made from his wages of $35 on each

19   check, correct?

20       A.    Yes.

21       Q.    The third page is Plaintiff's Exhibit

22   0005.  It's a Sherman Management Company under the

23   name Nestor Almonte.  On this particular check

24   there was a $48 deduction, correct?

25       A.    Yes.

```
 1                    CHANINA KLAHR

 2      Q.    These deductions are from the pay of

 3  Nestor Almonte, correct?

 4      A.    These deductions is this one person

 5  named Almonte, who previously worked under Manuel

 6  Almonte and now moved over his loan to his Nestor

 7  Almonte name.

 8      Q.    Is there any document reflecting that

 9  Nestor Almonte was going to have pay deducted from

10  his checks?

11      A.    Maybe.

12            MR. VALLETTI:  I will make a demand

13      for that document.

14      A.    I don't know.  That was definitely our

15  agreement.

16      Q.    Was it in writing?

17      A.    There was another such paper.  That loan

18  agreement that you have, there is another one,

19  modified one.  Not necessarily this one.  I don't

20  recall exactly what it says.  That thing was

21  modified and may explain why there is another

22  number here.

23      Q.    That name appears to be Manuel Almonte,

24  though, correct?

25      A.    Yes.  That's who was working.  That was
```

[Page 211]

1                    CHANINA KLAHR

2    his name.

3        Q.    At this point these documents reflect

4    that Nestor Almonte under that name is having

5    deductions from his pay for loans.  What I would

6    like to know is if you have the writing for Nestor

7    Almonte to have that pay deducted?

8        A.    He agreed that should be transferred to

9    there.

10       Q.    Did he do that verbally?

11       A.    Definitely was verbally.  The question

12   is is there something in writing.  I don't know

13   what that second loan paper says that clarified

14   that one.

15            MR. VALLETTI:  I will make a demand

16       for any document evidencing a loan to Nestor

17       Almonte authorizing deductions to be made

18       from his pay stubs.

19            MR. WEINBERGER:  Follow up in writing.

20            MR. VALLETTI:  Absolutely.

21            (Whereupon, at this time a recess was

22            taken.)

23       Q.    Back on.  I will refer again to a prior

24   exhibit to get clarification from Mr. Klahr.  We

25   are looking again at Exhibit 17.  It is the loan

[Page 212]

1                        CHANINA KLAHR

2    document signed by Manuel Almonte on 12-31-2012.

3    Would you like to explain a clarification for that?

4        A.    I believe this is the second document

5    that was a correction or modification of the first

6    document, the check that we gave he asked for a

7    $3,000 loan.  We gave him that check and he ended

8    up applying part of that money towards his

9    vacation, as it states here, not on the first one,

10   and he only had to repay $2,500 not the whole

11   3,000.

12              MR. VALLETTI:  Mark that Plaintiff's

13       Exhibit 21.

14              (Whereupon, the above-referred to

15              document was marked as Plaintiff's

16              Exhibit 21 for identification, as of

17              this date.)

18       Q.    I'm showing you what's marked

19   Plaintiff's Exhibit 21.  We will be picking up

20   hopefully where we left off.

21       This is an earlier document which I believe is

22   referenced in the loan agreement.  Does this

23   document reflect the original agreement before

24   modification?

25       A.    Yes.

[Page 213]

1                         CHANINA KLAHR

2       Q.    That was for $3,000 to be paid in $58

3   installments?

4       A.    Yes.

5       Q.    Later Plaintiff's Exhibit 17 comes in

6   and modifies that agreement?

7       A.    I believe so.  I recall something of

8   that nature.  And that appears to correspond to

9   that.

10      Q.    Did you authorize this loan or did you

11  have to get approval from someone else?

12      A.    I had to get approval.

13      Q.    Who did you get approval from?

14      A.    Finkelstein and Tabak, either one or

15  both.  Probably both.

16      Q.    Did you give loans out to other

17  employees other than Mr. Almonte?

18      A.    Yes.

19      Q.    In order to do that, did you have to get

20  approval from Finkelstein, Tabak, one or the other,

21  or both?

22      A.    Usually one.

23      Q.    One of them would suffice?

24      A.    Yes.

25      Q.    Typically who would you approach to get

```
 1                    CHANINA KLAHR
 2   authorization to give an employee a loan?
 3        A.    Finkelstein.
 4        Q.    Is there any particular reason why?
 5        A.    He signs the checks.
 6        Q.    When you say that he signs the checks,
 7   what checks are you talking about?
 8        A.    Any check for any money.  All of the
 9   moneys that he signed.  Paychecks, loans, whatever.
10   Any money that the super got.
11        Q.    Mr. Finkelstein controlled the flow of
12   money from New Hope Funding into 437 Morris Park,
13   LLC, to your knowledge?
14        A.    I don't know.  He signed checks or from
15   the payroll company would be a facsimile of his
16   signature.
17        Q.    I guess I will ask, to your knowledge,
18   where did Mr. Fineklstein get the money to pay
19   either loans or wages to employees of 437 Morris
20   Park?
21             MR. WEINBERGER:  Objection.
22        A.    I don't know.
23        Q.    You don't know?
24        A.    I don't know.  As far as I know he
25   controls the bank accounts.  I cannot say.
```

[Page 215]

1                    CHANINA KLAHR

2      Q.    You say he controls the bank accounts.

3  Do you know where the banks were that had those

4  accounts?

5      A.    I believe they all say J.P. Morgan

6  Chase.

7      Q.    In 2013, did there come a time when at

8  that point Nestor Almonte's employment ended with

9  437 Morris Park and 1195 Sherman?

10     A.    Yes.

11     Q.    When did that occur?

12     A.    He resigned I believe on December 2,

13  2013.  Effective date of the next day, which would

14  have been Tuesday after 5:00 p.m.  Probably the

15  3rd.

16     Q.    When you say he resigned, did he resign

17  from 437 on that day, on 12-2, or 1195 Sherman on

18  that day?

19          MR. WEINBERGER:  Objection as to

20      relevance.  That's not part of this case.

21      It is another proceeding going on.  That is

22      not relevant.

23          (Whereupon, a discussion was held off

24          the record.)

25     Q.    When you say that he resigned on

[Page 216]

1                       CHANINA KLAHR

2     12-2-2013, was that from 1195 and 437, or was there

3     some sort of difference?  What happened that day?

4          A.    He resigned his entire position with our

5     company and all parts of it.  He had -- this was an

6     outburst of something that was stemming for a few

7     months that we have documentation on, and he

8     surprisingly all of a sudden exploded with it now.

9          Q.    When you say it had been building up for

10    a couple of months, what are you talking about?

11         A.    There was an incident approximately a

12    month and a half, two months prior, I'm not sure of

13    the date.  Let's say for argument's sake two months

14    prior, where he had gone AWOL.  Absent without

15    leave.  He had already prior to that exceeded his

16    sick days and all kind of everything and so we

17    didn't pay him.  We didn't have any communication

18    with him.  We had no idea where he was.  Didn't

19    answer his phone.  Only knew he was actually around

20    because a reliable employee of mine said that he

21    saw him one time during that week.  So, he was

22    technically local.

23         We were aware that his wife and Wilton, his

24    brother-in-law, had left the country to a family

25    emergency.  And when his wife left is when he went

1                    CHANINA KLAHR

2   AWOL.  That particular incident extended into a

3   retaliation.  I don't know a better word to use.

4   Since we didn't pay him so he is now not going to

5   work.  His wife came back.  You didn't pay me, so

6   now I'm not going to work the next week.  He went

7   two weeks without pay.

8        Q.    What do you mean two weeks without pay?

9        A.    He didn't work for two weeks.  He was

10   not paid.  And we either -- Finkelstein or Tabak

11   tried to talk to him and find him, and eventually

12   they sat down with him.  The whole entire story was

13   recorded onto paper, which he signed an agreement

14   to everything that transpired and how we are going

15   to move forward.

16        It sort of moved forward nicely for a couple

17   of weeks or two months.  And then this day of

18   December 2, when I confronted him about something,

19   he exploded and said, "I know what you guys are

20   doing.  At first you did this.  At first you didn't

21   pay me.  I quit.  I'm not working no more.  I don't

22   like what you guys are doing to me."

23             MR. WEINBERGER:  Objection to

24        relevance.

25        Q.    He was employed until December 2013?

[Page 218]

1                           CHANINA KLAHR

2        A.    I believe so, until that date.  Whatever

3   the date it was.  December 2nd or 3rd, 2013.

4        Q.    At that time, actually from April 2013,

5   he had filled out his employment application and

6   acceptance forms using the name Nestor Almonte?

7        A.    Makes sense.  Yes.

8        Q.    I will show you what's been marked as

9   Exhibit 18.

10       A.    Okay.

11       Q.    Have you seen that document before?

12       A.    Yes.

13       Q.    What is that document?

14       A.    A document made by the super using the

15  name of Manuel Almonte.  At the time that he

16  stopped working that name he filled out this

17  document.

18       Q.    What is the date on that document?

19       A.    June 13, 2013.

20       Q.    You were present for Mr. Almonte's

21  deposition, correct?

22       A.    Yes.

23       Q.    He testified that he had a son, correct?

24       A.    Yes.

25       Q.    The son's name was Manuel Almonte,

[Page 219]

```
 1                      CHANINA KLAHR

 2   correct?

 3       A.    He never worked for me, right.

 4       Q.    I didn't ask that question.  He had a

 5   son named Manuel, correct?

 6       A.    Yes.

 7       Q.    He also testified that Manuel Almonte

 8   worked for the company, correct?

 9       A.    That is wrong.

10       Q.    I'm asking you what he testified to.

11   Did Nestor Almonte testify that Manuel Almonte also

12   worked for the company?

13       A.    He said something about a shadow or

14   whatnot.  Possibly he meant that.

15       Q.    You were sitting in seven hours' worth

16   of depositions?

17       A.    Right.

18       Q.    For Mr. Almonte alone?

19       A.    Yes.

20       Q.    He testified during that time that

21   Manuel was his shadow, correct?

22       A.    Yes.

23       Q.    What he meant by that, being his shadow,

24   he meant Manuel was working alongside him at 437

25   Morris Park, correct?
```

1                    CHANINA KLAHR

2           MR. WEINBERGER:   Objection as to form.

3      If you can answer.

4      A.    He implied that.  Which is untrue.

5      Q.    Did he testify to that?

6      A.    Yes.  A lie.

7      Q.    He also testified that his son was

8  terminated from the company in June of 2013,

9  correct?

10     A.    The process is that the dad that was the

11 super was working under the name Manuel Almonte,

12 who we now know was the son, which we did not know

13 at the time.  Nobody was terminated.  It was a

14 process at his request to go under his own name,

15 which he provided documentation.  That is him.

16     Q.    He provided that documentation in April

17 of 2013, correct?

18     A.    Yes.  So?

19     Q.    So this document is dated June 2013,

20 correct?

21     A.    Yes.  So?

22     Q.    The name on that document is Manuel

23 Almonte, correct?

24     A.    Yes.

25     Q.    This document, in fact, coincides with

[Page 221]

1                    CHANINA KLAHR

2    Mr. Almonte's testimony that his son was terminated

3    in June of 2013; is that correct?

4        A.    No.

5        Q.    Why not?

6        A.    Because this applies to that issue that

7    I'm telling you about.  That the dad was the super,

8    which turned out he was working under his son's

9    name.  The son never worked.  I know you don't want

10   to hear it, but that is part of this thing.  The

11   son never worked for the company, never asked to

12   work for the company, and we never asked him to

13   work for the company.

14       Q.    Why is there a termination sheet here,

15   the employment end compensation statement, for

16   Manuel Almonte dated almost two months after you

17   knew Nestor's name was Nestor Almonte?

18       A.    It is not a termination.  He was signing

19   that we had paid him all the money that was owed to

20   Manuel Almonte when he worked under Manuel

21   Almonte's name.  There was no further money owed.

22       Q.    Isn't that an employment end

23   compensation statement?

24       A.    Yes.  Not a termination letter.

25       Q.    When an employment ends, do you not have

[Page 222]

1                         CHANINA KLAHR

2    your employees fill out an employment end

3    compensation statement?

4         A.    Occasionally I try to get that.

5         Q.    Somebody's employment ended here,

6    correct?

7         A.    Right.

8         Q.    Manuel Almonte's employment ended there?

9         A.    The dad stopped working under the name

10   Manuel Almonte, and we needed something to say that

11   we paid him and we don't -- this was all done in

12   good faith, that he was moving on and doing this.

13   There was no problems.  We said we just want to

14   know.  You're not going to come back at the end of

15   the calendar year, so now we are doing it.

16        Q.    Why didn't you do it in April when he

17   told you his name was Nestor Almonte when he filled

18   out his employment application and acceptance form?

19        A.    This may very well have been the time

20   that it took.  It may have happened.  I don't know.

21        Q.    Let's look.

22        A.    Okay.

23        Q.    This is the employment acceptance form,

24   which is labeled as Plaintiff's Exhibit 7.  This is

25   the operative document we are discussing, April

1                    CHANINA KLAHR

2   2013.  Is that not filled out with the name Nestor

3   Almonte?

4       A.    It is.  We need to check the payroll.  I

5   want to answer this.  In order to answer I need to

6   know when that happened.  Maybe this is a scam.  We

7   know he has been concocting a very big scam.  When

8   you saw last time that he made false time sheets.

9       Q.    But you actually filled out this

10  document?

11      A.    Not his name.

12      Q.    You testified that you filled out this

13  document, correct?

14      A.    Right.  I gave it to the guy in front of

15  me and he wrote his name and dated it and signed

16  it.

17      Q.    Now, this is a document originating from

18  437 Morris Park, correct?

19      A.    Yes.

20      Q.    This document is an employment end

21  compensation statement, correct?

22      A.    This is just confirming something

23  happened two months prior.  Look at what it says.

24      Q.    You got Manuel Almonte's name, but you

25  already knew Nestor Almonte's name in April.

[Page 224]

```
 1                    CHANINA KLAHR

 2      A.    This is for Manuel Almonte.

 3      Q.    I know that.  Do you?  That was when the

 4  son stopped working for the company.

 5      A.    No.  The son never worked for the

 6  company a day in his life.  If he did, if his dad

 7  asked him to do something, that is unknown to me.

 8  Okay?  I don't believe that he ever did anything,

 9  anyway.  Not even what he was claiming, Oh, my son

10  did painting, whatever.

11      Q.    You know that Abraham testified in this

12  case, correct?

13      A.    I know he testified.

14      Q.    You were at the deposition?

15      A.    Yes.

16      Q.    He testified that he had actually given

17  directives to Nestor Almonte's son?

18            MR. WEINBERGER:  Objection.

19      A.    No.  He retracted the nature of the way

20  it was said.  He said he remembers talking to him.

21  He doesn't believe the guy did anything.  And he

22  was very clear that the job was never done, period,

23  to this date.

24      Q.    Are you denying that Abraham had a

25  conversation with Manuel about the pressure cleaner
```

[Page 225]

```
 1                      CHANINA KLAHR

 2    in the basement of 437 Morris Park?

 3              MR. WEINBERGER:  Objection.

 4         A.    Whatever he said is written in the

 5    testimony.  Let's look at it together.

 6         Q.    You were there, correct?

 7         A.    I want to look at it together.

 8         Q.    You were there, correct?

 9         A.    I was there, yes.

10         Q.    You heard Abraham's testimony?

11         A.    I heard him retract from the way it was

12    presented.

13         Q.    What did he retract?

14         A.    That it was not the son.  It was -- he

15    cannot identify this person, cannot identify that

16    this person is the person that he spoke to.  And

17    the job that he was discussing was never done, so

18    nobody did that work.  Which he clearly -- which

19    the mom testified that that was the sole job the

20    son claimed to have done.

21         Q.    The mother testified to that?

22         A.    Yes.

23         Q.    You were at that deposition too?

24         A.    Yes.

25         Q.    You sat in on a lot of depositions in
```

[Page 226]

```
1                    CHANINA KLAHR

2   this case, right?

3       A.    Yes.

4       Q.    You know what everybody said before you

5   sat in that chair, didn't you?

6       A.    Absolutely not.

7       Q.    You don't know what everybody said

8   before you sat in that chair, you heard everyone's

9   testimony, correct?

10      A.    When I heard it at the time.

11      Q.    So they all happened before today,

12  correct?

13      A.    Yes.  What are you trying to say?

14      Q.    What I'm trying to say, you heard

15  everyone's testimony before giving your own?

16      A.    When?  Today?

17      Q.    Before giving your own today.

18      A.    Okay.

19      Q.    So you are shaping your testimony to

20  match what everybody else said before?

21      A.    No.

22            MR. WEINBERGER:  Objection.

23      A.    I'm telling you the facts.  And let's go

24  back to that testimony, maybe this is the time

25  where I had that outburst and said he is a liar and
```

```
 1                    CHANINA KLAHR

 2  you told me I'm not allowed to make any comments.

 3      Q.    I didn't say that.

 4      A.    Really?

 5      Q.    Let's go back to Abraham's comments

 6  regarding Manuel Almonte, the son.  Abraham

 7  testified that he had talked to Manuel Almonte

 8  about using a water pressure machine that cleans

 9  the boiler, correct?

10           MR. WEINBERGER:  Objection.  I'm not

11      sure that is accurately stated.

12      Q.    I said that he talked to him.

13           MR. WEINBERGER:  I will let him

14      finish.  Then I will correct him.

15           (Whereupon, the requested portion was

16           read back by this reporter.)

17      A.    His response to that question or that

18  conversation was no, he was not sure if that was

19  that person.  That was one thing that he said.  And

20  the second thing that he said is that the job was

21  never done, anyway.

22      Now, I'm not sure if that is part of the

23  testimony, but he told it to me at the time, that

24  the job was never done, anyway.

25      Q.    Told you what at what time?
```

[Page 228]

1                     CHANINA KLAHR

2        A.    At the time of the deposition he said,

3   which should be part of the deposition, he said

4   that job was never -- that task that he was talking

5   to someone about, which may have been a handyman,

6   not the son, he cannot identify the son, that task

7   was never done to this date.

8        So that is the time that he spoke to him one

9   time to tell him to do something.  Nobody did it.

10       Q.    You were also present at the deposition

11  of Mr. Tabak, correct?

12       A.    No.

13       Q.    That one you don't know about?

14       A.    Not yet.  You are going to tell me.

15       Q.    Were you at Manuel Almonte's deposition?

16       A.    The kid?

17       Q.    Yes.

18       A.    I was not at the kid's, no.

19       Q.    We are good on that.

20            (Whereupon, a discussion was held off

21             the record.)

22            MR. VALLETTI:  Mark that 22.

23            (Whereupon, the above-referred to

24             document was marked as Plaintiff's

25             Exhibit 22 for identification, as of

[Page 229]

1                    CHANINA KLAHR

2              this date.)

3      Q.    I will show you what's been marked as

4    Plaintiff's Exhibit 16 for identification, a

5    two-page document.  Take a look.  Tell me when you

6    are finished.

7      A.    Okay.

8      Q.    So, the first document I'm going to show

9    you is page 1 of the two.  Have you seen this

10   document before?

11     A.    I don't believe so.

12     Q.    Do you know what it is?

13     A.    It says it is a monetary benefit

14   termination letter for unemployment insurance.

15     Q.    From the State of New York?

16     A.    Yes.

17     Q.    What name appears on that document?

18     A.    Manuel Almonte.

19     Q.    What period, if you can, in the middle

20   of the page, it says Basic Base Period.  Above

21   that.

22     A.    October 1, 2012, to September 30, 2013.

23     Q.    That is the base pay for Manuel A.

24   Almonte, correct, according to that sheet?

25     A.    Yes.

[Page 230]

1                    CHANINA KLAHR

2        Q.    I will show you a page 2.

3        A.    Okay.

4        Q.    Have you seen that document before?

5        A.    No.

6        Q.    Do you know what it is?

7        A.    It's monetary benefit of termination

8    from the Department of Labor New York State

9    Unemployment Insurance.

10       Q.    What name does that document bear?

11       A.    Nestor Almonte.

12       Q.    If you look for the base period, what

13   does that say?

14       A.    January 1, 2013 through December 31,

15   2013.

16       Q.    It looks as though two people had filed

17   for unemployment insurance benefits here.

18       A.    Okay.

19       Q.    On the first one there is a base period

20   from October 2012 to September 2013, and the second

21   one is January 1, 2013 through December 31, 2013,

22   correct?

23       A.    Yes.

24       Q.    You appeared on behalf of 437 Morris

25   Park and 1195 Sherman previously for the case of

[Page 231]

```
 1                    CHANINA KLAHR

 2   Nestor Almonte, correct?

 3        A.    Yes.  Believe so.

 4        Q.    In that hearing, you contend that Nestor

 5   Almonte was not terminated, he in fact resigned his

 6   position, correct?

 7        A.    That's correct, that's what happened.

 8        Q.    At same point we have that Manuel

 9   Almonte had also filed, correct?

10        A.    Yes.  I see that.

11        Q.    Did you appear on behalf of the employer

12   here at 437 Morris Park for Manuel's case?

13        A.    No.

14        Q.    Why not?

15        A.    I don't always appear.

16        Q.    Do you know if anybody else appeared?

17        A.    I don't know.

18        Q.    Do you know if anybody else objected to

19   the collection of benefits under that name?

20        A.    I don't know.  I doubt it.

21        Q.    Why would you doubt it?

22        A.    Because I don't recall, and I would have

23   been the one, probably.

24        Q.    As far as you know, no one refuted the

25   unemployment benefits claim of Manuel Almonte from
```

[Page 232]

1                     CHANINA KLAHR

2  437 Morris Park and 1195 Sherman?

3      A.    We don't generally refute the

4  unemployment.  I don't dispute these things unless

5  I have some special reason to.  Generally we get

6  many of them and we don't dispute them.

7      Q.    You are, or the company is, and you are

8  appearing on behalf of 437 Morris Park and 1195

9  Sherman for Nestor Almonte, correct?

10      A.    Yes.

11      Q.    And your basis there is that he

12  resigned, to reiterate, correct?

13      A.    The basis was that we decided that -- it

14  had nothing to do with whether he resigned or

15  didn't resign.  He had -- I want to talk to my

16  lawyer.

17      Q.    Not while a question is pending.

18      A.    I don't have -- I have to bring up

19  another incident.

20           MR. WEINBERGER:  Objection.  Anyway,

21      it's irrelevant.

22           MR. VALLETTI:  It's not irrelevant.

23      He has to finish answering.

24      A.    The reason why we decided to dispute

25  this is because when he resigned we had a verbal

1                    CHANINA KLAHR

2    agreement with him, Mr. Tabak, myself, I'm not sure

3    if Abraham was there.  Several meetings with him.

4        Q.    Mr. Almonte?

5        A.    Yes.  And we had a verbal understanding

6    that he was to vacate the property by a certain

7    time frame.  He reneged on that, and it went to

8    court and dragged on, to housing court.  He called

9    the Fire Department on us and made all kind of

10   false claims on us while he was staying there, and

11   we all of a sudden learned it was not somebody that

12   was dealing diplomatically with us as he was long

13   before.

14       We had a nice relationship, and we didn't feel

15   that we should be nice to him.

16       Q.    The basis for you to refute his

17   unemployment insurance claim is because he wasn't

18   playing nice?

19       A.    It wasn't true.  It wasn't true.  He

20   didn't deserve it, and we decided to stand up to

21   it.

22       Q.    At this point there are two people

23   claiming benefits for a relevant time period in

24   this case.  I want to know what your explanation is

25   for allowing two people to claim benefits and not

[Page 234]

1                      CHANINA KLAHR

2    refute the earlier one, for clearly a relevant time

3    period during this case.

4        A.    Because it is not something that we

5    generally do.

6        Q.    Isn't this the same person?

7        A.    It didn't happen the same time.  To my

8    knowledge, I only know about this one.  This

9    whatever.  It didn't happen at the same time.

10       Q.    Aren't these the same people?  Your

11   testimony is that Manuel Almonte and Nestor Almonte

12   were the same person for a long period of time.

13       A.    Yes, but he didn't make the claim at the

14   same time.  This is not the same.  I believe he

15   made the claim a whole different time, months ahead

16   of this.

17       Q.    Would he make the claim for unemployment

18   insurance benefits while he was still employed?

19       A.    Possibly.  I don't know.  I'm not

20   familiar with this.  I don't deal with this.  I

21   don't know what it is.

22       Q.    I will show you what's been marked as

23   Plaintiff's Exhibit 22.  I will show it to your

24   lawyer first.

25       This is something that we haven't had in this

[Page 235]

1                    CHANINA KLAHR

2    case, but it is a public document.

3         A.    Okay.

4         Q.    Tell me when you are finished with that.

5         A.    Okay.  I'm finished.

6         Q.    Could you refresh my recollection as to

7    the dates.  What was your final date or month

8    employed with F&T Management?

9         A.    Early September 2014.

10        Q.    Do you know who Geraldo Caraballo is?

11        A.    I believe I do.  I'm not sure.  I

12   believe so.

13        Q.    Who do you know Geraldo Caraballo to be?

14        A.    A very short-term employee handyman of

15   1105 Sherman.

16        Q.    Had you given orders to Mr. Caraballo?

17        A.    Yes.  If it's the guy.  I'm not sure.  I

18   believe I know who the character is.  I'd have to

19   see a picture to be sure.

20        Q.    Do you know the nature of this

21   complaint?

22        A.    No.

23        Q.    You were in charge of payroll for 1195

24   Sherman, too, correct?

25        A.    Yes.

```
 1                    CHANINA KLAHR

 2       Q.    Do you have any reason to believe why

 3  Mr. Caraballo would institute a lawsuit against

 4  1195 Sherman for unpaid overtime?

 5             MR. WEINBERGER:  Objection.

 6       A.    No.  He's not owed any money.

 7       Q.    Nobody is owed any money from this

 8  company, correct?

 9       A.    We have never been found guilty of such

10  a thing, even though several people have tried.

11       Q.    Has there ever been a settlement?

12       A.    Possibly.

13       Q.    So the company has paid a settlement for

14  unpaid overtime?

15             MR. WEINBERGER:  Objection.

16       A.    On a marginal -- they agreed a minimal

17  settlement of less then $10,000, a laughing stock.

18       Q.    Would you like something to refresh your

19  recollection as to the amount?

20       A.    That's what I know of.  There may be

21  something I don't know of.

22       Q.    Maybe there is another one?

23       A.    Maybe.

24             MR. VALLETTI:  Mark this as 23.

25             (Whereupon, the above-referred to
```

[Page 237]

```
1                    CHANINA KLAHR

2              document was marked as Plaintiff's

3              Exhibit 23 for identification, as of

4              this date.)

5      Q.    Look at what's been marked as 23.  It's

6  also been marked as Finkelstein 4 for his

7  deposition.  Take a look.

8      Have you seen that document before?

9      A.    Yes.

10     Q.    You are familiar with it?

11     A.    Yes.

12     Q.    What do you know that document to be?

13     A.    A charge by Ernesto Hernandez.

14     Q.    What do you mean a charge?

15     A.    A claim.  A suit.  A lawsuit.

16     Q.    Could you read what that says on the top

17  right here?

18     A.    Settlement and agreement.

19     Q.    It is a settlement agreement?

20     A.    Yes.

21     Q.    It was brought by Ernesto Hernandez.  Do

22  you know why he brought that suit?

23     A.    Yes.  I'm very familiar with it.

24     Q.    Why did he bring that suit?

25     A.    Well, I don't know exactly what the
```

[Page 238]

1                    CHANINA KLAHR

2     claims were, but we established that his claims are

3     false.

4          Q.    Did you?

5          A.    Yes.

6          Q.    How?

7          A.    Video testimony.

8          Q.    So the company paid $11,000 in

9     settlement fees to a person whose claims were

10    false?

11         A.    Yes.  It was not worth the legal thing

12    of going through.  It was a decision that was made.

13    Yes.  We have video testimony of that, of Ernesto

14    Hernandez.

15         Q.    Who testified in that case?

16              MR. WEINBERGER:  If you know.  I will

17         object to the form.

18              If you know.

19         Q.    He says he has video testimony.  Who

20    testified?

21         A.    We obtained video.  I obtained video

22    testimony of a conversation with Ernesto Hernandez

23    and the superintendent of the building where he

24    admitted in the video, live video and recorded,

25    both, which was in Spanish, which was then

[Page 239]

```
 1                    CHANINA KLAHR

 2   translated, that he said things that was not what

 3   the suit said.  In other words, he contradicted the

 4   suit.

 5        Q.    Who recorded him?

 6              MR. WEINBERGER:  Objection.  What's

 7        the relevance?

 8        Q.    Willfulness.

 9        A.    I did.

10        Q.    Were you a party to that conversation?

11        A.    Yes, I was.

12              MR. WEINBERGER:  Objection.

13        Q.    Where did the conversation take place?

14        A.    In my building.

15        Q.    Who was party to that conversation?

16              MR. WEINBERGER:  Objection.  We are

17        not going to answer that anymore.

18        Q.    He said it was in Spanish.  Do you speak

19   Spanish?

20        A.    No.  That's why we gave it to the

21   translator, a company.

22              MR. WEINBERGER:  Objection.

23        Irrelevant to the case.

24              MR. VALLETTI:  I'm going to have to

25        say it's actually very relevant because it
```

```
 1                    CHANINA KLAHR

 2       shows willfulness that these same parties

 3       are repeatedly sued for failure to pay

 4       overtime, and you know as their attorney

 5       that they keep getting sued.

 6            MR. WEINBERGER:  I'll say this on the

 7       record.  You know one of them may settle for

 8       what you mentioned, if you want to go on the

 9       record we're going to go into this.  I don't

10       want to go into this.  If you want to ask

11       him about the other one that you talked

12       about, there may be some facts that come out

13       that will be not so great for you.  So if

14       you want to do it, it is all irrelevant.  We

15       are not going into other lawsuits and

16       settlements.  Some of them were part of

17       settlement and confidentiality.  I think

18       there's confidentiality in here as well.

19            MR. VALLETTI:  It's on ECF.

20            MR. WEINBERGER:  I understand that.

21       But we are not getting into the details of

22       it.  So this is irrelevant.  It doesn't go

23       to willfulness, and it's irrelevant.

24            MR. VALLETTI:  I think repetitive

25       behavior speaks to willfulness too, but
```

[Page 241]

```
 1                  CHANINA KLAHR

 2      that's the law.

 3           MR. WEINBERGER:  Good.  If you want to

 4      bring that up and any others up, I can't

 5      stop you, but it is irrelevant to this

 6      proceeding.

 7           MR. VALLETTI:  I don't really want

 8      your backhanded threat, that stuff is going

 9      to come up in that case which hurts mine,

10      but, hey, listen, let's play nice.

11           MR. WEINBERGER:  It's not a threat.

12      I'm just telling you a fact.  I can't get

13      into the other one you brought up.  If you

14      did, you would realize it was not

15      willfulness.  It was willfulness in other

16      ways but not on our side.

17           That is neither here nor there.  If

18      you want I will tell you off the record

19      about the other one attorney to attorney, if

20      you want to know.

21           MR. VALLETTI:  I think I am finished

22      with my questioning at this time.  So no

23      further questions.

24           (Whereupon, a discussion was held off

25           the record.)
```

[Page 242]

```
1                    CHANINA KLAHR

2         EXAMINATION BY STUART WEINBERGER, ESQ.

3              MR. WEINBERGER:  Mr. Klahr, did you

4         ever hire the son, Mr. Almonte, Manuel

5         Almonte, whatever you want to call him?  Did

6         you ever hire the son of the superintendent

7         at 437 Morris Park Avenue?

8         A.    No.

9         Q.    Was the son, who we now know as Manuel,

10   ever authorized to work at 437 Morris Park Avenue?

11        A.    No, and didn't work anywhere else, to my

12   knowledge.

13        Q.    Did he ever work at 1195 Sherman Avenue?

14        A.    No.

15        Q.    When was the first time that you heard

16   the phrase "shadow"?

17        A.    This case, in your office, at the

18   deposition of this case.

19        Q.    Was there any reason that you would have

20   hired Manuel Almonte in this case, the son?

21        A.    No.

22        Q.    Look at what's been marked as

23   Plaintiff's Exhibit 17.

24        A.    Okay.

25        Q.    Who were you loaning money to at that
```

1                     CHANINA KLAHR

2    time?

3       A.    The superintendent.  The dad.

4       Q.    What name was he using at the time?

5       A.    Manuel Almonte.

6       Q.    Plaintiff's Exhibit 11, take a look.

7       A.    Okay.

8       Q.    Who was being paid these moneys that's

9    reflected in Number 11?

10      A.    The superintendent.

11      Q.    Who was?

12      A.    Manuel Almonte, the dad.  We only had

13   one employee.

14      Q.    Did the son ever work for 437 Morris

15   Park?

16            MR. VALLETTI:  Objection.  Asked and

17       answered.

18      A.    No.

19      Q.    Did the son ever work for 1995 Sherman

20   Avenue?

21      A.    No.

22      Q.    When was the first time that you learned

23   that the son claimed to have worked in this

24   building?

25      A.    The lawsuit papers.

[Page 244]

1                    CHANINA KLAHR

2       Q.    When payments were made by 437 Morris

3    Park and 1195 Sherman Avenue, who were the payments

4    made to in this case for the work that was done?

5    Was it the son or the father?

6            MR. VALLETTI:  Objection.

7       A.    The father.  The son never worked for

8    us.

9            MR. WEINBERGER:  Nothing further.

10       Thank you.

11    FURTHER EXAMINATION BY ROBERT VALLETTI, ESQ.

12            MR. VALLETTI:  Just to clarify, when

13       you said that he asked the question when was

14       the first time that you heard the phrase

15       "shadow," you testified it was at a

16       deposition of this case.  Do you remember

17       which deposition?

18       A.    One of the early depositions was the

19    first time it was mentioned.  I was at all the

20    depositions in the Almonte case.

21       Q.    Do you remember which deposition in

22    particular?

23       A.    No.

24       Q.    Was there ever a conversation where you

25    told Nestor Almonte that his son would be his

[Page 245]

1                    CHANINA KLAHR

2    shadow?

3        A.    Never.

4        Q.    Regarding the loans, the deductions here

5    were made on the payroll records to Manuel Almonte,

6    correct?

7        A.    Yes.

8        Q.    The deductions also continued on the pay

9    stubs for Nestor Almonte, correct?

10       A.    When he switched over, yes.

11

12       (continued)

13

14

15

16

17

18

19

20

21

22

23

24

25

[Page 246]

1                    CHANINA KLAHR

2            MR. VALLETTI:  That's all I have.

3        Thank you.

4

5            (Whereupon, the examination of this

6        witness was concluded at 2:55 P.M).

7        *          *          *          *

8

9        I have read the foregoing record of my

10    testimony taken at the time and place noted in the

11    heading hereof and I do hereby acknowledge it to be

12    a true and correct transcript of same.

13

14

15                              _____

16                              CHANINA KLAHR

17

18    Subscribed and sworn to

19    before me this _____ day

20    of _____, 2015.

21

22    _____

23

24        NOTARY PUBLIC

25

[Page 247]

1                    CHANINA KLAHR

2

3                     I N D E X

4

5  EXAMINATION OF     BY              PAGE

6  Chanina Klahr     Mr. Valletti    110-241, 244-246

7                    Mr. Weinberger  241-244

8

9                   E X H I B I T S

10

11   PLAINTIFF'S        DESCRIPTION      PAGE

12   10                 Document         147

13   11                 Document         151

14   12                 Document         174

15   13-20              Documents        184

16   21                 Document         212

17   22                 Document         228

18   23                 Document         237

19

20   I N F O R M A T I O N  T O  B E  S U P P L I E D

21   PAGE               DESCRIPTION

22   118                Request application

23   142                Request employment acceptance

24                      form

25   (continued)

[Page 248]

1                    CHANINA KLAHR

2

3

4    159              Request pay stubs

5    178              Request notebook

6    195              Request evidence

7    210              Request pay documents

8    211              Request loan documents

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

[Page 249]

1           C E R T I F I C A T I O N

2

3        I, Kimberly Dean, a Notary Public of the State

4     of New York do hereby certify:

5        That the testimony in the within proceeding

6     was held before me at the aforesaid time and place.

7     That said witness was duly sworn before the

8     commencement of the testimony, and that the

9     testimony was taken stenographically by me, then

10    transcribed under my supervision, and that within

11    transcript is a true record of the testimony of

12    said witness.

13       I further certify that I am not related to any

14    of the parties to this action by blood or marriage,

15    that I am not interested directly or indirectly in

16    the matter in controversy, nor am I in the employ

17    of any of the counsel.

18       IN WITNESS WHEREOF, I have hereunto set my

19    hand this_____day of _____, 2015.

20

21

22

23       _____

24          KIMBERLY DEAN

25