# EXHIBIT H

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

------------------------------------x

NESTOR ALMONTE,

                Plaintiff,

                            Civil Action No.

      -against-           1:2014cv05951

437 MORRIS PARK, LC d/b/a F&T

MANAGEMENT CO., 1195 SHERMAN

AVE LLC, SHERMAN MANAGEMENT

ASSOCIATES LLC, CHANINA KLAHR,

KALMAN TABAK and ABRAHAM

FINKELSTEIN,

                Defendants.

------------------------------------x

                February 27, 2015

                10:55 a.m.


    Deposition of ABRAHAM FINKELSTEIN, taken by
Plaintiff, pursuant to notice dated December 30,
2014, at the offices of Goldberg & Weinberger,
630 Third Avenue, New York, New York, before
SUZANNE PASTOR, a Shorthand Reporter and Notary
Public within and for the State of New York.

```
 1   A P P E A R A N C E S:

 2       VALLI KANE & VAGNINI, LLP
         Attorneys for Plaintiff
 3               600 Old Country Road, Suite 519
                 Garden City, New York 11530
 4
         BY:     ROBERT P. VALLETTI  ESQ.
 5               516.203.7180
                 rpv@vkvlasers.com
 6
 7       GOLDBERG & WEINBERGER, LLP
         Attorneys for Defendants
 8               630 Third Avenue, 18th Floor
                 New York, New York 11017
 9
         BY:     STUART WEINBERGER, ESQ.
10               212.986.8999
11
12
13
14    ALSO PRESENT:
15       CHANINA KLAHR
16
17
18
19
20
21
22
23
24
25
```

1              ABRAHAM FINKELSTEIN,

2    residing at 406 Avenue F, Brooklyn, New York

3    11209, having been first duly affirmed by the

4    Notary Public (Suzanne Pastor), was examined and

5    testified as follows:

6    EXAMINATION BY

7    MR. VALLETTI:

8         Q.    Good morning, Mr. Finkelstein.

9         A.    Good morning.

10        Q.    My name is Robert Valletti.  I'm

11   with the firm of Valli Kane & Vagnini; I

12   represent the plaintiff in this case, Nestor

13   Almonte.

14             Today I'm going to ask you a series

15   of questions.  If you don't understand, please

16   let me know, I'll be happy to rephrase the

17   question and ask it a different way so that you

18   do understand it.  If you answer it, I'll assume

19   you understood, as we all will.

20             Also, please keep your answers

21   verbal.  As you see, we have a court reporter

22   here today; she cannot take down nonverbal

23   gestures.  Do you understand?

24        A.    Okay.

25        Q.    Also, please let me finish my

1  questions and then you may give an answer.

2  Let's not have two people talking at one time,

3  because as talented as Ms. Pastor may be, she

4  cannot record two people talking at the same

5  time.  If you do not finish your answer, let me

6  know, I will let you finish.

7                Also, if you need a break at any

8  time, that's fine.  Please answer my pending

9  question before taking a break.  Do you

10 understand?

11      A.      Yes.

12      Q.      Have you given deposition testimony

13 before?

14      A.      Yes.  Once.

15      Q.      When was that?

16      A.      Two days ago.

17      Q.      What was the nature of the

18 deposition testimony?  What was it for?

19      A.      For a car accident.

20      Q.      Are you a party to that suit?

21      A.      Am I a party?  I guess so.

22      Q.      Plaintiff or defendant?

23      A.      Defendant.

24      Q.      Are you currently taking any

25 medications?

```
 1        A.     No.

 2        Q.     Is there any reason that you would

 3   not be able to tell the truth here today?

 4        A.     No.

 5        Q.     Can you state your current address

 6   for the record, please.

 7        A.     406 Avenue F, Brooklyn, New York

 8   11209.

 9        Q.     Is that a business address or a

10   residence?

11        A.     Residence.

12        Q.     A home or an apartment?

13        A.     Home.

14        Q.     How long have you lived there?

15        A.     20-some-odd years.

16        Q.     Did you prepare for today's

17   deposition?

18        A.     Somewhat.

19        Q.     Other than your attorney, did you

20   speak to anyone about the deposition testimony

21   you're giving today?

22        A.     To Mr. Klahr and Mr. -- possibly

23   Mr. Tabak.

24        Q.     When you say Clark, do you mean

25   Charlie Clark, also known as Chanina Klahr?
```

```
 1        A.    Yes.

 2        Q.    And Mr. Tabak is Kalman Tabak?

 3        A.    Correct.

 4        Q.    When did you speak to them about

 5   this case?

 6        A.    Today, yesterday, maybe the day

 7   before, maybe the day before that.

 8        Q.    What was the sum and substance of

 9   the conversation?

10        A.    Excuse me?

11        Q.    What was the sum and substance of

12   the conversation?

13        A.    I don't know.

14        Q.    You don't know?  What did you talk

15   to them about in regards to this case?

16        A.    I don't know.

17        Q.    Did you talk to him about the

18   plaintiff Nestor Almonte?

19        A.    Probably.

20        Q.    Was that a yes or no?

21        A.    It was a "probably."

22        Q.    Did you mention plaintiff's name,

23   Nestor Almonte?

24              MR. WEINBERGER:  Just answer.

25        A.    No, not Nestor Almonte.  He has
```

 1   another name.  Lopez.

 2        Q.    So did you mention Lopez?

 3        A.    Lopez, yes.

 4        Q.    What did you talk about when you

 5   spoke about Lopez?

 6        A.    What did we talk about when we were

 7   talking about Lopez.  What did we talk about

 8   when we talked about Lopez.  I don't know.

 9        Q.    You said you spoke to Mr. Klahr,

10   correct?

11        A.    Spoke to Mr. Klahr, yes.

12        Q.    Did you talk to him about his

13   deposition testimony yesterday?

14        A.    I talked to him about his

15   deposition testimony yesterday?  Probably.

16   Yes -- no, that's a yes.

17        Q.    What did you talk about?

18        A.    Don't recall.

19        Q.    When did that conversation happen?

20        A.    This morning.

21        Q.    You don't recall what you spoke

22   about this morning?

23        A.    Correct.

24        Q.    I'm going to remind you that you're

25   under oath today.

1          A.      Okay.

2          Q.      Did you review any documents in

3     preparation for this deposition?

4          A.      No.

5          Q.      You said you spoke to Mr. Tabak as

6     well.  What did you and Mr. Tabak discuss?

7          A.      Don't recall.

8          Q.      And that conversation took place

9     this morning?

10         A.      No.  Yesterday.  Or two days ago.

11    Don't remember.

12         Q.      Did you speak to Mr. Tabak about

13    his testimony that he gave yesterday?

14         A.      Did I speak to Mr. Tabak about the

15    testimony that he gave yesterday.  Don't

16    remember.

17                 MR. WEINBERGER:  Can we take a

18    break for one second?  Just take a break, calm

19    down.

20         A.      No, he's asking me a question.  I

21    don't remember.

22                 MR. WEINBERGER:  Give me one

23    second.

24                 (Counsel and the witness confer

25    outside the deposition room.)

```
 1        Q.      What's your highest level of
 2   education?
 3        A.      I went to 12th grade and then I sat
 4   in Yeshiva until I was 31.
 5        Q.      Do you have any degrees?
 6        A.      No.  High school diploma.
 7        Q.      Are you currently employed?
 8        A.      Self employed.
 9        Q.      What's the name of your business?
10   Or businesses.
11        A.      What's the name of my business.
12   437 Morris Park, LLC, 1101 Manor LLC, 1056
13   Boynton Avenue, LLC.  What else do we have.
14   1011 Walton LLC, 845 Walton LLC, 855 Tremont
15   LLC.  What else do I have.  New Hope Fund LLC,
16   1195 Sherman Avenue LLC.  I don't know.  Do I
17   have anything else?
18               MR. WEINBERGER:  I can't answer
19   that.
20        A.      I can't recall anything else.  Oh,
21   495 Walton LLC.
22        Q.      What was that last one?
23        A.      4995 Walton Avenue, LLC.  Timpson
24   Place -- I don't know, what's Timpson Place
25   called?
```

1                MR. WEINBERGER:  Close enough.

2        A.      Timpson Place LLC.

3        Q.      What is your position with these

4    companies?  Does it vary or is it the same?

5        A.      Same.

6        Q.      What is the position?

7        A.      Owner.  Owner.  Part owner.

8    Partner, that would be correct.

9        Q.      With respect to 437 Morris Park,

10   are there other owners or partners?

11       A.      Me and Kalman Tabak.

12       Q.      He's also an owner?

13       A.      Partner, yeah.

14       Q.      And with respect to 1195 Sherman,

15   are there any other officers or owners or things

16   of that nature?

17       A.      Don't remember.

18       Q.      Your position with 1195 Sherman is

19   the owner?

20       A.      I think I'm the -- I think I'm the

21   owner.  I think.  Not the building.  Not the

22   building, just 1195 Sherman --

23       Q.      Of the company you're saying.

24       A.      Because that's really -- the

25   owner -- we lease the building from somebody

1   else.  So we're just running an operation over

2   there.

3          Q.     Who do you lease it from?

4          A.     From the Gutfreunds.

5          Q.     Is that a company?

6          A.     It's the name of the people.

7          Q.     I don't understand, can you explain

8   that?  What is "good friends," the name of the

9   people?

10                 MR. WEINBERGER:  It's Gutfreund.

11  It's a last name.  I actually know who they are.

12  It's a last name of somebody.  Don't ask me to

13  spell it.

14                 MR. VALLETTI:  I would think

15  F-R-U-E-N-D.

16                 MR. WEINBERGER:  No, it's something

17  else.

18         A.     G-U-T-F-R-U-I-N-D, I don't know.

19         Q.     That's the name of a person you

20  said, correct?

21         A.     That's the name of the person, yes.

22         Q.     He's the owner of the building at

23  1195 Sherman?

24         A.     Correct.

25         Q.     How long have you owned 437 Morris

1    Park or been an owner or partner?

2         A.    I don't know, since we bought it.

3         Q.    When did you buy it?

4         A.    '95, '96, '97.  I don't know.  '94

5    maybe.

6         Q.    Have you always been that position

7    or were you once something different?

8         A.    Always that position.

9         Q.    How about 1195, when did you become

10   the owner of the company 1195 LLC?

11        A.    When we started it.

12        Q.    When was that?

13        A.    Beats me.

14        Q.    Do you remember a year?  It doesn't

15   have to be a specific date.

16        A.    No.  Must be in, I don't know,

17   2005, '6, '7.  Whenever it was started.

18        Q.    As owner of 437 Morris Park, what

19   responsibilities do you have?

20        A.    None.

21        Q.    Are you responsible for any of the

22   day-to-day operations of the building?

23        A.    No.

24        Q.    Who is?

25        A.    Mr. Klahr.

Q. Currently?

A. Currently Mr. Ehrman.

Q. Herman?

A. Ehrman.

Q. Do you know how to spell that name?

A. E-H-R-M-A-N.

Q. For the time period of 2011 to 2013, who was responsible for the operation of 437 Morris Park?

A. Mr. Klahr.

Q. In being responsible for the day-to-day activities, what were his responsibilities?

A. I don't know. Make sure the operation ran. Take care of complaints I guess. Yeah, I guess, you know, just to make sure that the building ran smoothly.

Q. You said take complaints. What do you mean --

A. Take care of complaints. Get complaints taken care of. Get complaints resolved.

Q. What kind of complaints?

A. I don't know.

Q. Did you hire Mr. Klahr?

1       A.      Yes.

2       Q.      When did you hire him?

3       A.      Wouldn't know.  '5, '6, '7.  '5 or

4    '6.  Sounds about right.  '5, '6, '7.

5       Q.      2005, '6, '7 or five, six or seven

6    years ago?

7       A.      No.  2004, '5, '6.  I really don't

8    know.

9       Q.      When you hired him, what position

10   did you hire him for?

11      A.      Take care of complaints.

12      Q.      Was that his title?  The "take care

13   of complaints guy"?

14      A.      Right.  You didn't see his business

15   card?

16      Q.      Do you have a copy of his business

17   card?

18      A.      No.  I was thinking maybe you have

19   one.  No.

20      Q.      As the "take care of complaints

21   guy," did he have another title?  Perhaps

22   manager?

23      A.      Did he have a title?

24      Q.      Is he a site manager, site

25   supervisor, something else?

1        A.      Yeah, you wanna call him a site

2    manager, call him a site manager.  Sounds like a

3    nice title.  In effect is that what he did?  I

4    don't know, is he a site manager?  Is site

5    manager the right thing?  I don't know.  How

6    would you call him?  I don't know.  He was

7    titleless.  How about that.

8        Q.      We'll call him a site manager for

9    now, all right?

10       A.      Okay.

11       Q.      So when you hired him, did you make

12   him the site manager for one building, several

13   buildings?

14       A.      Several buildings.

15       Q.      What buildings did you make him the

16   site manager for?

17              MR. WEINBERGER:  Well, object to

18   the form.  But if you can answer, go ahead.

19       A.      Should I answer?  437 Morris Park,

20   1101 Manor, 1056 Boynton, 1195 Sherman, 1011

21   Walton and 855 East Tremont.  That's what he was

22   hired for.

23       Q.      To your knowledge, is Mr. Clark

24   still employed with the company?

25       A.      No.  Today, no.

 1      Q.      When did his employment end?

 2      A.      I think like in June.

 3      Q.      What year?

 4      A.      2014.

 5      Q.      For the periods that you hired him,

 6   did he maintain all five of those buildings?

 7      A.      Excuse me one second.

 8              (Telephone interruption.)

 9      A.      Yes, okay, I'm ready to continue on

10   our merry way.

11      Q.      Mr. Finkelstein, I'll ask you to

12   not field any more phone calls during our

13   deposition, please.

14      A.      Okay.

15      Q.      Are you taking this deposition

16   seriously?

17      A.      Very.

18      Q.      Are you sure?

19      A.      Does it look like it?

20      Q.      No.

21      A.      Well, what do you want me to do?

22      Q.      It's up to you.

23              Okay, so where were we.  Charlie

24   Klahr is no longer employed with the company as

25   of June 2014.  So from the time he was hired

 1    until the time he ended his employment as a site

 2    manager for these buildings, six buildings, did

 3    he maintain those six buildings throughout the

 4    entire time?

 5         A.    No, he stopped on 1011 Walton and

 6    855 East Tremont went off the list some years

 7    ago.  I don't remember when.

 8         Q.    Was that your decision, that he no

 9    longer be the site manager for those two

10    buildings?

11         A.    No.  It just worked out like that.

12         Q.    What was the reason?

13         A.    Because they went off -- because we

14    consolidated some buildings on a contract

15    with -- on our contract with Aguilar.

16         Q.    Who is Aguilar?

17         A.    Aguilar is the people who we have a

18    contract with to -- how do I explain what

19    Aguilar is?

20              MR. WEINBERGER:  Try the best you

21    can.

22         A.    We have a contract with the city to

23    provide apartments.  And Aguilar is the

24    not-for-profit who does that.

25         Q.    When you say you have a contract

1    with the city --

2           A.     No, we don't have a contract.

3    Aguilar has a contract with the city and Aguilar

4    rents the apartments from us.  How about that.

5           Q.     So you don't have a direct contract

6    with the city?

7           A.     No.

8           Q.     Aguilar has the contract with the

9    city and that contract says to provide

10   apartments?

11          A.     Provide apartments and maintain

12   them.

13          Q.     Who are they providing apartments

14   to?

15          A.     Homeless people.  Clients.

16   Homeless clients.

17          Q.     Does the city pay Aguilar?

18          A.     Yes.

19          Q.     Does Aguilar pay any of the

20   companies that you had mentioned before for

21   these services?

22          A.     Does Aguilar pay?  Yes.  New Hope

23   Fund LLC.

24          Q.     You said before that you're an

25   owner or partner of New Hope Fund LLC, correct?

1        A.      Correct.

2        Q.      From New Hope Fund, I'm saying from

3   that point what does New Hope Fund do with the

4   money they receive from Aguilar for providing

5   these services for the homeless?

6        A.      They pay the rent to the buildings

7   and provide the maintenance.

8        Q.      When you say they provide the

9   maintenance, do they provide a staff of people

10  to do that?

11       A.      Do they provide a staff.  Actually,

12  do they provide a staff.  The only one paid on

13  the New Hope Fund is Charlie.  Otherwise

14  everybody else gets paid from the buildings

15  directly.

16       Q.      "Charlie" meaning Charlie Clark?

17       A.      Yes.

18       Q.      Does Charlie Clark still receive

19  monies from New Hope Fund LLC?

20       A.      Is he still receiving monies from

21  them?  Yes.

22       Q.      What for?

23       A.      I don't know.  Compensation,

24  termination.

25       Q.      You pay him compensation for

1    termination?

2         A.    Yeah, I guess so.

3         Q.    He was terminated?

4         A.    I don't know.  Whatever.  He

5    stopped working and that was the deal we worked

6    out.

7         Q.    How did he stop working?  Did he

8    quit?

9         A.    Did he quit?  I don't know.  It was

10   a mutual understanding.  Nobody quit, nobody was

11   fired.  It was just a mutual understanding that

12   he left and he was going to try other endeavors.

13        Q.    So it was a mutual split?

14        A.    Yup.

15        Q.    And the purpose that he gave you

16   for that mutual split was to start another

17   company or engage in some other endeavor.

18        A.    Right.

19        Q.    And that occurred in June of 2014,

20   approximately?

21        A.    Yeah.  We said he would keep on

22   giving him his salary for six months so he could

23   get his new business started.

24        Q.    Is that a written agreement?

25        A.    No.

1    Q.    So it was verbally done.

2    A.    Yup.

3    Q.    For the time period of 2011 to 2013

4    did this arrangement between New York City,

5    Aguilar -- did the arrangement between New York

6    City and Aguilar exist as it does today?

7    A.    Yes.

8    Q.    And did the arrangement between

9    Aguilar and New Hope Fund in 2011 to 2013, did

10   it exist as it does today?

11   A.    Yes.

12   Q.    When you said before that New Hope

13   Fund pays rent to the buildings, what did you

14   mean by paying rent to the buildings?

15   A.    Whatever.  For the apartments.

16   Q.    New Hope Fund pays for the

17   apartments that are provided to the homeless?

18   A.    Yes.

19   Q.    And they pay to the other LLCs

20   directly?

21   A.    I'm sorry, one more time.

22   Q.    New Hope Fund pays funds to the

23   buildings directly for the apartments that are

24   provided to these homeless tenants or clients?

25   A.    Mm-hmm.

```
 1        Q.      Can you verbalize that?

 2        A.      Yes.

 3        Q.      From there, once the money reaches

 4   these individual LLCs, what does that money go

 5   towards?

 6        A.      Maintaining the building.

 7        Q.      When you say "maintaining the

 8   buildings," do you mean it pays the wages of

 9   workers who maintain the buildings?

10        A.      Also.

11        Q.      What else does that include?

12        A.      What else does what include?

13        Q.      What else does the money go towards

14   besides paying the wages of the employees that

15   are responsible for maintaining the building?

16        A.      I don't know, whatever expenses the

17   building incurs.

18        Q.      So expenses and wages.

19        A.      Mm-hmm.

20        Q.      The money from New Hope Fund, we'll

21   take 437 Morris Park as the example, the money

22   comes in from New Hope Fund to 437 Morris Park

23   and Morris Park is responsible for paying the

24   wages of the employees and the expenses that are

25   incurred for the building?
```

1          A.      Correct.

2          Q.      And that arrangement existed from

3    2011 to 2013?

4          A.      Correct.

5          Q.      With respect to New Hope Fund, who

6    are the signatories of that LLC?

7                  MR. WEINBERGER:  Do you understand

8    the question?

9          A.      Who are the signatories to New Hope

10   Fund LLC?  It's me and Mr. Tabak and possibly

11   Mark.  Me and Mr. Tabak and possibly Mr. Ehrman.

12         Q.      Ehrman is the same Ehrman you

13   mentioned before?

14         A.      Correct.

15         Q.      He's the one that's currently

16   responsible for maintaining 437 Morris Park?

17         A.      Correct.

18         Q.      You personally sign checks that

19   were paying funds from New Hope Fund to 437

20   Morris Park?

21         A.      Yes.

22         Q.      And that was from the time period

23   of 2011 to 2013 that is also true?

24         A.      Yes.

25         Q.      During that time period from 2011

 1   to 2013, you also signed checks from New Hope

 2   Fund LLC to 1195 Sherman?

 3        A.    Correct.

 4        Q.    And the money that came from New

 5   Hope Fund LLC to 1195 Sherman, that was also use

 6   for the maintenance and the wages of workers

 7   responsible for maintaining the building?

 8        A.    Correct.

 9        Q.    And you personally signed those

10   checks from New Hope Fund to 1195 LLC?

11        A.    Actually it was wired, but yes, it

12   was money transferred.

13        Q.    It was done electronically?

14        A.    Yes.  But I did it, yes.

15        Q.    So as an owner of New Hope Fund LLC

16   and also -- as owners or partners of 437 Morris

17   Park and 1195 Sherman, you are responsible for

18   transfer of funds between the companies.

19        A.    Correct.

20        Q.    And that was true for the time

21   period of 2011 to 2013?

22        A.    Correct.

23        Q.    Do you maintain any positions with

24   the company that you mentioned before, Aguilar?

25        A.    No.

 1        Q.    Do you know who the owners are of

 2   that company?

 3        A.    It's a not-for-profit organization.

 4   No, I don't know who -- no, I don't know who the

 5   people are.  I mean I think I've met them.  I

 6   probably met them but I don't recall their names

 7   or their positions.

 8        Q.    So it's accurate to state that the

 9   money that pays the wages to the workers at both

10   437 and 1195, those monies were controlled by

11   you, Mr. Tabak and Mr. Ehrman?

12        A.    No, I think -- they were

13   controlled?  What do you mean "controlled"?  No.

14        Q.    You had the authority to disburse

15   wages -- let's do this piecemeal -- first from

16   New Hope Fund to 437 Morris Park.

17        A.    Listen here.  I was told what kind

18   of monies were needed in Morris Park, and that's

19   the monies that I put in.  I just made sure that

20   the accounts were all covered.  So if you want

21   to call me the responsible party, yes, I'm the

22   responsible party.

23        Q.    When you say "I was told," who told

24   you what monies were needed to be paid?

25        A.    Charlie.

1        Q.      Was that true for 437 Morris Park?

2        A.      Yes.

3        Q.      Was that true for 1195 Sherman?

4        A.      Yes.

5        Q.      And that's during the time period

6    2011 to 2013?

7        A.      Yes.

8        Q.      Were you aware of how many

9    employees were at 437 Morris Park?  Let's talk

10   just 2011 first.

11       A.      No.

12       Q.      Are you ever aware of the number of

13   employees that are at one of the buildings?

14       A.      No.

15       Q.      So when you're wiring the monies

16   electronically, it's all based on the word of

17   Charlie Clark.

18       A.      Correct.

19       Q.      And we'll speak to the time period

20   of 2011 to 2013.

21       A.      Correct.

22       Q.      Do you review any documents to make

23   sure that the money you're wiring was the right

24   amount?

25       A.      What does that mean?

1       Q.    Were there any documents you

2   reviewed prior to wiring the money to ensure

3   that that was the amount that was needed?

4       A.    No.

5       Q.    It was just the word of mouth?

6       A.    Word or text.

7       Q.    Word or text.  And that was texting

8   all throughout 2011 to 2013.  That's what we're

9   focussing on.

10      A.    Yes.

11      Q.    That was done by either word of

12   mouth or texts.

13      A.    Yup.  Yes.

14            MR. VALLETTI:  At this point I'll

15   make a demand for the text messages regarding

16   the payments that were made --

17      A.    No, no.

18            MR. VALLETTI:  This is between Stu

19   and I.

20            THE WITNESS:  This is all that

21   there is on this phone.  So there's no records

22   of any text.

23            MR. WEINBERGER:  Okay, so he just

24   said that.  So make a demand but he just told

25   you there aren't any.

1       A.      You want to subpoena all my texts

2   from T Mobile?

3               MR. WEINBERGER:  I understand.  We

4   don't have it, we don't have it.  So he said

5   they don't exist.

6       A.      Let's clarify this now.  So you'll

7   see exactly what I'm talking about so that

8   before you get cranky, here.

9               MR. WEINBERGER:  He can't see.

10  You'll have to go off the record.

11              THE WITNESS:  It's off the record.

12              MR. WEINBERGER:  Then go off the

13  record.

14              MR. VALLETTI:  We're off the

15  record.

16              (Discussion off the record.)

17      Q.      Let's talk about the manner in

18  which you did this.  When you were told to wire

19  these funds, you just go to your bank and tell

20  them send this money to company X?

21      A.      No, no, I did it online.

22      Q.      So you do it yourself.  And you're

23  transferring these funds from one account to

24  another.

25      A.      Right.

1      Q.      So what bank did you use?

2      A.      Chase.

3      Q.      And is the account in your name or

4   in the name of the company?

5      A.      No, it's the name of the company.

6      Q.      So it's in New Hope Fund's name?

7      A.      Yes.

8      Q.      Other than what you've shown me as

9   labeled expenses or -- I didn't know what else

10  you showed me in the text messages --

11     A.      Whatever.

12     Q.      We'll work off of what I know, at

13  least what I've seen from that text messages.

14  So monies were transferred without you knowing

15  exactly what they're for?

16     A.      Without me having the foggiest idea

17  what they're for.

18     Q.      So you're just blindly sending

19  money from one company to another.

20     A.      That's right.

21     Q.      And the only records that would be

22  there are from your bank.

23     A.      Correct.  I mean, then they would

24  be in the statement when they send out the

25  checks.  At the end of the day it all had to

1   make sense.

2          Q.     So did you verify that the amounts

3   you were sending to these companies were the

4   amount of the expenses paid and the wages of the

5   employees?

6          A.     Well, the expenses came out -- the

7   expenses came out on ACHs and the wages I

8   believe also came out on direct deposits.  So it

9   basically just all came up on my bank statement.

10  And all the vendors that were paid were paid

11  with ACHs if possible, I'd say as much as

12  possible, and the workers were paid by direct

13  deposit.  So they took out all the workers'

14  money in one -- there would be like on the bank

15  statement it would say direct deposit, $400 or

16  $800, taxes, whatever, another 200.  And the

17  payroll company took out their little fee for

18  processing it.  And that's it and life was good.

19         Q.     What's an ACH?

20         A.     A wire.  It's basically a wire that

21  you can send money to -- a wire to send money to

22  somebody else that goes overnight.  What's an

23  ACH?  Automatic --

24         Q.     Your explanation is fine.  I don't

25  need the actual acronym.  But that's how you

1   paid your vendors?

2          A.     That's how basically all the money

3   left the company.  It was very uncomplicated.

4   There wasn't really much room for screw-ups.

5          Q.     And you said the workers were paid

6   by direct deposits, correct?

7          A.     Yes.

8          Q.     All workers had direct deposits?

9          A.     I don't know, they were all

10  supposed to have it as much as possible.

11  Sometimes for some reason it wasn't, it was a

12  check.  But 90 percent of it should have been

13  direct deposit.

14         Q.     90 percent direct deposit?

15         A.     I would assume, yeah.  Probably.

16  Change that.  As much as possible.

17         Q.     Just as much as possible, okay.

18         A.     90 percent is probably correct.

19         Q.     You said two numbers before when

20  you were talking about the wages.  400 and 800.

21         A.     That was just an example.  It could

22  be 4,000 or 400 or 4 -- I mean, $400 was just a

23  plain number I picked out of my hat without

24  any...

25                 MR. VALLETTI:  Can I have these

1   marked, please.

2              (Finkelstein Exhibit 1 for

3   identification, 00330 through 00332)

4        Q.    Just so the record is clear,

5   Finkelstein 1 is a three-page document of

6   employee detail earnings in the name of Manuel

7   Agusto Almonte.  And they are defendants' Bates

8   numbered 330 through 332 inclusive.

9              Can you take a look at this

10  document.

11       A.    Yes.

12       Q.    Let me know when you're finished

13  looking at that document.

14       A.    Okay.

15       Q.    Have you ever seen that document

16  before?

17       A.    No.

18       Q.    Do you know what that document is?

19       A.    Something about payroll.  I would

20  assume.

21       Q.    On the bottom it says "employee

22  detail earnings."  Do you see that?

23       A.    Okay.

24       Q.    Can you do me a favor and read out

25  loud the amounts in bold in the middle column

1    for all three pages.

2          A.     850, 800, 800, 2077.37, 800, 800.

3    800, 800, 400, 400, 400, 400, 400.  400, 400,

4    400.  How many times do I say that?

5                MR. WEINBERGER:  Objection.  What's

6    the relevance of this?

7          Q.     So when you said 40 and 800 before,

8    you were talking about wages?

9          A.     It had nothing to do with that

10   number there.

11         Q.     By the way, did you notice the name

12   that was -- for the employee here?

13         A.     Almonte Manuel Agusto.

14         Q.     So when you were wiring the money

15   to, let's take New Hope Fund LLC, to 437 Morris

16   Park, was it a lump sum, was it in various sums?

17   How was it handled?

18         A.     Lump sum.

19         Q.     And once it reached 437 Morris

20   Park, we'll take that as the example, what

21   happened after that?  Do you know?

22         A.     Charlie distributed it according to

23   whatever needed to be done.

24         Q.     He distributed it by payroll

25   records, by employees?  Do you know anything

1    about that process?

2          A.     I don't know, he paid his workers

3    and he paid his bills.

4          Q.     When he paid his workers, how did

5    he pay his workers?

6          A.     I'm assuming that most of them were

7    supposed to get paid with direct deposits.  And

8    so whoever didn't get paid direct deposits got

9    paid with a check.

10         Q.     Do you know how their pay

11   structures were set up, whether they were

12   salary, hourly, something else?

13         A.     No idea.

14         Q.     Do you have any knowledge as to how

15   the employees in 437 Morris Park were paid?

16         A.     What's your question?

17         Q.     I'll rephrase it for you.  In 43

18   Morris Park, were employees paid by salary?

19                MR. WEINBERGER:  Do you know --

20   okay, can you answer?

21         A.     Were they paid in salary?  I have

22   no idea.  I mean, whatever -- however they were

23   paid.  What the deal was with the workers I

24   don't know.

25         Q.     So after you're just sending the

 1   money, it's out of your hands, you have no idea

 2   where it goes after that.

 3        A.    Correct.

 4        Q.    And you're the owner of 437 Morris

 5   Park.

 6        A.    I'm the boss.  Can you put that in

 7   big, bold letters?

 8        Q.    So from New Hope Fund to 437 Morris

 9   Park the funds go and after that you wash your

10   hands of that money.

11        A.    I don't wash nothing.  I don't

12   care.  Listen, I'm assuming that Mr. Charlie did

13   exactly what he was supposed to do with it.  And

14   that's it.

15        Q.    Did you assume Charlie did all the

16   right things with your money?

17              MR. WEINBERGER:  Objection as to

18   form.  But all right.

19        A.    100 percent.

20        Q.    But you don't know because once you

21   transferred it --

22        A.    No, I know.  I know because I trust

23   him.

24        Q.    So you know for sure.

25        A.    I know for sure that I trust him so

 1    trustfully that I have no question that he did

 2    exactly what he was supposed to do with that

 3    money.

 4         Q.    But you said after you wired the

 5    money to 437 you don't know what happened to it.

 6         A.    I don't know what happened to it.

 7    I trust Charlie 100 percent that he did exactly

 8    what he was supposed to do with that money.

 9         Q.    What about for 1195, once the money

10    was transferred to 1195 Sherman Avenue LLC, same

11    story, correct?

12         A.    Absolutely.

13         Q.    So after you transferred it, that's

14    all you did, you didn't look at it again, you

15    just assumed Charlie did whatever he had to do.

16         A.    Exactly, absolutely.  How many more

17    different ways could I say it that it should be

18    very explicit?

19         Q.    You should have seen how many times

20    Stu asked my client the same question.

21         A.    No, I'm saying --

22         Q.    Withdrawn.  That wasn't a question.

23         A.    Basically hands off people.  You

24    take someone to do the job, just do what you're

25    supposed to do and don't bother me, that's all.

1    Then I go feed my kids breakfast.  Put that on,

2    that's on the record.  Let me feed my kids

3    breakfast, let me drive my kids to school.

4         Q.    How old are your kids?

5         A.    How old are my kids.

6               MR. WEINBERGER:  Objection.  What's

7    the relevance?

8         A.    Why?  I'm proud of that.

9               MR. WEINBERGER:  Okay.

10        A.    Let's put this on the record.  My

11   oldest kid is -- ooh, I don't even know.  She

12   was born in '89 I think.

13        Q.    25.

14        A.    25, okay, so my oldest one is 25.

15   She has two kids.  My next one is -- no, it

16   can't be.  My next one is 25.  Must be 26.

17        Q.    26.

18        A.    Next one is 25.  Next one is 24,

19   next one is 23, next one is 21.  Sounds good.

20   Next one is 19 or 18.  Next one is 15, next one

21   is 14, next one is -- I forgot.  10.  And the

22   next one is 3.

23        Q.    What's your date of birth?

24        A.    11/11/62.

25        Q.    Could you provide me with your

1    social, and we'll only put the last four on the

2    record.

3                    MR. WEINBERGER:  Why?  Objection.

4                    MR. VALLETTI:  We're entitled to.

5                    MR. WEINBERGER:  I don't think

6    you're entitled to the Social Security number.

7    In fact, New York State doesn't allow you to

8    disclose anything anymore.

9                    MR. VALLETTI:  Is it New York State

10   or federal?  It's up to you.  I'll only put the

11   last four on the record.

12                   MR. WEINBERGER:  Send me a demand.

13   I don't want to put it on the record.

14                   MR. VALLETTI:  We can go completely

15   off the record and you can provide it to me and

16   we don't have it on the record at all.

17                   MR. WEINBERGER:  Why don't you just

18   send me a letter and we'll deal with it.  I

19   don't want it on the record what his Social

20   Security number is.

21                   MR. VALLETTI:  All right, I'll put

22   it in writing for you.

23        A.    Can you find something else to

24   argue about?

25        Q.    Sure.

 1        A.        So how many kids do you have?

 2                  MR. WEINBERGER:  You can't ask him

 3    that.

 4        A.        One second, that's not fair.

 5        Q.        We'll talk after.

 6                  How many kids in total do you have?

 7        A.        Ten.  So you're not going to tell

 8    me how many kids you have.

 9                  MR. WEINBERGER:  Not now.

10        Q.        Zero.

11        A.        Oh, okay.

12        Q.        If any of your kids worked, would

13    you want them to get paid for their work?

14        A.        If any of my kids worked would I

15    want them to get paid for work?  Probably.

16        Q.        What if they didn't get paid.

17    You'd get upset, right?

18        A.        No.

19        Q.        You wouldn't get upset if somebody

20    didn't pay your kids the money they're owed?

21        A.        No.  I mean, you asked me, I'm

22    answering you.

23        Q.        You can answer to the best of your

24    ability.  That's all good.

25                  So earlier we had referenced Manuel

 1    Agusto Almonte.  Do you know who that is?

 2         A.    I'm assuming that's Lopez.  That's

 3    the super, right?

 4         Q.    What do you mean by "the super"?

 5         A.    What do I mean by the super?  The

 6    super who's supposed to be the super of the

 7    building, that's responsible for, I don't

 8    know -- I don't know, the on-site guy that's

 9    responsible to take care of problems with the

10    building.

11         Q.    What building are you talking

12    about?

13         A.    I'm assuming 437.

14         Q.    And you said another name that was

15    Lopez, I think we discussed earlier.  That's

16    Nestor Lopez?

17         A.    I don't know anybody's name.  I

18    don't know why you're asking me.  The only thing

19    is this name Almonte, sometimes I saw it on the

20    bank statements when the checks came up.  And

21    Kalman told me that his name is Lopez.  I'm

22    assuming they're the same person.  I don't even

23    know.

24         Q.    When did Kalman tell you his name

25    was Lopez?

1        A.        When did Kalman tell me his name

2    was Lopez.  Actually he didn't tell me his name

3    is Lopez.  He told me he knows the super there

4    is Lopez.

5        Q.        When was that?

6        A.        When was that?  That was -- I don't

7    know, when I spoke to him.  Last week, this

8    week.  I don't know.

9        Q.        Did you know the name Lopez before

10   last week as the super of 437 Morris Park?

11       A.        I don't know.  I don't know.  I

12   don't remember.  Maybe yes, maybe not.

13       Q.        Let's talk a little bit about 437

14   Morris Park as a building.

15       A.        Yes.

16       Q.        What is it specifically?

17       A.        It's an apartment building that

18   serves as a homeless shelter.

19       Q.        Are all the people living there

20   homeless?

21       A.        No.  There are some tenants that

22   are not homeless.  There are some tenants that

23   are regular tenants.

24       Q.        Do you visit that building now?

25       A.        Sure.  All the time.

1          Q.      How often do you visit that

2    building?

3          A.      I don't know.  Once a month, once a

4    week.  I don't know, it depends on my mood.  It

5    depends if I have work to do.

6          Q.      Is that how it usually is, once a

7    month, once a week you visit the building?

8          A.      Yes.

9          Q.      And that's been true for how many

10   years?

11         A.      Since we had the building.

12         Q.      So when you're making these visits

13   to the building, what do you do when you go

14   there?

15         A.      What do I do there.  I take the

16   elevator to the sixth floor, I walk down all the

17   steps to the first floor and then go to the

18   basement and just make sure that the building's

19   still standing, nothing is falling apart between

20   the roof and the basement.

21         Q.      You call it your site inspection?

22         A.      Okay.  You could call it that.

23         Q.      And you do these about once a week

24   or once a month?

25         A.      Yes.  Or once every two months, I

 1   don't know.  Whenever I get around to doing it.

 2         Q.     You did this all throughout 2011,

 3   2012, 2013?

 4         A.     Yes.

 5         Q.     You said you go into the basement?

 6         A.     Correct.

 7         Q.     Can you describe the basement for

 8   me?  What's down there?

 9         A.     What's in the basement.  I don't

10   know, let's see, the super's apartment,

11   Charlie's office, a big vacant room, another

12   vacant room across that, boiler room, another

13   vacant room on the other side.  I don't know.

14   Okay, a bunch of vacant rooms and a boiler room

15   and apartment.

16         Q.     You say the super's apartment?

17         A.     The super's apartment.

18         Q.     Can you describe the super's

19   apartment?

20         A.     I describe, yes, it's a big living

21   room, dining room -- living room, dinette,

22   kitchen, one big room.  And then you have off on

23   the side two bedrooms.

24         Q.     How many doors does that have?

25         A.     The entrance door, two bedroom

1  doors, two doors for the bedroom.  Oh, we made

2  another room.  The room on the side.  Hold on,

3  stop.  What's that room on the side?

4            MR. WEINBERGER:  He can't --

5            THE WITNESS:  I have to ask him if

6  there's a door there.

7            MR. WEINBERGER:  If you know, you

8  know.

9       A.    Then there's a bathroom with a

10  door.  Bathroom still has a door?

11      Q.    How many means of egress are there

12  to that apartment?

13      A.    How many means of egress?  I don't

14  know.  The door and then the bedroom windows.

15      Q.    The windows are a means of egress?

16      A.    Yes.  You never climb out of the

17  windows?  Okay.  Stu doesn't have a problem

18  climbing out the window.

19            MR. VALLETTI:  I want to take a

20  quick bathroom break if you don't mind.

21            MR. WEINBERGER:  Not a bad idea.

22            (Recess taken.)

23  BY MR. VALLETTI:

24      Q.    For the time period of 2011 to

25  2013, who lived in the basement apartment of

1   437?

2          A.      The super.

3          Q.      Did he live alone?

4          A.      Did he live alone.  I don't know.

5   I think there were people there with him.

6          Q.      You said it was a two-bedroom

7   apartment?

8          A.      Two-bedroom, possibly a

9   three-bedroom.

10         Q.      Did he live there with his family?

11         A.      Yes.  As far as I know it was his

12  family that lived there.

13         Q.      How many people lived there?

14         A.      No idea.

15         Q.      In these monthly or weekly trips,

16  how many times did you pass the super's

17  apartment?

18         A.      Not very often.

19         Q.      Was it during every trip?

20         A.      No.  Very infrequently.

21         Q.      Very infrequently.

22         A.      Did I say that correct?  Very not

23  often.  I don't know.

24         Q.      Is English your first language?

25         A.      Yes.

1     Q.     Do you speak any other languages?

2     A.     Yes.

3     Q.     Is English okay to testify in?

4     A.     Yes.

5     Q.     Just wanted to make sure.

6     A.     Listen, I'm more Yankee than you

7  are.

8     Q.     I don't doubt it.

9     A.     I'm here since the 1850s.

10     Q.     I thought you said your date of

11  birth was the '60s.

12     A.     No, that was the 1960s.  My

13  mother's great grandmother was born -- on the

14  record.

15     Q.     So can you describe for me how very

16  infrequently you passed the super's apartment if

17  you were doing weekly site trips to 437 Morris

18  Park?

19     A.     I didn't say weekly.  I said

20  monthly or weekly.

21     Q.     You said weekly.

22     A.     Whenever.  And I said monthly also.

23  So whenever I went around.

24     Q.     So on these regular site

25  inspections --

1        A.     If I was there -- between

2   2011-2013, if I was there may be three times it

3   was probably a lot.

4        Q.     So you only passed the super's

5   apartment in the --

6        A.     What do you mean "passed"?

7        Q.     Walked past it.

8        A.     Because the entrance to his

9   apartment was from the yard, so I had to

10  physically go to the corner of the yard, knock

11  on the door.  You know what I'm saying?  If I

12  wasn't going into the apartment, I had no reason

13  to be in his end -- pass by his apartment.

14       Q.     Did you ever go into the apartment?

15       A.     Did I ever go into the apartment,

16  yeah, maybe once or twice.

17       Q.     During the period of 2011 to 2013?

18       A.     Yup.  Maybe once or twice.

19       Q.     Why?

20       A.     To say hello.  No reason.

21       Q.     Who did you say hello to?

22       A.     The super.  I said hello to him.

23       Q.     Who was the super?

24       A.     Whoever the super was.

25       Q.     From 2011 to 2013 who did you say

1    hello to in the basement apartment?

2          A.    The big guy.  What's his name.

3    Lopez or whatever he called him.

4          Q.    Did you say hello to a little guy?

5          A.    No, the big guy.  I don't know,

6    whatever.  I mean, whatever -- you show me a

7    picture of him, I'll maybe be able to identify

8    him.  Or if I see him in the street, he'll tell

9    me he's the super, maybe I'll see him.

10               MR. VALLETTI:  May I have that

11   marked.

12               (Finkelstein Exhibit 2 for

13   identification, Photograph)

14         Q.    Stu, have you seen that one?

15               MR. WEINBERGER:  I saw it.

16         Q.    Do you know who that is?

17         A.    No.

18         Q.    You never saw him before?

19         A.    Maybe.

20         Q.    Where did you see him?

21         A.    No idea.

22         Q.    When you say "maybe," where could

23   you have seen him?

24         A.    Listen, we're talking about Morris

25   Park so I'm assuming that I would see him on

1    Morris Park.  But no, I don't know this person.

2    No.  Maybe it's a bad picture, but I don't know

3    him.  No.  Not familiar at all.

4         Q.    So you don't know who that person

5    is, correct?

6         A.    No.

7         Q.    Do you know that he lived at 437

8    Morris Park?

9         A.    No.

10        Q.    And what was the name that's on

11   there?

12        A.    Almonte Manuel.

13        Q.    And you never saw this person, at

14   least on this ID as Manuel Almonte, you never

15   saw him at 437.

16        A.    This picture here, I don't

17   recognize this picture as someone who I saw at

18   437 Morris Park.

19        Q.    You didn't see him in the basement?

20        A.    That's not what I said.  I said

21   this picture here is not somebody who I

22   recognize as seeing somebody at 437 Morris Park.

23        Q.    So you never saw that person in the

24   basement.

25        A.    That's not what I said.  I said

1   this picture here is not somebody who I

2   recognize as seeing at 437 Morris Park.

3        Q.    So you never saw him in the

4   basement of 437 Morris Park?

5        A.    This picture here is not somebody

6   who I recognize as ever seeing at 437 Morris

7   Park.  Is that not clear?

8        Q.    So you never saw him in the

9   basement of 437 Morris Park?

10             MR. WEINBERGER:  Do you understand

11   the question?

12             THE WITNESS:  Did I not answer the

13   question?  He asked me if that picture is

14   somebody who I recognize as being at 437 Morris

15   Park.  And the answer to that question is no.

16        Q.    That's not my question, and you

17   know it's not my question.  You never saw that

18   guy in the basement --

19        A.    I said that picture does not look

20   like somebody who I ever saw in the basement of

21   437 Morris Park.

22        Q.    So you didn't see him in the

23   basement.

24             MR. WEINBERGER:  All right.

25        Q.    Did you see him in any apartments

1    then?

2        A.    You're asking me to look at a face

3    of a picture, a bad picture of a face of

4    somebody.  To me it does not look familiar.  I

5    don't recall ever seeing this person before.

6    Okay?

7        Q.    So you'd never seen him before.

8        A.    I don't recall ever seeing this

9    picture before.  The person in this picture

10   before.

11       Q.    And that picture --

12       A.    I don't recognize this person as

13   somebody who I ever saw at 437 Morris Park.  Was

14   I as clear as clear could be?

15       Q.    While you made your visits to 437

16   Morris Park, you said that you made your rounds

17   essentially from the roof to the basement,

18   correct?

19       A.    Mm-hmm.

20       Q.    If you saw something wrong, for

21   instance maybe a bannister was broken, there was

22   a leak or something, what would you do?

23       A.    If I saw there was a leak or

24   bannister?

25       Q.    Any problems while you were doing

1    your inspection of the building, what would you

2    do?

3                    (Telephone interruption.)

4                    MR. WEINBERGER:  You gotta turn the

5    phone off, please.

6                    Go ahead.

7        A.    If I would see a problem in the

8    building, what would I do.  I don't know.

9    Probably would mention it to Charlie if I

10   thought he had time to take care of it.  Yes,

11   that's probably what I would do.  Probably

12   mention it to Charlie if I thought he had time

13   to take care of it.  If he told me he doesn't

14   have time to take care of it, I'd say okay, just

15   leave it.

16       Q.    So if you saw something out of the

17   ordinary, something that needed to be fixed and

18   Charlie didn't have time to do it, you'd just

19   say, well, never mind, just leave it alone?

20       A.    Pretty much.

21       Q.    You didn't call anybody else to

22   have it repaired?

23       A.    I didn't call anybody else to have

24   it repaired?  No.  I didn't call anybody else to

25   have something repaired, no.  Unless it was a

 1  specific project that I was working on, no.

 2      Q.    What do you mean by a specific

 3  project you would be working on?

 4      A.    Well, fixing up an apartment or

 5  something.

 6      Q.    So there come times where you would

 7  be involved in specifically renovating or fixing

 8  apartments at 437 Morris Park?

 9      A.    There were times when I was

10  specifically involved in fixing up stuff, yes.

11      Q.    What did you do during those

12  occurrences?

13      A.    What did I do.  I don't know, I

14  called and spoke to the relevant contractors to

15  get it done.

16      Q.    Did you stay at the building?

17      A.    Did I stay there when it was being

18  done?  No.

19      Q.    Did you stay there for the call?

20      A.    I didn't take calls.  That I didn't

21  do.

22      Q.    I'm not saying did you take calls.

23  I'm saying when you made them.

24      A.    No, I would call up a contractor,

25  ask maybe to meet with him at a building and ask

1   him to do the work -- show him what I needed

2   done and see if we could get the job done.

3        Q.    So when you called did you wait at

4   the building for the contractor to arrive?

5        A.    Sometimes.

6        Q.    And when the contractor arrived,

7   did you go up to wherever it had to be to show

8   him what needs to be done?

9        A.    Yes.

10       Q.    And how often would that occur?

11       A.    Not very often.  The truth is I

12  don't even -- between 2011 and 2013?  I'm not

13  even sure that ever happened at all.  I'm just

14  thinking that I didn't do any major projects

15  during that time period.

16       Q.    What do you consider a major

17  project?

18       A.    I don't know.  A major renovation

19  would be -- a major renovation that would need

20  an outside contractor to do it.  Something that

21  the super wouldn't be able to -- wouldn't be

22  able to or wouldn't be expected to do.

23       Q.    Something a super wouldn't be able

24  to do?

25       A.    Wouldn't be able to do, wouldn't be

 1    expected to do.

 2         Q.    So give me an example of something

 3    that you would expect a super to be able to do.

 4         A.    Minor renovations.

 5         Q.    Give me examples, please.

 6         A.    I don't know, fixing leaks, fixing

 7    leaks, fixing -- if there was a leak that caused

 8    the ceiling to fall in, so I would maybe ask him

 9    to do it or get it done.  To do it, yeah,

10    basically.

11         Q.    Other than leaks, is there anything

12    else you would expect the super to do?

13         A.    Painting, plastering.  I don't

14    know.  If there was things that were being done

15    always in the apartments that always needed

16    done, that was the super's responsibility.

17         Q.    So during your site inspection, if

18    you saw those types of things that needed to be

19    done and Charlie wasn't available, you would

20    just let those go?

21         A.    I don't know.  If I met the super,

22    I might show it to him.  Might.

23         Q.    So if you didn't --

24         A.    I'm just trying to think if there

25    would be any specific cases where I would do

1    that.  I can't recall any specific case where I

2    told the super to take care of some kind of

3    renovation.

4          Q.    Did you have Lopez's number?  Phone

5    number.

6          A.    Did I have Lopez's phone number.

7    Probably.

8          Q.    And that's for the time period

9    between 2011 and 2013.

10         A.    Maybe.  I don't know.  I mean, it's

11   either yes or no.  Definitely not -- I didn't

12   have to have it.  I'm saying it's very possibly

13   I didn't have it and it's possible I did have

14   it.

15         Q.    Do you have the numbers for supers

16   in your other buildings?

17         A.    Some yes, some not.

18         Q.    Why wouldn't you want their

19   numbers?

20         A.    Why?  Because the less I'm

21   involved, the quieter life is.

22         Q.    The less you're involved, the

23   quieter life is, is that correct?

24         A.    That's exactly what I said.

25         Q.    And you're the owner of this

1    company --

2          A.    I'm the owner.

3          Q.    -- that operates this whole

4    building.

5          A.    I'm the boss.

6          Q.    You're the boss.  So we didn't

7    really cover this, but if the super couldn't

8    handle what you felt needed to be repaired in

9    the apartment or somewhere around the building,

10   you'd call an outside contractor, correct?

11         A.    Hold on.  I said if there was a

12   specific project that I was taking care of in

13   the renovation of an apartment, that that was my

14   little pet project, then I would take care of

15   it.  But otherwise, if there was something that

16   had to be done at the apartment that the super

17   couldn't handle, I did not take care of that,

18   no.

19         Q.    And you determined whether the

20   super could handle that or not.

21         A.    No.  If there was a specific, I

22   decided to go and renovate a whole apartment,

23   take down all the walls and take down -- I don't

24   think that ever happened over there, but if

25   that's what I decided to do, then I would go and

1    meet the contractor and ask him to do that for

2    me.  But if there was anything less than that, I

3    wouldn't get involved with it.  I mean, if I

4    saw -- for some reason I saw that it would

5    enhance my income and I was the only one who was

6    going to get it done, I would do it.  Anything

7    that was in the day-to-day -- that was in the

8    day-to-day running of the business or running of

9    the building, it had nothing to do with me.

10          Q.     Unless it enhanced your income.

11          A.     Right.

12          Q.     You like income.

13          A.     Right.

14          Q.     You like making money.

15                 MR. WEINBERGER:  Objection.

16          A.     Right.  You don't?

17          Q.     You don't like paying money.

18          A.     No, I pay money.

19          Q.     You don't like paying money though.

20    You'd rather keep money than pay money, right?

21          A.     I'd rather keep money than pay

22    money?  No.

23          Q.     So you'd rather pay money than keep

24    money.

25          A.     I like to make, I like to keep, I

 1   like to pay.  I just need that thing for when I

 2   come home for the wife.

 3        Q.     Oh, the check.

 4        A.     No.  Just when the wife asks for

 5   money, that I...

 6        Q.     Have you ever been sued before for

 7   failure to pay proper wages?

 8        A.     Have I ever been sued before for

 9   failure to pay proper wages.  Failure to pay

10   proper wages.  Not that I recall.

11               MR. VALLETTI:  Can I have this

12   marked, please.

13        A.     Oh, well, besides this obviously.

14        Q.     When you say "besides this," what

15   do you mean?

16        A.     Besides this Almonte whatever.

17               (Finkelstein Exhibit 3 for

18   identification, Complaint)

19        A.     Oh, okay.  Thank you.

20        Q.     What do you have in front of you?

21        A.     Some kind of a lawsuit from Gloria

22   Sacta and Ernesto Hernandez.

23        Q.     Have you ever seen that document

24   before?

25        A.     Probably did.

 1          Q.      And what's the nature of that

 2     lawsuit?

 3          A.      Something about money.  Something

 4     about wages.

 5          Q.      So you've been sued for failing to

 6     pay proper wages before.

 7          A.      Okay.

 8          Q.      Is that a yes?

 9          A.      That's a yes.  Yes, that's a yes.

10          Q.      Are you aware of any other lawsuits

11     of that type that you were sued for failure to

12     pay proper wages?

13          A.      Was this the -- yes, I am aware

14     somebody from -- yes, I am aware.  1195 Sherman,

15     many years ago.

16          Q.      And many years ago 1195 Sherman got

17     sued for failure to pay proper wages.  Do you

18     remember the name of the person who sued you?

19          A.      No.

20          Q.      Was the first name Herman?

21          A.      Herman.

22          Q.      Herman.

23          A.      Rings a bell.

24          Q.      By the way, do you recall what

25     happened with this case in Exhibit 3, the

1    Ernesto Hernandez case?

2          A.     No.

3          Q.     Is this still active?

4          A.     No idea.  I know Gloria Sacta did

5    something after.  Oh, I know Ernesto.  Ernesto

6    was the guy from Boynton, right?  Ernesto I

7    think we got rid of.  Whatever way Ernesto got

8    settled, and Gloria was still busy with that.

9          Q.     So Ernesto settled you said.

10         A.     Something.  I don't recall what

11   happened, how it got settled but it got done.

12         Q.     Do you recall the amount of the

13   settlement?

14         A.     No.

15         Q.     Were you informed of the amount of

16   the settlement?

17         A.     Probably.  Yes, I was.

18         Q.     Yes, you were.

19         A.     Yes.

20         Q.     Do you recall that amount now?

21         A.     No.

22              (Finkelstein Exhibit 4 for

23   identification, Settlement Agreement and General

24   Release of Claim)

25         Q.     Let me show you what's been marked

1    as Exhibit 4.  I'll show it to your attorney

2    first.

3              Have you seen this document before,

4    Mr. Finkelstein?

5         A.    Very possible.

6         Q.    So is that a yes?

7         A.    Probably.  The answer is probably.

8         Q.    What do you know this document to

9    be?

10        A.    Settlement agreement and general

11   release of claim.

12        Q.    Who is that for?

13        A.    Ernesto Hernandez.

14        Q.    You're a named defendant in this

15   case, correct?

16        A.    Correct.

17        Q.    Abraham Finkelstein.

18        A.    Correct.

19        Q.    Listed second in the caption.

20        A.    Yes.  That's me.

21        Q.    Also listed is New Hope Fund,

22   correct?

23        A.    Yes.

24        Q.    And 1195 Sherman Avenue LLC.

25        A.    Yes.

```
 1        Q.      And 437 Morris Park LLC.

 2        A.      Yes.

 3        Q.      They also named Aguilar, Inc.

 4        A.      Okay.

 5        Q.      The first name is Kalman Tabak,

 6   right?

 7        A.      Yes.

 8        Q.      Can you read what's labeled

 9   paragraph 1 there to yourself.

10        A.      "Defendant shall pay" --

11                MR. WEINBERGER:  To yourself.

12        A.      To myself?  Okay.  (The witness

13   reviews the document.)

14                Okay.

15        Q.      Does that refresh your recollection

16   of how much was paid to Mr. Hernandez for

17   failure to pay proper wages?

18                MR. WEINBERGER:  Objection.  That's

19   not -- objection.  You can answer but that's not

20   correct.  But you can answer it if you want.

21        A.      I don't want to answer it.

22        Q.      Can you just tell me what number is

23   written right there?

24        A.      11,000.

25        Q.      Thank you.
```

1                    So there was another case you had

2    mentioned before.  It was Herman.

3         A.    Herman.

4         Q.    And the nature of that complaint

5    was also failure to pay proper wages?

6         A.    Mm-hmm.  Yes.

7         Q.    And you were named as a defendant

8    in that?

9         A.    I don't recall.

10        Q.    1195 Sherman was named, correct?

11        A.    Sounds right.

12        Q.    Is that case still active?

13        A.    No.

14        Q.    It settled?

15        A.    That was settled.

16        Q.    Do you recall the terms of the

17   settlement?

18        A.    Yes.  I think it was like a $12,000

19   settlement.  Is that correct?  I think so.

20        Q.    And do you know what that was for,

21   that lawsuit?

22        A.    He claimed that he wasn't paid his

23   proper wages.

24        Q.    Other than this case with

25   Mr. Almonte, Mr. Hernandez and the gentleman

1    Herman, are you aware of any other lawsuits that

2    you're being sued either personally or one of

3    companies that you operate or own for failure to

4    pay improper wages?

5         A.    No.

6         Q.    And that's to your knowledge,

7    correct?

8         A.    Maybe you could jog my memory

9    again, but.

10                 Could I use the phone a second?

11                 MR. VALLETTI:  We'll go off the

12    record.

13                 (Recess taken.)

14   BY MR. VALLETTI:

15        Q.    As the owner of 437 Morris Park,

16   are you familiar with the policies your company

17   has with its employees?

18        A.    No.

19        Q.    Is there any reason as to why

20   you're not familiar with the policies of the

21   company?

22        A.    Don't want to be bothered with it.

23        Q.    Why don't you want to be bothered

24   with the policies of your company?

25        A.    Why?

1       Q.      Yes.

2       A.      Because I don't have to deal with

3    the employees anyway, so why be bothered with

4    it.

5       Q.      Well, just as a hypothetical here,

6    if your company is doing something wrong,

7    wouldn't you want to know about it?

8       A.      So that's why Mr. Klahr has

9    Mr. Weinberger and they discuss all the

10   different issues.

11      Q.      Let's not discuss what they

12   discuss.

13      A.      I'm just telling you that Mr. Klahr

14   talks to Mr. Weinberger.  I'm not going to be

15   much help anyway.  My wife --

16      Q.      You've been a help, I'll just say.

17      A.      My wife always says that I'm the

18   biggest help when I sleep.

19      Q.      Well, let me ask you a question --

20      A.      I stay out of trouble.

21              MR. VALLETTI:  Can I have that

22   marked, please.

23              (Finkelstein Exhibit 5 for

24   identification, Bates D 357 and 374)

25      Q.      I'm going to show you what's marked

 1    as Exhibit 5.  It's a two-page document, one of

 2    the documents was inadvertently re-produced on

 3    11 by 14, but it is an accurate copy of Bates

 4    number 374, and the first page is Bates numbered

 5    357.  Those are defendants' numbers.

 6               Can you take a look at these

 7    documents.  Tell me if you've ever seen either

 8    of them before.

 9         A.    Did I ever see any of these before.

10    I don't know.  Maybe yes, maybe no.

11         Q.    Let's take it one at a time.  This

12    one first.  Have you ever seen that document

13    before?

14         A.    No.  Actually, this document as it

15    stands now, no.

16         Q.    It's Bates number 357.  Just to

17    reiterate for the record, have you seen this

18    document before?

19         A.    This document as it stands,

20    absolutely not.  The only thing I might have

21    seen is I might have seen a copy of a check when

22    I did a bank statement.

23         Q.    And that check -- what do you mean

24    this check to be?  Is that a payroll check, an

25    expense check, something else?

```
 1        A.     A payroll check.

 2        Q.     And this is your payroll account

 3   here?

 4        A.     Mm-hmm.

 5        Q.     And what name is this addressed to?

 6        A.     Nestor Almonte.

 7        Q.     What company does this originate

 8   from?

 9        A.     437 Morris Park.

10        Q.     And if you could, what's the date

11   on this?

12        A.     5/23/13.

13        Q.     Could you read for me the

14   information listed below the pay account.

15        A.     "Effective Monday, June 24, 2013

16   super has to do cleaning of sidewalks and curbs

17   before 8 a.m.  Any summons received after

18   6/24/13 will affect a penalty for negligence

19   which is deducted from paycheck."

20        Q.     So that says if a summons is issued

21   to the super, there will be a deduction from his

22   paycheck for the amount of the summons.

23        A.     Okay.

24        Q.     And in this document here, have you

25   seen this document before?  This is Bates number
```

1   374.

2       A.      Not that I recall.

3       Q.      What's the company listed up at the

4   top?

5       A.      437 Morris Park Avenue, LLC.

6       Q.      And it maintains an office here, it

7   mentions a management office.  Where is that

8   office located?

9       A.      437 Morris Park Avenue.

10      Q.      That's in the basement, correct?

11      A.      Yes.

12      Q.      Could you just read for me down

13  here the second to the last line.

14      A.      "Any summons received after 6/24

15  will affect the penalty for negligence which is

16  deducted from paycheck."

17      Q.      Who is this addressed to?  Is there

18  anybody there?

19      A.      No, not that I see.

20      Q.      Is this a policy and procedure for

21  the super of the building?

22      A.      No idea.

23      Q.      Why don't we just read this bold

24  section here.

25      A.      "Effective Monday, June 24th, 2013

 1    super has to do the cleaning of sidewalks and

 2    curbs before 8 a.m."  We have found that to be

 3    enough time.

 4         Q.    So you were unaware that your

 5    company has policies of deducting directly from

 6    employees' paychecks if they're issued

 7    summonses?

 8         A.    That is correct.

 9         Q.    You are unaware of that, right?

10         A.    That's correct.

11         Q.    Who put that policy in place?

12              MR. WEINBERGER:  Objection.  He

13    just said.

14              MR. VALLETTI:  No, he's unaware of

15    the policy.  He doesn't know whether who put it

16    in place or not.

17              MR. WEINBERGER:  Can you answer the

18    question?  If you know.

19         A.    I'm assuming that Charlie did.

20         Q.    Did Charlie handle the policies of

21    your company?

22         A.    Yes.

23         Q.    437 Morris Park LLC, to be clear.

24         A.    Yes.

25         Q.    Did he also handle the policies of

1  1195 Sherman?

2        A.    Yes.

3        Q.    Did Sherman have a policy like this

4  where the soups will have deducted money from

5  their pay for summonses issued?

6        A.    No idea.

7        Q.    With respect to 437 Morris Park,

8  did you handle the hiring?

9        A.    No.

10       Q.    Who did?

11       A.    Charlie.

12       Q.    Did you fire anyone from 437 Morris

13  Park for the time period 2011 to 2013?

14       A.    Not that I know of.  Not that I

15  recall.

16       Q.    What about maintenance protocols

17  for calls received, was that handled by Charlie

18  as well?

19       A.    Yes.

20       Q.    You also received calls, correct?

21       A.    No.

22       Q.    Were you aware of a complaint

23  hotline for 437 Morris Park?

24       A.    Yes.

25       Q.    Can you explain to me what that is?

1          A.          If the tenant had a problem, he

2     called the hotline and he gave the message what

3     his problem was and whoever answered the hotline

4     calls relayed the messages to whichever people

5     were signed up on it.

6          Q.          Did you receive these hotline

7     calls?

8          A.          No.

9          Q.          Did you get any messages from the

10    hotline?

11         A.          No.

12         Q.          Who did receive the hotline calls?

13         A.          I guess Charlie and Mr. Tabak.

14         Q.          As compared to yourself, did

15    Mr. Tabak involve him more with the day-to-day

16    activities of the buildings?

17         A.          Absolutely.

18         Q.          So he was involved in day-to-day

19    activity at 437 Morris Park?

20         A.          More than I was.  He was definitely

21    more than I was.

22         Q.          What about at 1195 Sherman, did

23    Mr. Tabak also involve himself with the

24    day-to-day activities there?

25         A.          Yeah.  I don't know exactly how

1    much, but yes, I'm assuming when there was a big

2    issue he took care of it.  He was made aware of

3    it.

4         Q.    Did you ever discuss the hiring

5    policy with Charlie Clark?

6         A.    Not that I recall.

7         Q.    Were you ever concerned that the

8    people that were being hired did not have proper

9    documentation to work in this country?

10         A.    Repeat that.

11         Q.    I'll rephrase the question.  Were

12    you aware that there were employees at 437

13    Morris Park, and we can talk generally first,

14    that were not properly documented?

15         A.    I recall that the super at 437 had

16    some kind of issue like that.

17         Q.    And the super was --

18         A.    But I really don't recall any

19    specifics about it.

20         Q.    When you say the super, you meant

21    Lopez, correct?

22         A.    Yes.

23         Q.    And when did you become aware of

24    that issue?

25         A.    Don't know.  Probably way after he

1    was hired.

2         Q.    Was it in 2011?

3         A.    Was it in 2011?  I don't know.  I

4    was, you know, just told about it after fact.

5    It wasn't something that I was like majorly

6    involved in.  If anything, I was told in

7    passing.

8         Q.    Who were you told by?

9         A.    By Charlie probably.

10        Q.    And when did that conversation

11   occur?

12        A.    No idea.

13        Q.    Was it before or after Lopez had

14   moved into the basement apartment?

15        A.    Don't know.

16        Q.    Was this the only person that you

17   were told had documentation problems in 437

18   Morris Park?

19        A.    As far as I could recall, yes.

20        Q.    What about any of your other

21   employees at 1195 Sherman, 1056 Boynton,

22   anything like that?

23        A.    Not that I recall.

24        Q.    Did you tell Charlie to do anything

25   about that?  That Lopez apparently had

1   documentation problems?

2       A.      No.

3       Q.      Why not?

4       A.      No reason.

5       Q.      Did you ask at that point how he

6   was getting paid?

7       A.      Did I ask?  No.

8       Q.      Why not?

9       A.      Because it didn't interest me.

10      Q.      So at some point you learned that

11  Lopez had documentation issues.  How long was he

12  employed at that point?

13      A.      I don't know.  No idea.

14      Q.      Was it a year?

15      A.      No idea.  Could have been a year, a

16  day, three years.  I really don't know.

17      Q.      So possibly three years ago you

18  learned -- withdrawn.  Possibly three years

19  before that conversation he told you he was

20  undocumented.

21      A.      No.

22      Q.      Withdrawn.  Withdrawn.  You said

23  that conversation could have occurred three

24  years ago, correct?

25      A.      You asked me how long he was

```
 1   working there before I was told that.  I said I

 2   don't know.

 3       Q.    But possibly three years ago,

 4   correct?

 5       A.    Everything's possible.  I really

 6   don't know.

 7       Q.    Could it have been longer than

 8   three years?

 9       A.    It could have been ten years ago.

10       Q.    So it could have been in 2011.

11       A.    Could have been.

12       Q.    You're the guy who signs the

13   checks -- excuse me.  You're the guy who wires

14   the money for payroll, correct?

15       A.    Right.

16       Q.    And you learned that one of your

17   employees had a documentation issue, correct?

18       A.    Okay.

19       Q.    And you didn't inquire to Charlie

20   Clark about what was going on with the pay for

21   that employee, correct?

22       A.    No.

23       Q.    What would be the procedure behind

24   fixing that problem?

25       A.    I don't know.  There is no special
```

1    procedure in place.

2         Q.    Would you fire that employee?

3         A.    I don't know.  Maybe.

4         Q.    Do you have something to add?

5         A.    When I was told that he had some

6    kind of documentation issue, I was told that it

7    was something that was pretty much almost

8    settled and he needed some extra time to get it

9    done.  So I think that's basically the -- he

10   said that he needed -- skip it.

11                MR. WEINBERGER:  No, say it.

12        A.    He said -- from what I understood,

13   he needed some time to finish getting his

14   documents in order.  That's probably why I let

15   it go.

16        Q.    When did that conversation occur?

17        A.    Whenever he told me that he had a

18   problem with his papers.

19        Q.    Did you know Lopez by any other

20   names?

21        A.    Did I know Lopez by any other name.

22   I don't know.

23        Q.    What did you know his first name to

24   be?

25        A.    Listen, his name -- what I called

1    him and -- the only other access to his name I

2    had was what I got on the check.

3         Q.    What was he paid -- what name was

4    he paid under?

5         A.    I don't know.  Maybe Manuel

6    Almonte, or whatever it was.  Nestor Almonte, I

7    don't know.

8         Q.    So Nestor.  You knew his name was

9    Nestor.

10                MR. WEINBERGER:  Objection.  He

11   didn't say that.

12                MR. VALLETTI:  I think he just

13   testified there's a Nestor.

14        Q.    Where did you get that Nestor name

15   from?

16        A.    I'm saying what was on the

17   paychecks.

18        Q.    So there were paychecks with

19   Nestor's name on it.  Were there paychecks with

20   Nestor's name on it or not?

21        A.    Sounds right.

22        Q.    What time period are you talking

23   about?

24        A.    No idea.

25        Q.    Was it 2011?

 1          A.     No idea.

 2          Q.     Was it three years ago?

 3          A.     No idea.  Not the foggiest.

 4     Listen, we run a very hands-off operation.  We

 5     only do exactly what has to be done.  Absolutely

 6     necessary.  Otherwise I'm not involved.

 7          Q.     So as the owner of the business who

 8     handles the payroll, you're hands off?

 9          A.     I'm hands off.  It's not a major

10     business.

11               (Finkelstein Exhibit 6 for

12     identification, Bates D 767)

13               (Finkelstein Exhibit 7 for

14     identification, Bates D 315 through 316).

15               (Finkelstein Exhibit 8 for

16     identification, Notice and Acknowledgment of Pay

17     Rate)

18               MR. WEINBERGER:  I need a

19     two-minute break.

20     BY MR. VALLETTI:

21          Q.     I'm going to show you a document

22     that's been marked Finkelstein 8.  Please take a

23     look at this document and let me know when

24     you've had a chance to review that.

25          A.     Yes, what about it?

1      Q.      Have you ever seen that document

2   before?

3      A.      No.

4      Q.      Do you know what it is though?

5      A.      No.

6      Q.      It's a wages acknowledgment form.

7   Notice and acknowledgment of pay rate.

8              I'm going to direct your attention

9   to the left-hand side here.  What's the name of

10  the employer here?

11     A.      1101 Holding LLC.

12     Q.      Are you an owner of that company?

13     A.      Yes.  Boss.

14     Q.      Boss.  And under here it has a

15  doing business as, correct?

16     A.      Yes.

17             THE WITNESS:  You know what this

18  is, Stu?

19             MR. WEINBERGER:  I do.  But I've

20  never seen it before.

21     Q.      For the record, it's defendants'

22  Bates number 748.

23             MR. WEINBERGER:  Go ahead.

24     A.      Yes.

25     Q.      So it has a doing business as

1    labeled here, correct?

2         A.    Yes.

3         Q.    What's the name under the doing

4    business as?

5         A.    F&T Management.

6         Q.    What is F&T Management?

7         A.    Nothing.

8         Q.    Why do you list it on official

9    documents then?

10        A.    I don't know.  Beats me.  I didn't

11   put it on there.

12        Q.    Well, when you say it's nothing,

13   what do you mean "it's nothing"?

14        A.    It's not a legal entity.

15        Q.    So what is it?

16        A.    Not as far as I know.  It's what we

17   get our bills on from the plumbing supply.

18   Because the plumbing supply wanted to know what

19   name to put our bills under.  So we said oh, put

20   it on F&T because F stands for Finkelstein and T

21   stands for Tabak.  And probably Mr. Clark got

22   those bills and said now I know who I'm working

23   for.

24        Q.    So Charlie Clark worked for F&T

25   Management?

1          A.     No.  I said Charlie Clark thought

2    he was working for F&T Management.

3          Q.     But he wasn't actually working for

4    F&T Management?

5          A.     No.

6          Q.     Who was he working for then?

7          A.     He was working for me.

8          Q.     The boss.

9          A.     Right.  Do I sound tough enough?

10         Q.     Yes, you do.  I'm scared.

11         A.     Oh.

12         Q.     F&T Management, did you use that

13   entity to manage your buildings?

14         A.     I don't know.  Sometimes.

15         Q.     So yes, on occasion?

16         A.     The answer to that question is I

17   don't know.  I know my bills came out for F&T

18   Management from the plumbing supply so we're

19   easily identifiable.  But I don't even know --

20   may be even one of the first times I'm seeing it

21   on a legal document.  Possibly.

22         Q.     Had you seen it on a legal document

23   before?

24         A.     I'm saying possibly this is the

25   very first time.

```
 1        Q.      Well, I'm asking you have you seen
 2   it before on legal documents?
 3        A.      I don't recall ever seeing it on a
 4   legal document.  Maybe yes, but I don't recall.
 5        Q.      Did you use F&T Management on your
 6   letterhead?
 7        A.      Maybe.
 8        Q.      So is it a managing agent for which
 9   buildings?
10        A.      I don't know.  It's nothing.
11        Q.      Any building that you and Mr. Tabak
12   are owners, part owners, officers, president,
13   whatever, you used F&T to identify as the entity
14   that managed those buildings.
15        A.      Maybe.
16        Q.      And you said you had bills come
17   addressed to F&T Management?
18        A.      Bills.
19        Q.      What else came addressed to F&T
20   Management?
21        A.      I have no idea.
22        Q.      But you know about the bills.
23        A.      I know about plumbing supply bills
24   came to F&T I think.
25        Q.      What about bills from a company
```

 1    named Elmax?

 2          A.     Maybe also.

 3          Q.     What about when a company like 437

 4    Morris Park purchased supplies, would they use

 5    F&T Management?

 6          A.     Maybe.

 7          Q.     And 1195 Sherman, if they purchased

 8    supplies for their building, could they use the

 9    name F&T Management?

10          A.     Possibly.  Basically it was for

11    identifying purposes.  Yes, that would be the

12    best way to say that.

13          Q.     How long have you worked with

14    Mr. Clark?  Klahr.

15          A.     How long have I worked with

16    Mr. Klahr?  I have no idea.

17          Q.     More than ten years?

18          A.     I don't know.

19          Q.     More than five years?

20          A.     Must be more.  Let's see.  I know

21    that as long as we are learning -- you were

22    working for us longer than we were learning

23    together.

24               MR. WEINBERGER:  I think you're

25    going to have to explain what "learning" means.

1       Q.      Learning?

2       A.      I don't know.

3       Q.      Can we go off for a second?

4               (Discussion off the record.)

5       Q.      My question is how long have you

6   worked with Mr. Clark, let's just say for either

7   New Hope or 437 Morris Park, 1195 Sherman?

8       A.      I don't know.  I don't know,

9   somewhere between five and ten years.  I really

10  don't know.

11      Q.      So you're familiar with his

12  handwriting, in other words?

13      A.      Am I familiar with his handwriting,

14  no, probably not.  You could try, but probably

15  not.

16      Q.      Before you had mentioned --

17      A.      I probably am not because I have no

18  reason to ever see his handwriting.

19      Q.      Did you see his signature?

20      A.      Maybe.

21      Q.      Before you had mentioned Lopez and

22  his first name Nestor.  Did you put those two

23  together by yourself?  Had you seen it together

24  before?

25      A.      I saw the payroll checks.  On the

1    payroll checks I saw Nestor, and I'm assuming

2    that's the super.  And I know the super is

3    Lopez.  And my algebraic equation is that if

4    Nestor is super and the super is Lopez, so

5    Nestor Lopez.

6         Q.    That was algebra you said, right?

7         A.    Right.

8         Q.    I'm just going to show you what's

9    been marked as Finkelstein 7.

10        A.    Okay.

11        Q.    Have you ever seen that document

12   before?

13        A.    This particular document?  Probably

14   not.

15        Q.    But have you seen ones that are

16   similar?

17        A.    Work orders?  I've seen documents

18   that said -- I think I've seen documents that

19   have work orders on them from Aguilar, from

20   Bronx Neighborhood Cluster.  But that's

21   basically the most I could tell you.

22        Q.    What's the date on that document?

23        A.    Beats me.  4/27/11.

24        Q.    Can you read what's written at the

25   top right-hand corner?

1        A.        New super.  Now super.  Nestor

2   Lopez.  Received.

3        Q.        On the right-hand side of the

4   margin, are there names written in the margin?

5        A.        Yes.

6        Q.        What's the first name?

7        A.        Nestor.

8        Q.        So is it fair to say that at around

9   that time you understood Nestor to be the super?

10   From your personal knowledge.

11        A.        No idea.  I mean, you're saying

12   this is an algebraic equation, that if the

13   checks -- so Nestor is the super?  Maybe.  I

14   have no idea.

15        Q.        Do you recall when he became the

16   super?

17        A.        No.

18                  (Recess taken.)

19   BY MR. VALLETTI:

20        Q.        Have you seen payroll checks

21   before?

22        A.        What's that supposed to mean?

23        Q.        For 437 Morris Park, you wired

24   money from New Hope to 437, correct?

25        A.        Yes.

 1       Q.      And that money was for expenses and

 2   employee wages, correct?

 3       A.      Correct.

 4       Q.      Had you seen payroll checks before?

 5       A.      From Morris Park?

 6       Q.      Yes.

 7       A.      What I saw basically was on the --

 8   whatever came in the bank statement.  That's all

 9   I could say I saw.

10       Q.      What was on the bank statements?

11       A.      If a check came in the bank

12   statement.  Cashed a check, it came in back with

13   the bank statement or I saw it, or my wife saw

14   it or whoever put it into my computer.

15       Q.      Is that a home computer?

16       A.      Yes.

17       Q.      So you would basically handle your

18   payroll for 437 Morris Park from your home

19   computer?

20       A.      No.

21       Q.      Where would you handle it from?

22       A.      I wouldn't handle payroll at all.

23   All I would do is just, the checks that came

24   through, I would just reconcile the bank

25   statements.  That's all I did.  The only

1    connection I had to payroll checks is when I

2    reconciled the bank statement.  If I did it or

3    if my wife did it.

4         Q.    When did you reconcile bank checks?

5         A.    I don't know.

6         Q.    Did you do it in 2011?

7         A.    Could be.

8         Q.    You did it for 437 Morris Park?

9         A.    It was done.  I don't know if I did

10   it or my wife did it.  But it was done.

11        Q.    Does your wife work for any of the

12   companies?

13        A.    No.

14        Q.    So she does the reconciling of the

15   bank account for the wages?

16        A.    Sometimes.  She does the

17   reconciling of the bank account for the checks

18   that gout, period.

19        Q.    She's not an employee though,

20   right?

21        A.    She's not an employee.  She doesn't

22   even know how to read English well.

23        Q.    So she doesn't get paid for that,

24   right?

25        A.    No.  I mean, yes, absolutely, she

1    gets -- well, each bank statement -- I don't

2    even want to say how she gets paid.

3         Q.    How much does she get paid?

4         A.    I don't know.  Too much money.

5         Q.    With respect to 437 Morris Park, if

6    there were any payroll issues, who would be

7    aware of them?

8         A.    Stuart Weinberg.

9         Q.    What kind of issues would you be

10   talking about?

11        A.    You said issues, I didn't.

12        Q.    You understood it because when you

13   give me an answer, I assume you understood that

14   question because that's the rules I gave you

15   from before.  Remember?

16        A.    Issues means that there's some kind

17   of problem with payroll.  I have no idea what

18   kind of problems there are.  I wouldn't --

19   Charlie wouldn't even bother asking me.  He

20   would call Stu which and he would get to me with

21   a blank stare.

22        Q.    A blank stare?  Who would give you

23   a blank stare?

24        A.    No, I would give them a blank

25   stare.

     1        Q.      So you didn't know anything about

     2   the employees that were working and getting paid

     3   at 437 Morris Park.

     4        A.      No.

     5        Q.      You were never aware of -- in fact,

     6   the only time you would become aware of some

     7   sort of issue with pay would probably be through

     8   the lawsuits that you receive, correct?

     9        A.      Or when a check bounced.  A payroll

    10   check bounced.

    11        Q.      Why would a payroll check bounce?

    12        A.      I forgot to put money in.

    13        Q.      How often did payroll checks

    14   bounce?

    15        A.      I don't know.  On Morris Park I

    16   don't think they ever bounced.

    17        Q.      So there were never any bounced

    18   checks from Morris Park?

    19        A.      No.

    20        Q.      Where were there bounced checks

    21   from?

    22        A.      I don't know.  If it ever happened.

    23        Q.      Were there bounced checks from 1195

    24   Sherman?

    25        A.      Not that I recall.

1      Q.    How often would you transfer money

2  from New Hope Fund to 437 Morris Park LLC?

3      A.    Whenever I was asked to.

4      Q.    Who asked you to?

5      A.    I don't know, either Charlie --

6  Charlie or Kalman or Ehrman.  I don't know,

7  whatever.

8      Q.    Can you spell Ehrman again?

9      A.    You're talking 2011 to 2013.  I'm

10  saying Ehrman wouldn't be relevant for that.  So

11  either it was Charlie or Kalman if he needed

12  something paid from there.

13      Q.    With respect to the wages, how

14  often were those paid from New Hope Fund to 437

15  Morris Park?  Withdrawn.  The money that you

16  paid to your companies from New Hope LLC, how

17  were they denoted?  Were they titled something

18  or were they just wire transferred, something

19  else?

20      A.    I have no idea what you're asking

21  me.

22      Q.    In other words, when you wired

23  money from New Hope to 437 Morris Park --

24      A.    Did I put any memos?  No.

25      Q.    So it was just a transfer of money.

1    As the person wiring that money, you did not say

2    this money had to be used for one way or the

3    other.

4        A.    No.

5        Q.    So essentially you would transfer

6    money into some sort of operating account.

7        A.    Yes.

8        Q.    You didn't know what that money was

9    going to be used for other than wages and

10   expenses.

11       A.    No specific -- right, I was not

12   given any specific -- if he told me he was

13   spending it, you know.

14       Q.    Do you know what a power washer is?

15       A.    Do I know what a power washer is?

16   Yes.

17       Q.    Does 437 Morris Park have a power

18   washer on site?

19       A.    No.

20       Q.    There's no power washer in the

21   basement of 437?

22       A.    No.

23       Q.    Is there a machine that you could

24   use to clean boilers at 437?

25       A.    There's a steam cleaner.

1          Q.     My apologies.  So there's a steam

2     cleaner at 437 Morris Park, correct?

3          A.     Yes.

4          Q.     It's in the basement?

5          A.     Yes.

6          Q.     Do you know how to operate that

7     machine?

8          A.     Yes.

9          Q.     How many times have you used that

10    machine?

11         A.     I don't know.  No idea.  A couple.

12         Q.     From 2011 to 2013, let's stick with

13    that -- well, withdrawn.  When would you use the

14    steam cleaner?

15         A.     Where would I use the steam

16    cleaner?  When I didn't have work to do.  When I

17    didn't have work to do.

18         Q.     Why don't you tell me about when

19    you didn't have work to do why you'd use the

20    steam cleaner.

21         A.     I don't know.  What do I do?  I

22    don't know.  I have vague memories of using it.

23         Q.     What did you use it for?

24         A.     What did I use it for?  I don't

25    remember.  I really don't.

1    Q.    Did you use it to clean?

2    A.    Used it to try to clean maybe.  I

3  think if I remember correctly, I would try to do

4  something with it and get frustrated that it

5  wasn't working.

6    Q.    But you knew how to operate it.

7    A.    Yes.

8    Q.    Did you use it to clean the boiler?

9    A.    Actually, I think that's what was

10  getting me frustrated.  I was trying to use it

11  and I wasn't being successful.

12    Q.    What did you do when you weren't

13  successful with trying to clean the boiler?

14    A.    I don't know.  I don't remember.

15    Q.    Did you call anyone to help you?

16    A.    I don't remember.  Did I call

17  anyone to help me.  I don't remember.  I

18  couldn't tell you.

19    Q.    Forget whether you called someone

20  to help you or not, did somebody help you?

21    A.    Kalman maybe.

22    Q.    When did that occur?

23    A.    This is a vague memory.

24    Q.    But you said you used it a number

25  of times.

 1                MR. WEINBERGER:  Objection.

 2        A.     Did I use it a number of times?

 3        Q.     Yes.

 4        A.     I'm 52 years old, that steam

 5   washer's been around since I've been doing

 6   boilers and -- I don't know.  So have I used it

 7   from then until now in the last 30 years?  Yes.

 8   You want to know what I used it for, when I used

 9   it, vague memories of it.

10        Q.     Why would you use it?  Why would

11   you keep it?

12        A.     Why would I keep it?  I should

13   throw it out, you're right.  But I'll tell you

14   what, I know I didn't throw it out.  Because it

15   wasn't mine.  It was my brother's.

16        Q.     So from 2011 to 2013 a steam

17   cleaner was in the basement at 437, correct?

18        A.     Correct.

19        Q.     Did you ever teach anyone to use

20   that steam cleaner?

21        A.     Did I ever teach anybody to use

22   that steam cleaner.  I don't remember.  Teach

23   somebody to use a steam cleaner?  I don't

24   remember.

25        Q.     How did you account for

1    compensation of your supers?  Generally.

2         A.    You know something?  I have no idea

3    what you're asking me.  Was I clear?

4         Q.    Was some of the money transferred

5    from New Hope LLC to 437 Morris Park used to pay

6    your supers?

7         A.    I'm assuming so.

8         Q.    So did they get paid in cash?  Did

9    they get paid by check?  Something else?

10        A.    Cash?  Who has cash?

11        Q.    I don't.  Do you?

12        A.    Sure.

13        Q.    Here comes the billfold.

14              In other words, did you know how

15   your supers were compensated?

16        A.    As far as I know, my supers were

17   compensated by checks.  Or direct deposits.

18        Q.    Any other type of compensation they

19   would receive?

20        A.    Not that I know of.

21        Q.    You said you reconciled -- what did

22   you reconcile when you were doing the payroll

23   that you said you transferred the money from New

24   Hope to 437?  You're reconciling bank

25   statements?

```
 1        A.      Bank statements.

 2        Q.      On the bank statements were there

 3   names?

 4        A.      No.  On the checks.  If a check

 5   came in there was a name.

 6        Q.      What did you do when you reconciled

 7   them?  Can you explain the process to me?

 8   Because I don't understand it.  I don't run a

 9   business, you do.

10        A.      You must be a lawyer.

11        Q.      I am a lawyer, somewhat.  What do

12   you do when you reconcile?

13        A.      You go and you put your income that

14   came in and your expenses, your beginning

15   balance and your end balance and you just plug

16   in all the expenses that came in between.

17        Q.      Did you do this for New Hope LLC?

18        A.      Yes.

19        Q.      Did you do it for 437 Morris Park?

20        A.      Yes.

21        Q.      Did you do it for 1195 Sherman?

22        A.      Yes.

23        Q.      How much on a monthly basis, let's

24   start with this year, on a monthly basis how

25   much money comes in to 437 Morris Park?
```

```
 1          A.      No idea.

 2          Q.      On a monthly basis how much money

 3   goes out of 437 Morris Park for wages and

 4   expenses?

 5          A.      Probably as much money as goes in.

 6          Q.      So that account stands at zero when

 7   it's done with the process?

 8          A.      I don't know zero.  Basically at

 9   the end of the month there's probably no money

10   left in there.  There's probably very little

11   money left in there.

12          Q.      What about 1195 Sherman, same

13   process?

14          A.      Same process.

15          Q.      How about New Hope Fund LLC, how

16   much money comes into New Hope on a monthly

17   basis?

18                  MR. WEINBERGER:  Objection.  We're

19   not going to answer questions -- that's well

20   beyond the scope.

21                  MR. VALLETTI:  That's where the

22   wages come from, Stu, and that's directly at

23   issue in this case.

24                  MR. WEINBERGER:  No.

25                  MR. VALLETTI:  Absolutely.
```

1          MR. WEINBERGER:  You're not going

2    to find out how much money New Hope Funding

3    gets.  That's irrelevant.

4          Q.    How much money did New Hope Funding

5    pay to 437 on a monthly basis?

6          A.    I don't know.

7          Q.    Approximately.

8          A.    I don't know, could be, let's see,

9    50, $60,000 a month maybe.  Sounds like it,

10   right?

11         Q.    And what about 1195 Sherman?  How

12   much money comes from New Hope Funding LLC to

13   1195 Sherman on a monthly basis?

14         A.    I don't know.  15, $20,000 a month

15   maybe.

16         Q.    Is there a reason that 40 to

17   $45,000 less to 11935 than to 437?

18         A.    No.  It's just that they're

19   different -- 1195 Sherman is not a building.

20   1195 Sherman is basically my operating account

21   where I paid the workers from.  It was more just

22   to pay the workers.  There were less expenses

23   there.

24         Q.    So 437 Morris Park, from your

25   personal knowledge, what employees were being

1    paid from that operating fund?  Was it just the

2    employees at 437?

3         A.    Could have.

4         Q.    So did you pay employees at other

5    locations through the operating account for 437

6    Morris Park?

7         A.    No.

8         Q.    Did you pay employees --

9         A.    Go ahead.

10        Q.    What was that answer to?  Did you

11   pay employees through the 1195 operating

12   account?

13        A.    For other buildings, yes.

14        Q.    So 1195 would be used to pay, for

15   instance, maybe a porter at 1056 Boynton or

16   something along those lines.

17        A.    No, not a porter but a handyman.

18        Q.    Why not a porter?

19        A.    A super and a porter got paid from

20   437 Morris Park.  Then there was workers that

21   got paid from -- roving workers that got paid

22   from Sherman.  So Sherman was more a -- besides

23   the workers from Sherman, people working in

24   other places got paid from there.

25                 MR. WEINBERGER:  Time out for one

1    second.

2              (Discussion off the record.)

3              (TIME NOTED:  1:30 p.m.)

4

5              ABRAHAM FINKELSTEIN

6

7    Subscribed and sworn to before me

8    this      day of        , 2015.

9

10   _____

11   Notary Public

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1   WITNESS: _____
     DATE(S): _____
 2   CASE:    _____
 3   I wish to make the following changes, for the
     following reasons:
 4
     PAGE LINE ____ ____
 5   ____ ____ CHANGE FROM:_____
     ____ ____ CHANGE TO: _____
 6
     REASON:_____
 7   ____ ____ CHANGE FROM:_____
     ____ ____ CHANGE TO: _____
 8
     REASON:_____
 9   ____ ____ CHANGE FROM:_____
     ____ ____ CHANGE TO: _____
10
     REASON:_____
11   ____ ____ CHANGE FROM:_____
     ____ ____ CHANGE TO: _____
12
     REASON:_____
13   ____ ____ CHANGE FROM:_____
     ____ ____ CHANGE TO: _____
14
     REASON:_____
15   ____ ____ CHANGE FROM:_____
     ____ ____ CHANGE TO: _____
16
     REASON:_____
17   ____ ____ CHANGE FROM:_____
     ____ ____ CHANGE TO: _____
18
     REASON:_____
19   ____ ____ CHANGE FROM:_____
     ____ ____ CHANGE TO: _____
20
     REASON:_____
21   ____ ____ CHANGE FROM:_____
     ____ ____ CHANGE TO: _____
22
                    _____
23   Subscribed and sworn to before me this _____ day
     of _____, 2015.
24
     _____
25
```

1                    C E R T I F I C A T E

2

3    STATE OF NEW YORK  )

4                            : SS.

5    COUNTY OF NEW YORK )

6

7              I, SUZANNE PASTOR, a Shorthand

8    Reporter and Notary Public within and for the

9    State of New York, do hereby certify:

10              That ABRAHAM FINKELSTEIN, the witness

11    whose deposition is hereinbefore set forth, was

12    duly sworn by me and that such deposition is a

13    true record of the testimony given by the

14    witness.

15              I further certify that I am not

16    related to any of the parties to this action by

17    blood or marriage, and that I am in no way

18    interested in the outcome of this matter.

19              IN WITNESS WHEREOF, I have hereunto

20    set my hand this_____, 2015.

21

22                         _____

23                         SUZANNE PASTOR

24

25

```
 1                          INDEX
 2
     WITNESS           EXAMINATION BY           PAGE
 3
     Mr. Finkelstein Mr. Valletti               3
 4
 5
                         EXHIBITS
 6
     FINKELSTEIN   DESCRIPTION                 PAGE
 7
     Exhibit 1     00330 through 00332          32
 8
     Exhibit 2     Photograph                   48
 9
     Exhibit 3     Complaint                    59
10
     Exhibit 4     Settlement Agreement         61
11                 and General Release of
                   Claim
12
     Exhibit 5     Bates D 357 and 374          66
13
     Exhibit 6     Bates D 767                  79
14
     Exhibit 7     Bates D 315 through 316      79
15
     Exhibit 8     Notice and                   79
16                 Acknowledgment of Pay
                   Rate
17
18
19      INFORMATION REQUESTED TO BE SUPPLIED
20
        Witness' Social Security number        38
21
22
23
24
25
```

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK


----------------------------------------X


NESTOR ALMONTE,

                         Plaintiff,


     - against -


437 MORRIS PARK, LLC, D/B/A F&T MANAGEMENT CO.,

INC.

                         Defendants.

----------------------------------------X

                         600 Old Country Road
                         Garden City, New York
                         April 17, 2015
                         11:00 a.m.


     CONTINUED EXAMINATION BEFORE TRIAL OF ABRAHAM
FINKELSTEIN, a Defendant herein, taken by the
attorney for the Plaintiff, Pursuant to Order, and
held at the above-mentioned time and place, before
Kimberly Dean, a stenographer and Notary Public
within and for the State of New York.

1

2    A P P E A R A N C E S:

3

     VALLI KANE & VAGNINI, LLP.

4    Attorneys for the Plaintiff

     600 Old Country Road

5    Garden City, New York 11530

6    BY:  ROBERT P. VALLETTI, ESQ.

7

     GOLDBERG & WEINBERGER, P.C.

8    Attorneys for the Defense

     630 Third Avenue

9    New York, New York 10017

10   BY:  STUART WEINBERGER, ESQ.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              S T I P U L A T I O N S

2

3       IT IS HEREBY STIPULATED AND AGREED, By

4    and between the attorneys for the respective

5    parties herein, as follows:

6    That the sealing and filing of the within

7    deposition be waived.

8

9

10      IT IS FURTHER STIPULATED AND AGREED that

11   such deposition may be signed and sworn to

12   before any officer authorized to administer

13   an oath, with the same force and effect

14   as if signed and sworn before the officer

15   before whom said deposition is taken.

16

17      IT IS FURTHER STIPULATED AND AGREED that

18   all objections, except as to the form are

19   reserved to the time of the trial.

20

21

22

23

24

25

1                    ABRAHAM FINKELSTEIN

2       A B R A H A M   F I N K E L S T E I N,

3       called as a witness, after first having been

4       duly sworn by Kimberly Dean, a Notary Public in and

5       for the State of New York, was examined and

6       testified as follows:

7       DIRECT EXAMINATION BY ROBERT VALLETTI, ESQ.

8               COURT REPORTER:  State your name and

9           address for the record, please.

10              THE WITNESS:  Abraham Finkelstein.

11          406 Avenue F, Brooklyn, New York 11218.

12              MR. VALLETTI:  Good morning,

13          Mr. Finkelstein.

14      A.    Good morning.

15      Q.    How are you?

16      A.    Wonderful.

17      Q.    So, you sat for a deposition previously

18      with me.  I will just remind you some of the ground

19      rules.  I'm going to ask you questions today, and

20      if you don't understand any of the questions, let

21      me know and I will rephrase.

22          If you answer a question, we will assume that

23      you understand it and that you answered to the best

24      of your ability.

25          Also, keep your answers verbal.  We have a

1                    ABRAHAM FINKELSTEIN

2    court reporter here today.  She has to record

3    everything that's said in the room and she cannot

4    take down nonverbal cues.  Please keep your answers

5    verbal, understood?

6        A.    So far.

7        Q.    Okay.  I will ask that you let me finish

8    the question before giving your answer.  You might

9    know where I'm going, but let me finish so she can

10   take down everything, and then you can have your

11   response.

12       If there is a question pending, please finish

13   the question.  If you need a break, let me know.

14   Just finish any question that is out there.

15       Congratulations on the engagement of your

16   daughter.

17       A.    Thank you.

18       Q.    Congratulations on the engagement of

19   your son.

20            (Whereupon, a discussion was held off

21             the record.)

22       Q.    So, I want to start first with a little

23   bit about the relationship between New Hope Funding

24   and 437 Morris Park and 1195, LLC.  You had

25   testified that the moneys that came from New Hope

1                    ABRAHAM FINKELSTEIN

2    Funding, LLC, went to 437 Morris Park for wages of

3    employees and expenses, correct?

4         A.    Correct.

5         Q.    And the money that came from New Hope

6    Funding to 1195 Sherman Avenue, LLC, those were

7    also for wages not so much expenses, correct?

8         A.    Wages and expenses.

9         Q.    It was the same for both?

10        A.    Yes.

11        Q.    Is that correct?

12        A.    Yes.

13        Q.    New Hope Funding, LLC, has a contract

14   with Aguila, correct?

15        A.    Yes.

16        Q.    Aguila is the one that has the contract

17   with the city?

18        A.    Correct.

19        Q.    So there are no direct contracts with

20   the city to 437 Morris Park?

21        A.    No.

22        Q.    No direct contracts with 1195 Sherman

23   and New York City?

24        A.    No.

25        Q.    What is the purpose of New Hope Fund,

1                    ABRAHAM FINKELSTEIN

2    LLC, in relation to these buildings then, 437 and

3    1195?

4        A.    Just umbrella company.  I don't know.

5    New Hope rents out these -- New Hope I would say

6    rents -- pays rent to these buildings for the use

7    of the buildings.  That would be the best way to

8    describe it.

9        Q.    The rent that's paid directly to the

10   other LLC, meaning 437 and 1195, where does the

11   money come from in New Hope?

12       A.    From the city.

13       Q.    It's essentially you are an owner of New

14   Hope Fund, LLC, correct?

15       A.    Yes.

16       Q.    You are also an owner of 1195 Sherman,

17   correct?

18            MR. WEINBERGER:  Objection to form.

19            You can answer.

20       A.    Yes.

21       Q.    You are also an owner of 437 Morris

22   Park, LLC, correct?

23            MR. WEINBERGER:  Objection.

24       A.    Yes.

25       Q.    Essentially the money that's from the

1                  ABRAHAM FINKELSTEIN

2     city you are paying to yourself, and then that's

3     used to pay pages and expenses?

4          A.    Correct.

5          Q.    You had given testimony previously that

6     whenever there was some sort of job or renovation

7     going on in the building, that's something that you

8     personally would be involved with, correct?

9               MR. WEINBERGER:  Objection.

10               You can answer if you know.

11               THE WITNESS:  Does that mean I don't

12          have to answer the question?

13               MR. WEINBERGER:  I'm objecting to

14          form.

15               If you can, answer it.

16               THE WITNESS:  What do you mean?

17               MR. WEINBERGER:  I'm objecting to the

18          form.  I'm not sure that is what you said.

19          If you understand the question, you can

20          answer it.

21          A.    Okay.  Repeat the question.

22          Q.    I will try to rephrase it for you.

23          You had said in your previous testimony if

24     there were larger projects that the super wouldn't

25     either be equipped or you wouldn't believe the

1                    ABRAHAM FINKELSTEIN

2    super to do those particular jobs, you, yourself,

3    would be involved with either a renovation of an

4    apartment, a gut and replace, things of that

5    nature.  Do you recall that testimony?

6        A.    Yes.

7        Q.    You also said that you called

8    contractors to complete those jobs, correct?

9        A.    Yes.

10       Q.    Which contractors did you call when you

11   wanted to do something along the lines of a

12   renovation?

13       A.    Arnold Perla would be one, P-E-R-L-A.

14       Q.    Could you spell that again?

15       A.    P-E-R-L-A.

16       Q.    What type of work would Arnold Perla do?

17       A.    Renovations.  Anything that would need

18   constant workers to, you know, do it on a constant

19   basis.

20       If you need a worker for two weeks straight to

21   do something or a week straight or a few days

22   straight, or whatever it is, but you need someone

23   steady on a specific thing, he would do.

24       Q.    Is this the only contractor that you

25   would need to call to do a total renovation?

1          ABRAHAM FINKELSTEIN

2     A.     I don't recall anyone else that I used.

3     Q.     Let's talk about 437.  If you had a

4   renovation going on at either 437 Morris Park or

5   1195 Sherman, if you had a renovation going on

6   there, would you have materials ordered beforehand?

7     A.     As a general rule, the contractor took

8   care of it.

9     Q.     They would order the materials?

10     A.     Yes.

11     Q.     You testified earlier that you would

12   stay on-site if the contractors began working, in

13   the early parts, at least.  Do you remember that?

14          MR. WEINBERGER:  Objection to form.

15     A.     On-site I would be around.  On occasion

16   I would come around to see that things -- you know,

17   I wouldn't be there for any prolonged periods of

18   time.

19     Q.     You had stated, though, that you would

20   take the contractors to the apartment and show them

21   what needs to be done, correct?

22     A.     Yes.  Actually, you know --

23     Q.     Do you want to add something?

24     A.     That's it.

25     Q.     No?  You finished?

                    ABRAHAM FINKELSTEIN

1

2       A.    Yes.

3       Q.    Would you show the contractor the

4  apartment by yourself?

5       A.    Yes.

6       Q.    No one joined you from 437 Morris Park,

7  if you were showing an apartment there, no one

8  joined you there from the company itself?

9       A.    What do you mean the company?

10      Q.    For instance, if there was a renovation

11 going on, would the super join you to show that

12 renovation to Mr. Perla or the company Perla?

13      A.    No reason for that.  No.

14      Q.    Are you finished?  I don't want to

15 interrupt your answers.

16      A.    I'm finished.

17      Q.    By the way, this Perla, is that a

18 company, a person?  Who was this?

19      A.    A person who had workers.

20      Q.    Does this company have a name?

21      A.    No.

22      Q.    Do you have his contact information?

23      A.    No.

24      Q.    How did you meet Mr. Perla?

25      A.    I don't recall.

1                        ABRAHAM FINKELSTEIN

2        Q.    Did you call him to do any work at 437

3    Morris Park during 2011?

4        A.    I don't recall.

5        Q.    Did you call him to do any work at 437

6    Morris Park during 2012?

7        A.    I don't recall.

8        Q.    Did you call him to do any work at 437

9    Morris Park during 2013?

10       A.    I don't recall.

11       Q.    When is the last time that you recall

12   working with Mr. Perla?

13       A.    A few weeks ago.  Not in that building.

14       Q.    Does Mr. Perla have a business card?

15       A.    I don't know.  No idea.

16       Q.    Typically how many employees would

17   Mr. Perla supply for a job that you're discussing,

18   like the renovations or the gutting?

19       A.    It is irrelevant to 437 Morris Park.

20       Q.    How about 1195 Sherman?

21       A.    1195 Sherman?

22       Q.    Yes.

23       A.    Honestly, I don't know.

24       Q.    Why was it irrelevant to 437 Morris

25   Park?

1                    ABRAHAM FINKELSTEIN

2        A.    I don't remember when the last time that

3    he worked there.  I don't recall when the last

4    time that he worked there.

5        Q.    Let's forget the specifics then and say

6    generally, how many workers would he supply for any

7    type of renovation at those two buildings, if it

8    ever occurred?

9        A.    Probably two.

10       Q.    Would his workers join alongside workers

11   that were normally at those buildings, 437 Morris

12   Park and 1195 Sherman?

13       A.    No.

14       Q.    They worked exclusively by themselves?

15       A.    Yes.

16       Q.    You previously testified that you were

17   personally involved in some of these apartments or

18   renovations.  Could you tell me when the last time

19   was?  How about during the period of 2011 to 2013,

20   what renovations do you recall during that time

21   period?

22       A.    What renovations do I recall during that

23   time period?  Fixing over two apartments, fixing

24   over stores.  Replacing the floor of some stores

25   and two apartments.  Replacing the floor and the

1                    ABRAHAM FINKELSTEIN

2    store of two apartments.

3        Q.    The floors and the store of two

4    apartments?

5        A.    Yes.

6        Q.    I'm confused.

7        A.    Yes.  Whatever.

8        Q.    You did the floors in two apartments and

9    a store, correct?

10       A.    Yes.

11       Q.    Where is the store?

12       A.    In front of the building.

13       Q.    Which building?

14       A.    437 Morris Park.

15       Q.    Is it attached to the building?

16       A.    Yes.

17       Q.    Do you recall which apartments had the

18   floors redone?

19       A.    Do I recall which apartments had the

20   floors redone?  No.  I don't recall the apartment

21   numbers.  I recall the apartments, but I don't know

22   the numbers.

23       Q.    Do you remember what floors they were

24   on?

25       A.    First floor, adjacent to the store.  One

1          ABRAHAM FINKELSTEIN

2    job.

3        Q.    Does the first floor include a lobby?

4        A.    Yes.

5        Q.    Do you recall that during the time

6    period of having the two floors redone and the

7    store redone, was Mr. Klahr's office in the lobby

8    at that time?

9        A.    No.

10       Q.    It had already moved to the basement?

11       A.    Mr. Klahr's office moved to the

12   basement.  I don't remember where Mr. Klahr's

13   office was.  He had an office in the lobby?  I

14   don't recall.  I don't recall him having an office

15   in the lobby.  Possibly he did.  I don't recall him

16   having an office in the lobby.

17       Q.    Were there times that you personally

18   helped unclog a drain in the basement of 437 Morris

19   Park?

20       A.    Yes.

21       Q.    When was that?

22       A.    I don't recall.

23       Q.    Let's ask, was it in 2011?

24       A.    I don't remember.

25       Q.    You don't recall if it was in 2012?

1                    ABRAHAM FINKELSTEIN

2        A.    I don't remember.

3        Q.    And how about 2013?

4        A.    I don't remember.

5        Q.    Explain to me what happened at that

6    time.

7        A.    There was a drain that was clogged and

8    we were trying to get the snake to go into the

9    drain.  And we were unsuccessful.  We called the

10   sewer company to come and do it.

11       Q.    Who was with you at the time?

12       A.    Who was with me?  I don't know.  The

13   super, I guess.

14       Q.    When you say you guess, you are not

15   sure?

16       A.    Well, I think the super was, yes.

17       Q.    When you say trying to get the snake

18   into the drain, where did you get the snake from?

19       A.    I don't recall.  It was I guess -- I

20   don't recall.

21       Q.    The super, was that Lopez?

22       A.    I don't recall.

23       Q.    What super do you remember being with

24   you?

25       A.    I don't recall.

1                ABRAHAM FINKELSTEIN

2      Q.    How old was the super that was with you

3   to unclog the drain?

4      A.    He must have been -- I don't recall.

5      Q.    Could you put an approximate age on him?

6      A.    I don't remember who it was.  I'm

7   saying, whoever was the super there probably was

8   helping me.

9      Q.    You remember the time that you tried to

10  unclog the drain but you don't remember who was

11  with you?

12     A.    Yes.

13     Q.    It was the super?

14     A.    Yes, it was the super.  Yes.  I believe

15  it was the super.  Yes.

16     Q.    Was the super 50 years old, maybe?

17     A.    How old am I?

18     Q.    52.

19     A.    I didn't get his birthday, so I don't

20  know.

21     Q.    How old did he appear?  Did he appear to

22  be 50, 40, 30?

23     A.    I have no idea.

24     Q.    Could he have been 17?

25     A.    No.

1              ABRAHAM FINKELSTEIN

2       Q.    Could he have been 18?

3       A.    He was an older person.  I don't

4    remember who he was.  I'm sorry.  I don't remember

5    exactly sitting and looking at who was -- that one

6    was not a young 17.  It was an older person.

7       Q.    Who was the sewer company that you

8    called?

9       A.    Diaz & Diaz.

10      Q.    Did they arrive?

11      A.    I'm assuming they did.  I heard they

12   did, yes.

13      Q.    Who did you hear that from?

14      A.    From the super, if I remember correctly.

15      Q.    How fast did they arrive?

16      A.    No idea.

17      Q.    Again, the super, you don't know who

18   that was that told you they arrived?

19      A.    The super.  I don't have any personal,

20   you know, comings and goings with these people that

21   they should like stay in my mind.  If I dealt with

22   them once in a while, I dealt with them.  It was

23   not on an ongoing basis.

24      Q.    You remember some specifics about the

25   incident.  You say that the super was there.

1                    ABRAHAM FINKELSTEIN

2       A.    Yes, I remember the incident.  Yes.

3       Q.    Who was the super at that time then?

4       A.    His face skips my mind.  Okay.

5       Q.    His face skips your mind.  What does

6   that mean?

7       A.    Exactly what I said.

8       Q.    Could you explain it to me?

9       A.    No.

10       Q.    Why not?

11       A.    What part of skipping my mind does not

12   make sense to you?

13       Q.    What does skipping mean?

14       A.    I don't recall.  Okay.

15       Q.    I can understand that.

16       A.    Okay.

17       Q.    So, for these renovations, again, what

18   materials were delivered to the buildings?

19       A.    What materials were delivered to the

20   buildings?

21       Q.    Yes.  For the renovations.

22       A.    I don't know.  Whatever they needed to

23   do.

24       Q.    Well, for a normal renovation, what

25   would you need?

1                    ABRAHAM FINKELSTEIN

2          MR. WEINBERGER:  Objection to form.

3      You can answer the question.

4      A.    I don't know.  I guess just the work.

5  That would make sense.  Maybe 2x4s, stuff.  Maybe

6  sheetrock and compound, whatever they call it.

7  Compound.

8      Q.    What about for the floors, what would

9  you need to redo the floors in an apartment?

10     A.    Wood.

11     Q.    What about tiles, did you ever redo

12  floors with tiles?

13     A.    I guess they did.

14     Q.    How about thin-mixed mortar?

15     A.    Thin-mixed mortar, sounds right.  If

16  that's what you did, yes.

17     Q.    Do you remember the time when

18  Mr. Almonte or as you know him, Lopez, took

19  possession of the basement apartment in 437 Morris

20  Park?

21     A.    Do I remember the time that he took

22  possession of the basement apartment of 437 Morris

23  Park?  Vaguely.

24     Q.    Do you know that he needed to do some

25  work in the apartment before he took possession,

1                    ABRAHAM FINKELSTEIN

2    correct?

3         A.    Yes.

4         Q.    What kind of work do you remember that

5    he had to do to take possession of the apartment?

6         A.    What kind of work?  I think he changed

7    the kitchen cabinets.

8         Q.    Is that all?

9         A.    I don't know.

10        Q.    Did he have to redo the floor too?

11        A.    Possibly.

12        Q.    Were you there when he was redoing the

13   floor?

14        A.    Not that I recall.

15        Q.    Who ordered the materials to have the

16   renovation done?

17        A.    Not I.

18        Q.    Were you there for the delivery of the

19   materials?

20        A.    Not that I remember.

21        Q.    Were you there for the preparation of

22   the materials before the renovation either

23   continued or was ongoing?

24        A.    Not that I remember.

25        Q.    You didn't give any instructions to

1                    ABRAHAM FINKELSTEIN

2    Lopez while he was redoing that basement apartment?

3         A.    I don't remember.  Probably, if

4    anything, I gave him advice not instructions.

5         Q.    What kind of advice did you give?

6         A.    I have no idea.  I don't recall.  But I

7    don't give instructions.

8         Q.    What do you mean that you don't give

9    instructions?

10        A.    I don't give instructions.  Listen.

11        Q.    I think you were very clear in your last

12   testimony that you are the boss.

13        A.    Right.  As a boss I don't give

14   instructions because I don't have to be the boss.

15   I don't have to give instructions to be the boss.

16   I can be the boss because I'm the boss.

17        Q.    What does it mean to be the boss then?

18   Doesn't a boss give orders?

19        A.    No.  A boss walks around all proud.

20        Q.    When you were walking around the

21   basement apartment all proud, did you stop by

22   Lopez's apartment and talk to him?

23        A.    Very possibly.

24        Q.    Yes or no?

25        A.    I don't recall.  I had so many proud

1                    ABRAHAM FINKELSTEIN

2   moments that I don't recall all of them.

3            MR. WEINBERGER:  Let's take a break

4      for a second.

5            (Whereupon, a discussion was held off

6             the record.)

7            MR. VALLETTI:  Mark these 9 to 12.

8               (Whereupon, the above referred-to

9               documents were marked as

10              Plaintiff's Exhibits 9 to 12 for

11              identification, as of this date.)

12   Q.    Did you ever give instructions to the

13   son of the super on how to properly mix thin-mixed

14   mortar for ceramic tile installation?

15   A.    No.  Why should I do that?  No.  Not

16   that I recall.

17   Q.    I asked a question of Mr. Tabak during

18   his deposition regarding the management of 437

19   Morris Park, LLC, and he testified that those types

20   of issues are handled by Abraham.  And you are

21   Mr. Finkelstein.  Do you know what he meant by

22   that?

23   A.    Well, if there was more technical issues

24   on how to do something, yes, I would probably -- I

25   would probably be more the guy to ask than him.

1                    ABRAHAM FINKELSTEIN

2    I'm more technically involved than he is.  That's

3    all.

4         Q.    What does technically involved mean?

5         Explain that if you can.

6         A.    Nothing.  I understand a little more

7    about plumbing and heating than he does.

8         Q.    If there was issues with the building,

9    rather than approach Mr. Tabak, they would probably

10   want to approach you more?

11              MR. WEINBERGER:  Objection as to form.

12        A.    Who would approach me?

13        Q.    I don't know, maybe the employees or

14   Charlie of 437 Morris Park, would they approach you

15   because you are more technically involved?

16        A.    Would they approach me?  Charlie,

17   Possibly.

18        Q.    Could you give me an example of a time

19   when Charlie approached you for your technical

20   knowledge?

21        A.    No.  I don't have any examples.  If it

22   was -- mostly if there was a technical issue with a

23   contractor, to deal with the contractor, I probably

24   would be the person.  A technical issue with an

25   employee, I don't recall very much having to deal

1                  ABRAHAM FINKELSTEIN

2   with that.

3       If a contractor wanted to know how to set up

4   or how to do something, that probably would be more

5   of what Mr. Tabak was talking about.

6       Q.   He meant that those issues should come

7   from you rather than him?

8       A.   In dealing with the contractor,

9   probably.

10      Q.   What kind of dealings was he talking

11  about with the contractors?

12      A.   Whatever.

13           MR. WEINBERGER:  Objection to form.

14           But if you can answer, go ahead.

15      A.   Any kind of plumbing issue or electrical

16  issue that would come up would probably come to me.

17      Q.   When you say when a contractor wanted to

18  set something up, what kind of setting up were you

19  talking about?

20      A.   Plumbing issue or electrical issue or I

21  don't know.  Maybe just my hands on.  I'm more

22  handy than Mr. Tabak is.  That's all.

23      Q.   How long have you been involved with

24  handling maintenance in buildings, generally?

25      A.   I don't handle maintenance.

1                    ABRAHAM FINKELSTEIN

2        Q.     What kind of experience do you have in

3    being handy?

4        A.     The same if there was a contractor who

5    would want to do something, I would be -- going to

6    do something, I would probably meet him faster than

7    Mr. Tabak to figure out what gets done.  That's

8    all.  What to do or what to get done.

9        Q.     Mr. Klahr had testified two days ago at

10   his deposition that Lopez had approached him for a

11   company loan.

12       A.     Yes.

13       Q.     You have knowledge of the loan that we

14   are talking about?

15       A.     Vaguely remember, vaguely.

16       Q.     What is your recollection of the loan or

17   loans, if there was more than one?

18       A.     No specific recollection.  Just no

19   specific recollection.

20       Q.     You don't recall what it was for, the

21   loans?

22       A.     No.

23       Q.     Do you recall the amount of the loan or

24   loans?

25       A.     No.

1                    ABRAHAM FINKELSTEIN

2        Q.    You testified previously that you were

3    in charge of the money that flowed from New Hope to

4    437 Morris Park and 1195 Sherman.  Do you recall if

5    those moneys for the loans came from the same

6    operating accounts?

7        A.    I would assume they did.

8        Q.    Do you know for sure?

9        A.    I would assume that if he took a loan it

10   was from the operating account.  No reason it

11   should be anyplace else.  We tried to keep the

12   expenses of each building or the moneys from each

13   building, you know, on the proper accounts.

14       Q.    Did Mr. Klahr have to approach you for

15   authorization of the loans?

16       A.    Did he have to?  I would say as a rule

17   he probably did.

18       Q.    Do you recall specifically him

19   approaching you about these particular loans for

20   Lopez?

21       A.    No.  I recall that he approached me for

22   some kind of loans, and the truth is I have no

23   recollections of any specifics about the loans.  I

24   wouldn't remember.  I just, the truth is --

25                    MR. WEINBERGER:  Finish your answer.

1                    ABRAHAM FINKELSTEIN

2          What were you going to say?

3          Q.     Did you authorize the loans?

4          A.     If he asked for it, I said okay.  I

5     trusted his judgment.

6          Q.     Did you ask for anything in writing

7     regarding the loans?

8          A.     Did I ask for anything in writing?

9          Q.     Yes.

10         A.     Me personally, no.  This is not -- I'm

11    not hands on.  I'm very not hands on.  If he asked

12    if he can give a loan, I probably said okay and he

13    did whatever he had to do.  I didn't get really

14    involved in any specifics about what or why or how

15    or whether he was securing it.

16         Q.     I will show you what's been marked as

17    Plaintiff's Exhibit 9.  It is a continuation of

18    your exhibits here.

19         For you first.

20         A.     Okay.

21         Q.     Could you take a look at the document,

22    please, and I will show you what will be marked as

23    Plaintiff's Exhibit 11.

24         A.     Okay.

25         Q.     Take a look at 11, if you can.

1                    ABRAHAM FINKELSTEIN

2        A.    Okay.

3        Q.    Have you seen that document before?

4        A.    Not that I recall.  No.

5        Q.    On the top of that document, what does

6    there appear there?

7        A.    Check.

8        Q.    What is the amount of the check?

9        A.    $3,000.

10       Q.    Was this check issued from one of the

11   accounts for 437 Morris Park?

12       A.    Yes.

13       Q.    Does that refresh your recollection as

14   to the amount of the loan that was given to

15   Mr. Lopez?

16       A.    No.  It doesn't refresh it.  It says

17   over here it is $3,000.  That makes it $3,000,

18   but...

19       Q.    Can you read the bottom portion there?

20       A.    "Manuel Almonte received this $3,000

21   loan on Friday, December 12, 2012.  Mr. Almonte

22   will repay the loan with a payroll reduction of $58

23   each week ($230 per month) to begin in January

24   2013."  Signed by someone.

25       Q.    What name appears on the signature line?

```
 1                  ABRAHAM FINKELSTEIN

 2        A.    Possibly Manuel Almonte.  Possibly.

 3        Q.    Did you authorize that loan?

 4        A.    Probably.

 5        Q.    Do you recall authorizing the loan?

 6        A.    No.

 7        Q.    The second sheet there, Plaintiff's

 8   Exhibit 9.

 9        A.    Yes.

10        Q.    Have you seen that document before?

11        A.    No.  Not to my recollection.

12        Q.    Take a minute to review it and tell me

13   when you are finished.

14        A.    Yes.  Okay.

15        Q.    What does that document purport to be?

16        A.    I don't know, something about the

17   repayment of the $3,000 loan.

18        Q.    Has anything changed from the first

19   document to the second document with respect to the

20   substance, not exactly how it was written?

21        A.    There is a $500 payment toward vacation,

22   which it doesn't say on the original document.

23        Q.    What does the amount of the loan turn

24   out to be ultimately as of 12-31-2012, the date

25   listed on the bottom of the document?
```

1                    ABRAHAM FINKELSTEIN

2        A.    $2,500 it says.

3        Q.    Who do you know Manuel Almonte to be?

4              MR. WEINBERGER:  Objection to form.

5        You can answer.

6        A.    I'm assuming that he is the super of the

7    building.  I'm assuming that he is Lopez.  I'm

8    assuming that that guy is the super, who is Lopez,

9    from our conversation.

10       Q.    When was he the super until at 437

11   Morris Park?

12       A.    I don't know.

13       Q.    Do you remember when his employment

14   ended?

15       A.    No.  No.  No reason why I should know.

16       Q.    Did you speak to Kalman about the

17   super's employment ending at 437 Morris Park?

18       A.    I recall Mr. Klahr telling me that he

19   quit.  That's all I remember.  I really don't

20   recall any dates.

21       Q.    Was it sometime in 2013?

22       A.    I don't know.

23       Q.    The conversation that you had with

24   Charlie, when did that occur?

25       A.    I don't remember.

1                    ABRAHAM FINKELSTEIN

2              (Whereupon, a discussion was held off

3              the record.)

4                  (Whereupon, the above-referred to

5                  document was marked as Plaintiff's

6                  Exhibit 13 for identification, as of

7                  this date.)

8      Q.   Mr. Finkelstein, you testified that

9   Mr. Klahr told you that the super had quit from 437

10  Morris Park, correct?

11     A.   Yes.

12     Q.   You didn't remember when that

13  conversation took place, so I will try and refresh

14  your recollection.

15     I will show you what's been marked as

16  Plaintiff's Exhibit 13 for your deposition.

17              MR. VALLETTI:  Do you know what this

18       is, Stu?

19              MR. WEINBERGER:  Yes.

20     Q.   Take a look at that.  If you could

21  review the bottom and tell me when you are

22  finished.

23     A.   How much do you want me to read?

24     Q.   Whenever you are done reviewing it.

25     A.   Show me where to start.

1              ABRAHAM FINKELSTEIN

2        Q.    This section would be the relevant

3    section, indicating the bottom half of the page.

4    When you are satisfied, if this refreshes at some

5    point, I'm going to ask you a couple of questions.

6        A.    Okay.

7        Q.    First of all, I will go back.  It's a

8    two-page document.  It is an email string.  What

9    date is indicated on the bottom half that you just

10   reviewed?

11       A.    Over here?

12       Q.    Yes.

13       A.    December, Monday, December 2, 2013.

14       Q.    The conversation that you had, does that

15   refresh your recollection of when you had spoken to

16   Charlie about the super quitting?

17       A.    No.

18       Q.    Would you assume it was sometime after

19   the date that the super actually quit?

20       A.    Probably.

21       Q.    That document says the super quit on

22   December 2, 2013, correct?

23       A.    Okay.

24       Q.    I will show you what's been marked as

25   Plaintiff's Exhibit 10.  I will ask you to review

1                    ABRAHAM FINKELSTEIN

2    that.

3              MR. WEINBERGER:  You don't have to

4        read that out loud.

5        Q.    Have you seen that document before?

6        A.    Not to my recollection.

7        Q.    Could you read what the title is.

8        A.    Employment End Compensation Statement.

9        Q.    What is the name that appears at the

10   bottom of that?

11       A.    Here?

12       Q.    Yes, sir.

13       A.    Manuel Almonte.

14       Q.    What is the date on that document?

15       A.    6-13-2013.

16       Q.    Previously you viewed the document

17   marked as Plaintiff's Exhibit 13 that says the

18   super quit on December 2, 2013, correct?

19       A.    Yes.

20       Q.    There is an employment end compensation

21   statement for June 13, 2013, correct, six months

22   prior?

23              MR. WEINBERGER:  Objection.

24       A.    Monday, December 2, 2013.  Okay.  What

25   were you saying?

1           ABRAHAM FINKELSTEIN

2      Q.    For Manuel Almonte, correct?

3      A.    So it would seem, yes.

4      Q.    You are the owner of 1195 Sherman, LLC,

5  correct?

6            MR. WEINBERGER:  Objection to form.

7      A.    Yes.

8      Q.    Are you aware of any new lawsuits filed

9  against your company for failure to pay wages

10  properly?

11     A.    I think we went through that.

12     Q.    Do you know of any other cases now,

13  other than the ones that we talked about already,

14  that your company is getting sued for improperly

15  paying wages?

16     A.    I have been served with something

17  lately.  Yes.

18     Q.    I will show you what's been marked as

19  Plaintiff's Exhibit 12.

20           MR. WEINBERGER:  Okay.

21     A.    Okay.

22     Q.    Have you seen that document before?

23     A.    Yes.

24     Q.    What is that document?

25     A.    An employee claiming that he didn't get

1                    ABRAHAM FINKELSTEIN

2    paid the proper wages.

3        Q.    Is that a lawsuit pending?

4        A.    You can call it that.

5        Q.    The employee's name is Gerald Caraballo.

6    Do you know that name?

7        A.    No.

8        Q.    Did you read the document before?

9        A.    Skimmed through it.

10       Q.    What was the nature of the claims in

11   that?

12       A.    Something about a salary is not enough.

13   Not being fully compensated.  I don't know.

14       Q.    This document says 1195 Sherman, LLC,

15   owns or operates four or more apartment buildings

16   of about 52 to 54 rental units.  Is that correct?

17       A.    Sounds right.

18             MR. WEINBERGER:  Objection to form.

19   It says what it says.  Objection to form.

20       Q.    You handle payment of wages through New

21   Hope Funding for 1195 Sherman, LLC, correct?

22             MR. WEINBERGER:  Objection to form.

23       A.    Sorry?

24       Q.    I'll rephrase.

25             Previously you testified that the money from

1                    ABRAHAM FINKELSTEIN

2    New Hope Fund to 1195 Sherman, you handle those

3    transfers of funds, correct?

4        A.    Correct.

5        Q.    Those funds were for wages and for

6    expenses, correct?

7        A.    Correct.

8              MR. WEINBERGER:  So, actually, I have

9         nothing further for you.

10             THE WITNESS:  So could I go home?

11             MR. WEINBERGER:  Maybe.  I need one

12        minute.  I need to talk to Charlie first.

13             (Whereupon, at this time a recess was

14              taken.)

15       Q.    I just have a couple of follow-up

16   questions that I forgot to ask earlier.

17       Mr. Fineklstein, are you on any medication

18   today that could affect your truth-telling

19   abilities?

20       A.    No.

21       Q.    Is there any reason why you could not

22   tell the truth today in your testimony that you

23   have given?

24       A.    No.

25             MR. VALLETTI:  That's all I have for

1                     ABRAHAM FINKELSTEIN

2        you.

3              MR. WEINBERGER:  I have some short

4        questions for you.

5        EXAMINATION BY STUART WEINBERGER, ESQ.

6              MR. WEINBERGER:  Mr. Finkelstein, did

7        437 Morris Park employ Lopez's son?

8        A.    No.

9        Q.    Did 1195 Sherman employ Lopez's son?

10       A.    No.

11       Q.    As far as you know, did Mr. Lopez's son

12   do any work at 437 Morris Park, LLC?

13       A.    No.

14       Q.    As far as you know, did Mr. Lopez's son

15   do any work at 1195 Sherman?

16       A.    No, not that I know of.

17             MR. WEINBERGER:  Nothing further.

18       Thank you.

19             MR. VALLETTI:  A couple of follow-ups.

20       FURTHER EXAMINATION BY ROBERT VALLETTI, ESQ.

21             MR. VALLETTI:  How come you don't know

22       the answers to my questions but you give him

23       definitive answers?

24       A.    Because he is asking me if he was hired

25   to work.  And if he was hired to work for my

1                    ABRAHAM FINKELSTEIN

2     company as the super's son, I probably would have

3     known.

4          Q.    You probably would have known?

5          A.    If he was hired to work on a steady

6     basis, I'm sure Charlie would have mentioned to me

7     that the super's son also wants to go on the

8     payroll.

9          Q.    Charlie probably would have mentioned?

10         A.    Yes, probably would have mentioned to

11    me.

12         Q.    You testified earlier that you don't

13    look at the names on your payroll checks, correct?

14         A.    Correct.

15         Q.    You just pay whoever is getting paid?

16         A.    I don't see the payroll checks, period.

17         Q.    How do you know who works for your

18    companies?

19         A.    If it would have been the super's son I

20    would you have known about it.

21         Q.    Why would you have known if it was the

22    super's son?  Why would you know that specifically,

23    that the super's son was hired?

24         A.    Because the super's son, if the super's

25    son was hired as a worker, it is something that

1                    ABRAHAM FINKELSTEIN

2   Charlie would have mentioned to me.

3       Q.    You know, I showed you a picture of

4   Manuel Almonte, who is the super's son, and you

5   said his face was not familiar to you.  Do you

6   remember that testimony?

7       A.    Yes.

8       Q.    How do you know if he was hired or not

9   if you don't know what he looks like?

10      A.    Because Charlie would have mentioned it

11  to me.

12

13              (continued)

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    ABRAHAM FINKELSTEIN

 2              MR. VALLETTI:  I have nothing further.

 3        Thank you.

 4              THE WITNESS:  Okay.

 5

 6              (Whereupon, the examination of this

 7        witness was concluded at 12:35 P.M).

 8         *          *          *          *

 9

10        I have read the foregoing record of my

11   testimony taken at the time and place noted in the

12   heading hereof and I do hereby acknowledge it to be

13   a true and correct transcript of same.

14

15

16                          _____

17                          ABRAHAM FINKELSTEIN

18

19   Subscribed and sworn to

20   before me this _____ day

21   of _____, 2015.

22

23   _____

24

25        NOTARY PUBLIC
```

1                     ABRAHAM FINKELSTEIN

2

3                        I N D E X

4

5    EXAMINATION OF          BY               PAGE

6    Abraham Finkelstein     Mr. Valetti      110-143, 143-145

7                            Mr. Weinberger   143

8

9                        E X H I B I T S

10

11   PLAINTIFF'S          DESCRIPTION         PAGE

12   9-12                 Documents           128

13   13                   Document            137

14   *Exhibits were retained by counsel

15

16

17

18

19

20

21

22

23

24

25

1       C E R T I F I C A T I O N

2

3           I, Kimberly Dean, a Notary Public of the State

4       of New York do hereby certify:

5           That the testimony in the within proceeding

6       was held before me at the aforesaid time and place.

7       That said witness was duly sworn before the

8       commencement of the testimony, and that the

9       testimony was taken stenographically by me, then

10      transcribed under my supervision, and that within

11      transcript is a true record of the testimony of

12      said witness.

13          I further certify that I am not related to any

14      of the parties to this action by blood or marriage,

15      that I am not interested directly or indirectly in

16      the matter in controversy, nor am I in the employ

17      of any of the counsel.

18          IN WITNESS WHEREOF, I have hereunto set my

19      hand this_____day of _____, 2015.

20

21

22

23          _____

24              KIMBERLY DEAN

25